## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

_____

DONALD F. McBETH ) 
 ) 
*Plaintiff,* ) 
 ) Civil Action No.:  1:15-cv-02742-JMF
v. ) 
 ) **AMENDED COMPLAINT**
GREGORY I. PORGES, ) 
SPECTRA FINANCIAL GROUP LLC, and ) 
SPECTRA INVESTMENT GROUP LLC ) 
 *Defendants*. ) 
_____)

## INTRODUCTION

1.      This case involves broken trust, in both a legal and a personal sense, and the

unexplained disappearance of $5 million.  Donald F. McBeth (the "Plaintiff"), a 74-year-old

former sales and marketing executive, was fraudulently induced to invest in a hedge fund

based on claims that it employed a conservative strategy with a long track record of success.

Many of those claims were made in materials provided to him by a person he trusted and

respected—Deborah Rose, Spectra Financial Group LLC's Chief Operating Officer, who at

one time was married to the cousin of McBeth's nephew and affectionately referred to him

as her "Uncle Skip."

2.      Impressed by what appeared to be Defendant Gregory I. Porges' ("Porges")

diligent approach and outstanding returns, and trusting him to be honest and forthcoming,

McBeth made a capital contribution of $2 million to Spectra Opportunities Fund LLC (the

"Spectra Fund" or "Fund") on November 1, 2010, an entity controlled and managed solely

by Porges individually and through his control of his alter ego companies, Defendants

Spectra Financial Group LLC ("Spectra Financial") and Spectra Investment Group LLC

("Spectra Investment" and together with Spectra Financial, "Spectra").  The Spectra Fund experienced a modest return of 2.17% in November, and McBeth made a second capital contribution of $3 million to the Fund on December 1, 2010.

3.      Ten months after he invested in the Fund and in the midst of a gradually rising market for equities, McBeth's money had *completely vanished*—lost due to misappropriation, gross incompetence, or some combination of the two.

4.      Defendants' misconduct did not end with the loss of McBeth's money.  The Fund's assets were fully depleted by September 30, 2011, but Defendants hid this fact from McBeth and actively misinformed him about the status of his account.  They told McBeth that the Spectra Fund changed prime brokers in August 2011, going from Merrill Lynch to MF Global, and problems associated with the transfer and MF Global's bankruptcy made it impossible for them to generate account statements for periods after July 2011.

5.      This was simply a ruse designed to mislead McBeth.  According to later statements made by Porges, the Spectra Fund never used MF Global as a broker; that claim was false when made.  Publicly available information on MF Global also demonstrates that that firm did not begin experiencing financial problems until late October 2011, which is well after the implosion of the Spectra Fund.  MF Global's October bankruptcy would not have prevented Defendants from timely providing McBeth with account statements for August and September, as they were obligated to do.  And it certainly would not have stopped them from updating him on the Fund's dismal performance even if they could not generate formal account statements.

6.      Defendants eventually decided to come clean with McBeth.  In January 2012, Rose told McBeth that all his money was lost, and she also informed him that this was not a

novel situation: Porges had previously squandered capital provided to him by outside investors.  On behalf of Defendants, Rose promised McBeth that they would repay his entire $5 million investment, as Porges had done in the earlier case.  She repeated this promise in a number of subsequent conversations, and McBeth believed Rose, whom he continued to trust as a close family member.

7.      In the course of their conversations, Rose did not specifically address how Defendants lost McBeth's money.  Nevertheless, it is evident that they engaged in some type of willful or reckless misconduct.  If Defendants had been merely unlucky in managing the Fund—for example, the market had moved against their investment positions in an unforeseen fashion—they would have never committed to repaying McBeth.  In short, the promise to repay McBeth is a tacit admission of guilt.

8.      Defendants made a partial payment of $200,000 to McBeth in December 2013, and there were follow-up discussions between Porges and McBeth concerning the former's financial affairs for the purpose of determining when Porges would be able to make McBeth whole.  However, the promise to repay McBeth has proven to be nothing more than a ruse to prevent McBeth from asserting his legal rights.  Ultimately, McBeth could no longer believe it and this action follows.

## PARTIES

9.      Donald F. McBeth, currently a domiciliary of Florida and formerly a domiciliary of New Jersey, was an investor in the now defunct Spectra Fund.

