UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------x

DONALD F. MCBETH,                            :        No. 15-CV-2742 (JMF)
                                             :
                  Plaintiff,                 :        ECF CASE
                                             :
            -against-                        :
                                             :
GREGORY I. PORGES, SPECTRA                   :
FINANCIAL GROUP LLC, AND SPECTRA             :
INVESTMENT GROUP LLC                         :
                                             :
                  Defendants.                :
                                             :
                                             :
                                             :
----------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

SCHULTE ROTH & ZABEL LLP

919 Third Avenue
New York, New York  10022
(212) 756-2000

*Attorneys for Defendants*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................1

FACTUAL BACKGROUND..................................................................................4

ARGUMENT..........................................................................................................7

I.     THE COURT SHOULD DISMISS MCBETH'S COMPLAINT IN ITS ENTIRETY AGAINST ALL DEFENDANTS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED..............................................................7

     A.     McBeth's Breach of Contract Claim Should Be Dismissed Given the Absence of Any Breach and the Lack of Cognizable Damages ............................8

          1.     Spectra Financial, Spectra Investment, and Porges Did Not Breach the LLC Agreement Through Their Investment Strategies ..............................8

          2.     McBeth Has Failed to Plead that Defendants' Failure to Provide Account Statements or the Trading that Lead to the SEC Investigation Caused Him Any Damages.......................................................................10

     B.     McBeth's Fraudulent and Negligent Misrepresentation Claims Should Be Dismissed Given His Failure to Comply with Rule 9(b), His Inability to Plead Justifiable Reliance, the Absence of Misstatements, and the Lack of Damages ...13

          1.     McBeth's Misrepresentation Claims Fail to Comply with Federal Rule of Civil Procedure 9(b)......................................................................13

          2.     McBeth Cannot Justifiably Rely on Any Purported Pre-Investment Misstatements Given the Non-Reliance Clause in the Subscription Documents ................................................................................................14

          3.     McBeth's Misrepresentation Claims Centered on Spectra Financial's Trading Strategy are Meritless Given the Absence of Any False Representations ........................................................................................17

          4.     McBeth Has Not Plead an Actionable Misstatement Relating to Porges' Alleged Acceptance of Outside Capital From Other Investors in the Past...................................................................................................18

          5.     McBeth's Misrepresentation Claims Based on Defendants' Supposed Failure to Provide Account Statements Does Not Allege Any Damages................................................................................................18

C.      McBeth's Negligent Misrepresentation Claim is Barred by the LLC Agreement's Exculpatory Clause ........................................................................19

D.      McBeth's Breach of Fiduciary Duty and Unjust Enrichment Claims Should Be Dismissed as Duplicative and Superfluous in Light of the Breach of Contract Claim ...........................................................................................19

E.      McBeth's Promissory Estoppel Claim Should Be Dismissed Because He Has Not Plead That He "Took Action to His Detriment" ............................................20

II.     THE COURT SHOULD DISMISS MCBETH'S FIDUCIARY DUTY AND UNJUST ENRICHMENT CLAIMS AGAINST ALL DEFENDANTS FOR FAILURE TO JOIN A NECESSARY, INDISPENSABLE PARTY .............................21

A.      McBeth's Breach of Fiduciary Duty and Unjust Enrichment Claims are Derivative and Belong to the Spectra Fund ..........................................................21

B.      The Fiduciary Duty and Unjust Enrichment Claims Must Be Dismissed Because the Spectra Fund is a Necessary, Indispensable Party Who Cannot Be Named Without Destroying Diversity .............................................................22

III.    THE COURT SHOULD DISMISS THE BREACH OF CONTRACT AND BREACH OF FIDUCIARY DUTY CLAIMS AGAINST PORGES FOR FAILURE TO STATE A CLAIM ........................................................................................23

CONCLUSION ...................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*ABRY Partners V, L.P. v. F & W Acquisition LLC*,
    891 A.2d 1032 (Del. Ch. 2006)............................................................................................15

*Albert v. Alex Brown Mgmt. Servs.*,
    Nos. Civ. A. 762-N, 763-N, 2005 WL 2130607 (Del. Ch. Aug. 26, 2005)...........................22

*Aramarine Brokerage, Inc. v. OneBeacon Ins. Co.*,
    307 F. App'x 562 (2d Cir. 2009) ...........................................................................................8

*Atwell v. RHIS, Inc.*,
    No. 02C-12-003WLW, 2006 WL 2686532 (Del. Sup. Aug. 18, 2006)...................................18

*Bartfield v. Murphy*,
    578 F. Supp. 2d 638 (S.D.N.Y. 2008).......................................................................21, 22, 23

*Black Horse Capital, L.P. v. Xstelos Holdings, Inc.*,
    No. 8642-VCP, 2014 WL 5025926 (Del. Ch. Sept. 30, 2014) .........................................14, 17

*Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*,
    752 A.2d 1175 (Del. Ch. 1999).........................................................................................23, 24

*Cortec Indus., Inc. v. Sum Holding L.P.*,
    949 F.2d 42 (2d Cir. 1991).......................................................................................................4

*In re Crude Oil Commodity Litig.*,
    No. 06 Civ. 6677 (NRB), 2007 WL 1946553 (S.D.N.Y. June 28, 2007)...............................14

*Deloitte (Cayman) Corp. Recovery Servs., Ltd. v. Sandalwood Debt Fund A, L.P.*,
    31 Misc. 3d 1225(A), 929 N.Y.S.2d 199 (Sup. Ct. 2011) .......................................................8

*DirecTV Latin Am., LLC v. Park 610, LLC*,
    No. 08 Civ. 3987(VM)(GWG), 2009 WL 692202 (S.D.N.Y. Mar. 18, 2009) .......................22

*E.I. DuPont de Nemours & Co. v. Florida Evergreen Foliage*,
    744 A.2d 457 (Del. 1999) .......................................................................................................18

*Feeley v. NHAOCG, LLC*,
    62 A.3d 649 (Del. Ch. 2012)........................................................................................19, 24, 25

*Frati v. Saltzstein*,
    No. 10 Civ. 3255 (PAC), 2011 WL 1002417 (S.D.N.Y. Mar. 14, 2011) ...........................4, 16

*Furnari v. Wallpang, Inc.*,
    No. 13C-04-287 JRJCCLD, 2014 WL 1678419 (Del. Sup. Apr. 16, 2014)............................13

*Gerstley v. Mayer*,
No. N12C-10-126 (EMD), 2015 WL 756981 (Del. Sup. Feb. 11, 2015) ...............................11

*Grayson v. Imagination Station, Inc.*,
No. 5051-CC, 2010 WL 3221951 (Del. Ch. Aug. 16, 2010)....................................19

*Great Lakes Chem. Corp. v. Pharmacia Corp.*,
788 A.2d 544 (Del. Ch. 2001)...................................................................11, 15, 18

*H-M Wexford LLC v. Encorp, Inc.*,
832 A.2d 129 (Del. Ch. 2003)...................................................................15

*In re Harbinger Capital Partners Funds Investor Litig.*,
No. 12 Civ. 1244 (AJN), 2013 WL 5441754 (S.D.N.Y. Sept. 30, 2013), *opinion vacated in part on other grounds*, 2013 WL 7121186 (S.D.N.Y. Dec. 16, 2013), *reconsideration denied*, 2014 WL 3694991 (S.D.N.Y. July 7, 2014) ...............................22

*Kahn v. Portnoy*,
C.A. No. 3515-CC, 2008 WL 5197164 (Del. Ch. 2008) .......................................22

*Kelter v. Apex Equity Options Fund, LP*,
No. 08 Civ. 2911 (NRB), 2009 WL 2599607 (S.D.N.Y. Aug. 24, 2009) ....................4, 16, 17

*Klaxon Co. v. Stentor Elec. Mfg. Co.*,
313 U.S. 487 (1941).................................................................................8

*Kuroda v. SPJS Holdings, L.L.C.*,
971 A.2d 872 (Del. Ch. 2009)....................................................................19

*Lord v. Souder*,
748 A.2d 393 (Del. 2000) ........................................................................20

