UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X
                                                      :
DONALD F. MCBETH,                                     :
                                                      :
                              Plaintiff,              :          15-CV-2742 (JMF)
              -v-                                     :
                                                      :          OPINION AND ORDER
GREGORY I. PORGES, et al.,                            :
                                                      :
                              Defendants.             :
                                                      :
---------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _03/21/2016____

JESSE M. FURMAN, United States District Judge:

Approximately five years ago, Plaintiff Donald F. McBeth invested $5 million in a hedge fund called Spectra Opportunities Fund LLC (the "Spectra Fund" or "Fund").  Within ten months, the Fund had lost all of its assets — including McBeth's entire investment.  Crying foul, McBeth now brings claims against two entities associated with the Spectra Fund — namely, Spectra Financial Group LLC ("Spectra Financial") and Spectra Investment Group LLC ("Spectra Investment") — and the principal and Chief Executive Officer of those entities, Gregory I. Porges.  Specifically, McBeth alleges misrepresentation, contract and quasi-contract claims, breach of fiduciary duty, and promissory estoppel.  Defendants move, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss all of McBeth's claims.  For the reasons discussed below, Defendants' motion is granted in part and denied in part.

## BACKGROUND

In considering a Rule 12(b)(6) motion, a court is limited to the facts alleged in the complaint and is required to accept those facts as true.  *See, e.g.*, *LaFaro v. N.Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).  A court may, however, consider documents attached to the complaint; statements or documents incorporated into the complaint by reference;

matters of which judicial notice may be taken, such as public records; and documents that the plaintiff either possessed or knew about, and relied upon, in bringing the suit. *See, e.g.*, *Kleinman v. Elan Corp.*, 706 F.3d 145, 152 (2d Cir. 2013); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (applying that rule to district courts). Accordingly, the following facts are taken from the Second Amended Complaint ("Complaint" or "SAC"), exhibits incorporated by reference therein, and documents of which the Court may take judicial notice.

The relevant facts are relatively straightforward. McBeth is a retired business executive now living in Florida. (SAC (Docket No. 18) ¶¶ 1, 10). Spectra Investment and Spectra Financial are the managing member and investment manager of the Spectra Fund, respectively, and Porges is the principal and Chief Executive Officer of both entities. (*Id.* ¶¶ 11-13). The Complaint alleges that Porges completely dominated Spectra Financial, Spectra Investment, and the Spectra Fund and, accordingly, that each entity is his alter ego. (*Id.* ¶¶ 11, 14, 76-78). McBeth first heard of the Spectra Fund through a distant relative and "a person he trusted," Deborah Rose, who served as Spectra Financial's Chief Operating Officer and a member of Spectra Investment. (*Id.* ¶¶ 1, 12). Rose broached the subject of McBeth's investing in the Fund at a family dinner in December 2008, and thereafter sent him marketing and informational materials about the Fund. (*Id.* ¶ 22). About a year and a half later, Rose gave McBeth another set of marketing and informational materials. (*Id.* ¶ 29). In those materials, and subsequent discussions with McBeth and his son — who works in finance — Defendants represented that the Fund was "conservative" and employed a "risk-conscious approach" and that Porges had a history of successful investment. (*Id.* ¶¶ 1, 31, 33). Relying on those representations, McBeth invested $5 million in the Fund — specifically, $2 million on November 1, 2010, and another $3 million on December 1, 2010. (*Id.* ¶ 2).

When he invested in the Fund, McBeth entered into an agreement governed by three different documents (the "Offering Papers").  (*Id.* ¶ 40).  First, he entered into the Limited Liability Company Agreement of the Spectra Opportunities Fund LLC (the "LLC Agreement").  (*Id.* ¶ 40; *see id.*, Ex. 6 (LLC Agreement)).  Second, pursuant to the LLC Agreement, Defendants agreed to manage the Fund in accordance with the Confidential Private Offering Memorandum (the "Memorandum").  (*Id.* ¶ 40; *see id.*, Ex. 7 (Memorandum)).  Third, McBeth executed subscription papers that incorporated the Memorandum and LLC Agreement by reference and contained an investor suitability questionnaire (the "Subscription Documents").  (*Id.* ¶ 40; *see* Decl. Robert E. Griffin Supp. Defs.' Mot. To Dismiss Sec. Am. Compl. (Docket No. 21), Ex. 1 (Subscription Documents)).  In the Subscription Documents, McBeth affirmed that he was "experienced in investments of this kind," "own[ed] and invest[ed] on a discretionary basis at least $25,000,000 in investments," was "capable of evaluating the merits and risks of this investment," and was responsible for "mak[ing his] own investment decisions."  (Subscription Documents ¶ 11; *id.* at 19, 22).  In addition, the Offering Papers required Defendants to provide investors with monthly statements and annual audited financial statements.  (SAC ¶ 47).

By September 2011, within ten months of McBeth's investment, the Spectra Fund had lost all of its assets.[1]  Plaintiff does not purport to know precisely why the Fund went bust, but alleges that the drastic losses could have resulted only from behavior — such as risky, reckless trading or misappropriation — that violated the Fund's investment strategy (as described in both

---

[1]     Defendants assert that "Porges and the other managers lost $12.5 million" of their own money when the Spectra Fund collapsed.  (Mem. Supp. Defs.' Mot. To Dismiss (Docket No. 20) ("Defs.' Mem.") 1).  That assertion does not find any support in either the SAC or the other materials the Court may consider on a motion to dismiss.  The SAC does allege, however, that "the only investor in the Spectra Fund other than McBeth was Porges" (SAC ¶ 76), so it does stand to reason that Porges lost money too.

the Offering Papers and in the marketing materials).  (*Id.* ¶¶ 48, 50-51).  In addition, Plaintiff

alleges that Defendants never provided him with annual audited financial statements and delayed

sending him the monthly statements for August and September 2011, misrepresenting that the

delay related to the Fund's involvement in the bankruptcy of MF Global Holdings Ltd.  (*Id.*

¶¶ 49, 53-57).  Rose broke the news to McBeth that his investment was gone in a meeting on

January 20, 2012.  (*Id.* ¶ 58).  She also disclosed that Porges had previously "lost a significant

portion of the investment capital provided to him by outside investors."  (*Id.* ¶ 59).  Plaintiff

alleges he would not have invested his money in the Fund had he known that at the outset.  (*Id.*).

