UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DONALD F. MCBETH,<br><br>       *Plaintiff,*<br><br>   v.<br><br>GREGORY I. PORGES,<br>SPECTRA FINANCIAL GROUP LLC, and<br>SPECTRA INVESTMENT GROUP LLC<br><br>       *Defendants.* | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> Index No: 15-cv-02742 (JMF)<br><br>**THIRD AMENDED<br>COMPLAINT** |

## <u>INTRODUCTION</u>

1.     This case involves broken trust, in both a legal and a personal sense, and the unexplained disappearance of $5 million. Donald F. McBeth (the "Plaintiff" or "McBeth"), a 76-year-old former sales and marketing executive, was fraudulently induced to invest in a hedge fund based on claims that it employed a conservative strategy with a long track record of success, and was fraudulent induced thereafter to remain invested in that fund. The performance history that Defendants presented to McBeth showed that the fund's predecessor entities had crushed the market over their short history—returning ***73.41 percent*** and ***85.87 percent*** in 2004 and 2005, respectively, compared with returns of 8.99 and 3.00 percent for the fund's benchmark, the S&P 500. Based in large part on these early returns, Defendants also presented him with cumulative rates of return for later years that were even more noteworthy, such as a ***1,382.56 percent*** cumulative rate of return as of October 2008, compared to a -2.82% cumulative rate of return for the S&P 500. But these claims of outsized performance were an illusion.

2.     Defendants created this illusion by excluding from their calculation of performance certain accounts in which one of the fund's predecessor entities had suffered significant losses—a fact that McBeth only discovered during the course of discovery in this litigation. Further, Defendants artificially boosted their purported historical performance numbers by adding back certain expenses to their net revenue without disclosing that millions of dollars in payments were being treated as expenses.

3.     By presenting McBeth with false and misleading performance information prior to his investment, Defendants fraudulently induced McBeth to invest in the fund. Likewise, by sending McBeth false and misleading performance information after he had signed the subscription documents but before he had funded his investment, Defendants fraudulently induced McBeth to remain invested in the fund.

4.     Defendants' false claims about prior performance were made in materials provided to McBeth by a person he trusted and respected—Deborah Rose, Spectra Financial Group LLC's Chief Operating Officer, who at one time was married to the cousin of McBeth's nephew and affectionately referred to McBeth as her "Uncle Skip." Porges also met with McBeth prior to his investment with Spectra. Neither Porges nor Rose revealed to McBeth that the performance history was false and misleading because it excluded the results of accounts that had suffered significant losses and was artificially inflated by the addition of large expenses to the net income used to calculate the history.

5.     On November 1, 2010, impressed by what appeared to be Porges' diligent approach and outstanding returns, and trusting him to be honest and forthcoming, McBeth made a capital contribution of $2 million to Spectra Opportunities Fund LLC (the "Spectra Fund" or "Fund"), an entity controlled and managed solely by Porges individually and

through his control of his alter ego companies, Defendants Spectra Financial Group LLC ("Spectra Financial") and Spectra Investment Group LLC ("Spectra Investment Group" and together with Spectra Financial, "Spectra"). The Spectra Fund reported a return of 2.17% in November, and McBeth made a second capital contribution of $3 million to the Fund on December 1, 2010.

6.     Ten months after he invested in the Fund and amid a gradually rising market for equities, McBeth's entire $5 million investment had completely vanished, and neither Porges nor Spectra has ever provided an explanation for how that could take place in such a short period of time. As explained below, Defendants cannot articulate how a single investment decision was made over the course of the Fund's existence, much less how it suffered such catastrophic losses.

7.     Defendants' misconduct did not end there. Beginning in January 2011, Porges began surreptitiously to use his own money to meet the Fund's margin calls and to ensure that the Fund could maintain maximum leverage. Porges apparently intended to gamble the Fund back to profitability, but, at the same time, he wanted to insulate his money as fully as possible from the risks of this leverage. Accordingly, Porges structured these personal investments in the Fund as sham loans and repayments of those loans, which were routed back and forth through various Spectra entities. If the Fund's performance improved, Porges would have a track record he could use to lure investors, and if the Fund continued downward, he could use his total control of the Spectra entities to recover these "loans" as liabilities of the Fund before any money was returned to the Fund's sole outside investor, McBeth.

8.      The Fund's Net Asset Value went to zero by September 30, 2011. At that point, the Fund's assets equaled its liabilities, meaning that Defendants ceased active trading at the point where the value of the Fund's remaining assets equaled the value of the sham loans. But Defendants were unable to liquidate the Fund's remaining assets and pay off the "loans" because, at some point in October, Spectra became involved in the bankruptcy of MF Global, which had recently become its prime broker, and the Fund's assets were frozen.

9.      McBeth knew none of this, as Defendants effectively kept him in the dark about the status of his investment by their failure to provide monthly account statements. In January 2012, Rose told McBeth that all his money was lost, and she also informed him that this was not a novel situation: Porges had previously squandered capital provided to him by outside investors. On behalf of Defendants, Rose promised McBeth that they would repay his entire $5 million investment, as Porges had done in the earlier case. She repeated this promise in subsequent conversations, and McBeth believed Rose, whom he continued to trust as a close family member.

10.      But when the first portion of Spectra's assets became free of the MF Global bankruptcy, Defendants made no payments to McBeth. Despite their promises, Defendants used the Fund's newly unfrozen assets to personally enrich Porges. In March 2012, approximately $1.44 million was received from the trustee, and promptly was routed through a variety of Porges-controlled entities. The money trail ends with payments to Porges of virtually the entire amount of the funds received from the trustee. This $1.44 million was an asset of the insolvent Fund, and, at a minimum, should have been distributed to investors of the Fund in accordance with their invested capital, as opposed to being used to repay fake loans to Porges.

11.     When additional funds from the MF Global bankruptcy became available, Defendants made a partial payment of $197,707 to McBeth in December 2013. There were also follow-up discussions between Porges and McBeth concerning Porges' financial affairs to determine when Porges would be able to make McBeth whole. Ultimately, McBeth could no longer believe the promises to repay him and Defendants' bald assurances that they invested his money in good faith. This action follows.

## PARTIES

12.     Donald F. McBeth, currently a domiciliary of Florida and formerly a domiciliary of New Jersey, was an investor in the now defunct Spectra Fund. The Spectra Fund forfeited its status as a corporate entity on or about March 13, 2014.

13.     Gregory I. Porges, a domiciliary of New York, is the principal and Chief Executive Officer of Spectra Financial Group LLC and Spectra Investment Group LLC, and at all relevant times exercised complete control over the Spectra Fund, Spectra Investment, and Spectra Financial.

14.     Spectra Investment Group LLC is a Delaware Limited Liability Company with its principal place of business in New York, and was the managing member of the Spectra Fund. Its only members are Porges and Rose, who is a domiciliary of New Jersey, and it is completely dominated by Porges.

