```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
                                                   :
DONALD F. MCBETH,                                  :
                                                   :
                                                   :
                              Plaintiff,           :      15-CV-2742 (JMF)
                                                   :
            -v-                                    :      MEMORANDUM OPINION
                                                   :        AND ORDER
GREGORY I. PORGES et al.,                          :
                                                   :
                              Defendants.          :
                                                   :
----------------------------------------------------------------------X
```

JESSE M. FURMAN, United States District Judge:

    Plaintiff Donald F. McBeth brings this action against Defendants Spectra Financial Group LLC ("Spectra Financial"), Spectra Investment Group LLC ("Spectra Investment" and, collectively, the "Spectra Entities"), and Gregory I. Porges, claiming that Defendants fraudulently induced McBeth to invest $5 million in their hedge fund based on misrepresentations regarding Porges' investment track record. In their answer to Plaintiff's Third Amended Complaint, filed on March 28, 2018, Defendants assert a counterclaim for breach of contract (the "Counterclaim"), arguing that they are entitled to attorneys' fees incurred in this lawsuit based on McBeth's breach of his representation that he had relied on only certain documents in deciding whether to invest in the fund. McBeth now moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss the Counterclaim. For the reasons that follow, McBeth's motion is DENIED.

## BACKGROUND

    The Court presumes familiarity with the background of this case. It sets forth and accepts as true only those facts — taken from the Third Amended Complaint (or "TAC"), the

Counterclaim, and documents incorporated by reference into the pleadings, *see, e.g.*, *Weisman Celler Spett & Modlin, P.C. v. Trans-Lux Corp.*, No. 12-CV-5141 (JMF), 2014 WL 476348, at *1 (S.D.N.Y. Feb. 6, 2014) — that are relevant to the resolution of McBeth's motion.

In June 2010, McBeth committed to investing in Defendants' hedge fund (the "Spectra Fund" or the "Fund"). (Docket No. 149 ("TAC"), ¶ 38; Docket No. 156 ("Counterclaim"), ¶ 13).[1] He reached the decision to invest after discussing the Spectra Fund with, and receiving marketing materials and an audit report depicting Porges' historical investment performance from, Deborah Rose, the Chief Operating Officer of Spectra Financial and a member of Spectra Investment. (TAC ¶¶ 23-38). Relying at least in part on those discussions and materials, McBeth invested $5 million in the Fund — specifically, $2 million on November 1, 2010, and another $3 million on December 1, 2010. (*Id.* ¶¶ 5, 38). In connection with those investments, he entered into an agreement governed by several documents (the "Offering Papers"), including a Subscription Agreement, a Qualified Purchaser Certification, and an Informational Questionnaire for Individual Subscribers (the "Subscription Documents"); a Limited Liability Company Agreement; and a Confidential Private Offering Memorandum (the "Memorandum"). (Counterclaim ¶¶ 1, 13; *see also* Docket No. 167, Exs. 1 ("Subscription Docs."), 4).

These documents included several provisions relevant to the Counterclaim. First, the Subscription Agreement provided that the Spectra Entities and the Spectra Fund were relying on the representations and warranties McBeth made in the Offering Papers. (Counterclaim ¶¶ 14, 18; Subscription Docs. 2, 4). Second, McBeth represented and warranted that he had carefully read, understood, and agreed to abide by the terms of the Offering Papers; that he had been able

---

[1] Spectra Investment and Spectra Financial are the managing member and investment manager of the Spectra Fund, respectively, and Porges is the principal and Chief Executive Officer of both entities. (TAC ¶¶ 13-15).

to ask any questions and obtain any additional information he needed to verify the terms of his investment and the accuracy of the Memorandum; and that he would be bound by the Subscription Documents. (Counterclaim ¶ 15; Subscription Docs. 2). Third, McBeth represented that he had relied "solely upon the information in, and referred to in, the Memorandum and nothing else" in deciding to invest in the Fund and acknowledged that "no person" was "authorized to give any information or to make any statement not contained in the Memorandum, and that any information or statement not contained in, or referred to in, the Memorandum must not be relied upon as having been authorized by the Company" (the "Non-Reliance Clause"). (Counterclaim ¶ 16; Subscription Docs. 2). Finally, McBeth agreed to "indemnify and hold harmless" the Spectra Entities "from and against any and all direct and consequential loss, damage, liability, cost or expense (including reasonable attorneys' . . . fees . . . , whether incurred in an action between the parties hereto or otherwise[)]" that the Spectra Entities might suffer in connection with the Subscription Documents, "including any misrepresentation" or "any breach of any . . . representation or warranty" by McBeth (the "Indemnification Clause"). (Counterclaim ¶ 19; Subscription Docs. 5).