10.      Gregory I. Porges, a domiciliary of New York, is the principal and Chief Executive Officer of Spectra Financial Group LLC and Spectra Investment Group LLC, and

at all relevant times exercised complete control over the Spectra Fund, Spectra Investment, and Spectra Financial.

11.     Spectra Investment Group LLC is a Delaware Limited Liability Company with its principal place of business in New York, and was the managing manager of the Spectra Fund.  Its only members are Porges and Rose, who is a domiciliary of New Jersey, and it is completely dominated by Porges.

12.     Spectra Financial Group LLC is a Delaware Limited Liability Company with its principal place of business in New York, and was the investment manager of Spectra Fund.  Its only members are Porges and Diana Porges, who is a domiciliary of New York, and it is completely dominated by Porges.

13.     Porges is also the genuine party in interest to the agreements Spectra entered into with Plaintiff.  As detailed below, Porges fully controlled the various Spectra entities, all of which were his alter ego companies, and therefore his personal liability for Spectra's misconduct can be imputed.

**JURISDICTION AND VENUE**

14.     Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332 because Plaintiff is a domiciliary of Florida, Defendant Porges is a domiciliary of New York, Defendants Spectra Financial and Spectra Investment are citizens of New York and Delaware, their respective members are domiciled in New York and New Jersey, and the amount in controversy exceeds $75,000.

15.     Venue in this district is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or fraudulent omissions on which the claims are based occurred in the District of New York.

16.     The parties have further agreed to waive the applicability of any arbitration clauses contained in agreements between them, and to not contest that the United States District Court for the Southern District of New York is the appropriate venue for the resolution of the claims in this matter.

## FACTUAL BACKGROUND

### Defendants Fraudulently Induce McBeth to Invest in the Spectra Fund

17.     Porges conceived of the idea for the Spectra Fund at a certain point in 2007. Having traded with his own money for a number of years, Porges wanted a piece of the significant fees earned by leading hedge fund managers for investing money on behalf of financial institutions, pension funds, and high net-worth individuals, and decided that the only way he could do that was to create an investment fund.  To that end, he decided to launch the Spectra Fund.

18.     To assist him in creating and marketing this new fund, Porges hired Rose to be his Chief Operating Officer.  While Rose had previously served as the Chief Administrative Officer for Soros Private Funds Management LLC and was a Vice President at Goldman Sachs for a number of years, she lacked experience in marketing hedge funds to investors.  Rose and Porges also faced a number of handicaps in promoting the Fund, including the challenging financial market and economic environment that developed in 2008 and the fact that Porges was relatively unknown in the investment community.

19.     Rose started pushing the Fund in early 2008, but her efforts were unsuccessful.  She could not convince even a single investor to join the Spectra Fund, and the launch date for the Fund was repeatedly postponed.

20.     Desperate to find someone to invest in the Fund, Rose decided the time had come to pitch her "Uncle Skip."  Rose knew that McBeth had the financial means to invest in the Spectra Fund and also that he held her in high regard.  The two have known each for over twenty years, and they had a close personal relationship.  At the time, McBeth saw Rose as intelligent, trustworthy, and highly sophisticated in financial matters.  He implicitly trusted her judgment, and Rose used that trust to her personal advantage.

21.     At a family dinner on or about December 14, 2008, Rose touted the Spectra Fund as an investment opportunity.  She told McBeth that Porges had a distinguished investment track record, and invited him to meet with Porges to learn more about the Fund. The following day, Rose sent McBeth an email with directions to Spectra's office, enclosing a Fourth Quarter 2008 presentation and a November 2008 fund fact sheet.  The email and its enclosures are attached hereto as Exhibits 1 to 3.

22.     In the materials Rose provided to McBeth, Porges, through Spectra, presented the Fund as a sophisticated investment fund run by a manager with a consistent track record of success.  Specifically, Porges represented that Spectra's proprietary strategy, which he would seek to employ on behalf of investors in the Spectra Fund, had generated a cumulative rate of return of 1383% over the period of January 2004 to October 2008, compared to a -2.82% cumulative rate of return for the strategy's benchmark, the S&P 500, over the same period of time.  The fact sheet contained standard measures of risk, including Sharpe and Sortino Ratios, which also indicated that on a risk-adjusted basis the returns were exceptional.