*MBIA Ins. Corp. v. Royal Indem. Co.*,
426 F.3d 204 (3d Cir. 2005)......................................................................15

*McReynolds v. Trilantic Capital Partners IV L.P.*,
No. 5025-VCL, 2010 WL 3721865 (Del. Ch. Sept. 23, 2010)................................15

*Merck & Co, Inc. v. Reynolds*,
599 U.S. 633 (2010).................................................................................7

*In re Merkin*,
817 F. Supp. 2d 346 (S.D.N.Y. 2011).........................................................8

*Metro. Life Ins. Co. v. Tremont Group Holdings, Inc.*,
No. C.A. 7092-VCP, 2012 WL 6632681 (Del. Ch. Dec. 20, 2012) ..................19, 22

*Naughright v. Weiss*,
    826 F. Supp. 2d 676 (S.D.N.Y. 2011)...........................................................................13, 14

*Nolu Plastics, Inc. v. Ledingham*,
    No. 20445-NC, 2005 WL 5654418 (Del. Ch. Dec. 17, 2005).................................24

*RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*,
    45 A.3d 107 (Del. 2012)..............................................................................................15

*Sabre Int'l Sec., Ltd. v. Vulcan Capital Mgmt., Inc.*,
    95 A.D.3d 434 (1st Dep't 2012)..................................................................................20

*San Diego Cnty. Emps. Ret. Ass'n v. Maounis*,
    749 F. Supp. 2d 104 (S.D.N.Y. 2010)...................................................................16, 22

*Scalisi v. Fund Asset Mgmt., L.P.*,
    380 F.3d 133 (2d Cir.2004).........................................................................................22

*Simon v. Castello*,
    172 F.R.D. 103 (S.D.N.Y. 1997)................................................................................14

*St. James Recreation, LLC v. Reiger Opportunity Partners, LLC*,
    No. Civ. A. 19346, 2003 WL 22659875 (Del. Ch. Nov. 5, 2003).........................23

*Strougo v. BEA Assocs.*,
    No. 98 Civ. 3725 (RWS), 2000 WL 45714 (S.D.N.Y. Jan. 19, 2000) ...................22

*Summit Investors II, L.P. v. Sechrist Indus., Inc.*,
    No. Civ. A. 19400, 2002 WL 31260989 (Del. Ch. Sept. 20, 2002) .......................24

*Terra Secs. Asa Konkursbo v. Citigroup, Inc.*,
    820 F. Supp. 2d 541 (S.D.N.Y. 2011).......................................................................16

*Those Certain Underwriters at Lloyd's v. Nat'l Installment Ins. Servs., Inc.*,
    No. 19804-NC, 2007 WL 2813774 (Del. Ch. Apr. 16, 2007)................................17

*Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*,
    845 A.2d 1031 (Del. 2004) .........................................................................................21

*Touch of Italy Salumeria & Pasticceria, LLC v. Bascio*,
    No. 8602-VCG, 2014 WL 108895 (Del. Ch. Jan. 13, 2014) .................................14

*VLIW Technology, LLC v. Hewlett-Package Co.*,
    840 A.2d 606 (Del. 2003) .............................................................................................8

**Statutes & Rules**

6 Del. C. § 18-1101(c) ...................................................................................................19

6 Del. C. § 18-1101(e) ................................................................................................19

28 U.S.C. § 1652(b) ....................................................................................................8

Fed. R. Civ. P. 9(b) ...........................................................................................4, 13, 14

Fed. R. Civ. P. 12(b)(6) ............................................................................................4, 8

Fed. R. Civ. P. 12(b)(7) ..........................................................................................4, 21

Fed. R. Civ. P. 19 ....................................................................................................4, 21

Fed. R. Civ. P. 23.1 ....................................................................................................22

## PRELIMINARY STATEMENT

Nearly five years ago, Donald McBeth — a wealthy, sophisticated investor with over $25 million in discretionary investments and $40 million to his name — decided to invest in the Spectra Opportunities Fund LLC (the "Spectra Fund"). In doing so, McBeth was not dipping his toes into the world of risky, alternative investment strategies for the first time. Rather, by that point, McBeth had experience investing in, among other things, the securities of non-U.S. issuers based in developing countries, real estate investment trusts ("REITs"), and other private investment funds. McBeth understood the risks inherent in investment fund memberships, and sought out those risks by repeatedly asking Gregory Porges and Deborah Rose to let him invest in the Spectra Fund. Ultimately, McBeth was allowed to invest $5 million in the Spectra Fund — without having any obligation to pay management fees — alongside Spectra Investment Group LLC ("Spectra Investment"), which itself committed $12.5 million of its own capital to the Spectra Fund.

Nobody disputes that McBeth unfortunately lost $5 million after the Spectra Fund collapsed in September 2011. It is equally clear, though, that Spectra Investment lost $12.5 million in the Spectra Fund, and that Porges had his own money in Spectra Investment. As a result, McBeth's theory of the case makes no sense. Indeed, for every dollar that McBeth lost through his investment in the Spectra Fund, Spectra Investment lost more than two dollars. That fact alone shows that Porges did not orchestrate a "scheme and series of wrongful actions … to the detriment of McBeth," as McBeth alleges. That is especially true, given that Porges always looked out for McBeth's best interests. Indeed, when McBeth sent an additional $3 million to the Spectra Fund to bring his total commitment to the originally planned $8 million, Porges returned the additional capital to McBeth because he knew that the Spectra Fund had been struggling.

So contrary to McBeth's pleading, the Spectra Fund's losses — which damaged Porges approximately twice as much as McBeth — were not the result of any wrongdoing. Instead, investments such as the Spectra Fund involve tradeoffs:  an investor can make multiples of his contribution, but he can also lose everything.  The Private Offering Memorandum (the "Memorandum"), which McBeth analyzed before making his investment, was replete with descriptions of the aggressive trading strategies that Spectra Financial Group LLC ("Spectra Financial") — as the investment manager of the Spectra Fund — could use when investing the Spectra Fund's capital.  The Memorandum also set forth the risks that McBeth would assume through his membership in the Spectra Fund, including the possibility that he could lose his entire investment.

Ultimately, McBeth's allegations begin to fall apart when read alongside the Memorandum.  Take, for instance, McBeth's accusation that Spectra Financial traded the Spectra Fund's capital in a manner "more akin to (highly leveraged) gambling than investing."  In reality, the Memorandum cautioned that Spectra Financial could employ "significant" leverage that could "amplify net profits and losses."  Or, consider McBeth's claim that Spectra Financial promised to employ hedging strategies to mitigate risk.  The Memorandum stated that Spectra Financial was not "obligated to, and may elect not to, hedge against risks."  McBeth's accusation that the Spectra Fund's capital was concentrated in a handful of securities?  The Memorandum informed McBeth that there was "no limit on the amount of the Fund's assets that can be invested in any particular position or strategy."  The charge that the Spectra Fund's losses were due to an impermissible options contract?  Once again, the Memorandum allowed Spectra Financial to buy and sell "listed and over-the-counter options and other derivative instruments."

McBeth's chicanery does not end there. McBeth asserts that he relied on purported misrepresentations that occurred in the months and years preceding his investment in the Spectra Fund. But that allegation collapses in light of the Spectra Fund's Subscription Documents. In the Subscription Documents, McBeth warranted that he was relying "solely upon the information in, and referred to in, the Memorandum and nothing else" and that he understood that "no person is authorized to give any information or to make any statement not contained in the Memorandum." As a result, McBeth's purported reliance on statements that predate his review of the Memorandum cannot be deemed justifiable or reasonable.

But the Amended Complaint gets worse. Even though McBeth seeks $5 million in damages to compensate him for his investment losses, his claims are partially based on conduct that could not plausibly have caused those damages. For example, how could McBeth have been damaged by the failure to receive account statements in August and September 2011 when he would have been contractually barred from requesting a withdrawal until the Spectra Fund had lost all of its equity? McBeth also ignores an exculpatory clause in the Spectra Fund's Limited Liability Company Agreement (the "LLC Agreement") that insulates Defendants from claims that are not based on "gross negligence, fraud, or willful misconduct."