At the same January 20, 2012 meeting, Rose promised, "on behalf of Defendants, that

they would fully repay his $5 million investment."  (*Id.* ¶ 60).  Relying on that promise, McBeth

did not "assert any legal claims against Defendants."  (*Id.* ¶ 61).  McBeth had further discussions

with Rose and Porges about repayment, and McBeth ultimately received $200,000.  (*Id.* ¶¶ 62,

70-73).  In the subsequent discussions, Rose and Porges also provided some potential insights

into how the Fund lost its money.  Porges stated that he "normally holds only 20 to 40 positions,

and if he believes in the attractiveness of a particular stock he will make it as much as 20% of the

portfolio."  (*Id.* ¶ 64).  Porges would also use options.  (*Id.* ¶ 65).  Finally, Rose revealed that the

Securities and Exchange Commission ("SEC") was investigating "unusual activity in accounts

controlled by Spectra, including trades where Spectra was taking contrary positions . . . buying a

security in one account, and selling the same security in another account."  (*Id.* ¶ 67).  Plaintiff

alleges that these revelations could explain how the Fund collapsed, but "that is only a

possibility" and that Defendants "may have simply misappropriated" his money.  (*Id.* ¶ 66).

4

## LEGAL STANDARDS

In evaluating a motion to dismiss, a court must accept all facts set forth in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See, e.g.*, *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). A claim will survive a Rule 12(b)(6) motion, however, only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). A plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," *id.*, and cannot rely on mere "labels and conclusions" to support a claim, *Twombly*, 550 U.S. at 555. If the plaintiff's pleadings "have not nudged [his or her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Id.* at 570. Finally, to the extent that a plaintiff alleges fraud, Rule 9(b) requires the plaintiff to plead his claims "with particularity," specifying "the circumstances constituting fraud." Fed. R. Civ. P. 9(b). In particular, "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (internal quotation marks omitted). Failure to satisfy the Rule 9(b) standard, if applicable, is grounds for dismissal. *See, e.g.*, *id.* at 293; *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010).

## DISCUSSION

Plaintiff brings claims for fraudulent misrepresentation (Count One), negligent misrepresentation (Count Two), breach of contract (Count Three), breach of fiduciary duty

(Count Four), promissory estoppel (Count Five), and unjust enrichment (Count Six). (SAC ¶¶ 79-106). Further, he alleges that Porges should be held liable as the alter ego of the Spectra entities. (*Id.* ¶¶ 76-78). The Court will address each claim, largely but not entirely in order.

## A. Choice of Law

Before turning to the merits of Plaintiff's claims, the Court must address what law applies to each of the claims. The LLC Agreement and the Subscription Documents both contain choice-of-law provisions opting for Delaware law. (LLC Agreement ¶ 16.2; Subscription Documents ¶ 23(e)). Specifically, the LLC Agreement provides that Delaware law "shall govern the validity of this Agreement, the construction of its terms and interpretation of the rights and duties of the Members," (LLC Agreement ¶ 16.2), and the Subscription Documents state that they "shall be deemed to have been made under, and shall be governed by, and construed in accordance with, the internal laws of the State of Delaware (excluding the law thereof which requires the application of or reference to the law of any other jurisdiction)," (Subscription Documents ¶ 23(e)). Not surprisingly, in light of those provisions, the parties agree that Delaware law governs McBeth's contract claims. (*See* Defs.' Mem. 8 n.5; Mem. Law Opp'n Defs.' Mot. To Dismiss Pl.'s Sec. Am. Compl. (Docket No. 25) ("Pl.'s Opp'n") 18-19). The parties agree that Delaware law also applies to Plaintiff's breach-of-fiduciary-duty claim. (*See* Defs.' Mem. 8 n.5; Pl.'s Opp'n 20-23). And there does not appear to be a material difference between Delaware law and New York law (the only other law that could apply (*see* Pl.'s Opp'n 9-10)) with respect to Plaintiff's claims for unjust enrichment and promissory estoppel. *Compare, e.g.*, *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009) (unjust enrichment), *and Lord v. Souder*, 748 A.2d 393, 399 (Del. 2000) (promissory estoppel), *with Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J.*, 448 F.3d 573, 586-87 (2d Cir.

2006) (unjust enrichment), *and Roberts v. Karimi*, 204 F. Supp. 2d 523, 527 (E.D.N.Y. 2002) (promissory estoppel).

The parties disagree, however, with respect to whether the choice-of-law provisions in the LLC Agreement and the Subscription Documents apply to Plaintiff's claims for fraudulent and negligent misrepresentation.[2]  The scope of the choice-of-law provisions is a question governed by New York law, which provides that "tort claims are outside the scope of contractual choice-of-law provisions that specify what law governs the construction of the terms of the contract." *Fin. One Public Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 335 (2d Cir. 2005).  That is, "in order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be sufficiently broad as to encompass the entire relationship between the contracting parties." *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996) (internal quotation marks omitted).  Applying those principles here, the Court concludes that the choice-of-law provisions in the LLC Agreement and the Subscription Documents do not cover Plaintiff's claims for fraudulent and negligent misrepresentation, as the provisions do not "encompass the entire relationship between the contracting parties" and are comparable to provisions that courts have held not to encompass such tort claims.  *See, e.g.*, *Frontline Processing Corp. v. Merrick Bank Corp.*, No. 13-CV-3956 (RPP), 2014 WL 837050, at *8 n.4 (S.D.N.Y. Mar. 3, 2014) (holding that a choice-of-law clause, which provided that "this Agreement and all rights and obligations hereunder, including but not limited to matters of construction, validity and performance, are governed by and construed in accordance with the laws of the State of New York," did not cover tort claims); *Twinlab Corp. v. Paulson,* 724

---

[2]     It is not clear that the choice of law matters for those claims either, as the elements under Delaware and New York law are similar.  (*Compare, e.g.*, Defs.' Mem. 13-18 *with* Pl.'s Opp'n 11-16).  In any event, the Court addresses the question because the parties have addressed it.

N.Y.S.2d 496, 496 (2d Dep't 2001) (holding that a choice-of-law provision, which stated that the "validity, interpretation, construction and performance" of the agreement would be governed by and construed in accordance with New York law and also designated New York as the forum for any actions "relating directly or indirectly" to the agreement, did not cover a civil RICO claim). Accordingly, the Court will apply New York law to those claims.[3]

## B.  Fraudulent and Negligent Misrepresentation

Plaintiff's first claims — for fraudulent and negligent misrepresentation — relate primarily to Defendants' statements *before* the parties entered into their contract.  To state a cause of action for fraudulent misrepresentation under New York law, a plaintiff must allege "a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury." *Lerner*, 459 F.3d at 291 (internal quotation marks omitted).  To state a claim for negligent misrepresentation, on the other hand, a plaintiff must allege "'(1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information.'" *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 490 (2d Cir. 2014) (quoting *J.A.O. Acquisition Corp. v. Stavitsky*, 8 N.Y. 3d 144, 148 (2007)).  Thus, for each claim,