15.     Spectra Financial Group LLC is a Delaware Limited Liability Company with its principal place of business in New York, and was the investment manager of Spectra Fund. Its only members are Porges and Diana Porges, who is a domiciliary of New York, and it is completely dominated by Porges.

16.     Porges is also the genuine party in interest to the agreements Spectra entered into with Plaintiff. As detailed below, Porges fully controlled the various Spectra entities, all of which were his alter ego companies, and therefore his personal liability for Spectra's misconduct can be imputed.

## JURISDICTION AND VENUE

17.     Federal diversity jurisdiction exists pursuant to 28 U.S.C. § 1332 because Plaintiff is a domiciliary of Florida, Defendant Porges is a domiciliary of New York, Defendants Spectra Financial and Spectra Investment Group are citizens of New York and Delaware, their respective members are domiciled in New York and New Jersey, and the amount in controversy exceeds $75,000.

18.     Venue in this district is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or fraudulent representations on which the claims are based occurred in the Southern District of New York.

19.     The parties have further agreed to waive the applicability of any arbitration clauses contained in agreements between them, and not to contest that the United States District Court for the Southern District of New York is the appropriate venue for the resolution of the claims in this matter.

## FACTUAL BACKGROUND

### Defendants Fraudulently Induce McBeth to Invest in the Spectra Fund

20.     Porges conceived of the idea for the Spectra Fund in 2007. Having traded with his own money for some years, Porges wanted a piece of the significant fees earned by leading hedge fund managers for investing money on behalf of financial institutions, pension funds, and high net-worth individuals, and decided that the only way he could do that was to create an investment fund. To that end, he decided to launch the Spectra Fund.

21.     To assist him in creating and marketing this new fund, Porges hired Rose to be his Chief Operating Officer. While Rose had previously served as the Chief Administrative Officer for Soros Private Funds Management LLC and was a Vice President at Goldman Sachs for a number of years, she lacked experience in marketing hedge funds to investors. Rose and Porges also faced handicaps in promoting the Fund, including the challenging financial market and economic environment that developed in 2008 and the fact that Porges was relatively unknown in the investment community.

22.     Rose started pushing the Fund in early 2008, but her efforts were unsuccessful. She could not convince even a single investor to join the Spectra Fund, and the launch date for the Fund was repeatedly postponed.

23.     Desperate to find someone to invest in the Fund, Rose decided the time had come to pitch her "Uncle Skip." Rose knew that McBeth had the financial means to invest in the Spectra Fund and that he held her in high regard. The two have known each for over twenty years, and they had a close personal relationship. At the time, McBeth saw Rose as intelligent, trustworthy, and highly sophisticated in financial matters. He trusted her, and Rose used that trust to her personal advantage.

24.     At a family dinner on or about December 14, 2008, Rose touted the Spectra Fund as an investment opportunity. She told McBeth that Porges had a distinguished investment track record, and invited him to meet with Porges to learn more about the Fund. The following day, Rose sent McBeth an email with directions to Spectra's office, and she enclosed a Fourth Quarter 2008 presentation (the "Q4 2008 Presentation") and a November 2008 fund fact sheet (the "November 2008 Fact Sheet"). Porges reviewed and approved

these materials. The email, the Q4 2008 Presentation, and the November 2008 Fact Sheet are attached hereto as Exhibits 1, 2, and 3, respectively.

25.     In the Q4 2008 Presentation and the November 2008 Fact Sheet provided to McBeth, Defendants presented the Fund as a sophisticated investment fund run by a manager with a consistent track record of success. Specifically, Defendants represented that Spectra's proprietary strategy, which they would seek to employ on behalf of investors in the Spectra Fund, had generated a cumulative rate of return of 1383 percent over the period of January 2004 to October 2008, compared to a -2.82 percent cumulative rate of return for the strategy's benchmark, the S&P 500, over the same period of time. The Fact Sheet contained standard measures of risk, including Sharpe and Sortino Ratios, which indicated that on a risk-adjusted basis the returns were exceptional.

26.     Further, both the Q4 2008 Presentation and the November 2008 Fact Sheet highlighted the remarkably successful historical returns (based upon audited financial information) that Porges claimed to have enjoyed from 2004 through the third quarter of 2008 in certain predecessor entities defined by the Presentation as the "Spectra Family of Funds", including, Managed Risk Trading L.P., Spectra Investments, LLC, Spectra Investment Group, LLC, and Spectra Capital Management, LLC. The documents claimed returns of 73.41 percent and 85.87 percent in 2004 and 2005, respectively, compared with returns of 8.99 and 3.00 percent for the S&P 500. These statements about returns were false and misleading because there was no disclosure that certain accounts with significant losses were excluded in calculating the performance information for 2004 and 2005, the cumulative performance information as of October 2008, and the Sharpe and Sortino ratios.

There is also no reference to any Spectra entities being omitted from the calculation of historical returns.

27.     In addition, Defendants made certain claims about the Fund's investment approach. They stated that Spectra would protect investors from significant losses by minimizing risk and preserving capital. For example, in describing the Fund's objectives, they indicated that Spectra would "seek absolute returns by establishing trades . . . in a diversified and disciplined manner utilizing strict risk control" and would "maintain preservation of capital through all market environments." (Ex. 2 at 14).

28.     Similarly, in setting forth the Fund's risk management policies, Defendants made highly specific representations about the depth and breadth of Spectra's risk controls:

> . . . utilizes a multi-tier system evaluating risk on an individual security basis, strategy basis and a firm wide portfolio basis. Strict limits are imposed on the funds' exposure with specific focus on strategy exposure, geographic exposure, sector exposure and beta/market exposure. . . Key factors in this process are:
>
> - Market Neutrality
>
> - Continuous Trade Evaluation and Risk Analysis
>
> - Position Limits
>
> - Risk/Reward Ratio
>
> - Diversification by strategy, industry, geography, related risk and issuers
>
> - Hedging at the position level strategy and the portfolio level strategy

(*Id.*, at 19).

29.     The Q4 2008 Presentation also contains a "Historical Performance Disclaimer," which is supposed to provide guidance on the performance information

included therein. It refers to an "accompanying statement of investment performance statistics," and notes that these audited statistics include the "combined performance of [Managed Risk Trading], [Spectra Investment Group], [Spectra Capital Management], and [Spectra Investments] . . . for each of the four years ended December 31, 2007." This statement was false and misleading because it did not reveal that certain accounts had been excluded from the calculation of historical performance.