By September 2011, within ten months of McBeth's investment, the Spectra Fund had lost all of its assets. (TAC ¶ 6). Following various discussions with the Defendants — in which Defendants purportedly promised to repay McBeth's lost investment and ultimately transmitted $200,000 to him — McBeth brought the instant suit, alleging in part that he was fraudulently induced by the Defendants to invest in the Fund. (Docket No. 1). In February of this year, after discovery and motion practice, the Court granted in part and denied in part Defendants' motion for summary judgment and granted McBeth leave to file the Third Amended Complaint. (Docket Nos. 140, 167-3). In amending his complaint, McBeth added claims — the underlying

3

facts of which were revealed during discovery — that Defendants engaged in fraudulent or negligent misrepresentation by excluding certain low-performing funds from the historical performance statistics reflected in the marketing materials and audit report they had disclosed to McBeth, as well as artificially enhancing their performance figures by including certain expenses in reported net income. (TAC ¶¶ 105-13). Despite having represented in the Non-Reliance Clause that his decision to invest was based solely upon information in the Memorandum, McBeth alleges that he relied on those fraudulent documents in deciding to invest. (*Id.*). In response, Defendants asserted the Counterclaim, alleging that any reliance by McBeth on materials outside the Memorandum constituted a breach of the Non-Reliance Clause. (Counterclaim ¶¶ 23-29).

## LEGAL STANDARDS

The same pleading standard that applies to complaints also applies to counterclaims. *See Feingold v. Chrismas*, 818 F. Supp. 2d 763, 768 (S.D.N.Y. 2011). Accordingly, in reviewing McBeth's Rule 12(b)(6) motion to dismiss, the Court must accept the factual allegations set forth in the Counterclaim as true and draw all reasonable inferences in favor of the Defendants. *See, e.g.*, *Cohen v. Avanade, Inc.*, 874 F. Supp. 2d 315, 319 (S.D.N.Y. 2012). A court may not dismiss claims pursuant to Rule 12(b)(6) unless the non-moving party has failed to plead sufficient facts to state a claim to relief that is facially plausible, *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, one that contains "factual content that allows the court to draw the reasonable inference that the [moving party] is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). More specifically, Defendants in their Counterclaim must allege facts showing "more than a sheer possibility that [the Plaintiff] has acted unlawfully." *Id.* A claim that offers only "labels and conclusions" or "a formulaic recitation of the elements of a

cause of action will not do." *Twombly*, 550 U.S. at 555. If Defendants have not "nudged [their] claim] across the line from conceivable to plausible, [that claim] must be dismissed." *Id.* at 570.

## DISCUSSION

The gravamen of Defendants' Counterclaim is that if McBeth relied on the allegedly fraudulent marketing materials and historical performance statistics in deciding whether to invest in the Spectra Fund, he breached his representation that he relied solely on the Memorandum. Thus, Defendants argue, the substantial attorneys' fees they have incurred defending themselves against his lawsuit regarding those same allegedly fraudulent materials are the result of McBeth's breach, and he must indemnify Defendants against those expenditures. "A claim for indemnification resulting from the breach of a representation and warranty is a claim for breach of contract." *Hudson's Bay Co. Luxembourg, S.A.R.L. v. JZ LLC*, C.A. No. 10C-12-107 (JRJ) (CCLD), 2011 WL 3082339, at *2 (Del. Super. Ct. July 26, 2011). The Subscription Documents are governed by Delaware law (*see* Subscription Docs. 9), which provides that "the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff." *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003). Damages are available on a breach-of-contract claim only "where the breach is a proximate cause of the losses and the damages were reasonably foreseeable at the time of contracting." *Falcon Tankers, Inc. v. Litton Sys., Inc.*, 355 A.2d 898, 907 (Del. Super. Ct. 1976). "Proximate cause and reasonable foreseeability of an injury are questions for the trier of fact." *Kling Meats, Inc. v. Balt. Spice Co.*, No. 84C-OC-19, 1988 WL 130370, at *2 (Del. Super. Ct. Nov. 23, 1988).