23.     In the presentation, Defendants buttressed those extremely positive metrics by representing that Spectra employs a principled approach to investing: "Spectra has a

proven track record of outstanding performance through various market environments, including multiple down cycles in the financial markets"; "[w]e have proven success in both bull and bear markets"; and "[e]very Spectra professional strives to uphold the firm's rigorous investment process . . . and adherence to the *highest principles of risk management and integrity*."  (emphasis added).

24.     In addition, Defendants claimed that Spectra would protect investors from significant losses by minimizing risk and preserving capital.  For example, in describing the Fund's objectives, they indicated that Spectra would "seek absolute returns by establishing trades . . . in a diversified and disciplined manner *utilizing strict risk control*" and would "maintain *preservation of capital* through all market environments."  (emphasis added).

25.     Similarly, in setting forth the Fund's risk management approach, Defendants made highly specific representations about the depth and breadth of Spectra's risk controls:

> utilizes a multi-tier system evaluating risk on an individual security basis, strategy basis and a firm wide portfolio basis.  Strict limits are imposed on the funds' exposure with specific focus on strategy exposure, geographic exposure, sector exposure and beta/market exposure. . . .   Key factors in this process are:
>
> - Market Neutrality
>
> - Continuous Trade Evaluation and Risk Analysis
>
> - Position Limits
>
> - Risk/Reward Ratio
>
> - Diversification by strategy, industry, geography, related risk and issuers
>
> - Hedging at the position level strategy and the portfolio level strategy

26.     Approximately 18 months later, Rose provided McBeth with a Second Quarter 2010 presentation and a June 2010 fund fact sheet, attached hereto as Exhibits 4 and 5, which contained substantially similar representations as the earlier materials and included updated performance information.  According to these new materials, Spectra's strategy had performed exceptionally well in both the 2008 market downturn (a -4.92% rate of return as compared to a -38.49% rate of return for the S&P 500) and the later market recovery (a 103.73% rate of return in 2009 and a year to date rate of return of 40.31%, as compared to 23.45% and -1.81% rates of return for the S&P 500 over the same time periods).

27.     Defendants also included information on Spectra's portfolio construction that reinforced their claims about its risk-conscious approach.  Defendants represented that under normal market conditions Spectra is typically 58% short and 42% long, and it is broadly diversified with its 30 largest positions accounting for less than 50% of the portfolio. Accordingly, Spectra's strategy was supposed to guard against market direction risk (*i.e.*, will the stock market go up or down) and position risk (*i.e.*, will an unforeseen event effecting a particular security or market segment impact the Fund's overall returns).

28.     Prior to his investment in the Spectra Fund, McBeth and his son, who works in finance, also participated in discussions with Porges and Rose that reinforced the positive representations contained in its written materials.  In direct conversation with McBeth, Porges focused on the fact that he had been able to achieve outstanding returns over the course of a long investment career, covering both market upturns and downturns.  He provided few details about the Fund itself, which did not surprise McBeth because Rose had told him that Porges was introverted and thus uncomfortable dealing with potential investors.  Separately, Rose informed McBeth's son that Porges employs a broadly

diversified investment strategy, which includes opportunistic exposure to a variety of arbitrage trades, and he carefully limits his market exposure through hedging.

29.     McBeth was impressed by the information he received from Defendants.  He believed their statements to be accurate, and, critically for McBeth, he trusted Rose to be honest with him.  McBeth believed Rose would have alerted him if there was any reason he should be concerned about investing in the Spectra Fund.  Relying on those material misrepresentations and omissions of material facts, McBeth invested $5 million in the Spectra Fund.  McBeth would prove to be the Fund's only outside investor.  In fact, the only other investor in the Fund was Porges.

### The LLC Agreement and Memorandum

30.     In connection with his investment in the Fund, McBeth entered into the Spectra Opportunities Fund LLC Limited Liability Company Agreement (the "LLC Agreement") with Spectra and Porges (which Porges signed), a copy of which is attached hereto as Exhibit 6.  Under the Agreement, Defendants committed to managing the Spectra Fund in accordance with the Confidential Private Offering Memorandum (the "Memorandum"), a copy of which was also provided to McBeth and is attached hereto as Exhibit 7.  The LLC Agreement sets forth that Defendants "will not engage in any Investment transactions other than as described in the Memorandum without prior notification to the Members."  Similarly, in describing the duties of Spectra, the Agreement requires them to follow the investment strategy outlined in the Memorandum.