Most egregious are McBeth's forum shopping efforts. Significantly, this Court only has this case because McBeth chose to drop the Spectra Fund as a party in order to create diversity jurisdiction. Originally, McBeth commenced this action against Porges, Spectra Investment, Spectra Financial, and the Spectra Fund. In response to this Court's order raising jurisdictional questions, McBeth filed an amended complaint alleging derivative claims without naming the Spectra Fund as a party, rather than proceeding in state court. Many of McBeth's claims should be dismissed on that basis alone.

If there were a trial on the merits, the majority of the McBeth's factual allegations would be exposed as untrue. But there is no reason for this case to go forward. For the reasons set forth below, the Court should dismiss the Amended Complaint pursuant to Rules 9(b), 12(b)(6), 12(b)(7), and 19 of the Federal Rules of Civil Procedure.

## FACTUAL BACKGROUND[1]

Donald McBeth is a sophisticated investor who, as of June 2010, possessed $40 million in assets and at least $25 million in discretionary investments. (Griffin Decl., Ex. 1 at 19, 22, 28).[2] McBeth invests in, among other things, U.S. stocks, non-U.S. stocks of companies in developed and emerging countries, corporate bonds and debentures, private investment funds, REITs, and other real estate holdings. (*Id.*, Ex. 1 at 21). According to McBeth, he is responsible for making his own investment decisions, and is experienced when it comes to investments in private placements of restricted securities. (*Id.*, Ex. 1 at 22). Apart from his investment income, McBeth's major source of wealth is the "generous retirement bonus" that he received after a successful business career culminating when his employer was sold in a corporate transaction. (*Id.*, Ex. 1 at 22). McBeth owns homes in North Belgrade, Maine and Vero Beach, Florida, and previously resided in the New York City suburb of Wyckoff, New Jersey. (*Id.*, Ex. 1 at 28; AC, ¶ 9; ECF No. 2 (Civil Cover Sheet)).

---

[1] Although the Court must "'accept as true all facts alleged in the complaint' and 'draw all reasonable inferences in favor of the plaintiff,'" *Frati v. Saltzstein*, No. 10 Civ. 3255 (PAC), 2011 WL 1002417, at *2 (S.D.N.Y. Mar. 14, 2011), if the Court were to deny this motion to dismiss, the Defendants would dispute many — if not most — of the allegations in the Amended Complaint.

[2] In the Amended Complaint, McBeth writes that he "also entered into a Subscription Agreement with Porges and Spectra, which incorporated the Memorandum and LLC Agreement by reference." (Amended Complaint ("AC"), ¶ 34). For whatever reason, McBeth attached the Memorandum and LLC Agreement as exhibits to the AC, but he did not attach the Subscription Documents. The Court can nevertheless consider the Subscription Documents because "[c]ourts may consider exhibits to the complaint and documents incorporated into the complaint by reference, and 'documents that are integral to the plaintiff's claims, even if not expressly incorporated by reference[.]'" *Kelter v. Apex Equity Options Fund, LP*, No. 08 Civ. 2911 (NRB), 2009 WL 2599607, at *3 (S.D.N.Y. Aug. 24, 2009); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 46-48 (2d Cir. 1991). The Subscription Documents are attached as Exhibit 1 to the Declaration of Robert Griffin ("Griffin Decl.").

In June 2010, McBeth chose to invest $8 million into Spectra Fund alongside Gregory Porges. (Griffin Decl., Ex. 1 at 28; AC, ¶ 29).[3] The Spectra Fund was an alternative investment vehicle whose managing member was Spectra Investment and whose investment manager was Spectra Financial. (AC, ¶¶ 11-12). Spectra Financial, Spectra Investment, and the Spectra Fund were managed by Gregory Porges, alongside many other investment professionals such as Andrew Burton (Senior Managing Director), Ian Estepan (Portfolio Manager), Jack Basavaiah (Portfolio Manager), Allan Rosenberg (Director of Research), and Deborah Rose (Chief Operating Officer). (*Id.*, Ex. 7 at 11-13).

Before investing in the Spectra Fund, McBeth reviewed the LLC Agreement, the Memorandum, and the Subscription Documents. (AC, ¶¶ 30-34, Exs. 6, 7; Griffin Decl., Ex. 1). The LLC Agreement explained, among other things, that Defendants would not be liable to members of the Spectra Fund, including McBeth, unless the conduct at issue "constitute[d] gross negligence, fraud, or willful misconduct." (AC, Ex. 6 at ¶ 5.5.1).

The Memorandum, in relevant part, set forth the investment strategies that Spectra Financial would use in investing the Spectra Fund's capital and the risks associated with those strategies. (AC, Ex. 7 at 15-19, 21-34). For example, the Memorandum explained that Spectra Financial was not obligated to hedge against risks in the financial markets (*Id.*, Ex. 7 at 23), that Spectra Financial could use "significant" leverage in an attempt to generate large returns for the Spectra Fund (*Id.*, Ex. 7 at 18, 22), and that Spectra Financial could invest the Spectra Fund's

---

[3]      While the Amended Complaint alleges that "the only other investor in the Fund was *Porges*" (AC, ¶ 29 (emphasis added)), it was, in fact, *Spectra Investment* that invested capital alongside McBeth in the Spectra Fund. If this case proceeds further, the facts will show that other Spectra Investment personnel had equity in the Spectra Fund alongside McBeth and Porges. The facts will also show, among other things, that (1) Porges allowed McBeth to invest in the Spectra Fund as a favor, given McBeth's close family relationship with Porges' colleague Deborah Rose; (2) the reason why McBeth invested $5 million, rather than the originally committed $8 million, is that Porges refused, on behalf of Spectra Investment, to allow McBeth to contribute the additional $3 million because the Spectra Fund was underperforming; (3) McBeth did not pay the 2% management fee that is customary in the industry; and (4) McBeth was always aware of how Spectra Financial was investing the Spectra Fund's assets given that McBeth and Porges would regularly meet to discuss the Spectra Fund's performance.

assets in myriad securities including, among other things, "options and other derivative instruments." (*Id.*, Ex. 7 at 15). The Memorandum also highlighted the Spectra Fund's risks more generally, including by cautioning readers that "[n]o one should invest in the fund who cannot afford the loss of principal[.]" (*Id.*, Ex. 7 at 2-3; *see also id.*, Ex. 7 at 4, 19, 34).

In the Subscription Documents, McBeth represented and warranted, among other things, that he understood the Memorandum, and that he was a sophisticated investor who could sustain substantial losses in connection with his investment. McBeth, for instance, declared that he had "carefully read, underst[ood], and agree[d] to be bound by the Memorandum," affirmed that he was "able to afford an interest in a speculative venture … and [could] sustain a loss of this entire investment," and verified that he was a "Qualified Purchaser under Section 2(a)(51)(A) of the 1940 Act" given that he was "[a]n individual … acting for its own account … who … in the aggregate owns and invests on a discretionary basis at least $25,000,000 in investments." (Griffin Decl., Ex. 1 at 2, 3-4, 19).

Critically, in executing the Subscription Documents, McBeth also promised that he was not relying on anything other than the Memorandum in deciding to invest in the Spectra Fund, and understood that nobody was authorized to make any statement regarding the Spectra Fund that was not contained in the Memorandum:

> "Reliance on Information Provided. Subscriber acknowledges that in deciding to invest in the Company, *Subscriber has relied solely upon the information in, and referred to in, the Memorandum and nothing else*. Subscriber acknowledges that no person is authorized to give any information or to make any statement not contained in the Memorandum, and that *any information or statement not contained in, or referred to in, the Memorandum must not be relied upon as having been authorized by the Company*."

(*Id.*, Ex. 1 at ¶ 4 (emphasis added)).  So, contrary to McBeth's present argument that he decided to invest in the Spectra Fund based on PowerPoint presentations and oral discussions (AC, ¶¶ 21-29), McBeth actually relied "*solely*" on the Memorandum.