---

[3]      The cases cited by Defendants for the contrary position are neither binding nor persuasive.  (*See* Defs.' Mem. 14 n.10; Reply Mem. Further Supp. Defs.' Mot. To Dismiss (Docket No. 29) ("Defs.' Reply") 2-3).  In *Deloitte (Cayman) Corporate Recovery Servs., Ltd. v. Sandalwood Debt Fund A, LP*, 929 N.Y.S.2d 199 (Sup. Ct. 2011), the Court did not apply New York law to the scope of the clause at issue.  *See id.* at *3 ("[T]he scope of the choice-of-law provision in this case is . . . governed by Delaware law.").  Similarly, *Capital Z Fin. Servs. Fund II, L.P. v. Health Net, Inc.*, 840 N.Y.S.2d 16 (1st Dep't 2007), relied on *Turtur v. Rothschild Registry Intl., Inc.*, 26 F.3d 30 (2d Cir. 1994), *see* 840 N.Y.S.2d at 23 — a case that applied Texas law to the scope question, *see Finance One*, 414 F.3d at 334 (finding that, for purposes of New York law, "*Turtur* is irrelevant") — and also held that, *whichever* law applied to the tort claims, the claims should be dismissed, *see* 840 N.Y.S.2d at 24.

a plaintiff must plead and prove reasonable reliance.  "[W]hether a plaintiff has adequately

pleaded justifiable reliance can be a proper subject for a motion to dismiss."  *Granite Partners,*

*L.P. v. Bear, Stearns & Co. Inc.*, 58 F. Supp. 2d 228, 259 (S.D.N.Y. 1999).

      Here, Defendants argue that McBeth's reliance on any statements they made prior to

execution of the Offering Papers was unreasonable as a matter of law because the Offering

Papers contained a "non-reliance" clause.  (Defs.' Mem. 14-16; *see* Subscription Documents

¶ 4).  "In assessing the reasonableness of a plaintiff's alleged reliance, courts in this Circuit

consider the entire context of the transaction, including factors such as its complexity and

magnitude, the sophistication of the parties, and the content of any agreements between them."

*San Diego Cty. Emps. Ret. Ass'n v. Maounis*, 749 F. Supp. 2d 104, 120 (S.D.N.Y. 2010) (citing

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003)).  If

a sophisticated party specifically disclaims reliance on prior representations when entering a

contract, "that party cannot, in a subsequent action for common law fraud, claim it was

fraudulently induced to enter into the contract by the very representation[s] it has disclaimed

reliance upon."  *Harsco Corp. v. Segui*, 91 F.3d 337, 345 (2d Cir. 1996); *accord Lazard Freres*

*& Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1542 (2d Cir. 1997).  Applying that principle,

New York courts have routinely enforced merger and non-reliance clauses against sophisticated

plaintiffs to deny extra-contractual claims that require a showing of reasonable reliance.  *See*

*Kelter v. Apex Equity Options Fund, LP*, No. 08-CV-2911 (NRB), 2009 WL 2599607, at *8

(S.D.N.Y. Aug. 24, 2009) (noting "the general rule that when a sophisticated investor signs an

integrated agreement, he cannot reasonably rely on misrepresentations not contained within that

agreement"); *Carlin Equities Corp. v. Offman*, No. 07-CV-359 (SHS), 2008 WL 4387328, at *7

(S.D.N.Y. Sept. 24, 2008) (same); *see also, e.g., Natoli v. NYC P'ship Hous. Dev. Fund Co.*, 960

N.Y.S.2d 137, 139 (2d Dep't 2013) (holding that the trial court should have dismissed the plaintiff's fraud claims where the agreement contained a disclaimer "by which the plaintiff disavowed reliance upon any representations extrinsic to that agreement").

In light of that authority, McBeth's fraudulent and negligent misrepresentation claims based on Defendants' pre-contract communications plainly fail as a matter of law.  First, McBeth was a former business executive and, by his own admission, a sophisticated investor.  (*See* SAC ¶ 1; Subscription Documents ¶ 11).[4]  As Defendants point out, McBeth specifically affirmed that he

- met "the suitability requirements set forth in the Memorandum," including that he was a sophisticated investor who satisfied the relevant regulatory requirements for the type of investment involved,[5] who could "afford a total loss of principal," and who had read and understood the risks;

- was "either alone or with [his] financial adviser(s) . . . experienced in investments of this kind" and was "capable of evaluating the merits and risks of this investment";

- was a qualified purchaser because he "own[ed] at least $5,000,000 in investments" and "own[ed] and invest[ed] on a discretionary basis at least $25,000,000 in investments";

- was responsible for "mak[ing his] own investment decisions"; and

- had "prior experience in investing in private placements of restricted securities."

---

[4]   In addition, when discussing the potential investment with Porges and Rose, McBeth was accompanied by his son, "who works in finance."  (SAC ¶ 32).

[5]   *See* Regulation D, 17 C.F.R. §§ 230.501(a)(5)-(6), 230.506 (permitting private offerings to "accredited investors"); Investment Company Act, 15 U.S.C. § 80a-3(c)(7) (permitting registration exemptions for securities sold to "qualified purchasers"); *see also Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 128 n.5 (D. Conn. 2004) ("Because of the level of sophistication required to invest in a hedge fund and other requirements, such funds are not subject to extensive regulation and are permitted to pursue a wide range of investment strategies.").

(Subscription Documents ¶ 11; *id.* at 19, 22; Memorandum 4-5).  Additionally, the Memorandum emphasized that Defendants' offering was "designed for sophisticated investors" and that an investment in the Spectra Fund "should not be made by any person that . . . has not (either alone or in conjunction with a financial advisor) carefully read or does not understand, this Memorandum, including . . . the portions concerning the risks."  (Memorandum 4-5; *see also id.* at ii ("INVESTMENT IN THE COMPANY IS INTENDED ONLY FOR SOPHISTICATED PERSONS THAT ARE ABLE TO BEAR A SUBSTANTIAL LOSS OF THEIR CAPITAL CONTRIBUTIONS OF THEIR CAPITAL CONTRIBUTIONS.").  Thus, McBeth plainly qualifies as a sophisticated investor as a matter of law.  *See, e.g.*, *Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 820 F. Supp. 2d 541, 546 (S.D.N.Y. 2011) ("The facts alleged in the Akershus Complaint are sufficient to establish that, as a matter of law, Akershus and Langen were sophisticated investors."); *Kelter*, 2009 WL 2599607, at *8 (concluding, on a Rule 12(b)(6) motion, that "[n]one of the facts" in a securities fraud case brought by an individual plaintiff who invested in a hedge fund "counsel against following the general rule" regarding sophisticated investors); *Belin v. Weissler*, No. 97-CV-8787 (RWS), 1998 WL 391114, at *6 (S.D.N.Y. July 14, 1998) (concluding, on a Rule 12(b)(6) motion, that the plaintiff, "by his own admission, is a sophisticated investor who represented that he had 'sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks associated with investing in the [Limited] Partnership.'" (quoting and relying on the investment documents' suitability questionnaire)).

Second, the Offering Papers contain not only standard merger clauses (*see* Subscription Documents ¶ 23(a) ("These Subscription Documents and the LLC Agreement represent the entire agreement of the parties.")), but also explicit and unambiguous non-reliance provisions.