30.     The disclaimer states that "certain administrative costs" had been added back to the companies' net income—a statement intended to reflect that a management fee would be charged to shareholders of the Fund going forward. This is a standard calculation done to reflect that the Companies historically had not been a hedge fund, a circumstance in which these types of administrative expenses would be covered by the management fee. In this case the disclaimer was false and misleading because far more than standard administrative costs were added back into net income. Defendants juiced their historical returns adding in millions of dollars of payments to members of the companies while characterizing them as normal expenses.

31.     Approximately 18 months later, Rose provided McBeth with a Second Quarter 2010 presentation (the "Q2 2010 Presentation") and a June 2010 fund fact sheet (the "June 2010 Fact Sheet"), attached hereto as Exhibits 4 and 5, respectively. The Q2 2010 Presentation and the June 2010 Fact Sheet contained representations substantially similar to those in the Q4 2008 Presentation and the November 2008 Fact Sheet and included updated performance information. Defendant Porges reviewed and approved the materials.

32.     In the Q2 2010 Presentation and the June 2010 Fact Sheet, Defendants included information on Spectra's portfolio construction that reinforced their claims about

its risk-conscious approach. The Q2 2010 Presentation indicated that "Spectra historically used on average 4/1 leverage. The New Fund intends to employ less leverage." Defendants also represented that, under normal market conditions, Spectra is typically 58% short and 42% long, and it is broadly diversified with its 30 largest positions accounting for less than 50% of the portfolio. Accordingly, Spectra's strategy was supposed to guard against market direction risk (*i.e.*, will the stock market go up or down) and position risk (*i.e.*, will an unforeseen event effecting a particular security or market segment impact the Fund's overall returns).

33.     The Q2 2010 Presentation and the June 2010 Fact Sheet also included the same false and misleading performance history that had been included in the Q4 2008 Presentation and the November 2008 Fact Sheet, albeit with a few minor adjustments. The Q2 2010 Presentation repeated the same false performance history figures that had appeared in the Q4 2008 Presentation and the November 2008 Fact Sheet, and then presented information on how those returns would be affected by "[a] hypothetical fee structure of 2% management fee and 20% management fee." The June 2010 Fact Sheet included those net figures without explaining that they represented claimed performance net of hypothetical fees.

34.     Like the Q4 2008 Presentation, the Q2 2010 Presentation referenced an "accompanying combined statement of investment performance statistics" and notes that these audited statistics include the "combined performance of [Managed Risk Trading], [Spectra Investment Group], [Spectra Capital Management], and [Spectra Investments] . . . for each of the six years ended December 31, 2009." There was no indication that any

accounts were excluded or that other Spectra entities existed which were not being included in the performance statistics.

35.     The document to which these written materials referred is the Combined Statement of Investment Performance Statistics, attached hereto as Exhibit 6, which was prepared by the certified public accountants, McGladrey & Pullen, LLP ("McGladrey") for Spectra Financial as the holding company for the various Spectra entities. In that document, McGladrey states that the statement of performance results "presents in all material respects" the performance of the companies (including Spectra Investment Group) during the periods stated, and that the performance data for these companies "are fairly stated in all material respects." Nothing in this document gives any indication that the performance information set forth therein, and in the Q4 2008 Presentation and the Q2 2010 Presentation, excluded certain accounts or that any Spectra entities were not covered by the audit. Defendants provided McBeth with a copy of the Combined Statement of Investment Performance Statistics before he invested in the Fund.

36.     Prior to his investment in the Spectra Fund, McBeth also participated in a discussion with Porges and Rose that reinforced the positive representations contained in Defendants' written materials, including the extremely successful performance history set forth in those written materials. In this meeting, Porges focused on the fact that he had been able to achieve outstanding returns over the course of a long investment career, covering both market upturns and downturns. These statements were false and misleading because they reaffirmed the misrepresentations about historical performance contained in the other materials provided to McBeth.

37. McBeth had previously made investments in various stocks, bonds, mutual funds, and a long-short fund in which his son was an analyst for the manager, but he had limited exposure to investment vehicles such the Spectra Fund. McBeth carefully reviewed all of the information he received from Defendants, and nothing contained therein raised red flags for him. McBeth also shared these materials with his son, Craig McBeth, who has long worked in the financial services industry and runs his own fund. Like his father, Craig McBeth saw nothing in the materials that created concerns for him.

38. McBeth was impressed by the information he received from Defendants, particularly the stellar performance data. He believed their statements to be accurate, and, critically for McBeth, he trusted Rose to be honest with him. McBeth believed Rose would have alerted him if there was any reason he should be concerned about investing in the Spectra Fund. Relying on Defendants' material misrepresentations and omissions of material facts, McBeth committed to investing $5 million in the Spectra Fund on June 24, 2010.

39. If McBeth had been informed of the truth—that the performance history reported in the Q4 2008 Presentation, the November 2008 Fact Sheet, the Q2 2010 Presentation, the June 2010 Fact Sheet, the Combined Statement of Investment Performance Statistics (and alluded to in Porges' statements to McBeth) excluded certain accounts of Spectra Investment Group that had experienced substantial losses and was artificially boosted by adding large expenses to net income—he never would have invested in the Spectra Fund. If this omitted information had been included in the information McBeth received, it would have dramatically and negatively altered their historical returns. Moreover, the existence of large losses in even a small number of accounts would have raised serious questions for McBeth about Spectra's risk management and Porges'

judgment. Armed with the genuine facts, McBeth would have undoubtedly declined to make the investment.

**Defendants Fraudulently Induced McBeth to Remain Invested in the Spectra Fund**

40.　There were a number of delays before the Spectra Fund launched, and it did not begin operation until approximately October 1, 2010. On October 27, 2010, Rose contacted McBeth by email (the "Oct. 27, 2010 Email") and stated (in the email and an accompanying letter from her and Porges) that Spectra had a "fiduciary responsibility" to inform him that the Fund was down 5.5 percent in its first month of operation. The email also enclosed an October 2010 fund fact sheet (the "October 2010 Fact Sheet") that contained performance information through September 30, 2010. The Oct. 27, 2010 Email and related documents are attached hereto as Exhibit 7. Porges approved these materials.

41.　As with the earlier performance information, McBeth reviewed and reasonably relied on the materials he received from Defendants. What he could not have known was the October 2010 Fact Sheet was false and misleading because it did not reveal that certain accounts with substantial losses were excluded in calculating the 2004 and 2005 annual returns and the cumulative returns. He also could not have known that the returns had been artificially inflated by adding excessive expenses to net income. Accordingly, while Defendants' statement that the Fund had suffered a loss of 5.5% in October 2010 may have been accurate, they falsely represented that returns for 2004 to 2005 were positive and that the cumulative return since 2004 (including October 2010) was 1142.34 percent.