McBeth does not, and could not, dispute that Defendants allege the existence of a contract, breach of the Non-Reliance Clause, and damages. Nevertheless, he contends that

5

Defendants' claim fails because they induced him to breach his representations and warranties and, thus, were the intervening cause of their losses. (Docket No. 161 ("McBeth Mem."), at 4-7). He may well prevail on that argument at trial, but it is not an argument that can be resolved on a motion to dismiss. That is because "the issue of proximate cause is ordinarily a question of fact to be determined by the trier of fact" based "upon mixed considerations of logic, common sense, justice, policy and precedent." *Duphily v. Del. Elec. Co-op., Inc.*, 662 A.2d 821, 830 (Del. 1995) (internal quotation marks omitted). Here, accepting McBeth's argument that Defendants proximately caused McBeth's breach of the Non-Reliance Clause would essentially require the Court to accept McBeth's theory of the case: that Defendants gave him the marketing materials and audit report with the knowledge and intent that he would rely on those documents to his detriment. Yet these assertions rest on highly disputed issues of fact that are inappropriate for the Court to resolve at this stage in the litigation. *See, e.g.*, *Fini v. Remington Arms Co.*, No. C.A. 97-12 (SLR), 1998 WL 299358, at *10 (D. Del. May 27, 1998) (factual questions for a jury include "intent to induce reliance").

*Kaufman v. Guest Capital, L.L.C.*, 386 F. Supp. 2d 256 (S.D.N.Y. 2005), and *Zissu v. Bear, Stearns & Company* ("*Zissu I*"), 627 F. Supp. 687 (S.D.N.Y. 1986), *rev'd on other grounds*, *Zissu v. Bear, Stearns & Co.* ("*Zissu II*"), 805 F.2d 75 (2d Cir. 1986), are instructive. In *Kaufman*, the plaintiff invested $500,000 in the defendants' investment fund on the basis of presentations by, and discussions with, fund representatives, who claimed that the investment would be low risk and high return, involving a "discipline[d]" strategy of selling stocks that had devalued by ten percent. 386 F. Supp. 2d at 259-61. After the plaintiff decided to invest, he was sent a Private Placement Memorandum ("PPM") and Subscription Agreement, which disclosed that the investment risked loss of capital and was not guaranteed to generate income and that the

fund expected to apply the principles of market discipline and consistency to investment decisions. *Id.* at 261-62. The PPM also included a non-reliance clause, which provided that no representations or warranties had been made to the plaintiff by the fund or any person and that the investor had relied solely on the PPM in reaching the decision to invest, as well as an indemnification provision. *Id.* at 262, 276. The plaintiff signed the PPM without reading any of the governing documents. *Id.* at 263. Following the loss of his investment — and discovery that the defendants had invested twenty percent of the fund portfolio in a seller of amateur telescopes — the plaintiff sued the defendants. *Id.* at 258, 263-64. Defendants asserted counterclaims for breach of contract and fraud, alleging that the plaintiff had breached the indemnification provision in the Subscription Agreement and committed fraud by recklessly making false representations that he was a sophisticated investor and that he understood the risks and strategy of the fund's investing. *Id.* at 275.

Applying Delaware law, the District Court denied the defendants' motion for summary judgment on their breach-of-contract counterclaim. Defendants alleged that the plaintiff's failure to indemnify them for their costs in defending against his lawsuit constituted a breach of the Subscription Agreement's indemnification clause; the plaintiff disputed this characterization, arguing that the defendants' "alleged misrepresentations, and not his own admitted failure to read the offering documents, proximately caused the filing of these lawsuits." *Id.* The Court acknowledged that the undisputed facts demonstrated that the plaintiff had not read or understood the PPM or other offering documents, which constituted a breach of his representations in those documents. *Id.* at 276. It denied summary judgment, however, because it was "unclear whether defendants' losses in the form of attorney's fees as a result of Kaufman's failure to read or understand the offering documents were reasonably foreseeable at the time of

the contract," and this question was properly reserved for a jury. *Id.* The same principle applies in the instant suit: The question of whether McBeth proximately caused Defendants to accrue attorneys' fees or Defendants were the intervening cause turns on whether Defendants intended McBeth to rely on the outside materials — which is a question for a jury.