31.     The Memorandum contains statements about how the Spectra Fund will be managed that are consistent with those set forth in the marketing materials.  In particular, the investment strategy pursued by Defendants will aim to "capture attractive absolute returns

by exploiting pricing anomalies" using a variety of arbitrage strategies.  By focusing on pricing discrepancies, Defendants will seek "to assume limited stock market risk" and will use both long and short positions so as to "reduce net market exposure."  In other words, Defendants were obligated to pursue positive returns on a risk-adjusted basis, as opposed to aggressively attempting to capture large gains through speculative transactions.

32.     Further, the Memorandum indicates that Defendants will employ diligent internal controls so as to minimize risk to investors:  "Optimization of returns is sought by establishing trades with attractive risk-reward characteristics in a *diversified and disciplined manner utilizing strict risk control procedures*." (emphasis added).

33.     According to the LLC Agreement, Defendants are required to "maintain adequate records and accounts of all operations and expenditures and furnish the Members with the reports required hereunder."  This would include monthly account statements, which are standard reports provided to limited partners in this type of fund structure. Reflecting this fact, the Memorandum indicates Defendants will calculate the Net Asset Value ("NAV") of the Spectra Fund on a monthly basis so as to provide this information to investors.

34.     McBeth also entered into a Subscription Agreement with Porges and Spectra, which incorporated the Memorandum and LLC Agreement by reference.

**The Spectra Fund Implodes Almost Immediately After McBeth's Investment**

35.     Following McBeth's investment, the Spectra Fund collapsed in stunning fashion.  In stark contrast to the representations made to McBeth about the safety of investing in the Fund given Spectra's distinguished track record and diligent risk management, the Spectra Fund suffered huge losses in virtually every month of its short existence.  Over the period of December 1, 2010 to September 30, 2011, McBeth's monthly returns were as follows:

| Date | Spectra Fund Rate of Return (Monthly) | Account Balance | S&P 500 Rate of Return (Monthly)[1] |
|---|---|---|---|
| December 31, 2010 | -20.09% | $4,030,396 | 6.53% |
| January 31, 2011 | -29.12% | $2,856,897 | 2.26% |
| February 28, 2011 | -34.99% | $1,857,287 | 3.2% |
| March 31, 2011 | -3.02% | $1,801,129 | -.11% |
| April 30, 2011 | -22.23% | $1,400,648 | 2.85% |
| May 31, 2011 | 33.32% | $1,867,309 | -1.35% |
| June 30, 2011 | -33.27% | $1,246,081 | -1.83% |
| July 31, 2011 | 24.38% | $1,549,924 | -2.15% |
| August 31, 2011 | -72.56% | $425,272 | -5.68% |
| September 30, 2011 | -100% | $0 | -7.18% |

---

[1] Information provided by Morningstar and available at: http://performance.morningstar.com/Performance/index-c/performance-return.action?t=SPX&region=usa&culture=en-US.

36.    Production of Spectra's internal documents and business records will show in detail how McBeth's money was lost, but at this point it is clear that Defendants fraudulently misled McBeth to invest in the Fund and breached the LLC Agreement.

37.    As an initial matter, the dramatic size of the losses—including being *down 72.56%* in August and being *down 100%* in September—are fundamentally inconsistent with the representations contained in the marketing materials about Spectra's strategy and risk management.  The same is true as to the strategy described in the Memorandum.  For example, if Defendants had employed standard risk controls, as they were required to do, then the size of its losses would have been limited by diversification (in both strategy and position), hedging, and stop losses.  While the Spectra Fund could have suffered significant drops in NAV in particular months, it would not have gone to zero in *less than a year*.

38.    Indeed, the types of losses experienced by the Spectra Fund could have only been caused by willful misconduct or the taking on of wholly unwarranted risks, more akin to (highly leveraged) gambling than investing.  There are no other reasonable explanations (other than outright theft), particularly given that the Fund's benchmark, the S&P 500, was marginally positive, when accounting for reinvestment of dividends, over the same period of time.