After committing $8 million to the Spectra Fund (Griffin Decl., Ex. 1 at 28), McBeth ended up investing $5 million in two installments in November and December 2010. (AC, ¶ 2).  Despite Spectra Financial's best efforts, the Spectra Fund ultimately lost all of its equity by September 2011.  (*Id.*, ¶¶ 3, 35).  Contrary to McBeth's allegations, this was not due to "misappropriation, gross incompetence, or some combination of the two."  (*Id.*, ¶ 3).  Rather, it was because the Spectra Fund was inherently risky, as the Memorandum and Subscription Documents spelled out.  (*Id.*, Ex. 7 at 3, 4, 19, 34; Griffin Decl., Ex. 1 at 3-4).  Indeed, Porges — through his interest in Spectra Investment — lost approximately twice as much as McBeth when the Spectra Fund collapsed.  (AC, ¶ 8).

## ARGUMENT

## I.

## THE COURT SHOULD DISMISS MCBETH'S COMPLAINT IN ITS ENTIRETY AGAINST ALL DEFENDANTS FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

For the reasons set forth below, all of McBeth's claims — breach of contract, fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty, unjust enrichment, and promissory estoppel — should be dismissed against all defendants on the merits for failure to state a claim upon which relief may be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).[4]

---

[4]       Notably, McBeth did not bring a Section 10(b)(5) claim given that it clearly would be time barred under Section 1652(b)'s two-year discovery rule.  *See* 28 U.S.C. § 1652(b); *see also Merck & Co, Inc. v. Reynolds*, 599 U.S. 633 (2010).

A.	McBeth's Breach of Contract Claim Should Be Dismissed Given the Absence of <u>Any Breach and the Lack of Cognizable Damages</u>

The breach of contract claim should be dismissed because (1) Spectra Financial's trading activity discussed in the Amended Complaint was permitted under the Memorandum, and (2) McBeth has failed to plead that the other purported breaches of the LLC Agreement — *i.e.*, the failure to provide account statements in August and September 2011 and certain trading that lead to an SEC investigation in 2013 — caused him any cognizable damage.

1.	Spectra Financial, Spectra Investment, and Porges Did Not Breach the LLC Agreement Through Their Investment Strategies

McBeth wrongly claims that Defendants failed to invest McBeth's capital in accordance with the strategy promised in the Memorandum.  (AC, ¶¶ 75-77).  Under Delaware law,[5] a plaintiff asserting a breach of contract claim must plead, among other things, "the breach of an obligation imposed by that contract."  *VLIW Technology, LLC v. Hewlett-Package Co.*, 840 A.2d 606, 612 (Del. 2003).  Here, McBeth has not plead that Defendants breached the LLC Agreement by trading in a manner prohibited by the Memorandum.  By contrast, the Amended Complaint only describes trading activity that was permitted under the Memorandum.

*First*, McBeth "cherry picks"[6] from the Memorandum to allege that Defendants promised to use an investment strategy that "assume[d] limited stock market risk," "reduce[d] net market exposure," "pursue[d] positive returns on a risk-adjusted basis," and ensured the

---

[5]	Federal courts in diversity apply the choice of law rules of the forum state.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  "Under New York's choice of law rules, it is clear that 'in cases involving a contract with an express choice of law provision … a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction.'"  *Aramarine Brokerage, Inc. v. OneBeacon Ins. Co.*, 307 F. App'x 562, 564 (2d Cir. 2009).  Moreover, New York courts will apply Delaware law — if chosen by the parties in a choice-of-law clause — to both contract-based and tort-based claims.  *See Deloitte (Cayman) Corp. Recovery Servs., Ltd. v. Sandalwood Debt Fund A, L.P.*, 31 Misc.3d 1225(A), 929 N.Y.S.2d 199, at *3 (Sup. Ct. 2011).  The LLC Agreement and Subscription Documents both contain Delaware choice of law clauses (AC, Ex. 6 at § 16.2; Griffin Decl., Ex. 1 at § 23(e)), so Delaware law applies to all of McBeth's claims.

[6]	As the Court has explained in the federal securities context, "offering memoranda … must be read in the context of the entire document.  Plaintiffs cannot be permitted to 'cherry pick' language from the offering memoranda, and then ignore explicit cautionary language[.]"  *In re Merkin*, 817 F. Supp. 2d 346, 355 (S.D.N.Y. 2011) (internal citations omitted).

"safety of investing in the Fund."  (AC, ¶¶ 31, 35, 75).  But contrary to McBeth's claims, the

Memorandum was replete with references to the high-risk, speculative nature of the Spectra

Fund, and repeatedly warned McBeth that he could lose his entire investment:

- "No one should invest in the fund who cannot afford the loss of principal[.]"
  (AC, Ex. 7 at 2-3).

- "An investment in the Company should not be made by any person that (i) cannot
  afford a total loss of principal … ."  (AC, Ex. 7 at 4).

- "The risks of the Fund's investment strategies are substantial and the Fund could
  realize substantial losses, rather than profits, from some or all of the activities
  described above."  (AC, Ex. 7 at 19; *see also* AC, Ex. 7 at 34).

*Second*, McBeth claims that Defendants promised to minimize the Spectra Fund's

losses through diversification and hedging, but that the Spectra Fund ultimately was comprised

of highly concentrated, unhedged positions.  (AC, ¶¶ 37, 51, 53, 76).  The Memorandum,

however, did not promise that the Spectra Fund would be diversified and hedged.  In fact, the

Memorandum said the opposite.  The Memorandum stated that Spectra Financial was *not*

obligated to diversify or hedge the Spectra Fund's portfolio:

- "[T]he Investment Manager is not obligated to, and may elect not to, hedge
  against risks. …"  (AC, Ex. 7 at 23).

- "There is no limit on the amount of the Fund's assets that can be invested in any
  particular position or strategy.  Accordingly, a loss in any single position or
  strategy could materially reduce the Fund's assets."  (AC, Ex. 7 at 30).

*Third*, McBeth attacks the Spectra Fund's leverage, claiming that the Spectra

Fund's losses only could have been caused by trading that was "more akin to (highly leveraged)

gambling than investing."  (AC, ¶¶ 38, 52, 77).  But the Memorandum did not warrant that the

Spectra Fund would avoid leverage.  Quite the contrary.  The Memorandum said that the Spectra

Fund could incur "significant" leverage to generate larger returns, and set forth how that leverage

could "amplify" net losses:

- "The Fund may borrow funds in connection with its investment activities, both for leveraging purposes and to acquire investments in anticipation of new capital contributions … . The use and amount of leverage will vary throughout the life of the Fund … ." (AC, Ex. 7 at 18; *see also id.* at 2).

- "Leverage will enhance the ability of the Fund to acquire assets, but also will amplify net profits and losses and increase transaction costs. … The amount of leverage incurred by the Fund at any time may be significant[.]" (AC, Ex. 7 at 22).

*Finally*, McBeth contends that the Spectra Fund's collapse was triggered when the Spectra Fund invested in options. (AC, ¶ 52, 77). But the Memorandum did not restrict Spectra Financial from trading options. Once again, the Memorandum provided that the exact opposite was true. The Memorandum explained how Spectra Financial could invest the Spectra Fund's assets in "listed and over-the-counter options and other derivative instruments," and detailed the risks associated with trading options:

- "In pursuing its investment objective, the Fund may trade, buy, sell, sell short and otherwise acquire, hold, dispose of, and deal in … listed and over-the-counter options and other derivative instruments …" (AC, Ex. 7 at 15).

- "Both the purchasing and selling of call and put options entails risks. …" (AC, Ex. 7 at 30).

Overall, not a single trading strategy alleged in the Amended Complaint to have caused the Spectra Fund's losses was prohibited under the Memorandum. Rather, *every* strategy — portfolio concentration (as opposed to diversification), the lack of hedging, the use of leverage, the purchase of options — was *affirmatively allowed* in the Memorandum. Given that, this breach of contract theory must be dismissed.