(*See* Subscription Documents ¶ 4; Memorandum at ii).  For example, the Subscription

Documents provide as follows:

> Subscriber acknowledges that in deciding to invest in the Company, Subscriber
> has relied solely upon the information in, and referred to in, the Memorandum and
> nothing else.  Subscriber acknowledges that no person is authorized to give any
> information or to make any statement not contained in the Memorandum, and that
> any information or statement not contained in, or referred to in, the Memorandum
> must not be relied upon as having been authorized by the Company.

(Subscription Documents ¶ 4).  And the Memorandum similarly states:

> NO PERSON HAS BEEN AUTHORIZED TO MAKE ANY
> REPRESENTATIONS OR PROVIDE ANY INFORMATION WITH RESPECT
> TO THE [INVESTMENT] EXCEPT SUCH INFORMATION AS IS
> CONTAINED IN THIS MEMORANDUM.  ANY INFORMATION
> REQUESTED BY A PROSPECTIVE INVESTOR AND PROVIDED BY THE
> COMPANY IS QUALIFIED IN ITS ENTIRETY BY THE INFORMATION
> CONTAINED HEREIN.

(Memorandum at ii).[6]  These clauses are "sufficiently specific" to apply to Plaintiff's

misrepresentation claims.  *See, e.g.*, *Oseff v. Scotti*, 15 N.Y.S.3d 350, 353 (2d Dep't 2015)

(holding that an agreement providing that the defendants made no representations regarding

"'any matter or thing affecting or relating to this agreement, except as specifically set forth in

this agreement'" and indicating "that it contain[ed] all of the terms agreed upon between the

---

[6]      Notably, even the *pre*-investment marketing materials upon which McBeth alleges
reliance directed him to rely solely upon the Offering Papers.  (*See* SAC, Ex. 2, at 24 ("This
presentation is not intended to be complete, and material aspects of the descriptions contained
herein may change at any time.  If you express an interest in investing in a Fund, you will be
provided with the Confidential Memorandum as well as the governing documents for such (the
'Fund Documents').  You must review the Fund Documents, including the risk factors disclosed
in the Fund Documents, prior to making a decision to invest.  *You should rely only on the
information in the Fund Documents in making your decision to invest.*" (emphasis added)); *id.*,
Ex. 4, at 27 ("An investment in the Funds is not suitable for all investors.  You must review the
Fund Documents, including the risk factors disclosed in the Memorandum, prior to making a
decision to invest, and you should thoroughly review the Memorandum with your professional
advisers . . . .  *You should rely only on the information contained in the Fund Documents in
making your decision to invest. You should not rely in any way on this presentation information.*"
(emphasis added)).

parties and that it was entered into after full investigation" was "sufficiently specific to bar the [plaintiffs] from claiming that they were fraudulently induced into entering the contract"); *accord Matana v. Merkin*, 989 F. Supp. 2d 313, 319-20 (S.D.N.Y. 2013); *Carlin Equities Corp. v. Offman*, No. 07-CV-359 (SHS), 2008 WL 4387328, at *5 (S.D.N.Y. Sept. 24, 2008). In fact, they are even more specific than clauses that the Second Circuit has construed to bar extra-contractual claims that require a showing of reasonable reliance. *See, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007) (holding that extra-contractual misrepresentation claims were barred by a standard merger clause providing "that the only promises, restrictions, and warranties to the transaction were those set forth in the transaction documents"). Given that, and Plaintiff's sophistication, it follows that his alleged reliance on Defendants' statements and omissions before execution of the Offering Papers was unreasonable as a matter of law and that Plaintiff's misrepresentation claims therefore fail. *See, e.g.*, *San Diego Cty. Emps. Ret. Ass'n*, 749 F. Supp. 2d at 120-21 ("Given the sophistication of [the plaintiff] and its investment advisor, and the clear, unambiguous language of the non-reliance provisions at issue, the Court finds Plaintiff's purported reliance on statements made before the execution of the Subscription Agreement to be unreasonable as a matter of law.").

In arguing otherwise, Plaintiff contends that certain alleged misrepresentations and omissions were peculiarly within Defendants' knowledge, but that argument is unpersuasive. (Pl.'s Opp'n 13 (citing *Basis Yield Alpha Fund (Master) v. Goldman Sachs Grp., Inc.*, 980 N.Y.S.2d 21, 28 (1st Dep't 2014), for the rule that non-reliance clauses do not bar fraud claims based on "facts peculiarly within [the other party's] knowledge")). Plaintiff asserts that such misrepresentations or omissions included: (1) the fact that Porges had previously lost investment capital provided to him by outside investors; (2) the fact that the Fund would be grossly

undercapitalized; and (3) "most importantly," that Defendants did not intend to manage the Fund as represented to McBeth.  (*Id.*).  Facts are peculiarly within a party's knowledge, however, only if they "could not have been discovered with the exercise of due diligence." *Coraud LLC v. Kidville Franchise Co., LLC*, 109 F. Supp. 3d 615, 620 (S.D.N.Y. 2015).  With respect to the first two categories, McBeth fails to allege that due diligence could not have revealed Porges' investment history or Spectra's capital (and if he had, such a claim might have been implausible in any event).  Additionally, the Memorandum does not make representations about *Porges's* past performance; it states only that the *Spectra Fund* had not previously raised capital from outside investors *with respect to funds managed by Spectra Financial*.  (Memorandum 1).  The third alleged omission, relating to Defendants' secret intent not to follow the stated investment strategy, is not the type of "fact" to which the peculiar-knowledge exception applies.  *Cf. LBBW Luxemburg S.A. v. Wells Fargo Sec. LLC*, 10 F. Supp. 3d 504, 518 (S.D.N.Y. 2014) ("[T]he peculiar knowledge exceptions applies here because the defendant 'had access to nonpublic information regarding the deteriorating credit quality of subprime mortgages.'" (quoting *Basis Yield Alpha Fund*, 980 N.Y.S.2d at 30)).  Were it otherwise, non-reliance clauses would be almost worthless, as a plaintiff could always allege that the defendant concealed an intent not to comply with the terms of their later contract.[7]

---

[7]     Plaintiff also argues (albeit only in a footnote) that Porges cannot avail himself of the non-reliance clauses because he did not sign the contracts in a personal capacity.  (Pl.'s Opp'n 11 n.4 (citing *In re Worldcom, Inc.*, 374 B.R. 94, 109 (Bankr. S.D.N.Y. 2007), and *Triano v. Tuccio*, 643 N.Y.S.2d 157, 157 (2d Dep't 1996)).  That may be true, but the only allegation McBeth makes with respect to Porges himself is that he "focused on the fact that he had been able to achieve outstanding returns over the course of a long investment career, covering both market upturns and downturns."  (SAC ¶ 32).  That allegation is insufficiently specific to support a fraudulent misrepresentation claim, which is subject to the heightened pleading requirements of Rule 9(b).  And Plaintiff's negligent misrepresentation claim fails as he does not allege a special relationship of trust and confidence between himself and Porges.  *See Prime Mover Capital Partners, L.P. v. Elixir Gaming Tech., Inc.*, 793 F. Supp. 2d 651, 674 (S.D.N.Y. 2011)