42.　In the Oct. 27, 2010 Email, Defendants advised McBeth that he was "not legally obligated to fund [his] subscription and [could] choose to withdraw [his] subscription based on this information." McBeth would have taken advantage of this opportunity to

withdraw if Defendants had informed him of the truth about the historical returns set forth in the October 2010 Fact Sheet. As noted above, the inclusion of the excluded accounts and details about the large addbacks to net income would have materially altered the information that had been provided to him about performance and risk controls, and raised concerns about Porges' professional acumen.

43.     During the tenure of McBeth's investment, Defendants also withheld all relevant information from McBeth about the Fund's portfolio and risk exposure. Defendants provided monthly statements to him for a time that listed in summary fashion the value of his investment in the Fund, but Defendants never provided him with information on the Fund's investments, including audited financial statements.

44.     Defendants would have been unable to engage in recklessly aggressive trading if they were providing McBeth with accurate information about the size, type and performance of the Fund's investments. Indeed, McBeth would have taken steps to withdraw from the Fund if he had received audited financial statements or other information showing that it fundamentally differed from how it was described to him by Defendants.

**McBeth Discovers That He Was Misled By Defendants**

45.     McBeth did not know—and there was no way he could have discovered— that the performance history he received from Defendants was false and misleading. In fact, prior to the initial filing of this case, McBeth had no basis even to suspect that accounts had been excluded from the calculation of the performance statistics Defendants sent to him.

46.     For example, the Q2 2010 Presentation specifically states that the predecessor entities "were managed as separate accounts using strategies substantially similar to the strategies to be used by the Investment Manager on behalf of the funds." This statement

suggests that the calculation of the performance history of the four named predecessor entities included all of the accounts that were managed by those entities, as well as indicates that the Spectra Fund would employ similar investing strategies to the four entities.

47.     Moreover, even if McBeth had reason to suspect that Defendants had selectively excluded poorly performing accounts from their reported historical performance, he had no way of discovering on his own how those accounts had performed. The various Spectra entities were private companies with no publicly reported performance information. Accordingly, no amount of due diligence could have uncovered that certain of their accounts had suffered large losses. Likewise, no amount of due diligence could have discovered that large expenses were added back into net income in computing the historical returns of the Spectra entities.

48.     Based on documents produced in discovery, McBeth learned for the first time that Spectra and Porges had committed fraud in calculating their historical performance. During the period from January 2004 to April 2005, Spectra Investment Group had two series of accounts with its prime broker, Goldman Sachs—one with accounts with numbers beginning with 77 and another with accounts with numbers beginning with 369. In work papers that McGladrey produced in discovery, there are copies of account statements for these accounts that show that both the 77 and 369 series of accounts were managed by Spectra Investment Group. Each account statement lists the owner of the account as "Spectra Financial Group LLC (Spectra Investment Group)" and has the same address and taxpayer identification number. Attached hereto as Exhibit 8 is a spreadsheet created by McGladrey that lists the account statements that they received for the periods of 2004 to

2006. Under "Spectra Investment Group LLC" there is a list of the 77 and 369 accounts that were held at Goldman Sachs.

49.     In May 2005, the 369 accounts were transferred to Pax Clearing Corporation, which was owned by Merrill Lynch at that time, and consolidated into three accounts: GAN145, ZCM000, and ZCJ000 (the "Pax Clearing Accounts"). But there is no evidence that the ownership of these accounts changed, and they undoubtedly remained under the direct control of Defendant Porges: He personally signed the agreements with Pax Clearing relating to these accounts (attached hereto as Exhibit 9) on behalf of Spectra Financial, listing himself as President of Spectra Financial. Accordingly, any track record that purported to cover the investment performance of Porges and his associated entities should have included the Pax Clearing Accounts.

50.     In 2006, the Pax Clearing Accounts suffered catastrophic losses, and all trading ceased in them by the end of October. Attached hereto as Exhibit 10 are the final statements for the accounts that year-to-date performance in the three accounts during 2006 as follows: GAN 145 (-$2,740,965.86); ZCM000 (-$1,931.59); and ZCJ000 ($191,804.33).

51.     If these accounts had been included in the audit, as they should have been, it would have dragged down the aggregate historical performance numbers that Defendants presented to McBeth. In order to convince McGladrey to omit the accounts from the scope of the audit, Defendants represented to their auditor that the accounts were used for market making and the Spectra Fund would not be pursuing market making as an investment strategy. This fact is clearly set forth in Exhibit 8, which is taken from McGladrey's work papers. Each 369 account includes the following notation: "Market maker – account will not

be reported on, confirmation disregared [sic]." This same Exhibit shows that the Pax Clearing Accounts were not even requested by McGladrey as part of their analysis.

52.     The exclusion of the 369 and Pax Clearing Accounts from the historical performance audit of the Spectra entities is a deception on McBeth and potential investors in the Fund that cannot be justified. The 369 and Pax Clearing accounts were not engaged in garden-variety market making, which is clear from the size of the losses suffered in the accounts. The account statements show tens of millions of dollars in transactions in companies for which no Spectra entity was a designated market maker.

53.     Defendants also had their auditor include in the performance audit accounts (with positive returns) that employed strategies they had no intention of pursuing in the Spectra Fund. Notably, McGladrey included the private investment in public entity ("PIPE") accounts of Spectra Capital, and appears to have done the same for the market making accounts of Managed Risk Trading.

54.     Further, even if market making was the reason for excluding the 369 and Pax Clearing accounts from the calculation of performance history, the fact the accounts were excluded should have still been disclosed. Such a disclosure would have given potential investors the opportunity to ask Defendants about how the omitted accounts performed and whether the Spectra Fund would be employing similar strategies going forward. McBeth was deprived of this opportunity by Defendants' misconduct. Instead, Defendants deceived him into erroneously believing he was receiving an accurate portrayal of their historical performance.

55.     In addition, Defendants' historical performance was artificially inflated by adding back large expenses to net income. McGladrey's work papers demonstrate that over

$4.3 million in expenses were added back for 2004, over $3.4 million in expenses were added back for 2005, and over $1.6 million in expenses were added back for 2006. In total, McGladrey added back $10.9 million in expenses for the period of 2004 to 2007, and total equity and expenses was calculated by the auditor to equal approximately $42 million. This means that the add backs boosted the Fund's reported performance by almost 25%.

56. Given that the expense add backs were supposed to approximate the 2% management fee that investors would be paying to Spectra, no reasonable person would have anticipated that they would have such a dramatic impact on historical performance. Given this impact, Defendants were obligated to disclose the size of the expenses that they had been used to supplement the Spectra entities' net income. This is particularly true given that the largest expenses appear to relate to distributions to members of the entities, as opposed to salaries paid to employees without an interest in the entities. If these had been properly characterized as distributions, they would not qualify as administrative expenses and thus should not have been added back to net income without an appropriate disclosure.