Similarly, in *Zissu*, the plaintiff alleged that Bear, Stearns & Co. had violated Sections 12(2) and 15 of the Securities Act of 1933, Section 10(b) of the Securities Act of 1934, and Rule 10b-5. *Zissu I*, 627 F. Supp. at 689. More specifically, Zissu claimed that "he was induced to execute a subscription agreement . . . at a total cost of $1,500,000 by untrue statements of material fact and by omissions of material facts in original and supplemental selling documents prepared by representatives of" the defendants. *Id.* The defendants asserted counterclaims, alleging that the plaintiff had breached various warranties he made in signing the subscription agreement and that they were entitled to indemnification for their damages resulting from those breaches. *Id.* at 690. The defendants contended that the plaintiff had brought a claim "alleging material oral and written misstatements upon which he had relied" outside the offering memorandum, "effectively admit[ing] a breach of the acknowledgment he made that no [additional] representations or warranties had been made to him." *Zissu II*, 805 F.2d at 77. The defendants prevailed at trial, and the District Court affirmed that verdict. *Zissu I*, 627 F. Supp. at 691-94. On appeal, the Second Circuit reversed the indemnification determination on the ground that the language of the indemnification clause "did not meet the requisite level of specificity necessary to hold Zissu liable to reimburse [the defendants] for defense costs in their successful defense against Zissu's securities claims." *Zissu II*, 805 F.2d at 79. But the Court of Appeals did not find fault with the District Court's underlying conclusion that the defendants could properly recover attorneys' fees based on the plaintiff's breach of his representation that he had not relied

8

on outside materials in deciding to invest. *See id.* at 78-79; *see also McCain v. Phoenix Res., Inc.*, No. 84-CV-0901 (SWK), 1989 WL 146212 (S.D.N.Y. Nov. 17, 1989). McBeth attempts to distinguish *Kaufman* and *Zissu* by pointing to minor factual discrepancies between those cases and the instant action, (*see* Docket No. 168 ("McBeth Reply"), at 6-7 & n.6), but those attempts fall short; although the facts in those earlier decisions are not identical to the allegations in this case, the similarities are dispositive, and the question of proximate cause must go to the jury.

The Court is also unpersuaded by McBeth's alternative argument: that Defendants "acquiesced to McBeth's purported breach of the Subscription Agreement by providing him the materials at issue and remaining silent between the date the Agreement was executed through the filing of their counterclaim." (McBeth Mem. 7). Acquiescence is an affirmative defense under Delaware law, *see Norberg v. Sec. Storage Co. of Wash.*, No. 12885, 2000 WL 1375868, at *5 (Del. Ch. Sept. 19, 2000); *see also Weyerhaeuser Co. v. Domtar Corp.*, 204 F. Supp. 3d 731, 737 n.3 (D. Del. 2016), *aff'd*, 721 F. App'x 186 (3d Cir. 2018), and therefore cannot be resolved on a Rule 12(b)(6) motion unless the defense "appears on the face of the complaint," *Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 145 (2d Cir. 2010). In making his acquiescence argument, McBeth once again assumes factual conclusions that have yet to be resolved in his favor — in essence, that Defendants intended for McBeth to rely on the marketing materials and audit report when he decided to invest. Because it is essential to resolve these factual issues, acquiescence is not the sort of affirmative defense that "appears on the face of the complaint" or can be decided in a pre-answer motion to dismiss.[2]

---

[2] In the final paragraph of his reply brief, McBeth argues that Defendants "should have asserted" the Counterclaim in their original answer and that, if the Court allows the Counterclaim to proceed, "the parties will need to engage in additional discovery, including fact discovery on the fees Defendants have accrued to date related to each of the various claims in the case and expert discovery on the reasonableness of those fees." (McBeth Reply 9-10). It is well

9

## CONCLUSION

For the foregoing reasons, McBeth's motion to dismiss the Counterclaim is DENIED.

The Clerk of Court is directed to terminate Docket No. 160.

SO ORDERED.

Date: August 8, 2018
      New York, New York

JESSE M. FURMAN
United States District Judge

---

established, however, that a party may not raise a new argument in a reply brief. *See, e.g.*, *Knipe v. Skinner*, 999 F.2d 708, 711 (2d Cir. 1993). In any event, the Court is skeptical of McBeth's need for pretrial discovery insofar as the amount of attorney's fees would be fixed, if at all, by the Court following trial. *See, e.g.*, *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1316 (2d Cir. 1993). And regardless, McBeth cites no authority for the proposition that a need for discovery is grounds to dismiss a claim pursuant to Rule 12(b)(6).