**Defendants' Initial Attempt to Hide Their Misconduct**

39.    On August 19, 2011, Rose emailed McBeth an account statement dated as of July 31, 2011, which showed an account balance slightly greater than $1.5 million.  At this point, Rose knew that the Spectra Fund had suffered catastrophic losses in August but she did not reveal this critical fact in the email.  Rather, her email was ebullient, suggesting that

nothing was wrong with the Spectra Fund:  "Hi Skip, Attached is the July statement. Speak to you on Monday. Have great weekend!  Love, Deb."

40.     This was the final account statement he would receive before the end of 2012.  Defendants withheld the August and September account statements likely to buy themselves time and because they were concerned that McBeth would withdraw his remaining funds if he knew the Fund's actual NAV.  This concern was legitimate, as McBeth had long been considering whether to sell his shares in the Spectra Fund.  If he had known that its NAV was continuing to fall he would have promptly requested a withdrawal.

41.     On December 29, 2011, Rose emailed McBeth's accountant, copying McBeth, to inform him that the "most updated information I have for Don's investments is the month end statement from July which I have attached."  Rose also noted "we have suffered significant losses this year."  Rose blamed the delay in providing performance information on the fact the "Spectra is caught up in the MF Global liquidation process," because "we moved prime brokers in August and have been dealing with the fall out ever since."  The email is attached hereto as Exhibit 8.

42.     These statements were false.  The Spectra Fund had not suffered "significant losses" on the year; it had completely collapsed over two months before Rose sent the email.  Moreover, Rose knew the exact value of McBeth's account, *namely zero*, but she purposefully withheld this information from McBeth's accountant.  Rose had been hiding the Fund's abysmal performance from McBeth since August 2011, and apparently decided also to mislead his accountant.

43.     As for Rose blaming the lack of account statements on MF Global's bankruptcy, that claim was also false.  During a meeting between Porges, Rose, McBeth,

and McBeth's son, Porges was asked about account statements and he initially tried to make the same excuse as Rose.  However, McBeth's son caught him in the lie.  McBeth's son asked Porges when MF Global collapsed, and Porges stated it was "in September 2011."  By September the Fund was "nearly worthless," McBeth's son noted in response, and thus it could not have been engaged in any trading of significant volume.  He then asked Porges if the Spectra Fund had only traded through its original broker, Merrill Lynch.  Porges had to admit that "yes, we only traded with Merrill Lynch."

44.     In actuality, Porges misstated when MF Global first began experiencing financial problems.  As detailed by subsequent news reports, the firm started experiencing significant issues on October 21, 2011, when it improperly transferred certain customer money, and filed for bankruptcy ten days later.  Consequently, even if (contrary to fact) the Spectra Fund had started using MF Global as its broker in August, that would not have prevented Defendants from issuing account statements for August and September.

**Defendants Commit to Fully Compensating McBeth**

45.     At a certain point, Defendants reversed course and decided to reveal to McBeth that they had lost his $5 million investment.  On or around January 20, 2012, Rose met with McBeth and informed him that the money he had invested in the Spectra Fund was gone.

46.     Rose explained that earlier in his career Porges had lost a significant portion of the investment capital provided to him by outside investors.  This was a surprise to McBeth, as neither Rose nor Porges had disclosed this and McBeth would have never invested in the Fund if he had known.  This is particularly true because Rose's revelation contradicted information contained in the Fund's marketing materials and legal documents.

According to the Second Quarter 2010 presentation, the Spectra Fund was supposedly "offering outside investors the opportunity to invest with its partners for the first time." Similarly, the Fourth Quarter 2008 presentation and the Second Quarter 2010 presentation both claim the Spectra Fund is "[Porges'] first capital raise from outside investors for Spectra."  And a substantively identical representation is contained in the Memorandum.

47.    Rose further promised McBeth, on behalf of Defendants, that they would fully repay his $5 million investment.  She explained Porges had repaid outside investors on the earlier occasion, and they were committed to doing the same for McBeth.  She repeated this promise in subsequent conversations with McBeth.  For example, in one phone conversation Rose related that Porges wanted McBeth to provide him with additional investment capital so that Porges would be able to repay McBeth sooner.  Rose noted, however, that she did not think this was necessary.

48.    Defendants made this promise to McBeth in order to discourage him from taking legal action against them, and their promise had its intended effect.  Believing that they would repay him, and relying on their promise to do so, McBeth did not assert any legal claims.