2.      McBeth Has Failed to Plead that Defendants' Failure to Provide Account Statements or the Trading that Lead to the SEC Investigation Caused Him Any Damages

Delaware law requires a party alleging breach of contract to not only demonstrate the breach, but also "that the failure to perform *caused damages*." *Gerstley v. Mayer*, No. N12C-

10-126 (EMD), 2015 WL 756981, at *5 (Del. Sup. Feb. 11, 2015) (emphasis added); *see also Great Lakes Chem. Corp. v. Pharmacia Corp.*, 788 A.2d 544, 549-50 (Del. Ch. 2001) (noting that "[a]n essential element of any claim for breach of contract is a cognizable injury" and dismissing a contract claim when "[n]othing in the complaint links the alleged breach and the claimed injury").  In the Amended Complaint, McBeth alleges that Defendants breached the LLC Agreement (a) by failing to provide McBeth with account statements, and (b) through a trader's "simultaneous[] buying and selling" of securities that lead to an SEC investigation in late 2013.  (AC, ¶¶ 54-55, 78-79).

If this case were to go forward, the allegations supporting those theories of breach of contract would be proven to be incomplete and misleading.[7]  Regardless, though, they are not actionable theories of breach of contract because McBeth has not plead that either activity caused McBeth any cognizable damages.

*First*, McBeth claims that he was damaged by not having received account statements in August and September 2011 because "[i]f he had known that [the Spectra Fund's Net Asset Value] was continuing to fall he would have promptly requested a withdrawal."  (AC, ¶ 40; *see also* AC ¶¶ 39-44, 79).  But the LLC Agreement did not permit "prompt" withdrawals.  Instead, the LLC Agreement permitted quarterly withdrawals *provided* that McBeth gave Spectra Investment the required 60 days' notice.  (AC, Ex. 6 at § 3.11).  If McBeth had sought to withdraw capital in August or September 2011 after having not received account statements, the earliest he could have done so would have been for the fourth quarter on December 31, 2011.  That is so, because McBeth would have needed to give notice in late July to comply with the 60-day notice deadline to withdraw after the third quarter ended on September 30, 2011.  (*Id.*).

---

[7]     While not relevant to this motion to dismiss, any failure to receive Spectra Fund account statements was due to a technological breakdown between the Spectra Fund's prime broker and the Spectra Fund's administrator after the Spectra Fund switched prime brokers.

To withdraw capital for December 31, 2011, McBeth would have been obligated to give Spectra Investment 60-days' notice on October 31, 2011. But, by October 31, 2011, the Spectra Fund already had collapsed. (AC, ¶¶ 35-37). So even if Defendants did breach the LLC Agreement by failing to provide account statements for August and September 2011 (AC, ¶ 79) — and McBeth does not specifically point to a provision in the LLC Agreement requiring monthly account statements[8] — that alleged breach could not have caused McBeth any damage because he would have been contractually barred from requesting a withdrawal until the Spectra Fund had collapsed. For that reason, the breach of contract claim predicated on the failure to receive account statements must be dismissed given McBeth's inability to plead cognizable damages.

*Second*, McBeth has not plead how he was damaged by the alleged "simultaneous buying and selling shares of the same securities" that lead to an SEC investigation two years after the Spectra Fund's collapse. (AC, ¶¶ 35, 54-56, 78). Nowhere in the Amended Complaint does McBeth allege, among other things, (i) whether this trading actually occurred from November 2010 through September 2011 (*i.e.*, the period in which McBeth lost money in the Spectra Fund), (ii) whether this trading had anything to do with the Spectra Fund's assets, or (iii) whether this trading even coincided with the Spectra Fund's existence. In short, there is a complete disconnect in the Amended Complaint between this vague, conclusory allegation and McBeth's supposed economic damages.

---

[8]     McBeth alleges that, "[a]ccording to the LLC Agreement, Defendants are required to 'maintain adequate records and accounts of all operations and expenditures and furnish the Members with the reports required hereunder.' This would include monthly account statements[.]" (AC, ¶ 33). The provision that McBeth quotes — Section 5.2.2(viii) of the LLC Agreement — did not require monthly account statements, though. In fact, Section 7.3 of the LLC Agreement required Spectra Investment to provide annual reports and "such *periodic reports* as the Managing Member determines to be necessary and appropriate." (AC, Ex. 6 at § 7.3 (emphasis added)). Also, Section 5.2.1 of the LLC Agreement provided that Spectra Investment was authorized to "provide … such accounting, bookkeeping and portfolio trading services to the Company … including … *preparing periodic account statements* for distribution to Members." (AC, Ex. 6 at § 5.2.1 (emphasis added)).

In reality, if this case goes forward, the facts will show that the SEC — following a complete, thorough investigation — found that the Defendants had not committed any wrongdoing whatsoever. Regardless, though, McBeth has failed to plead a causal nexus between the Spectra Fund's losses in September 2011 and an SEC investigation that began approximately two years later. The breach of contract claim, to the extent predicated on activity relating to the SEC investigation, must be dismissed for failure to plead damages.

B. **McBeth's Fraudulent and Negligent Misrepresentation Claims Should Be Dismissed Given His Failure to Comply with Rule 9(b), His Inability to Plead <u>Justifiable Reliance, the Absence of Misstatements, and the Lack of Damages</u>**

McBeth's fraudulent and negligent misrepresentation claims should be dismissed for the following reasons: (1) the Amended Complaint does not comply with Federal Rule of Civil Procedure 9(b); (2) McBeth has not plead justifiable reliance on alleged misstatements that occurred prior to McBeth's investment; (3) the Memorandum does not misrepresent the trading strategy for the Spectra Fund; (4) the Memorandum does not misrepresent whether Porges has accepted capital from outside investors in the past; and (5) McBeth has not been damaged by Defendants' alleged failure to provide account statements.[9]

1. **McBeth's Misrepresentation Claims Fail to Comply with Federal Rule of Civil Procedure 9(b)**

As an initial matter, McBeth's misrepresentation claims should be dismissed for failing to comply with Federal Rule of Civil Procedure 9(b). Rule 9(b) states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *Naughright v. Weiss*, 826 F. Supp. 2d 676, 689 (S.D.N.Y. 2011) (finding that Rule 9(b) also applies to negligent misrepresentation claims). The Court has

---

[9] Additionally, McBeth's misrepresentation claims, to the extent based on the failure to trade in accordance with the Memorandum (AC, ¶¶ 31-32, 67) or the failure to provide account statements (AC, ¶ 68), should be dismissed as duplicative of the contract claim. *See Furnari v. Wallpang, Inc.*, No. 13C-04-287 JRJ CCLD, 2014 WL 1678419, at *7-8 (Del. Sup. Apr. 16, 2014).

explained that "[w]hen a claim is brought against multiple defendants, Rule 9(b) requires that a plaintiff differentiate his allegations as to each defendant and inform each defendant separately of the specific allegations." *Naughright*, 826 F. Supp. 2d at 689. Plaintiffs cannot make "'sweeping references'" to defendants generally or "'lump[] all defendants together'" without violating Rule 9(b). *Id.* at 689; *In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677 (NRB), 2007 WL 1946553, at *6 (S.D.N.Y. June 28, 2007); *Simon v. Castello*, 172 F.R.D. 103, 106 (S.D.N.Y. 1997).

But McBeth has done exactly that. McBeth repeatedly alleges that "*Defendants*" were responsible for various misrepresentations and other misconduct without differentiating his allegations as to each defendant as Rule 9(b) requires. (*See, e.g.*, AC, ¶¶ 4-8, 23-25, 27, 29-33, 36-37, 40, 44-45, 47-48, 55-56, 58, 60). In other places, McBeth asserts that "*Spectra and Porges*" or "*Porges and Spectra*" engaged in wrongdoing, blurring any distinction between the two entities — Spectra Investment and Spectra Financial — and their respective responsibilities. (AC, ¶¶ 30, 34, 74, 82). As a result, the Court should dismiss McBeth's misrepresentation claims for failing to comply with Federal Rule of Civil Procedure 9(b).