## C.  Breach of Contract

The Court turns next to McBeth's contract claims.  McBeth essentially alleges that Defendants breached the LLC Agreement in three ways: by not following the promised investment strategy, by engaging in grossly negligent trading or misappropriation, and by failing to provide the financial statements required under the agreement.  (SAC ¶¶ 90-94).  For a breach-of-contract claim to survive a motion to dismiss under Delaware law, "the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff."  *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).  "Under standard rules of contract interpretation, a court must determine the intent of the parties from the language of the contract."  *Twin City Fire Ins. Co. v. Delaware Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003). When deciding a motion to dismiss, courts must not "choose between reasonable interpretations of ambiguous contract provisions."  *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, No. 3658-VCS, 2009 WL 1124451, at *8 (Del. Ch. Apr. 20, 2009).  Courts should find ambiguity, however, "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."  *Rhone-Poulenc Basic Chemicals Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992). Moreover, "[c]ourts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty."  *Id.*

Applying those principles here, Plaintiff's contract claim fails to the extent it is premised on the theory that Defendants failed to follow a promised investment strategy.  The

---

("'[U]nder New York law, a plaintiff may recover for negligent misrepresentation only where the defendant owes her a fiduciary duty.'" (quoting *Stewart v. Jackson & Nash*, 976 F.2d 86, 90 (2d Cir. 1992)).

Memorandum provided that Spectra would "allocate[] and reallacote[] the Fund's assets as it deems appropriate in its sole discretion."  (Memorandum 15-16).  The Memorandum did represent that Spectra Fund "generally intend[ed] to allocate assets across" four strategies, but it also explicitly stated that the "descriptions of the Fund's investment strategies should not be understood as in any way limiting the potential scope of the Fund's investment strategies, as the Fund may engage in additional investment strategies not described herein that the Investment Manager believes to be in the best interests of the Fund without providing notice to" investors. (*Id.* at 19).  What is more, the Memorandum explicitly authorized, and provided notice to McBeth regarding, the specific strategies about which he now complains.  For example, McBeth alleges that Defendants violated the Memorandum by "making highly concentrated bets on a single security using maximum leverage" and using options.  (SAC ¶ 92; *see id.* ¶ 65).  But the Offering Papers expressly provided that Spectra was "not obligated to, and may elect not to, hedge against risks" (Memorandum 23), could incur "significant" leverage that would "amplify net profits and losses" (*id.* at 22), and could invest in "listed and over-the-counter options and other derivative instruments" (*id.* at 15; *see also id.* at 30 (discussing the risks of options)).

More broadly, the Offering Papers repeatedly warned McBeth that his investment was risky, speculative, volatile, and could result in a complete loss of his capital investment.  The very first paragraph of the Memorandum, for example, proclaimed that the investment McBeth made was "SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK.  INVESTMENT IN THE COMPANY IS INTENDED ONLY FOR SOPHISTICATED PERSONS THAT ARE ABLE TO BEAR A SUBSTANTIAL LOSS OF THEIR CAPITAL CONTRIBUTIONS IN THE COMPANY. . . . [OR] A COMPLETE LOSS OF ITS INVESTMENT IN THE COMPANY." (Memorandum at ii).  And the "Investment Strategy" section of the Memorandum closed with a

capitalized warning that "THERE CAN BE NO ASSURANCE THAT THE FUND'S

INVESTMENT OBJECTIVE WILL BE ACHIEVED . . . .   THE RISKS OF THE FUND'S

INVESTMENT STRATEGIES ARE SUBSTANTIAL AND THE FUND COULD REALIZE

SUBSTANTIAL LOSSES . . . FROM SOME OR ALL OF THE ACTIVITIES DESCRIBED

ABOVE."  (Memorandum 19).  Thus, McBeth was on notice that Defendants' investment

strategy would not necessarily be, as he now contends, conservative and risk averse.  That is, the

Offering Papers "not only besp[oke] caution, they shout[ed] it from the rooftops."  *Halperin v.*

*eBanker USA.com, Inc.*, 295 F.3d 352, 360 (2d Cir. 2002).[8]

    With one exception, Plaintiff's other breach-of-contract claims fare better.  First, the

Offering Papers did not permit Defendants to engage in grossly negligent trading or

misappropriation of assets.  (*See* Memorandum 40 ("The Managing Member will not be liable to

the Members or to the Company for mistakes of judgment or for losses due to such mistakes,

unless caused by gross negligence, fraud, or willful misconduct.")).  Thus, to the extent that

McBeth alleges gross negligence (for example, by taking contrary positions in the same

security), he states a valid claim.  On the other hand, because Plaintiff's claim of possible

misappropriation sounds in fraud (SAC ¶¶ 62, 92), it is subject to the heightened pleading

requirements of Rule 9(b), *see Rombach v. Chang*, 355 F.3d 164, 167 (2d Cir. 2004), and

Plaintiff's conclusory and vague allegations of looting do not meet those requirements, *see, e.g.,*

---

[8]    Notably, Plaintiff himself concedes that, under the terms of the Offering Papers,
"Defendants could, in response to market conditions, alter the Fund's course."  (Pl.'s Opp'n 18).
Plaintiff tries to cabin that discretion by asserting that Defendants could alter the Fund's course
only "for a period," but the Offering Papers themselves contain no such limitation.  Moreover,
even if Plaintiff were correct, and Defendants had discretion to "alter the Fund's course" only
"for a period," the "period" during which the Fund could pursue alternative, risky, speculative
investments could, in complete harmony with the agreements, have lasted for ten months — that
is, the length of time during which McBeth's capital was invested in the Fund.