57. In sum, Defendants omitted the accounts with large losses from their reported performance history and added back expenses to net income to inflate the returns, but concealed this information from McBeth, who would prove to be their only outside investor. They took advantage of "Uncle Skip's" trust and goodwill, by defrauding him with statements about outsized returns that were simply untrue.

### The LLC Agreement and Memorandum

58. In connection with his investment in the Fund, McBeth entered into the Spectra Opportunities Fund LLC Limited Liability Company Agreement (the "LLC Agreement") with Spectra and Porges (which Porges signed), a copy of which is attached

hereto as Exhibit 11. Under the LLC Agreement, Defendants committed to managing the

Spectra Fund in accordance with the Confidential Private Offering Memorandum (the

"Memorandum"), a copy of which was also provided to McBeth. Lastly, McBeth entered

into a Subscription Agreement with Porges and Spectra, which incorporated the

Memorandum and LLC Agreement by reference and contained an investor questionnaire.

The Offering Memorandum and Subscription Agreement are attached hereto as Exhibit 12.

59.     The LLC Agreement states that Defendants "will not engage in any

Investment transactions other than as described in the Memorandum without prior

notification to the Members."  (Ex. 11 at 4). Similarly, in describing the duties of Spectra,

the Agreement requires them to follow the "investment strategy" outlined in the

Memorandum. (*Id.*, at 13).

60.     The Spectra Fund's "investment strategy" is specifically set forth in the

Memorandum. In particular, the investment strategy pursued by Defendants will aim to

"capture attractive absolute returns by exploiting pricing anomalies" using a variety of

arbitrage strategies. By focusing on pricing discrepancies, Defendants will seek "to assume

limited stock market risk" and will use both long and short positions so as to "reduce net

market exposure."  (Ex. 12 at 2). In other words, Defendants committed to pursuing positive

returns on a risk-adjusted basis, as opposed to aggressively attempting to capture large gains

through speculative transactions.

61.     Further, the Memorandum contains an "Investment Objective" section that

explains in detail how the Spectra Fund will actively manage a "long-short portfolio" in

order to "capture attractive absolute returns."  (*Id.*, at 15-19). As set forth therein,

Defendants were also required to employ diligent internal controls so as to minimize risk to

investors: "Optimization of returns is sought by establishing trades with attractive risk-reward characteristics in a diversified and disciplined manner utilizing strict risk control procedures." (*Id.*, at 15 (emphasis added)).

62.     A separate section of the Memorandum is entitled "Certain Risk Factors" and it explains that while Defendants' "investment and trading methodology seeks to minimize some of the risks and volatility associated with investing in Financial Instruments, there is no assurance that [Defendants] will be successful in doing so. . . " (*Id.*, at 21). The section proceeds to list in boilerplate fashion the risks inherent to investing in securities, as well as the risks associated with the Fund's LLC structure. (*Id.*, at 21-39).

63.     Nowhere in those almost twenty pages of generic risk disclosures do Defendants disclose that Spectra may disregard or abandon, without any notice to investors, the investment strategy set forth in the Memorandum; or that Spectra may disregard or abandon, without any notice to investors, its commitment to utilizing "strict risk control procedures." The risk disclosures are not intended to be a license for Defendants to recklessly trade, and no reasonable investor would interpret them in that manner.

64.     Defendants were also required to provide McBeth with information about the Fund's operations and its performance. According to the LLC Agreement, Defendants are obligated to "maintain adequate records and accounts of all operations and expenditures and furnish the Members with the reports required hereunder." (Ex. 11 at 13). Consistent with industry custom and the representations made in the marketing materials, this would include monthly account statements with portfolio information and analysis, and more detailed quarterly reports.

65.     In addition, both the LLC Agreement and the Memorandum indicate that, beginning with the fiscal year ended December 31, 2010, Defendants will cause an annual report to be prepared and distributed to investors, which will contain, among other information, audited financial statements. (*Id.*, at 21; Ex. 12 at 9).

66.     In terms of restrictions, the LLC Agreement prohibits Defendants from using the Fund's assets for any purpose other than the exclusive benefit of the Fund. Defendants are also not permitted to commingle the Fund's assets with those of any other person. (Ex. 11 at 17).

67.     The LLC Agreement states that the "[Fund] shall be dissolved" upon the insolvency of the Fund, and this is to take place "on the day on which the event occurs giving rise to the dissolution." (*Id.*, at 25). Upon dissolution, the Managing Member, or a liquidating trustee if one is appointed, is obligated to liquidate the Fund's assets and wind up its affairs. This can only be delayed based on a finding that the liquidation of the Fund's assets would cause undue losses. (*Id.*, at 25-26).

**The Spectra Fund Implodes Almost Immediately After McBeth's Investment**

68.     Following McBeth's investment, the Spectra Fund collapsed in stunning fashion. In stark contrast to the representations made to McBeth about the safety of investing in the Fund given Spectra's distinguished track record and diligent risk management, the Spectra Fund suffered huge losses in virtually every month of its short existence. Over the period of December 1, 2010 to September 30, 2011, McBeth's monthly reported returns were as follows:

| Date | Spectra Fund Rate of Return (Monthly) | Account Balance | S&P 500 Rate of Return (Monthly)[1] |
|---|---|---|---|
| December 31, 2010 | -20.09% | $4,030,396 | 6.53% |
| January 31, 2011 | -29.12% | $2,856,897 | 2.26% |
| February 28, 2011 | -34.99% | $1,857,287 | 3.2% |
| March 31, 2011 | -3.02% | $1,801,129 | -.11% |
| April 30, 2011 | -22.23% | $1,400,648 | 2.85% |
| May 31, 2011 | 33.32% | $1,867,309 | -1.35% |
| June 30, 2011 | -33.27% | $1,246,081 | -1.83% |
| July 31, 2011 | 24.38% | $1,549,924 | -2.15% |
| August 31, 2011 | -72.56% | $425,272 | -5.68% |
| September 30, 2011 | -100% | $0 | -7.18% |

69.     Defendants breached the LLC Agreement by engaging in grossly negligent trading. The dramatic size of the losses—including being down 72.56% in August and being down 100% in September—are fundamentally inconsistent with the investment strategy described in the Memorandum. For example, if Defendants had employed standard risk controls, as they were required to do, then the size of its losses would have been limited by diversification (in both strategy and position), hedging, and stop losses. While the Spectra Fund could have suffered significant drops in NAV in particular months, it would not have gone to zero in less than a year.

---

[1] Information provided by Morningstar and available at: http://performance.morningstar.com/Performance/index-c/performance-return.action?t=SPX&region=usa&culture=en-US.

70.     Indeed, the losses experienced by the Spectra Fund could have been caused only by the taking on of wholly unwarranted risks, more akin to (highly leveraged) gambling than investing. There are no other reasonable explanations, particularly given that the Fund's benchmark, the S&P 500, was marginally positive, when accounting for reinvestment of dividends, over the same time period.