### Porges Admits That McBeth Was Misled

49.    There were follow-up discussions between Porges, Rose, McBeth, and McBeth's son concerning the status of the repayment.  In the course of those discussions, Porges and Rose revealed critical facts concerning Spectra's actual investment processes.

50.    A September 10, 2013 meeting was held to discuss Spectra's performance with an eye towards determining when Porges could compensate McBeth.  Porges explained to McBeth that Spectra had started the year strong but two trades had gone against them.

Rose claimed that the Fund was approximately "flat" for the year.  They made these statements so as to explain why Porges had not yet repaid McBeth.

51.      In the course of this meeting, Porges stated he normally holds only 20 to 40 positions, and if he believes in the attractiveness of a particular stock he will make it as much as 20% of the portfolio.

52.      Porges further related that he would take such concentrated positions using options, which are inherently levered instruments, and thus the actual risk of the positions would be even greater.  When one assumes an outright long or short position with an option, you have the potential to make a multiple of the return you would have made from making the same directional trade with the underlying security.  But if the option expires "out of the money" 100% of the investment capital is lost.  Accordingly, Porges was risking as much as 20% of the portfolio on a single roll of the dice as to whether an option would be "in the money" at the expiration date, which, for some investments, was as short as a day or two.

53.      In other words, the Spectra Fund was not diversified and it did not use standard risk controls, which is inconsistent with the representations made to McBeth but is consistent with the Fund collapsing under the weight of grossly incompetent investing.  What may have occurred is that once the Spectra Fund suffered substantial losses early in 2011, Porges resorted to making large, risky bets in an ill-conceived bid to break even.  Further losses on those trades then caused the Fund to collapse.

54.      Other problems at Spectra were revealed in a conversation between Rose and McBeth's son.  During a lunch meeting that occurred in the latter half of 2013, Rose informed him that the SEC was investigating Spectra for potential violations of the securities laws.  The impetus for the investigation was unusual activity in accounts controlled by

Spectra, including trades where Spectra was taking contrary positions in its accounts or in outside accounts controlled by a Spectra representative—buying a security in one account, and selling the same security in another account.

55.     It is unclear what findings the SEC has made, if any, or even if the investigation has been concluded.  The very existence of such an investigation, however, is indicative of breaches of duties owed to McBeth.  The LLC Agreement required Defendants to "do any and all acts and things for the preservation, protection, improvement, and enhancement of the [Spectra Fund]'s assets in accordance with the investment strategy." The taking of diametrically opposed positions in Spectra-controlled brokerage accounts cannot be reconciled with that obligation.

56.     No financial or strategic benefit can be gained by simultaneously buying and selling the same equity, index, or option in a single account or multiple accounts controlled by a particular investor.  If Defendants were buying and selling the same security in accounts Spectra managed on behalf of the Spectra Fund that would amount to wasting McBeth's money to the benefit of Spectra's broker, and potentially Porges, if there were certain agreements in place between the broker and Porges.  Irrespective of whether this conduct was intentional or grossly negligent, it would still qualify as a breach of the LLC Agreement.  And it also would be suggestive of deeper issues.  For example, if Spectra's internal controls were so deeply flawed that it did not realize it was taking inconsistent trade positions that too would have breached the LLC Agreement.

## Defendants Repay McBeth only a Fraction of his Loss

57.     In November or December 2013, Porges contacted McBeth and explained that Spectra had come into additional money as a result of MF Global's liquidation.  On

December 18, 2013, Porges informed McBeth in a letter that the Fund was going to wind

down and that he would receive a distribution from the Fund.

58.     Shortly thereafter, Defendants made a payment of $200,000 to McBeth, just

4% of McBeth's original investment in the Fund.  The payment was structured as a pro rata

capital distribution from the Fund, however as discussed above, the Fund had lost all of its

value back in September 2011.  In reality, the payment was from money paid to Spectra for

a bankruptcy unrelated to the Fund or its investments.  Porges simply redirected money from

one of his alter-ego companies to the Fund in order to compensate McBeth.

59.     On May 11, 2014, McBeth and his son met with Porges and Rose to discuss

when McBeth could expect to receive additional payments towards the $5 million loss.

Porges stated he wanted to do the "honorable thing," but he was not yet in position to make

additional payments.  At one point, Porges attempted to walk-away from his commitment to

repay McBeth by claiming if he had the "luxury" of making repayments to McBeth he

would.  At the conclusion of the meeting, however, it was agreed the parties would schedule

a follow-up meeting at which time Porges would provide details on how he would make

McBeth whole.