> 2.     McBeth Cannot Justifiably Rely on Any Purported Pre-Investment Misstatements Given the Non-Reliance Clause in the Subscription Documents

Under Delaware law, plaintiffs claiming fraudulent misrepresentation must plead, among other things, that "'the plaintiff acted in justifiable reliance on the representation.'" *Black Horse Capital, LP v. Xstelos Holdings, Inc.*, No. 8642-VCP, 2014 WL 5025926, at *21 (Del. Ch. Sept. 30, 2014). The same is true for negligent misrepresentation claims. *See Touch of Italy Salumeria & Pasticceria, LLC v. Bascio*, No. 8602-VCG, 2014 WL 108895, at *5 & n.40 (Del. Ch. Jan. 13, 2014). In this case, McBeth has not plead that he justifiably relied on any purported

misrepresentations that were not found in the Memorandum given the existence of a clear "non-reliance clause" in the Subscription Documents.

Delaware courts have made clear that when sophisticated parties — such as McBeth — enter into contracts containing "non-reliance clauses," they cannot later claim that they reasonably relied on information not contained within those agreements. *See ABRY Partners V, L.P. v. F & W Acquisition LLC*, 891 A.2d 1032, 1057-58 (Del. Ch. 2006) (Strine, V.C.) ("The teaching of this court … is that a party cannot promise, in a clear integration clause of a negotiated agreement, that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those other representations' fraudulent inducement claim."); *see also RAA Mgmt., LLC v. Savage Sports Holdings, Inc.*, 45 A.3d 107, 118-19 (Del. 2012) (explaining that "*Abry Partners* accurately states Delaware law and explains Delaware's public policy in favor of enforcing contractually binding written disclaimers of reliance"); *McReynolds v. Trilantic Capital Partners IV L.P.*, No. 5025-VCL, 2010 WL 3721865, at *7 (Del. Ch. Sept. 23, 2010); *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 141-43 (Del. Ch. 2003); *Great Lakes Chemical Corp.*, 788 A.2d at 555-56; *cf. MBIA Ins. Corp. v. Royal Indem. Co.*, 426 F.3d 204, 215-18 (3d Cir. 2005) (Alito, J.) (applying Delaware law).

This Court similarly has construed "non-reliance clauses" in contracts relating to hedge fund investments in the Section 10(b)(5) context, and dismissed cases given the absence of justifiable reliance. For example, the Court dismissed a claim based on purported misrepresentations that occurred before an investor signed a hedge fund subscription agreement because "[g]iven the sophistication of [Plaintiff] and its investment advisor, and the clear, unambiguous language of the non-reliance provisions at issue, the Court finds Plaintiff's

purported reliance on statements made before the execution of the Subscription Agreement to be unreasonable as a matter of law." *San Diego Cnty. Emps. Ret. Ass'n v. Maounis*, 749 F. Supp. 2d 104, 120-21 (S.D.N.Y. 2010); *see also Frati v. Saltzstein*, No. 10 Civ. 3255(PAC), 2011 WL 1002417, at *3-4 (S.D.N.Y. Mar. 14, 2011); *Kelter v. Apex Equity Options Fund, LP*, No. 08 Civ. 2911(NRB), 2009 WL 2599607, at *8 (S.D.N.Y. Aug. 24, 2009); *cf. Terra Secs. Asa Konkursbo v. Citigroup, Inc.*, 820 F. Supp. 2d 541, 546 (S.D.N.Y. 2011) (explaining, in a case governed by New York law, that it was unreasonable for sophisticated investors to have relied on PowerPoint presentations).

By executing the Subscription Documents, McBeth disclaimed any reliance on information that was not included in the Memorandum, and warranted that he understood that nobody was authorized to make any representations about the Spectra Fund that were not contained in the Memorandum. (Griffin Decl., Ex. 1 at ¶ 4). McBeth also represented the following about his sophistication and suitability in order to be allowed to invest in the Spectra Fund:

- "Subscriber affirms that … *it meets the suitability requirements set forth in the Memorandum* … and … Subscriber, either alone or in connection with its financial advisor(s), *is experienced in investments of this kind* …" (Griffin Decl., Ex. 1 at ¶ 11 (emphasis added); *see also* AC, Ex. 7 at 4 ("Suitability").

- "Subscriber hereby represents and warrants that Subscriber is a Qualified Purchaser under Section 2(a)(51)(A) of the 1940 Act and that Subscriber qualifies as such because Subscriber is … *[a]n individual who owns at least $5,000,000 in investments*…" (Griffin Decl., Ex. 1 at 19 (emphasis added)).

- "Subscriber hereby represents and warrants that Subscriber is a Qualified Purchaser … and that Subscriber qualifies as such because Subscriber is … [a]n individual … who … is acting for its own account … and who … *in the aggregate owns and invests on a discretionary basis at least $25,000,000 in investments*." (Griffin Decl., Ex. 1 at 19 (emphasis added)).

- That, in the last 5 years, McBeth had purchased, among other things, "Non U.S. stocks of companies in emerging market countries," " "Interests in private limited

partnerships, LLCs or other investment funds," and "Interests in REITs or other real estate investment entities." (Griffin Decl., Ex. 1 at 21).

- That McBeth "*make[s] [his] own investment decisions*," has "*prior experience in investing in private placements of restricted securities* involving the payment of performance based compensation," and had roughly $40 million in total assets. (Griffin Decl., Ex. 1 at 22, 28 (emphasis added)).

Given the "non-reliance clause" and McBeth's representations in the Subscription Documents as to his sophistication and suitability, McBeth cannot plead justifiable reliance on any alleged misstatements not contained within the Memorandum. (AC, ¶¶ 21-29).

3.  McBeth's Misrepresentation Claims Centered on Spectra Financial's Trading Strategy are Meritless Given the Absence of Any False Representations

In order to state a claim for fraudulent or negligent misrepresentation, a plaintiff must generally plead that the defendant made a "false representation." *See, e.g.*, *Black Horse*, 2014 WL 5025926, at *21; *Those Certain Underwriters at Lloyd's v. Nat'l Installment Ins. Servs., Inc.*, No. 19804-NC, 2007 WL 2813774, at *4 (Del. Ch. Apr. 16, 2007). As this Court has made clear in the Section 10(b)(5) context, an investor cannot state a fraud claim based on a hedge fund's trading strategies when the strategies attacked in the complaint were all permitted under the hedge fund's private placement memorandum. *See Kelter*, 2009 WL 2599607, at *5-7 (holding that "plaintiff ha[d] failed to show that the representations in the PPM were false, as all of the deviations … alleged by plaintiff were explicitly contemplated").

In addition to being duplicative of McBeth's contract claim (*see* p. 13 n. 9, *supra*), McBeth's misrepresentation claims based on Spectra Financial's trading should be dismissed given that the Memorandum did not contain any false representations. Overall, every investment

strategy attacked in the Amended Complaint — concentrated positions, leverage, options, the

lack of hedging — was permissible under the Memorandum. (*See* pp. 9-11, *supra*).[10]

4. McBeth Has Not Plead an Actionable Misstatement Relating to Porges' Alleged Acceptance of Outside Capital From Other Investors in the Past

McBeth also alleges that the Memorandum misrepresented that Porges never had

accepted outside capital from investors in the past. (AC, ¶¶ 46, 67). Contrary to McBeth's

allegation, the Memorandum did not represent that Porges had not accepted capital from outside

investors previously. Instead, it states: "The Fund represents the first raising of capital from

outside investors *with respect to the Spectra funds managed by the Investment Manager [i.e.,*

*Spectra Financial]*." (AC, Ex. 7 at 11 (emphasis added); *see also id.* at 1). So, even if Porges

had accepted capital from outside investors in the past (and he has not), the Memorandum does

not represent anything to the contrary about Porges personally.[11]

5. McBeth's Misrepresentation Claims Based on Defendants' Supposed Failure to Provide Account Statements Does Not Allege Any Damages

Delaware law is clear that "*damage* to the plaintiff as a result of such reliance" is

one of the elements of fraud. *E.I. DuPont de Nemours & Co. v. Florida Evergreen Foliage*, 744

A.2d 457, 461-62 (Del. 1999). Similarly, "[t]o assert a claim for negligent misrepresentation,"

the plaintiff must demonstrate "*a pecuniary loss* caused by justifiable reliance upon the false

information." *Atwell v. RHIS, Inc.*, No. 02C-12-003WLW, 2006 WL 2686532, at *1 (Del. Sup.