*In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 587, 599 n.60 (S.D.N.Y. 2005) (holding that a "vague allegation of looting . . . runs afoul of Rule 9(b)."). Finally, Plaintiff states a valid claim that Defendants breached their agreement by failing to comply with their reporting obligations — namely, by failing to send an annual report with an audited financial statement and delaying in sending certain monthly unaudited statements. (*See* Memorandum 9). Notably, Defendants do not seriously contest that, taking Plaintiff's allegations as true, they committed a breach; instead, they contend that the breach caused McBeth no damages. (Defs.' Mem. 17-18). But it is not implausible to infer that, had Defendants complied with their reporting obligations, Plaintiff could have, and would have, taken steps to mitigate, if not prevent, the loss of his investment. Accordingly, Plaintiff's breach-of-contract claim survives, but only to the extent that it is premised on the theory that Defendants engaged in gross negligence and the theory that Defendants failed to comply with their reporting obligations.[9]

## D. Unjust Enrichment

Plaintiff also brings a claim of unjust enrichment. Unjust enrichment is a quasi-contract claim that may be pursued only in the absence of a contract or, in the alternative, where there is a

---

[9]   Plaintiff's misrepresentation claims based on the Offering Papers themselves must be dismissed, as they amount to little more than repackaged contract claims. That is, to the extent that the Offering Papers allowed Defendants to act as they did, Plaintiff's misrepresentation claims fail for the reasons stated above. And to the extent that the Offering Papers did not allow Defendants to act as they did, any misrepresentation claim is duplicative of the contract claim. *See, e.g.*, *First Bank of Americas v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 291-92, 690 N.Y.S.2d 17, 20-21 (1st Dep't 1999) ("A fraud claim should be dismissed as redundant when it merely restates a breach-of-contract claim, i.e., when the only fraud alleged is that the defendant was not sincere when it promised to perform under the contract."). Finally, to the extent that the Second Amended Complaint purports to allege "misstatements and omissions of present facts" as opposed to "contractual promises," *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 183-84 (2d Cir. 2007), it fails to pass the plausibility threshold. McBeth claims that the Memorandum misrepresented that his investment was *Porges*'s first raising of capital, but, as noted, the Memorandum states that it was the first raising of capital for the "Investment Manager," namely Spectra Financial, not Porges personally. (*See* Memorandum 1, 11).

doubt about the existence or enforceability of a contract.  *See, e.g.*, *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J.*, 448 F.3d 573, 586-87 (2d Cir. 2006); *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 891 (Del. Ch. 2009); *see also, e.g.*, *Albert v. Alexander Brown Mgmt. Servs., Inc.*, No. 762-N, 2005 WL 2130607, at *8 (Del. Ch. Aug. 26, 2005) (noting that while a plaintiff may pursue contract and quasi-contract claims in the alternative, "[t]his is generally so . . . only when there is doubt surrounding the enforceability or the existence of the contract").  Here, the parties' dispute is governed by an express contract and thus unjust enrichment does not lie.  *See, e.g.*, *Pappas v. Tzolis*, 20 N.Y.3d 228, 234 (2012) ("Because the sale of interests in the LLC was controlled by contracts . . . the unjust enrichment claim fails as a matter of law.").

Contrary to Plaintiff's contentions (Pl.'s Opp'n 25), the fact that Porges himself was not a party to the parties' contract and that Plaintiff may therefore not have a contract claim against him individually does not affect the analysis or the result.  First, as discussed below, Plaintiff brings alter ego claims against Porges.  (SAC ¶¶ 76-78).  To allow him to bring unjust enrichment claims against Porges notwithstanding the contract between him and the Spectra entities would effectively permit an end-run around the requirements of the common law alter ego doctrine.  *Cf. N. Am. Steel Connection, Inc. v. Watson Metal Products Corp.*, 515 F. App'x 176, 181 n.11 (3d Cir. 2013) ("As the District Court accurately explained, 'NASCO cannot use the joint venture theory as an end-run around the burdens imposed on a party seeking to disregard the corporate form.'"); *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs.*, Inc., 295 F. Supp. 2d 366, 393 (S.D.N.Y. 2003) (rejecting plaintiff's attempt to restrain the property of third-party individuals "until their alleged alter ego status has been adjudicated"); *Kuroda*, 971 A.2d at 891-92 (holding that since "unjust enrichment cannot be

used to circumvent basic contract principles recognizing that a person not a party to a contract cannot be held liable to it," the plaintiff "cannot use a claim for unjust enrichment to extend the obligations of a contract" with an LLC to the LLC's individual members "who are not parties to the contract").  Second, whether brought against Porges or the Spectra entities, Plaintiff's unjust enrichment claim and his breach-of-contract claim are premised on the same conduct — namely, Defendants' alleged failure to adhere to the investment strategies specified in the Offering Papers.  *Cf. Sergeants Benev. Ass'n Annuity Fund v. Renck*, 796 N.Y.S.2d 77, 81 (1st Dep't 2005) (concluding that dismissal of an unjust enrichment claim was inappropriate because the claim was predicated on *conduct* outside of the contract).  Thus, "[t]o the extent that [Plaintiff's other] claims succeed, the unjust enrichment claim is duplicative; if [his] other claims are defective, an unjust enrichment claim cannot remedy the defects."  *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 791 (2012).  Accordingly, McBeth's unjust enrichment claim must be and is dismissed.

**E.  Breach of Fiduciary Duty**

Defendants argue that Plaintiff's breach-of-fiduciary-duty claim should also be dismissed as duplicative because the "contract claims address the alleged wrongdoing."  (Defs.' Mem. 18-19 (quoting *Grayson v. Imagination Station*, No. 5051-CC, 2010 WL 3221951, at *7 (Del. Ch. Aug. 16, 2010))).  Although the same facts underlie both claims, "the appropriate question" under Delaware law is not whether the claims arise from the same facts, but rather "whether there exists an independent basis for the fiduciary duty claims apart from the contractual claims."  *PT China LLC v. PT Korea LLC*, No. 4456-VCN, 2010 WL 761145, at *7 (Del. Ch. Feb. 26, 2010); *see also Grayson*, 2010 WL 3221951, at *7 ("The relevant inquiry . . . is whether the obligation sought to be enforced arises from the parties' contractual relationship or from a

fiduciary duty."). Applying that standard here, Plaintiff's breach-of-fiduciary-of-duty claims, in general, do not appear duplicative. The Memorandum explicitly contemplates suits alleging breach of fiduciary duty that seek to hold Spectra liable for grossly negligent "mistakes of judgment or for losses due to such mistakes" (Memorandum 40; *see also* LLC Agreement ¶ 5.5.1), and a finder of fact could determine that Defendants made such mistakes, thereby breaching their fiduciary duties, but — in light of the discretion granted to Defendants under the contract, as detailed above — not necessarily breaching their contractual duties. *Cf.* Frank H. Easterbrook & Daniel R. Fischel, *Contract and Fiduciary Duty*, 36 J.L. & Econ. 425, 427 (arguing that the duty of loyalty functions to "replace[] detailed contractual terms" where there are "unusually high costs of specification and monitoring"). On the other hand, to the extent Plaintiff's allegation that Defendants breached their fiduciary duty by "concealing material information" (Pl.'s Opp'n 20) refers to their not having provided the monthly or annual reports called for in the Offering Papers — Plaintiff does not state so explicitly, but Defendants suggest that is the proper reading of the allegation (Defs.' Reply 10) — it would be duplicative of his contract claim. With that one caveat, however, Plaintiff's breach-of-fiduciary-duty claims are not duplicative — or at least Defendants have not shown otherwise.