71.     Discovery in the case also supports the conclusion that the Fund collapsed due to grossly negligent trading. The account statements that Defendants produced show a massive number of oversized transactions in all manner of securities. There is no discernible strategy that can be gleaned from these transactions, the expenses associated with this frenzied, highly leveraged trading would have been substantial, and, perhaps most importantly, Defendants cannot even explain what they were doing.

72.     Porges, who testified as a corporate representative on behalf of Defendants, could not say (1) what investment decisions or strategies caused the Fund's losses; (2) what research or analyses supported those decisions or strategies; (3) what investment decisions were made or strategies were employed by the Fund's portfolio managers; (4) what research or analyses supported those decisions or strategies; (5) how Defendants made any particular decisions about market exposure; (6) what research or analyses supported those decisions; (7) how Defendants made any particular decisions about use of leverage; and (8) what research or analyses supported those decisions.

73.     Defendants' documents are similarly devoid of evidence of due diligence on the Fund's investments. For example, at the end of December 2010, the Fund had an almost $20 million short position in the Student Loan Corporation, which made the investment greater in value than the Fund's total capital. But there are no documents in Defendants'

files showing analyses of Student Loan Corporation. The same is true of the Fund's other large investments in technology, natural resources, and healthcare companies.

74.     With respect to risk management, Defendants seemingly eschewed internal risk controls altogether. Defendants did not have written risk control policies, and they did not have any set requirements with respect to use of leverage, diversification, or stop losses. Further, the only internal analyses that Defendants ever performed with respect to risk were the creation of charts tracking certain measurements, such as days it would take to liquidate the portfolio, that were used for marketing purposes.

75.     The Fund's losses were also caused, in part, by the grossly negligent use of leverage, which was only made possible by the use of fake loans. Over the Fund's short existence, Defendants always used the maximum amount of leverage that its prime broker would permit, irrespective of market conditions or the types of investments being made.

76.     Beginning in January 2011, Porges made the decision to support the Fund using his own capital, so that the Fund could maintain this extreme leverage. Without these additional funds, the Fund would have had to reduce its leverage. He did this in furtherance of his own interests. While the Fund was down significantly in its initial months, Porges would be able to protect his historical track record if he could engineer a dramatic turnaround. That would not have been possible through disciplined trading; Porges needed to generate the types of returns that he could only realize through maximum leverage.

77.     Unbeknownst to McBeth, Porges devised a strategy for maintaining leverage while insulating his capital contributions to the Fund from potential losses. He began making capital contributions to Spectra entities that he completely controlled, that were then funneled as loans to the Fund, which he also controlled. The loans were used to meet margin

calls caused by the Fund's extensive use of leverage, and the loans were then repaid to Porges as quickly as possible. At the beginning, the loans were repaid in a day or two, but as the Fund's performance spiraled downward, the loans became significant liabilities of the Fund. Attached hereto as Exhibit 13 is a list of these related party transactions, which show that capital contributions/loans and withdrawals by Porges (and other members) to Spectra entities were closely followed or preceded by financial transactions between those Spectra entities and the Fund.

78.     All aspects of these transactions were a sham, designed to protect Porges' new investments in the Fund from the likely and foreseeable result of mixing extreme leverage and reckless trading, namely the Fund's complete collapse. With respect to the capital contributions and capital withdrawals between Porges and the Spectra entities, Defendants ignored the obligations set forth in the various corporate documents for the entities in which Porges made these transactions. For example, the Spectra Investment Group LLC Agreement mandated that capital withdrawals could only take place four times a year: March 31, June 30, September 30, and December 30. Nevertheless, Porges made capital withdrawals from Spectra Investment Group throughout 2011, and sometimes mere days after he had made a capital contribution.

79.     As for the loans, they technically called for interest to be paid on them, but that requirement was ignored by Defendants in most circumstances. As set forth in Exhibit 13, these loans were regularly repaid without accounting for interest payments.

80.     Beyond these hallmarks of misconduct, Defendants' scheme is evident because the Fund ceased active trading only at the point where its remaining assets covered the balance of the fake loans, which was slightly over $2.5 million at the end of September

2011. Rather than conserving assets by de-levering or taking defensive positions, Defendants quixotically kept going full steam ahead, with the Fund's largest losses being suffered in August and September. Defendants were seemingly intent on either turning the Fund around or squandering all the Fund's assets except those required to repay the related-party loans.

## Defendants' Initial Attempt to Hide Their Misconduct

81.     On August 19, 2011, Rose emailed McBeth an account statement dated July 31, 2011, that showed an account balance slightly greater than $1.5 million. At this point, Rose knew that the Spectra Fund had suffered catastrophic losses in August but she did not reveal this critical fact in the email. Rather, her email was ebullient, suggesting that nothing was wrong with the Spectra Fund: "Hi Skip, Attached is the July statement. Speak to you on Monday. Have great weekend! Love, Deb." This was the final account statement McBeth would receive before the end of 2012. Defendants withheld the August and September account statements.

82.     Defendants purposefully kept McBeth in the dark. Under the terms of the LLC Agreement, Defendants were obligated to dissolve the Fund and begin to liquidate its assets on the day it became insolvent, which meant by no later than September 30, 2011, when the Fund's Net Asset Value went to zero. But in breach of the LLC Agreement and their fiduciary duties, Defendants apparently decided to wait to dissolve the Fund until they had repaid the approximately $2.5 million in Porges' personal funds that had been commingled with the Fund's assets.

83.     Before Defendants could successfully liquidate the remaining assets and repay the loans, Spectra became caught up in the bankruptcy of MF Global and its accounts

were seized. This made it impossible for them to repay the loans until control of the accounts were returned to them. However, Defendants had no way of knowing when this would take place.

84. On December 29, 2011, Rose emailed McBeth's accountant, copying McBeth, to inform him that the "most updated information I have for Don's investments is the month end statement from July which I have attached." Rose also noted "we have suffered significant losses this year." Rose blamed the delay in providing performance information on the fact the "Spectra is caught up in the MF Global liquidation process," because "we moved prime brokers in August and have been dealing with the fall out ever since." The email is attached hereto as Exhibit 14.

85. Those statements were materially false. The Spectra Fund had not suffered "significant losses" on the year, rather it had completely collapsed over two months before Rose sent the email. Moreover, Rose knew the exact value of McBeth's account, namely zero, but she purposefully withheld this information from McBeth's accountant. Rose had been hiding the Fund's abysmal performance from McBeth since August 2011, and apparently decided also to mislead his accountant.