60.     The next meeting occurred on September 23, 2014, and Porges was again

asked how he was going to repay McBeth.  Porges stated that he could not afford to repay

McBeth directly, but if McBeth could provide Porges with $1 million Porges would be able

to recoup his money by investing it.  McBeth declined this highly questionable and, under

the circumstances, insulting request for additional investment capital.  McBeth had been

patient, but by this point it was clear that Defendants were not going to honor their promise

to repay him.

**Spectra is the Alter Ego of Porges**

61.     It is unsurprising that Porges personally committed to compensate McBeth following the collapse of the Fund, as Porges has always been the alter ego of Spectra and the Fund.  Porges is the principal and CEO of Spectra.  Spectra was originally created as a personal trading vehicle for Porges, he had final responsibility for all investment and management decisions at Spectra and the Fund, and the only investor in the Spectra Fund other than McBeth was Porges.  Additionally, Porges and the Spectra entities operated out of the same office on 595 Madison Avenue in New York City, and in connection with this dispute they are represented by the same counsel.

62.     Spectra and the Fund were also grossly under-capitalized, meaning that they lacked sufficient capital to cover their own reasonably anticipated expenses.  Porges responded to this situation by commingling his own funds with that of his businesses.  During the September 10, 2013 meeting referenced above, Porges confided to McBeth that he regularly used his own money to meet margin calls and to satisfy their debts, and he even took out a mortgage on his house to provide Spectra with working capital.

63.     Despite Porges' personal support of Spectra and the Fund, the latter was wound down in 2013.  This extensive mixing of personal and corporate funds is further proof that Spectra is the alter ego of Porges.

## CAUSES OF ACTION

### COUNT I
### Fraudulent Misrepresentation

64.     Plaintiff repeats and alleges, as if set forth fully herein, the allegations of paragraphs 1 to 63 of this Amended Complaint.

65.     Defendants knowingly and intentionally misrepresented Spectra's past performance, risk controls, and investment approach in order to induce McBeth to invest in the Spectra Fund.

66.     As described more fully above, Defendants represented that Spectra had a record of outstanding investment returns and that this was the first time that Porges had raised capital from outside investors.  Moreover, they represented that Spectra focuses on preservation of capital and employs a variety of risk controls, including hedging, diversification in positions and strategies, and loss stops.  The aforementioned representations were false when made, and were designed to and did convince McBeth to invest in the Spectra Fund.

67.     Defendants also withheld material information from McBeth about the Spectra Fund's extremely risky investment strategy, including that the Fund would regularly assume highly concentrated positions (as high as 20% of the portfolio in a single security), had inadequate risk controls, would use maximum leverage, and was grossly under-capitalized.  They also concealed the fact that Porges had previously managed capital provided to him by outside investors, and, in those circumstances, had lost a substantial portion of it.  This information was concealed from McBeth because they were aware that McBeth would never invest in the Fund if he were informed as to its actual strategy and Porges' true historical returns.

68.     In addition, Defendants withheld account statements from McBeth, falsely claiming that Spectra was unable to provide those statements because of issues associated with Spectra's prime broker.  They did this so as to conceal their misconduct from McBeth, as well as to prevent McBeth from requesting the withdrawal of his remaining funds.  Had

McBeth known that the Spectra Fund had suffered such severe losses, he would have promptly sought to withdraw his money from the Spectra Fund.

69.     As a result of Defendants' fraud, McBeth suffered damages in an amount to be determined at trial.

## COUNT II
## Negligent Misrepresentation

70.     Plaintiff repeats and alleges, as if set forth fully herein, the allegations of paragraphs 1 to 69 of this Amended Complaint.

71.     As described above, Defendants, through misrepresentations and omissions (if not fraudulent, then negligent) induced McBeth both to invest in the Spectra Fund and to remain invested in the Fund.  Had McBeth been informed of the truth, he would have never invested in the Spectra Fund.

72.     As a result of Defendants' misrepresentations and omissions of material facts, McBeth suffered damages in an amount to be determined at trial.

## COUNT III
## Breach of Contract

73.     Plaintiff repeats and alleges, as if set forth fully herein, the allegations of paragraphs 1 to 72 of this Amended Complaint.