Aug. 18, 2006) (emphasis added). In addition to being duplicative of his contract claim (*see* p.

13 n.9, *supra*), the misrepresentation claims based on the failure to receive account statements

---

[10] Even if Spectra Financial had deviated from the trading strategies anticipated in the Memorandum, McBeth still could not state a fraud claim on this ground because "[p]redictions about the future cannot give rise to an actionable fraud claim." *Great Lakes*, 788 A.2d at 554.

[11] To the extent similar statements are found in the Spectra Fund's marketing materials (AC, ¶ 46), McBeth cannot demonstrate justifiable reliance in light of the non-reliance clause. (*See* pp. 6-7, 14-17, *supra*).

should be dismissed for the same reasons as the breach of contract claim (*see* pp. 11-12, *supra*) — McBeth has failed to plead damages.

> C.    McBeth's Negligent Misrepresentation Claim is Barred by the LLC Agreement's <u>Exculpatory Clause</u>

Additionally, McBeth cannot state a claim for negligent misrepresentation, in particular, given that negligence-based claims are exculpated under the LLC Agreement.  Section 5.5.1 of the LLC Agreement protects Defendants from being "liable, responsible or accountable in damages or otherwise" to McBeth for any acts reasonably believed to be within the scope of their authority, unless such conduct amounts to "gross negligence, fraud, or willful misconduct." (AC, Ex. 6 at § 5.5.1).[12]  Since McBeth's negligent misrepresentation claim is clearly not based on "gross negligence, fraud, or willful misconduct," the Court should dismiss the claim in light of the exculpatory provision.  *See Metro. Life Ins. Co. v. Tremont Group Holdings, Inc.*, No. C.A. 7092-VCP, 2012 WL 6632681, at *18 (Del. Ch. Dec. 20, 2012).[13]

> D.    McBeth's Breach of Fiduciary Duty and Unjust Enrichment Claims Should Be Dismissed as Duplicative and Superfluous in Light of the Breach of Contract <u>Claim</u>

Under Delaware law, "if the contract claim addresses the alleged wrongdoing … 'any fiduciary duty claim arising out of the same conduct is superfluous.'"  *Grayson v. Imagination Station, Inc.*, No. 5051-CC, 2010 WL 3221951, at *10 (Del. Ch. Aug. 16, 2010). Similarly, Delaware law is clear that "[a] claim for unjust enrichment is not available if there is a contract that governs the relationship between parties that gives rise to the unjust enrichment claim."  *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009).  In this case, the

---

[12]    Delaware's Limited Liability Company Act permits the use of such clauses in LLC Agreements to both eliminate an LLC member's duties and preclude liability for certain conduct that would otherwise be actionable. *See* 6 Del. C. §§ 18-1101(c), (e); *see also Feeley v. NHAOCG, LLC*, 62 A.3d 649, 663-64 (Del. Ch. 2012).

[13]    If this case goes forward, Defendants reserve all rights to argue that they did not act with the requisite "gross negligence, fraud, or willful misconduct" with respect to any of McBeth's other claims.

allegations supporting McBeth's breach of fiduciary duty and unjust enrichment claims generally mirror the allegations underlying the breach of contract claim. (*Compare* AC, ¶¶ 81-84 and ¶¶ 88-90 *with* AC, ¶¶ 73-80). As a result, the Court should dismiss the fiduciary duty claim and unjust enrichment claim as duplicative of the contract claim.[14]

E.  McBeth's Promissory Estoppel Claim Should Be Dismissed Because He Has Not Plead That He "Took Action to His Detriment"

Delaware law is clear that a party alleging promissory estoppel must establish, among other things, that "the promisee reasonably relied on the promise and *took action to his detriment*." *Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000) (emphasis added).[15] Here, even if McBeth has adequately plead the other elements of promissory estoppel, the Court should dismiss McBeth's promissory estoppel claim because McBeth has not plead that he "reasonably relied on the promise and took action to his detriment."

McBeth claims that "Defendants promised McBeth that they would repay McBeth's $5 million investment in the Spectra Fund so as to induce McBeth not to bring any legal actions against them." (AC, ¶ 86). McBeth's promissory estoppel claim, in other words, depends on the fact that McBeth was induced to *not* bring legal claims against Defendants. But McBeth has now brought those claims, so any reliance on the supposed promise could not have been to his detriment. If McBeth's claims are meritorious, then he will be able to recover damages. If McBeth claims are not meritorious, then they will be dismissed no differently than they would have been years ago.

---

[14]    McBeth also has not plead the elements of breach of fiduciary duty and unjust enrichment largely because Defendants have not engaged in any wrongdoing for all of the reasons set forth above.

[15]    Even if New York law were to apply to this claim, the analysis would not change because the elements of promissory estoppel in New York are generally the same. *Compare Lord*, 748 A.2d at 399 *with Sabre Int'l Sec., Ltd. v. Vulcan Capital Mgmt., Inc.*, 95 A.D.3d 434, 439 (1st Dep't 2012) (explaining that, under New York law, the elements of promissory estoppel include an "injury sustained in reliance on the promise").

**II.**

**THE COURT SHOULD DISMISS MCBETH'S FIDUCIARY DUTY AND
UNJUST ENRICHMENT CLAIMS AGAINST ALL DEFENDANTS FOR
FAILURE TO JOIN A NECESSARY, INDISPENSABLE PARTY**

McBeth's breach of fiduciary duty and unjust enrichment claims, both of which

are derivative under Delaware law, must be dismissed for the additional reason that McBeth has

failed to join a necessary, indispensable party[16] — the Spectra Fund.  In fact, McBeth not only

failed to name the Spectra Fund, he strategically chose to drop the Spectra Fund as a defendant in

response to this Court's April 14, 2015 order.  McBeth clearly wants to pursue his claims in this

Court rather than state court, but knows that the Spectra Fund's presence would destroy complete

diversity.  The Court should not allow such blatant forum shopping, and it should dismiss these

claims pursuant to Federal Rules of Civil Procedure 12(b)(7) and 19.

A.      McBeth's Breach of Fiduciary Duty and Unjust Enrichment Claims are Derivative
and Belong to the Spectra Fund

Under Delaware law,[17] whether a claim is "direct" or "derivative" depends on

"(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and

(2) who would receive the benefit of any recovery or other remedy (the corporation or the

stockholders, individually)."  *Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031,

1033 (Del. 2004).  Applying Delaware law, the Court has held that fiduciary duty and unjust

---

[16]      As the Court has made clear, "Rule 19 mandates that parties with an interest in the subject matter of an
action be joined when necessary to avoid 'impair[ing] or imped[ing] the person's ability to protect the[ir] interest,'
and empowers a court to dismiss an action when it is impossible to join a party without which the action cannot
equitably proceed." *Bartfield v. Murphy*, 578 F. Supp. 2d 638, 644 (S.D.N.Y. 2008) (citing Fed. R. Civ. P. 19).
Moreover, "[Rule 19] sets forth a two-step test for determining whether an action must be dismissed for failure to
join a party.  First, a court must determine whether an absent party belongs in the suit, i.e., whether the party
qualifies as a 'necessary' party under Rule 19(a),' and if so, must determine if 'in equity and good conscience, the
action should proceed among the existing parties or should be dismissed." *Id.* (quoting *Viacom Int'l Inc. v. Kearney*,
212 F.3d 721, 724-25 (2d Cir. 2000)); *see also* Fed. R. Civ. P. 19.
[17]      The Court has made clear that the law of the state of incorporation applies to whether claims are direct or
derivative.  *See Bartfield v. Murphy*, 578 F. Supp. 2d 638, 645 (S.D.N.Y. 2008).  The Spectra Fund (like Spectra
Investment and Spectra Financial) is a Delaware LLC so Delaware law applies.