In the alternative, Defendants argue that any fiduciary duty claim is derivative and thus belongs to the Spectra Fund, that the Spectra Fund is therefore an indispensable party within the meaning of Rule 19 of the Federal Rules of Civil Procedure, and that adding the Fund would destroy complete diversity. (Defs.' Mem. 22-24). The Court disagrees. First, to the extent Plaintiff alleges that he would have withdrawn his money had he received adequate information from Defendants (apart from the reports called for in the Offering Papers, which are covered by the contract claim), his claim is direct, not derivative. *See, e.g.*, *In re Harbinger Capital*

21

*Partners Funds Investor Litig.*, No. 12-CV-1244 (AJN), 2013 WL 5441754, at *9 (S.D.N.Y. Sept. 30, 2013) ("[T]o the extent that Plaintiffs' claims involve the nondisclosure of information . . . , Delaware cases establish that these so-called 'holding' claims are direct."), *vacated in part on reconsideration*, 2013 WL 7121186 (S.D.N.Y. Dec. 16, 2013), *and reconsideration denied*, 2014 WL 3694991 (S.D.N.Y. July 7, 2014).   Second, although fiduciary duty claims alleging "fund mismanagement" are normally derivative under Delaware law, *see id.*, the Spectra Fund was dissolved and the only two members of the Fund — McBeth and Porges — "are now clearly adversaries."   *In re Cencom Cable Income Partners, L.P.*, No. Civ. 14634, 2000 WL 130629, at *4 (Del. Ch. Jan. 27, 2000).   Under similar circumstances in the partnership context, a Delaware court has held that "the justifications for requiring partners to bring derivative claims — the consolidation of lawsuits and a preference for intra-partnership dispute resolution — [are] inapplicable."   *Harbinger Capital Partners Funds Investor Litig.*, 2013 WL 5441754, at *8 (discussing *Cencom Cable Income Partners*).   It is somewhat unclear whether Delaware courts would apply that holding in the LLC context, but the Court is inclined to believe they would — and, at a minimum, is not prepared to hold otherwise based on the briefing to date.[10]

Accordingly, Defendants' motion to dismiss Plaintiff's fiduciary duty claim is denied.

---

[10]     Citing *Matthew v. Laudamiel*, No. 5957-VCN, 2012 WL 605589 (Del. Ch. Feb. 21, 2012), Defendants contend that derivative claims brought on behalf of defunct LLCs are not governed by *Cencom Cable Income Partners*, but by Delaware statutory provisions, which provide for appointment of a trustee or receiver by the Court of Chancery.   *See* Del. Code Ann. tit. 6, § 18-805.   But *Matthew* did not address *Cencom Cable Income Partners* or the other authorities that create an equitable exception to the classification of claims as derivative if, among other things, doing so would reward the alleged wrongdoers.   *See, e.g.*, *Agostino v. Hicks*, 845 A.2d 1110, 1125 (Del. Ch. 2004) (discussing this exception).   Nor do Defendants address (1) whether and to what extent the Delaware statutory provisions, which expressly refer to "the Court of Chancery," apply in a federal diversity case; and (2) why a defunct LLC must be joined as a necessary party to an action between its only two members.

**F.  Alter Ego**

As noted, Porges himself was not a party to the agreement with McBeth.  Nevertheless, McBeth seeks to hold him individually liable for breach of contract and breach of fiduciary duty on the theory that he is the alter ego of Spectra Investment and Spectra Financial.  (*See* Pl.'s Opp'n 20 n.9; SAC ¶¶ 11, 14, 76-78).  The alter ego inquiry under Delaware law is a "fact intensive" one.  *Case Fin., Inc. v. Alden*, No. 1184-VCP, 2009 WL 2581873, at *4 (Del. Ch. Aug. 21, 2009).  First, a court must determine whether the relevant parties operated as a "single entity" by considering factors such as (1) whether the company was adequately capitalized for the undertaking; (2) whether the company was solvent; (3) whether corporate formalities were observed; (4) whether the controlling shareholder siphoned company funds; and (5) whether, in general, the company simply functioned as a facade for the controlling shareholder.  *See id.*  No one factor dominates the inquiry.  *See id.*  In addition, alter ego claims in Delaware "require[] an element of fraudulent intent."  *Soroof Trading Dev. Co. v. GE Microgen, Inc.*, 283 F.R.D. 142, 147 (S.D.N.Y. 2012) (quoting *Blair v. Infineon Techs. AG*, 720 F. Supp. 2d 462, 470 (D. Del. 2010)).  "Courts and commentators," however, "have noted that this standard is less than clear and it has been criticized for its ambiguity and randomness."  *Id.* (internal quotation marks omitted).  Notably, the Second Circuit has explained that, under Delaware law, "a plaintiff need not prove that there was actual fraud but must show a mingling of the operations of the entity and its owner plus an 'overall element of injustice or unfairness.'"  *NetJets Aviation, Inc. v. LHC Commc'ns, LLC,* 537 F.3d 168, 176 (2d Cir. 2008) (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. 1331, 1989 WL 110537, at *4 (Del. Ch. Sept. 19, 1989); *see also id.* at 177 (noting that a "plaintiff need not prove that the corporation was created with fraud or unfairness in mind" and that "[i]t is sufficient to prove that it was so used").  A lawsuit's "underlying cause

23

of action, by itself, does not supply the necessary fraud or injustice." *Soroof*, 283 F.R.D. at 151

(internal quotation marks omitted).  Significantly, where an alter ego claim does not sound in

fraud, it is not subject to the particularity requirement of Rule 9(b) of the Federal Rules of Civil

Procedure.  *See Gabriel Capital, L.P. v. NatWest Fin., Inc.*, 122 F. Supp. 2d 407, 433 (S.D.N.Y.

2000) (citing cases), *abrogated on other grounds by In re Initial Pub. Offering Sec. Litig.*, 241 F.

Supp. 2d 281 (S.D.N.Y. 2003); *Rolls-Royce Motor Cars, Inc. v. Schudroff*, 929 F. Supp. 117, 122

(S.D.N.Y. 1996) (same); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797

F.3d 160, 182 n.14 (2d Cir. 2015) (noting that "[w]hile the substantive elements of [a state-law

claim] that must be *proven* are a matter of state law, what must be *pleaded* and with what level of

particularity are governed by" the Federal Rules of Civil Procedure).