86. As for Rose blaming the lack of account statements on MF Global's bankruptcy, that claim was also false. During a meeting between Porges, Rose, McBeth, and McBeth's son, Porges was asked about account statements and he initially tried to make the same excuse as Rose but McBeth's son caught him in the lie. McBeth's son asked Porges when MF Global collapsed, and Porges stated it was "in September 2011." By September the Fund was "nearly worthless," McBeth's son noted in response, and thus it could not have been engaged in any trading of significant volume. He then asked Porges if the Spectra Fund

had only traded through its original broker, Merrill Lynch. Porges had to admit that "yes, we only traded with Merrill Lynch."

87.     In actuality, Porges misstated when MF Global first began experiencing financial problems. As detailed by subsequent news reports, the firm started experiencing significant issues on October 21, 2011, when it improperly transferred certain customer money, and filed for bankruptcy ten days later. Consequently, MF Global's bankruptcy would not have prevented Defendants from issuing account statements for August and September.

**Defendants Commit to Fully Compensate McBeth**

88.     At a certain point, Defendants reversed course and decided to reveal to McBeth that they had lost his $5 million investment. On or around January 20, 2012, Rose met with McBeth and informed him that the money he had invested in the Spectra Fund was gone.

89.      Rose explained that earlier in his career Porges had lost a significant portion of the investment capital provided to him by outside investors. This was a surprise to McBeth, as neither Rose nor Porges had disclosed this and McBeth would have never invested in the Fund if he had known.

90.     Rose further promised McBeth, on behalf of Defendants, that they would fully repay his $5 million investment. She explained Porges had repaid outside investors on the earlier occasion, and they were committed to doing the same for McBeth. She repeated this promise in subsequent conversations with McBeth. For example, in one phone conversation Rose related that Porges wanted McBeth to provide him with additional

investment capital so that Porges would be able to repay McBeth sooner. Rose noted, however, that she did not think this was necessary.

## **Defendants Secretly Repay the Fake Loans**

91.    Despite those statements, Defendants did not repay McBeth when Spectra's assets became free of the MF Global bankruptcy. Rather, these assets were used to enrich Defendant Porges through a series of related party transactions in entities that he fully controlled. Attached hereto as Exhibit 15 is a register containing these transactions.

92.    On March 7, 2012, the trustee for the MF Global bankruptcy transferred $1,440,586.94 to the Fund from an account listed as PHD 1402, and that very same day the Fund transferred $1,420,586.94 to Spectra Financial. This transaction was purportedly to repay a loan to the Fund. On March 8, Spectra Financial then transferred that same amount to Spectra Investment Group purportedly, once again, to repay a loan.

93.    On March 9, 2012, these funds were received by Spectra Investment Group. It proceeded to use the funds to transfer $300,000 to Spectra Capital for the purpose of purportedly repaying a loan from that entity, and of making a loan to that entity. Spectra Capital transferred this $300,000 to an account listed as PHM 1512 to meet a margin call. On that same day, Spectra Investment Group transferred $1 million to Defendant Porges purportedly to repay a loan.

94.    On March 18, 2012, Spectra Capital repaid $50,000 of the loan from Spectra Investment Group. Spectra Investments also made a $86,000 loan to Spectra Investment Group, and another $150,000 was received from an account listed as PHM 1421. On March 19, Spectra Investment Group then transferred $532,000 to Defendant Porges purportedly to repay a loan. On April 1, 2012, Spectra Capital repaid the remaining $18,000 to Spectra

Investment Group. In total, Porges received $1,068,000 of the $1,440,586.94 that belonged to the Spectra Fund and properly should have gone to its investors.

95.     There were follow-up discussions between Porges, Rose, McBeth, and McBeth's son concerning the status of the repayment to McBeth. In the course of those discussions, Defendants never revealed that they were funneling the Fund's scarce assets to Porges.

96.     A September 10, 2013, meeting was held to discuss Spectra's performance with an eye towards determining when Porges could compensate McBeth. Porges explained to McBeth that Spectra had started the year strong but two trades had gone against them. Rose claimed that the Fund was approximately "flat" for the year. They made these statements to explain why Porges had not yet repaid McBeth.

97.     In November or December 2013, Porges contacted McBeth and explained that Spectra had come into additional money as a result of MF Global's liquidation.

98.     On December 18, 2013, McBeth received a letter from Porges on behalf of the Fund, which stated that a final asset distribution had been made by the MF Global bankruptcy trustee and this would "allow us to finalize entities obligations for 2013." Porges also informed McBeth in the letter that the Fund was going to wind down and that he would receive a distribution from the Fund. However, what is remarkable about the letter is what it does not reveal. Defendants kept from McBeth that the Fund had received an earlier transfer of assets from the trustee, and almost all of these assets were transferred to Porges.

99.     Shortly thereafter, Defendants made a payment of $197,707 to McBeth, less than 4% of McBeth's original investment in the Fund. The payment was structured as a pro rata capital distribution from the Fund, with a pro rata distribution also going to Porges.

100.    On May 11, 2014, McBeth and his son met with Porges and Rose to discuss when McBeth could expect to receive additional payments towards the $5 million loss. Porges stated he wanted to do the "honorable thing," but he was not yet in position to make additional payments. At one point, Porges attempted to walk away from his commitment to repay McBeth by claiming if he had the "luxury" of making repayments to McBeth he would. At the conclusion of the meeting, however, it was agreed the parties would schedule a follow-up meeting at which time Porges would provide details on how he would make McBeth whole.

101.    When the parties next met on September 23, 2014, Porges was again asked how he was going to repay McBeth. Porges stated that he could not afford to repay McBeth directly, but if McBeth could provide Porges with $1 million, Porges would be able to recoup his money by investing it. McBeth declined this highly questionable and, under the circumstances, insulting request for additional investment capital. McBeth had been patient, but by this point it was clear that Defendants were not going to honor their promise to repay him.

### Spectra is the Alter Ego of Porges

102.    It is unsurprising that Porges personally committed to compensate McBeth following the collapse of the Fund, as Porges has always been the alter ego of Spectra and the Fund. Porges is the principal and CEO of Spectra. Spectra was originally created as a personal trading vehicle for Porges, he had final responsibility for all investment and management decisions at Spectra and the Fund, and the only investor in the Spectra Fund other than McBeth was Porges. Additionally, Porges and the Spectra entities operated out of

the same office on 595 Madison Avenue in New York City, and in connection with this dispute they are represented by the same counsel.

103.    Spectra and the Fund were also grossly under-capitalized, meaning that they lacked sufficient capital to cover their own reasonably anticipated expenses. Porges responded to this situation by commingling his own funds with that of his businesses. During the September 10, 2013 meeting referenced above, Porges confided to McBeth that he regularly used his own money to meet margin calls and to satisfy their debts, and he even took out a mortgage on his house to provide Spectra with working capital.

104.    Despite Porges' personal support of Spectra and the Fund, the latter was wound down in 2013. This extensive mixing of personal and corporate funds is further proof that Spectra is the alter ego of Porges.