74.     As described above, the LLC Agreement constitutes a valid and binding contract enforceable against Spectra and Porges, who is the real party in interest with respect to Spectra's commitments.

75.     The LLC Agreement required Porges, through Spectra, to invest the Spectra Fund's assets in accordance with the terms of the Memorandum and the investment strategy set forth therein.  It also required him to direct Spectra's efforts to maximizing the Fund's

assets, as well as maintaining adequate records on behalf of investors, which included the dissemination of monthly account statements.

76.     The Memorandum indicated that the Spectra Fund, as managed by Defendants, would employ an investment strategy that included the use of hedging, strict risk controls, and diversification to limit risk and preserve capital.

77.     Defendants breached the LLC Agreement by not investing capital provided by McBeth in accordance with the promised investment strategy, as evidenced by the Spectra Fund's dramatic decline in value, particularly as compared to its benchmark.  In addition, they breached the LLC Agreement by engaging in grossly negligent trading, including making highly concentrated bets on a single security using maximum leverage.

78.     Defendants also breached the LLC Agreement by simultaneously buying and selling shares of the same securities, and thus not directing Spectra's efforts towards maximizing the Fund's assets.

79.     Defendants further breached the LLC Agreement by failing to provide McBeth with monthly account statements for the final months of the Fund's existence.  By doing so, they prevented McBeth from learning of the Fund's dismal performance and withdrawing his capital based on that performance.

80.     McBeth has suffered damages as a result of those breaches of the LLC Agreement in an amount to be determined at trial.

**COUNT IV**
**Breach of Fiduciary Duty**

81.     Plaintiff repeats and alleges, as if set forth fully herein, the allegations of paragraphs 1 to 80 of this Amended Complaint.

82.     As required by the law and the agreements between the parties, Spectra and Porges, as the majority and controlling partner to the LLC Agreement through his control of Spectra, owed fiduciary duties to McBeth, a limited partner.

83.     Defendants breached those duties by engaging in grossly negligent trading, including making highly concentrated bets on a single security using maximum leverage. They also breached their fiduciary duties by simultaneously buying and selling shares of the same securities, and thus not directing their efforts towards maximizing the Fund's assets.

84.     McBeth has suffered damages as a result of Defendants' breaches of their fiduciary duties in an amount to be determined at trial.

## COUNT V
## Promissory Estoppel

85.     Plaintiff repeats and alleges, as if set forth fully herein, the allegations of paragraphs 1 to 84 of this Amended Complaint.

86.     As described above, Defendants promised McBeth that they would repay McBeth's $5 million investment in the Spectra Fund so as to induce McBeth not to bring any legal actions against them.  In turn, McBeth reasonably relied on their promise to his personal detriment.

87.     Injustice can only be prevented by enforcement of Defendants' promise to repay McBeth given that McBeth was the unwitting victim of their misconduct, as detailed above.  McBeth has suffered damages as a result of their breach of the promise to repay him in an amount to be determined at trial.

## COUNT VI
## <u>Unjust Enrichment</u>

88.    Plaintiff repeats and alleges, as if set forth fully herein, the allegations of paragraphs 1 to 87 of this Amended Complaint.

89.    As described above, Defendants engaged in a scheme and a series of wrongful actions for their own material benefit.  By so doing, they unjustly enriched themselves to the detriment of McBeth, who lost the entire $5 million he entrusted to Defendants.

90.    Defendants have been unjustly enriched and McBeth has suffered damages as a result of their conduct in an amount to be determined at trial.

## RELIEF REQUESTED

91.    Plaintiff respectfully requests an award:

(a)    granting compensatory damages in an amount to be determined at trial but believed to be approximately $5 million;

(b)    Interest on any award at the maximum allowable rate; and

(c)    Granting such other relief, including punitive damages and attorneys' fees, as may be just and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands trial by jury on all issues so triable.

DATED:    April 27, 2015
New York, New York

Respectfully submitted:

By: _____

L. Reid Skibell (LS8877)
Andrew St. Laurent
James Valentino
HARRIS, O'BRIEN, ST. LAURENT &
CHAUDHRY LLP
111 Broadway, Suite 1502
New York, NY 10006

*Attorneys for Plaintiff Donald F. McBeth*