enrichment claims arising out of alleged hedge fund mismanagement are derivative. *See In re Harbinger Capital Partners Funds Investor Litig.*, No. 12 Civ. 1244 (AJN), 2013 WL 5441754, at *9 (S.D.N.Y. Sept. 30, 2013), *opinion vacated in part on other grounds*, 2013 WL 7121186 (S.D.N.Y. Dec. 16, 2013), *reconsideration denied*, 2014 WL 3694991 (S.D.N.Y. July 7, 2014); *San Diego Cnty. Emps. Ret. Ass'n v. Maounis*, 749 F. Supp. 2d 104, 127 (S.D.N.Y. 2010).[18] In this case, McBeth's breach of fiduciary duty claim and unjust enrichment claim are derivative because they both arise out of McBeth's allegations that the Spectra Fund's assets were not managed appropriately. (AC, ¶¶ 83, 88-89).[19]

> **B.** The Fiduciary Duty and Unjust Enrichment Claims Must Be Dismissed Because the Spectra Fund is a Necessary, Indispensable Party Who Cannot Be Named <u>Without Destroying Diversity</u>

As the Court previously has made clear, "courts appear unanimous in concluding that the party on whose behalf a derivative claim is brought is indispensable and one whose absence warrants dismissal." *Bartfield*, 578 F. Supp. 2d at 650; *see also DirecTV Latin Am., LLC v. Park 610, LLC*, No. 08 Civ. 3987(VM)(GWG), 2009 WL 692202, at *10 (S.D.N.Y. Mar. 18, 2009), *adopted by* 614 F. Supp. 2d 446 (S.D.N.Y. 2009); *Strougo v. BEA Assocs.*, No. 98 Civ. 3725 (RWS), 2000 WL 45714, at *3 (S.D.N.Y. Jan. 19, 2000). Since McBeth's fiduciary duty and unjust enrichment claims are derivative, those claims cannot proceed without adding the Spectra Fund as a party.

---

[18]   *See also Metro. Life Ins. Co.*, 2012 WL 6632681, at *8-9; *Albert v. Alex Brown Mgmt. Services*, Nos. Civ. A. 762-N, 763-N, 2005 WL 2130607, at *13 (Del. Ch. Aug. 26, 2005).

[19]   The Court should dismiss the derivative claims for the additional reasons that McBeth failed to make a demand or plead demand futility under Federal Rule of Civil Procedure 23.1 and Delaware law. *See* Fed. R. Civ. P. 23.1; *see also Scalisi v. Fund Asset Mgmt., L.P.*, 380 F.3d 133, 138 (2d Cir.2004) ("The substantive law which determines whether demand is, in fact, futile is provided by the state of incorporation of the entity on whose behalf the plaintiff is seeking relief."); *Kahn v. Portnoy*, C.A. No. 3515-CC, 2008 WL 5197164, at *9 (Del. Ch. 2008) ("In order to maintain a derivative suit on behalf of an LLC, a member must either (1) make a demand on the managers of the company to bring the suit or (2) show that 'an effort to cause those managers or members to bring the action is not likely to succeed.' Thus, if demand is not made on the board of directors or managers of the LLC, the complaint must allege with particularity the reasons why seeking such demand would have been futile.").

But adding the Spectra Fund would destroy complete diversity. As Your Honor recently noted in response to McBeth's original complaint, "[i]t is well established that a limited liability company ('LLC') is deemed to be a citizen of each state of which its members are citizens." (4/14/15 Order, ECF No. 7, at 1 (citing *Handelsman v. Bedford Vill. Assocs. L.P.*, 213 F.3d 48, 51-52 (2d Cir. 2000)). If the Spectra Fund were added as a party, then the Spectra Fund's citizenship would be present on both sides, and diversity would be lacking. *See Bartfield*, 578 F. Supp. 2d at 650. Because the Spectra Fund is an indispensable party with respect to McBeth's derivative claims that cannot be named as a party without destroying diversity, the Court should dismiss McBeth's breach of fiduciary duty and unjust enrichment claims.

### III.

### THE COURT SHOULD DISMISS THE BREACH OF CONTRACT AND BREACH OF FIDUCIARY DUTY CLAIMS AGAINST PORGES FOR FAILURE TO STATE A CLAIM

Finally, in addition to the reasons set forth above, the Court should dismiss the breach of contract and breach of fiduciary duty claims against Porges because (1) Porges is not a party to the LLC Agreement, and (2) as a matter of Delaware law, Porges cannot be held liable for a breach of the duty of care in his capacity as a manager of Spectra Investment to McBeth as the minority member of the Spectra Fund. Regardless of whether this case goes forward against Spectra Investment and Spectra Financial, the Court should dismiss the contract and fiduciary duty claims against Porges, in particular.[20]

*First*, Delaware courts have made clear that "[i]t is a general principle of contract law that only a party to a contract may be sued for breach of that contract." *Wallace ex rel.*

---

[20]    Under Delaware law, individual managers of an LLC can only be liable for misrepresentations committed by the LLC to the extent they are "actual participants" in the misrepresentations. *See St. James Recreation, LLC v. Reiger Opportunity Partners, LLC*, No. Civ. A. 19346, 2003 WL 22659875, at *1-2, 8 (Del. Ch. Nov. 5, 2003). Porges reserves the right to argue going forward that he cannot be liable for many of the alleged misrepresentations that McBeth attributes to him because he was not a participant in those statements.

*Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1180 (Del. Ch. 1999); *see also Summit Investors II, L.P. v. Sechrist Indus., Inc.*, No. Civ. A. 19400, 2002 WL 31260989, at *5 (Del. Ch. Sept. 20, 2002). Also, Delaware courts have explained that the manager of an LLC cannot be held liable for a breach of the LLC's operating agreement because "a claim of breach of contract may not be asserted against someone who is not a party to the Operating Agreement." *Nolu Plastics, Inc. v. Ledingham*, No. 20445-NC, 2005 WL 5654418, at *2 (Del Ch. Dec. 17, 2005); *see also Wallace*, 752 A.2d at 1180. In this case, McBeth's breach of contract claim is based on alleged breaches of the LLC Agreement. (AC, ¶¶ 77-79). But since Porges is not a party to the LLC Agreement, the Court should dismiss the breach of contract claim against Porges personally.

*Second*, Delaware courts also have held that a member of an LLC — which itself is the managing member of a second LLC — cannot be sued by a minority member of the second LLC for a "duty of care" violation, when the allegations center on the defendant's conduct in his capacity as a member of the first LLC. *See Feeley*, 62 A.D.3d at 671-72. Applying that rule to this case, Porges (a member of Spectra Investment) cannot be sued by McBeth (a minority member of the Spectra Fund) for a duty of care violation, to the extent McBeth's claim centers on Porges' conduct as a member of Spectra Investment as opposed to a representative of the Spectra Fund.

The Amended Complaint does exactly that. McBeth's breach of fiduciary duty claim is predicated on gross negligence (AC, ¶ 83), which is synonymous with an allegation that Porges breached the duty of care. *See Feeley*, 62 A.D.3d at 664, 672. McBeth does not claim, however, that Porges was grossly negligent in his capacity as a representative of the *Spectra Fund*. Rather, the only logical reading of McBeth's breach of fiduciary duty count is that Porges

allegedly breached the duty of care through his grossly negligent supervision of *Spectra Investment* (the managing member of the Spectra Fund). (*Id.*, ¶¶ 82-83). As a result, McBeth's breach of fiduciary duty claim against Porges, individually, must be dismissed under the rule articulated in *Feeley*.

## CONCLUSION

For the reasons set forth above, the Court should grant Defendants' motion and (1) dismiss all of McBeth's claims for failure to state a claim upon which relief may be granted, (2) dismiss McBeth's breach of fiduciary duty and unjust enrichment claims for failure to join a necessary, indispensable party, and (3) dismiss McBeth's breach of contract and breach of fiduciary duty claims against Porges individually.

Dated: New York, New York
      May 28, 2015

SCHULTE ROTH & ZABEL LLP

By: s/ Howard Schiffman
    Howard Schiffman
    Robert E. Griffin

919 Third Avenue
New York, New York 10022
(212) 756-2000

Howard.Schiffman@srz.com
Robert.Griffin@srz.com

*Attorneys for Defendants Gregory I. Porges, Spectra Financial Group LLC, and Spectra Investment Group LLC*