 Applying those factors here, and mindful of the fact-intensive nature of the inquiry, the

Court cannot say, at this stage of the litigation, that McBeth fails to allege a plausible alter ego

claim.  Plaintiff alleges that Porges "fully controlled the various Spectra entities," that Porges

created "Spectra" (without specifying Financial or Investment) "as a personal trading vehicle,"

that Porges extensively commingled personal and corporate assets, and that Porges and all the

Spectra entities shared the same office address.  (SAC ¶¶ 14, 76).  He further alleges that Spectra

was "grossly under-capitalized, meaning that they lacked sufficient capital to cover their own

reasonably anticipated expenses."  (*Id.* ¶ 77).  That is enough to allege a "single entity."  And

insofar as "the same facts used to show that the business entities operated as a single enterprise

can lend the requisite fraud or inequ[]ity," *Soroof*, 283 F.R.D. at 151, Plaintiff's allegations are

also sufficient, at this stage, to plead "an overall element of unfairness or injustice," *NetJets*

*Aviation*, 537 F.3d 168, 177.  In particular, drawing all inferences in Plaintiff's favor, the

allegations regarding the commingling of personal and corporate assets and the insufficient

capital to cover expenses plausibly plead an "inequitable use of the corporate form." *Soroof*, 283 F.R.D. at 151 (quoting *EBG Holdings LLC v. Vredezicht's Gravenhage 109 B.V.*, No. 3184–VCP, 2008 WL 4057745, at *12 (Del. Ch. Sept. 2, 2008)).  Accordingly, the claims against Porges individually survive Defendants' motion to dismiss.

## G.  Promissory Estoppel

Finally, Plaintiff brings a promissory estoppel claim against Defendants based on Porges's and Rose's promises, after the Fund had collapsed, to make him whole.  (SAC ¶¶ 101-103).  To prove such a claim, a plaintiff must show "1) a clear and unambiguous promise made by the defendant; 2) reasonable and foreseeable reliance on that promise; and 3) injury to the plaintiff as a result of the reliance." *Lampros v. Banco do Brasil, S.A.*, 538 F. App'x 113, 114 (2d Cir. 2013) (summary order).  Here, Plaintiff alleges a clear and unambiguous promise and reliance that is, at a minimum, not unreasonable as a matter of law.  The rub is in the third element — injury.  To satisfy that element, Plaintiff alleges that, as a result of his reliance on Defendants' promises to repay, he delayed bringing suit and cannot now bring a Section 10(b) claim pursuant to Title 15, United States Code, § 78j(b) and Title 17, Code of Federal Regulations, Section 240.10b.  (SAC ¶ 102).  That may be true, but Plaintiff fails to show that including a Section 10(b) claim would have materially affected his ability to obtain relief given that he did bring analogous state-law claims.  *Cf. San Diego Cty. Emps. Ret. Ass'n*, 749 F. Supp. 2d at 123 ("Because the elements of common law fraud in New York are 'substantially identical to those governing § 10(b), the identical analysis applies.' (quoting *Morse v. Weingarten*, 777 F. Supp. 312, 319 (S.D.N.Y. 1991))).  In other words, if McBeth proves any of his claims, he will be compensated for his losses; if he fails to prove his claims, it is unlikely that bringing a Section

10(b) claim would have made a difference.  As Plaintiff does not plausibly allege injury "as a result of the reliance" on Defendants' promises, his promissory estoppel claim is dismissed.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss is GRANTED in part and DENIED in part, and Plaintiff's claims are dismissed except for his breach-of-contract and breach-of-fiduciary-duty claims and his corresponding alter-ego claims against Porges.

One question remains: whether McBeth should be permitted to amend his complaint again, as he requests in a single sentence at the end of his memorandum of law in opposition to Defendants' motion.  (Pl.'s Opp'n 25).  Under Rule 15 of the Federal Rules of Civil Procedure, "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  The Second Circuit has held that a Rule 15(a) motion — as the Court construes Plaintiff request — "should be denied only for such reasons as undue delay, bad faith, futility of the amendment, and perhaps most important, the resulting prejudice to the opposing party." *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 603 (2d Cir. 2005) (internal quotation marks omitted); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) ("leav[ing] unaltered" prior case law on denial of leave to amend, including the rule that "leave may be denied where amendment would be futile").  Nevertheless, "the grant or denial of an opportunity to amend is within the discretion of the District Court." *Williams v. Citigroup Inc.*, 659 F.3d 208, 214 (2d Cir. 2011) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Applying those principles here, leave to amend is not warranted because further amendment would be futile.  The Court has dismissed the misrepresentation, unjust enrichment, and promissory estoppel claims, as well as any breach-of-contract claim premised on a theory of

26

looting.  In brief, the misrepresentation claim fails because of the non-reliance provisions written

into the Offering Papers themselves; the unjust enrichment claim fails because it is duplicative of

Plaintiff's breach-of-contract claims; and the promissory estoppel claim fails because Plaintiff

has not suffered a legally cognizable injury from his alleged reliance.  New or different

allegations would not change those facts; that is, the problem with the claims "is substantive

[and] better pleading will not cure it."  *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

The fact that Plaintiff already amended his complaint in an attempt to cure the deficiencies raised

in Defendants' initial motion to dismiss — a motion that, notably, was substantially identical to

the motion addressed in this Opinion and Order (*see* Docket No. 15) — underscores the futility

of further amendment.  *See, e.g.*, *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008)

(affirming the district court's denial of leave to amend in part because of the previous

opportunities that the plaintiff had received to amend the complaint).  Additionally, Plaintiff was

explicitly cautioned that he "w[ould] not be given any further opportunity to amend the

complaint to address issues raised by the motion to dismiss."  (Docket No. 17).

Claims that were not addressed in Defendants' initial motion to dismiss could call for a

different result.  As Defendants note, one of the principal amendments to Plaintiff's complaint

was its additional emphasis on the claim that Defendants *might* have looted the Fund's assets.

(Defs.' Mem. 10-11; *see also* First Am. Compl. (Docket No. 8) ¶¶ 73-80 (showing that breach of

contract theories did not include misappropriation).  Because that claim was arguably not

addressed directly in Defendants' initial motion and because the Court dismissed it under Rule

9(b), leave to amend would ordinarily be warranted.  *See Official Publ'ns, Inc. v. Kable News

Co.*, 884 F.2d 664, 669 (2d Cir. 1989) (noting that "where [a] complaint is deficient under Rule

9(b), leave to amend is usually afforded" (internal quotation marks omitted)).  But, here, Plaintiff

fails to give "any indication that he is in possession of facts that would cure the problem[]" identified, *Clark v. Kitt*, No. 12-CV-8061 (CS), 2014 WL 4054284, at *15 (S.D.N.Y. Aug. 15, 2014); in fact, he has repeatedly conceded that he "does not know precisely how his investment was lost" (SAC ¶ 36; *see also id.* ¶ 62; Pl.'s Opp'n 1 ("What McBeth does not know is precisely how the Defendants squandered or misappropriated his money.")), and even states that, "[p]rior to discovery," his theories of how the Fund went bust are "mere conjecture."  (Pl.'s Opp'n 14). As the Federal Rules of Civil Procedure do "not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions" or speculation, *Iqbal*, 556 U.S. at 678-79, and Plaintiff himself concedes that he is not in possession of facts to meet the relevant pleading standard, amendment of the looting allegation would also be futile.

       The Clerk of Court is directed to terminate Docket No. 19.


       SO ORDERED.

Date:  March 21, 2016
       New York, New York

                                       JESSE M. FURMAN
                             United States District Judge