## CAUSES OF ACTION

### COUNT I
### Fraudulent Misrepresentation

105.    Plaintiff repeats and alleges, as if set forth fully herein, the allegations of paragraphs 1 to 104 of this Third Amended Complaint.

106.    Defendants knowingly and intentionally misrepresented Spectra and Porges' past performance in order to induce McBeth to invest in the Fund, and to induce McBeth to remain invested in the Fund.

107.    As described more fully above, Defendants represented that Spectra had a record of outstanding investment returns and presented McBeth with outstanding performance history that falsely purported to be a calculation of returns from all of the accounts managed by Defendants' predecessor entities. In fact, certain accounts managed by Spectra Investment Group during 2004 and 2005 were excluded from calculation of the

performance history. These misrepresentations and omissions were designed to and did convince McBeth to invest and remain invested in the Spectra Fund.

108.    To the extent that Spectra Investment Group did not manage these excluded accounts over some period, they still should have been included in the audit of historical performance. Defendants' represented that this audit and their reported performance information covered the predecessor entities of the Spectra Fund. It would have been false and misleading to omit any Spectra entities from the scope of the audit.

109.    Defendants' also represented that only standard administrative expenses had been added back into net income in calculating the historical performance of their predecessor entities. This was materially misleading because large expenses were added back that were far beyond anything "standard." These expenses seemingly including distributions made to members, increasing net income by approximately 25%. At a minimum, Defendants were required to disclose the size of these add backs given their impact on net income. These misrepresentations and omissions were designed to and did convince McBeth to invest and remain invested in the Spectra Fund.

110.    As a result of Defendants' fraud, McBeth suffered damages in an amount to be determined at trial.

## COUNT II
## Negligent Misrepresentation

111.    Plaintiff repeats and alleges, as if set forth fully herein, the allegations of paragraphs 1 to 110 of this Third Amended Complaint.

112.    As described above, Defendants, through misrepresentations and omissions (if not fraudulent, then negligent) induced McBeth to invest in the Spectra Fund and to remain invested therein. Had McBeth been informed of the truth, he would have never

invested in the Spectra Fund or, if he already invested, he would have requested a withdrawal or brought suit against them at an earlier time.

113.    As a result of Defendants' misrepresentations and omissions of material facts, McBeth suffered damages in an amount to be determined at trial.

**COUNT III**
**Breach of Contract**

114.    Plaintiff repeats and alleges, as if set forth fully herein, the allegations of paragraphs 1 to 113 of this Third Amended Complaint.

115.    As described above, the LLC Agreement constitutes a valid and binding contract enforceable against Spectra and Porges, who is the real party in interest with respect to Spectra's commitments.

116.    The LLC Agreement required Defendants to invest the Spectra Fund's assets in accordance with the terms of the Memorandum and the investment strategy set forth therein. It also required them to seek to maximize the Fund's assets, as well as to maintain adequate records on behalf of investors.

117.    The Memorandum indicated that the Spectra Fund, as managed by Defendants, would employ an investment strategy that included the use of hedging, strict risk controls, and diversification to limit risk and preserve capital.

118.    Defendants breached the LLC Agreement by not investing capital provided by McBeth in accordance with the promised investment strategy, as evidenced by the Spectra Fund's dramatic decline in value, particularly as compared to its benchmark. This took place through grossly negligent trading as detailed above.

119.    Defendants further breached the LLC Agreement by failing to provide McBeth with an annual report for fiscal year 2010, audited financial statements for fiscal

year 2010, and monthly account statements for the final months of the Fund's existence. By doing so, they prevented McBeth from learning of the Fund's actual strategy, lack of risk controls, and dismal performance, and from withdrawing his capital or bringing suit in response at an earlier time. They also breached the LLC Agreement by failing to provide an annual report and audited financial statements for fiscal years 2011 to 2013, as the Fund was not wound down until some point in 2013.

120.     Defendants also breached the LLC Agreement by allowing Porges to commingle his assets with that of the Fund. They did this by falsely characterizing Porges' money used to meet margin calls and maintain leverage as loans from various Spectra entities. By doing so, they enabled Porges to pursue his own agenda of using maximum leverage in an attempt to alter the Fund's performance dramatically while at the same time insulating his investments from being lost.

121.     Defendants breached the LLC Agreement by not dissolving and liquidating the Fund in accordance with the procedures set forth in the Agreement.

122.     McBeth has suffered damages as a result of those breaches of the LLC Agreement in an amount to be determined at trial.

**COUNT IV**
**Breach of Fiduciary Duty**

123.     Plaintiff repeats and alleges, as if set forth fully herein, the allegations of paragraphs 1 to 122 of this Third Amended Complaint.

124.     As required by the law and the agreements between the parties, Spectra and Porges, as the majority and controlling partner to the LLC Agreement through his control of Spectra, owed fiduciary duties to McBeth, a limited partner.

125.     Defendants breached those duties by concealing material information from McBeth, including that (a) the performance history for the Fund's predecessors had been artificially inflated by excluding certain accounts; (b) they were engaging in extremely risky trading; (c) they were accepting money from Porges disguised as loans from Spectra entities; and (d) they were repaying those fake loans while the Fund was insolvent and instead of distributing money to investors. Had he learned of any of this information, he would have withdrawn his capital from the Fund or brought suit in response.

126.     Defendants further breached those duties by engaging in grossly negligent trading, as detailed above.

127.     Defendants also breached those duties by accepting money from Porges disguised as loans from various Spectra entities, which was done to further the personal interests of Porges over those of the Fund's investor, McBeth. In addition, they breached those duties by delaying the Fund's dissolution and repaying fake loans while the Fund was insolvent and instead of distributing money to investors.

128.     McBeth has suffered damages as a result of Defendants' breaches of their fiduciary duties in an amount to be determined at trial.

## RELIEF REQUESTED

129.     Plaintiff respectfully requests an award:

(a)     granting compensatory damages in an amount to be determined at trial but believed to be approximately $5 million;

(b)     Interest on any award at the maximum allowable rate; and

(c)     Granting such other relief, including punitive damages and attorneys' fees, as may be just and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff

demands trial by jury on all issues so triable.

DATED:     March 27, 2018
           New York, New York

Respectfully submitted:

By: ____/s/_____
L. Reid Skibell (LS8877)
David B. Deitch (DD9900)
S. Gabriel Hayes-Williams (SH0775)
HARRIS, ST. LAURENT &
CHAUDHRY LLP
40 Wall Street, 53rd Floor
New York, NY 10005
Tel. 212.397.3370
Email: rskibell@sc-harris.com
           ddeitch@sc-harris.com
           sghayes@sc-harris.com
*Attorneys for Plaintiff Donald F. McBeth*