UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
:
DONALD F. MCBETH, :
:
Plaintiff, : 15-CV-2742 (JMF)
:
-v- : OPINION AND ORDER
:
GREGORY L. PORGES, et al., :
:
Defendants. :
:
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

Plaintiff Donald F. McBeth brings this case, in which trial is scheduled for December 4, 2018, against Defendants Spectra Financial Group LLC ("Spectra Financial"), Spectra Investment Group LLC ("Spectra Investment"), and Gregory I. Porges (collectively, "Defendants"). In the Third Amended Complaint ("TAC"), the operative complaint, McBeth alleges that Defendants fraudulently induced him to invest $5 million in their hedge fund and that Porges loaned money to the hedge fund as it was failing and improperly concealed the loans as capital contributions. (*See* Docket No. 149 ("TAC")). Now pending are several motions: (1) a motion filed by McBeth to file a Fourth Amended Complaint ("FAC") adding an allegation regarding payments from the fund to Porges-affiliated entities, requesting rescission damages, and removing material related to dismissed counts (Docket No. 200-1 ("FAC") ¶¶ 62, 108(b)); (2) a motion *in limine* filed by Defendants (Docket No. 179 ("Def. MIL Mem.")); (3) a motion *in limine* filed by McBeth (Docket No. 191 ("Pl. MIL Mem.")); and (4) a separate motion by McBeth to exclude expert testimony (Docket No. 186 ("Pl. Expert Mot.")). For the reasons set

forth below, the motion to amend is DENIED, the motions *in limine* are each GRANTED in part and DENIED in part, and McBeth's motion to exclude expert testimony is DENIED.

## BACKGROUND

The Court presumes familiarity with this case, the background of which has been described elsewhere. *See, e.g.*, *McBeth v. Porges*, No. 15-CV-2742 (JMF), 2018 WL 3768032 (S.D.N.Y. Aug. 8, 2018) (Docket No. 183); *McBeth v. Porges*, 171 F. Supp. 3d 216 (S.D.N.Y. 2016) (Docket No. 33). Relevant to these motions are the parties' theories of the case. McBeth is now left with two primary theories. One theory, the so-called "Performance Statistics" theory, is that Defendants misrepresented the historic performance of related Spectra entities in the Fund's marketing materials and that those misrepresentation induced him to invest in the Fund. (*See* TAC ¶¶ 105-113 (counts alleging fraudulent misrepresentation and negligent misrepresentation)). The other theory, the so-called "Loans Claim," is that Defendants breached the contract between McBeth and the Fund and breached their fiduciary duty to McBeth by making undisclosed loans to the Fund as it was failing. (*See id.* at ¶¶ 114-115 (breach of contract), 123-28 (breach of fiduciary duty)). McBeth seeks over $5 million in compensatory and rescission damages. (*See id.* at ¶ 129; Docket No. 177 ("Joint Pretrial Statement") ¶¶ 50-55). Defendants bring a counterclaim alleging that McBeth breached the "Subscription Documents," the contract signed during the investment process, by relying on documents he agreed not to consider (namely, the marketing materials) when making his investment decision. (*See* Docket No. 156 ("Counterclaim") 23-29). They request over $750,000 in attorneys' fees. (*See id.* at 31, ¶ 30). As noted, the case is scheduled for a jury trial beginning on December 4, 2018.

McBeth has amended his complaint several times. Most recently, in February 2018, after discovery, motion practice, and a partial grant of summary judgment to Defendants, the Court

granted McBeth leave to file the TAC.  (*See* Docket Nos. 140, 167-3).  The Court granted leave to allow McBeth to add claims that Defendants had engaged in fraudulent or negligent misrepresentation by excluding certain low-performing funds from the historical performance statistics reflected in the marketing materials and audit report, as well as artificially enhancing their performance figures by including certain expenses in reported net income.  *See McBeth*, 2018 WL 3768032, at *2.  (*See also* TAC ¶¶ 105-13).  McBeth now seeks leave to (1) add allegations that Defendants transferred $500,000 out of the Fund to Porges-affiliated entities in September 2013; (2) add rescission damages to the relief requested; and (3) remove factual allegations and legal claims that relate exclusively to dismissed counts.  (*See* Docket No. 200 ("Mot. to Amend"); FAC ¶¶ 62, 108(b)).

## MOTION FOR LEAVE TO AMEND

The Court begins with McBeth's motion for leave to amend the complaint.  Under Rule 15 of the Federal Rules of Civil Procedure, "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  But, "[w]here, as here, a scheduling order governs amendments to the complaint, the lenient standard under Rule 15(a) . . . must be balanced against the requirement under Rule 16(b) that the Court's scheduling order shall not be modified except upon a showing of good cause."  *Holmes v. Grubman*, 568 F.3d 329, 334-35 (2d Cir. 2009) (internal quotation marks and citation omitted); *see* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent.").  "Whether good cause exists turns on the diligence of the moving party."  *Holmes*, 568 F.3d at 335 (internal quotation marks omitted).  Specifically, the moving party "must demonstrate that it has been diligent in its efforts to meet the Court's deadlines" and that, "despite its having exercised diligence, the applicable

3

deadline could not have been reasonably met." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, No. 05-CV-3749 (KMW) (DF), 2009 WL 2524611, at *7 (S.D.N.Y. Aug. 14, 2009), *aff'd*, 2009 WL 3467756 (S.D.N.Y. Oct. 28, 2009). "A party fails to show good cause when the proposed amendment rests on information that the party knew, or should have known, in advance of the deadline." *Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc.*, 889 F. Supp. 2d 453, 457 (S.D.N.Y. 2012) (internal quotation marks omitted); *see also Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340-41 (2d Cir. 2000) (affirming the denial of a motion to amend because the plaintiff had the information necessary to support his new claim when filing an earlier complaint).

Applying those standards here, McBeth's motion is DENIED. Most significantly, McBeth does not provide a good reason for his failure to discover the $500,000 payments earlier in the litigation. He says that he failed to discover the payments earlier because they "were buried in rows 60 and 61 of tab 1 of an 8-tab spreadsheet" (Docket No. 206 ("Reply to Mot.") 3), and that he only "discovered the references to these transactions while preparing the Joint Pretrial Statement" (Docket No. 207 ("Hayes-Williams Decl.") ¶ 6). He also suggests that Defendants caused his failure by responding improperly to an interrogatory about the Fund's debts. (Reply to Mot. 3). But McBeth never rebuts Defendants' assertion that he "possessed the information relating to the supposed repayment of expenses nearly two years ago when it was produced in fact discovery." (Docket No. 203 ("Opp. to FAC") 1). Indeed, the record is devoid of any suggestion that McBeth failed to discover the payments earlier due to anything other than insufficient diligence and research on his part. Nothing suggests that he lacked access to the spreadsheet containing the payment more than two years ago, let alone earlier this year when he was granted leave to file the TAC. In light of this record, the Court finds that McBeth knew or

4

should have known about the payments when he filed the TAC and, accordingly, that McBeth fails to show good cause for his failure to include the new allegation in the TAC. *See Perfect Pearl*, 889 F. Supp. 2d at 458-59.

McBeth's other arguments for amendment also fall short. First, McBeth seeks to amend the complaint to add a prayer for rescission damages. (*See* FAC ¶ 108(b)). Such an amendment, however, is unnecessary. The TAC requests compensatory damages, interest, *and* "other relief . . . as may be just and appropriate." (TAC ¶ 129). And notwithstanding Rule 8(a)(3) of the Federal Rules of Civil Procedure (which provides that a complaint "must contain . . . a demand for the relief sought"), the law is clear that, in any final judgment, the Court "*should* grant the relief to which each party is entitled, *even if the party has not demanded that relief in its pleadings.*" Fed. R. Civ. P. 54(c); *see* CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 1255 (3d ed. 2018); *see also Truth Seeker Co. v. Durning*, 147 F.2d 54, 56 (2d Cir. 1945) (holding that a plaintiff is, "without reference to its prayer . . . , entitled to the relief to which the stated facts entitle it, even though its own theory of relief may have been unsound"). In other words, amendment is unnecessary because McBeth may pursue rescission damages even under the TAC.[1] Finally, McBeth's proposal to delete "evidence that relates only to claims that have already been dismissed" does not justify amendment of the complaint. (*See* Mot. to Amend ¶ 10). To the extent that the operative complaint includes allegations relevant only to claims that have been dismissed, the Court will not consider them or admit corresponding evidence at trial.

---

[1] In light of that conclusion, the Court need not reach the question of prejudice. But it is worth noting that, for the reasons explained below, allowing McBeth to seek rescission damages would not unfairly prejudice Defendants, as they contend (*see* Opp. to FAC 16), because the availability of rescission damages does not change the scope of the jury trial.

*See* Fed. R. Evid. 402.[2] Accordingly, there is no good cause to amend the complaint to make these inconsequential changes.

## MOTIONS *IN LIMINE*

Next, the Court turns to the parties' motions *in limine* (except to the extent that they seek to exclude expert testimony, which the Court addresses below). McBeth seeks to exclude evidence of the due diligence he conducted before investing in Defendants' fund, evidence of his individual wealth, and evidence relating to the Spectra Group. (Pl. MIL Mem. 3-12). Defendants seek to exclude testimony from McBeth's son, Craig McBeth, concerning the necessity of due diligence and the accuracy of the Performance Statistics, and to exclude evidence or arguments concerning rescission damages. (Def. MIL Mem. 6-14, 24-25). The Court addresses each in turn.

### A. McBeth's Due Diligence

First, McBeth's request to exclude evidence "about the due diligence he conducted prior to deciding to invest in the Spectra Fund" is DENIED. (*See* Pl. MIL Mem. 10-11). Under New York law (which governs the misrepresentation claims, *see McBeth*, 171 F. Supp. 3d at 224), McBeth must prove "justifiable" or "reasonable" reliance on the misinformation to prevail on his misrepresentation claims. *See Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178, 180 (2011). Justifiable or reasonable reliance cannot be found "if the true facts could have been ascertained by the plaintiffs 'by means available to them through the exercise of ordinary intelligence.'" *Vasquez v. Soto*, 877 N.Y.S.2d 467, 468 (N.Y. App. Div. 2d Dep't 2009). That

---

[2] McBeth argues that some paragraphs in the TAC that Defendants contend are irrelevant are actually relevant to his non-dismissed claims. (*See* Reply to Mot. 8-10). Defendants are granted leave to respond to that argument, in a letter brief not to exceed three pages, by **November 21, 2018.**

said, it can be found even without the plaintiff's exercise of due diligence if the relevant information is "particularly within [the defendants'] knowledge." *Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181 (2d Cir. 2007). Even in that case, however, the plaintiff still must prove that "reliance on the alleged misrepresentations was not so utterly unreasonable, foolish or knowingly blind as to compel the conclusion that whatever injury it suffered was its own responsibility." *Id.* at 182. Because the information McBeth received included a "suspicious" report of "eyebrow-raising" annual returns (specifically, 73% and 86% per year (TAC ¶ 1)), *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 236 (2d Cir. 2006), even if McBeth establishes that the accurate information about the Spectra entities' historic performance was particularly within Defendants' control (which itself may require evidence on what McBeth sought from Defendants), the jury still must decide whether reliance on the misinformation was "utterly unreasonable." *See Merrill Lynch*, 500 F.3d at 182. That inquiry includes an evaluation of whether McBeth did anything other than rely blindly on the suspicious information — that is, whether McBeth conducted any diligence.

**B. McBeth's Individual Wealth**

Second, McBeth's request to exclude evidence of his individual wealth — including evidence that he made "north of 50 million" dollars on the sale of a company (Docket No. 176-10), and that he was a "Qualified Purchaser" who either "owns at least $5,000,000 in investments" or "invests on a discretionary basis at least $25,000,000" (Docket No. 197-20, at 19) — is GRANTED in part and DENIED in part. (*See* Pl. MIL Mem. 8-10). Evidence of individual wealth "is generally inadmissible in trials not involving punitive damages." *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 266 (2d Cir. 1999) (internal quotation marks, citations, and alteration omitted). But "such evidence may be admitted to impeach the testimony of a

witness who opens the door to the subject." *Id.* (internal quotation marks, citations, and alteration omitted); *see also Tesser v. Bd. of Educ. of City Sch. Dist. of City of New York*, 370 F.3d 314, 318 (2d Cir. 2004). Moreover, evidence of individual wealth can be admissible to prove a person's status as a sophisticated investor. *See Crigger*, 443 F.3d at 236 (holding that evidence of the plaintiffs' status as sophisticated investors included that "the plaintiffs had substantial and varied experience with *millions* in investments" (emphasis added)); *id.* at 235 (affirming the instruction to the jury to "determine whether the plaintiffs engaged in enough due diligence *relative to their net worth* and the resources potentially at their disposal" (emphasis added)). Because McBeth's status as a sophisticated investor is a crucial issue, evidence that he is wealthy — including that he had "millions" of dollars in investments, *see id.* at 236 — is admissible. At the same time, the Court will not allow Defendants to introduce more specific evidence of McBeth's wealth (including but not limited to the precise size of his investments or the amount of money that he earned from the sale of a company), as the probative value of such evidence is substantially outweighed by the danger of unfair prejudice. *See* Fed. R. Evid. 403.

## C. Spectra Group

Third, McBeth's request to exclude evidence related to the Spectra Group is DENIED. (*See* Pl. MIL Mem. 3; Docket No. 202). Evidence concerning the ownership of the accounts excluded from the Performance Statistics is relevant to the completeness of the Performance Statistics and thus the determination of whether there was a misrepresentation.[3] Given that

---

[3] The entities Porges formed during his time in finance include Spectra Investment Group, Spectra Capital Management, Spectra Investments, Spectra Financial Group, Managed Risk Trading, and Spectra Group. The Performance Statistics for the Spectra Fund included the historical performance of some, but not all, of those entities. (TAC ¶ 26; Docket 190-1 ("Porges Decl.") ¶ 12). McBeth asserts that the Performance Statistics excluded certain accounts that Spectra Investment Group owned. (TAC ¶ 39). Defendants assert that Spectra Group owned the excluded accounts. (Porges Decl. ¶ 12).

McBeth will try to prove that Spectra Investment Group owned the excluded accounts (and thus that there was a misrepresentation), it would not be "consistent with sound discretion to deny [Defendants'] the chance to introduce evidence in opposition." *Moretti v. Comm'r*, 77 F.3d 637, 644 (2d Cir. 1996) (internal quotation marks omitted). Nor are McBeth's objections to Defendants' discovery practices grounds for exclusion. McBeth knew about Spectra Group no later than March 3, 2017, when Defendants filed a declaration explaining the exclusion of Spectra Group from the Performance Statistics. (*See* Pl. MIL Mem. 3; Porges Decl. ¶ 12).[4] Yet, when McBeth filed the TAC and sought to file the FAC earlier this year, he insisted that little, if any, additional discovery was required. (*See* Docket No. 52, at 14; Docket No. 200, ¶ 3 ("McBeth is not requesting that discovery be reopened.")). In light of these statements, McBeth cannot use Defendants' failure to provide additional discovery on the Spectra Group as grounds for exclusion. In any event, even if the new allegations in the TAC made additional evidence on Spectra Group relevant to discovery, Defendants did not have to formally disclose the evidence because it had "otherwise been made known to [McBeth] during the discovery process." Fed. R. Civ. P. 26(e)(1).

**D. Craig McBeth**

Fourth, Defendants' request to exclude Craig McBeth's testimony is GRANTED in part and DENIED in part. (*See* Def. MIL Mem. 24-25). The request to exclude Craig McBeth's testimony on the necessity of due diligence and the accuracy of the Performance Statistics is granted. As a fact witness, Craig McBeth can testify only to opinions that are "not based on scientific, technical, or other specialized knowledge." Fed. R. Evid. 701(c). His views on the

---

[4] In fact, McBeth has likely known about the Spectra Group since at least October 24, 2016, when a witness testified that the disputed "369 accounts . . . were Spectra Group and the 77 account were Spectra Investment Group." (Docket No. 197-3, at 17).

9

necessity of due diligence and the accuracy of the Performance Statistics, however, come from his "specialized knowledge" as a hedge fund professional who "has long worked in the financial services industry and runs his own fund," (*see* TAC ¶ 37), not from his sense "perception" or the "reasoning processes of the average person." Fed. R. Evid. 701(a), 702; *see United States v. Haynes*, 729 F.3d 178, 195 (2d Cir. 2013). As such, that testimony is opinion testimony that a lay witness is not permitted to give. *See* Fed. R. Evid. 701; *Haynes*, 729 F.3d at 195. At the same time, Craig McBeth can testify to facts he observed as a percipient witness.

**E. Rescission Damages**

Finally, in light of the Court's conclusion above that McBeth is entitled to seek rescission damages under Rule 54(c), Defendants' request to exclude "any evidence or arguments concerning rescissory damages" is DENIED. (Def. MIL Mem. 7). Nor are Defendants correct that rescission damages would alter the scope of the jury trial. (*See id.* at 10-12). To decide whether a party has the right to a jury trial, "we ask 'whether the action would have been deemed legal or equitable in 18th century England.' Second, 'we examine the remedy sought and determine whether it is legal or equitable in nature.' We then 'balance the two, giving greater weight to the latter.'" *Pereira v. Farace*, 413 F.3d 330, 337 (2d Cir. 2005) (quoting *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 42 (1989) (citation omitted)). With respect to the second step, the "general rule" is that "monetary relief is legal." *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340, 352 (1998). There is no dispute that "compensatory damages . . . [are a] form of legal relief." *Pereira*, 413 F.3d at 339. Rescission damages, however, are more complicated: Whether they are "legal or equitable depends on the basis for the . . . claim and the nature of the underlying remedies sought." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002) (internal quotation marks omitted). "[F]or restitution to lie in equity, the

10

action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Id.* at 214-15. By contrast, when the relief sought is just "restitution in money," it is "rescission at law," and it is a legal remedy. DAN B. DOBBS ET AL., LAW OF REMEDIES § 4.3(6) (3d ed. 2018).

Here, McBeth seeks only general rescission damages, making the nature of the remedy legal and weighing in favor of a jury trial. The nature of McBeth's four claims also weighs in favor of a jury trial. First, "fraudulent misrepresentation is [a] . . . tort," *Field v. Mans*, 516 U.S. 59, 70 (1995), a classic common-law cause of action to which the jury right applies, *see Feltner*, 523 U.S. at 347-48. Second, negligent misrepresentation also "sound[s] basically in tort." *Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709 (1999) (citation omitted); *see Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*, 38 F.3d 1279, 1283 (2d Cir. 1994) ("tort of negligent misrepresentation"). Third, a breach-of-contract claim "has historically been uniformly treated as a legal claim." *Brown v. Sandimo Materials*, 250 F.3d 120, 126 (2d Cir. 2001); *see also Pereira*, 413 F.3d at 339 (describing "breach of contract and negligence" as "legal issues"). And finally, although "as a 'general rule' breach of fiduciary duty claims were historically within the jurisdiction of the equity courts," when the remedy sought is general monetary damages, as here, the fiduciary duty claim is understood primarily as a claim for "compensatory damages — a legal claim." *Pereira*, 413 F.3d at 338, 340. Thus, whether he seeks "compensatory" or "rescission" damages, McBeth has a right to a jury trial on all issues.

Defendants' other objections to rescission damages also fail. First, the rescission damages claim is not based on an impermissible holder theory. A holder claim is "a cause of action by persons wrongfully induced to *hold* stock instead of selling it" and, as such, is a type of "securities purchaser claim." *Citigroup Inc. v. AHW Inv. P'ship*, 140 A.3d 1125, 1132, 1137

(Del. 2016). McBeth's claims are not "state securities law claims," but state "common law claims," which *Citigroup* did not address. *See id.* at 1132-33; *see, e.g.*, *Umbach v. Carrington Inv. Partners (US), LP*, 851 F.3d 147, 160-61 (2d Cir. 2017) (affirming a district court's holding that damages were available for a breach-of-contract claim under Delaware law based on a hedge fund's refusal to return an investor's money). Second, the rescission damages are not based on impermissibly speculative evidence. If the jury credits McBeth's testimony that he would have withdrawn his money, it must evaluate damages "in accordance with the but-for world — i.e., the hypothetical world that would exist if the Agreement had been fully performed." *See id.* at 165 (internal quotation marks omitted). Evidence proffered by McBeth and discussed below — namely, Edward O'Neal's calculations on hypothetical redemption dates — can help the jury with this evaluation.

All of that said, McBeth's request for both compensatory and rescission damages may raise complicated issues regarding the proper calculation of damages, double recovery, and damage mitigation. Resolving those issues will be important for purposes of the jury instructions and verdict sheet — yet the parties have not adequately briefed them in view of the more fundamental disagreements resolved here. Accordingly, and in light of the parties' failure to heed the Court's requirement for *joint* proposed jury instructions and a *joint* proposed verdict form (*see* Individual Rule 5(B)(ii), (D)), the parties are hereby ORDERED to submit, **by no later than November 21, 2018**, the following: (1) *joint* proposed jury instructions, including revised instructions on damages; (2) a *joint* proposed verdict sheet; and (3) from each party, a statement of the damages claimed, including the manner and method used to calculate any claimed damages and a breakdown of the elements of such claimed damages (*see* Individual Rule

5(A)(xiii)). Additionally, each side is granted leave to submit a letter brief, not to exceed five pages, addressing any outstanding damages issues.

## MOTIONS TO EXCLUDE EXPERT TESTIMONY

Finally, the Court turns to the parties' requests to exclude expert testimony.[5] The exclusion of expert testimony is governed by Rule 702 of the Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" to his opinion if:

> (a) the expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In *Daubert*, the Supreme Court defined the "gatekeeping role" of district courts with respect to expert testimony, declaring that "the Rules of Evidence — especially Rule 702 — . . . assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. at 597. The Rule 702 inquiry is a "flexible one" that "must be tied to the facts of a particular case." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (internal quotation marks omitted). Although a district court should "admit expert testimony only where it is offered by a qualified expert and is relevant and reliable," *Cohalan v. Genie Indus., Inc.*, No. 10-CV-2415 (JMF), 2013 WL

---

[5] Strictly speaking, the requests to exclude expert testimony are untimely. (*See* Docket Nos. 38, 163, 165, 173; Individual Rule 3(I)). Nevertheless, the Court will address the parties' motions on the merits.

13

829150, at *3 (S.D.N.Y. Mar. 1, 2013), exclusion remains "the exception rather than the rule," *Floyd v. City of New York*, 861 F. Supp. 2d 274, 287 (S.D.N.Y. 2012) (internal quotation marks omitted). "[T]he traditional and appropriate means of attacking shaky but admissible evidence" is not exclusion, but rather "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

Here, each side moves to exclude, in whole or in part, the testimony of two expert witnesses for the other side. The Court will address each in turn.

**A. Aaron Young**

First, McBeth's motion to exclude Aaron Young's testimony and his request for a *Daubert* hearing are DENIED. (*See* Docket No. 187 ("Pl. Expert Mot. Mem.") 7-15, 22). McBeth's objection to Young's testimony on customary hedge fund due diligence boils down to a challenge to the latter's qualifications and the basis for his testimony. But Young's extensive experience with large, institutional hedge funds is sufficient to qualify him as an expert, even though his testimony will be applied to an individual, not institutional, investor. (*See* Docket No. 174-1 ("Young Report") ¶¶ 1-4). *See Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 82 (2d Cir. 1997). Indeed, at times, "well-trained people with somewhat more general qualifications" are *better* suited to testify to industry practices and customs than are experts qualified with a high "degree of specificity," but who may have an insular perspective. *See id.* And, because Young is qualified as an expert, the remaining "[d]isputes as to the strength of his credentials . . . go to the weight, not the admissibility, of his testimony." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995).

McBeth's challenge to the basis for Young's opinion on customary due diligence similarly fails because, since there is "some explanation as to how the expert came to his

14

conclusion," *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006), *aff'd*, 552 U.S. 312 (2008), the "lack of textual authority for his opinion [also] go[es] to the weight, not the admissibility, of his testimony," *McCullock*, 61 F.3d at 1044. Finally, Young's opinion on what McBeth could have discovered through proper diligence is also admissible. As an expert, Young can testify to the "ultimate issue" in the case, just not to a legal conclusion. Fed. R. Evid. 704(a); *see United States v. Feliciano*, 223 F.3d 102, 121 (2d Cir. 2000). He can even express his opinion on the elements of the legal conclusion, as long as he does not express an opinion directly on the legal conclusion. *See* Fed. R. Evid. 704 Advisory Committee Note. That means that Young may not testify that McBeth's reliance on the Performance Statistics was unreasonable, *see, e.g.*, *Callahan v. Wilson*, 863 F.3d 144, 152-53 (2d Cir. 2017) (holding that a district court did not abuse its discretion in excluding expert testimony about whether the defendant "act[ed] reasonably under the circumstances"), but may testify to the factors that inform whether his reliance was reasonable, including whether McBeth could have obtained the accurate Performance Statistics. (*See* Young Report ¶¶ 33-36, 40-42).

**B. Sander Gerber**

Second, McBeth's motion to exclude Sander Gerber's testimony and to have a *Daubert* hearing is also DENIED. (*See* Pl. Expert Mot. Mem. 16-22). Gerber's nearly thirty-year history in the hedge fund industry sufficiently qualifies him to testify as an expert on customary hedge fund due diligence and on the difference between market making and proprietary trading, even though none of his recent experience is with market making. (*See* Docket No. 180-7 ("Gerber Report") ¶ 2). *See SR Int'l Bus. Ins. Co. v. World Trade Ctr. Properties, LLC*, 467 F.3d 107, 132-33 (2d Cir. 2006). And, because he is qualified as an expert in those areas, the remaining challenges to the basis of his testimony go to weight, not admissibility. *See McCullock*, 61 F.3d

at 1044. Lastly, because he is testifying as an expert, he can testify to the "ultimate issue" — including whether the Performance Statistics properly excluded market making accounts and the sufficiency of McBeth's due diligence compared to industry practice — without encroaching on the jury's role. *See* Fed. R. Evid. 704(a).

## C. Edward O'Neal

Third, Defendants' request to exclude Edward O'Neal's testimony is GRANTED in part and DENIED in part. (*See* Def. MIL Mem. 15-21). O'Neal may testify to the difference between proprietary trading and market making because his general experience in the securities industry, including his year at the Securities and Exchange Commission ("SEC"), qualifies him as an expert on general industry issues. (*See* Docket No. 180-1 ("Amended O'Neal Report") ¶ 4). *See McCullock*, 61 F.3d at 1044; *see also Stagl*, 117 F.3d at 82 (noting the benefits of more generalized expertise). O'Neal may also testify about the accounts he believes are included in the Performance Statistics because "[a]n expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion." *Riegel*, 451 F.3d at 127. Similarly, O'Neal may explain his calculations on the Performance Statistics because they are not basic calculations, but complex ones that use percentages and compounding and thus are likely beyond the jury's mathematical ability. (*See* Amended O'Neal Report ¶ 11).

By contrast, however, O'Neal may not testify that the excluded accounts "materially affected" the Performance Statistics or that Defendants' loans created a "conflict of interest" because such testimony improperly states legal conclusions. (*Id.*; Docket No. 180-4 ("O'Neal Rebuttal Report") ¶¶ 5, 9, 11). *See Feliciano*, 223 F.3d at 121 ("'In evaluating the admissibility of expert testimony, this Court requires the exclusion of testimony [that] states a legal

conclusion'" (quoting *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)). Additionally, O'Neal's testimony on the additional risk created by the alleged loans is not relevant to McBeth's surviving claims and, thus, inadmissible. *See* Fed. R. Evid. 401-402.

**D. David Zweighaft**

Finally, Defendants' objections to David Zweighaft's testimony are also DENIED in part and GRANTED in part. Zweighaft may walk the jury briefly through the loan documents he reviewed because they form the basis for his opinion on their proper characterization. *See Riegel*, 451 F.3d at 127. Zweighaft may also testify to his opinion on the validity of the loan scheme and audit process because those opinions are not legal conclusions or direct evaluations of other witnesses' credibility. *See Feliciano*, 223 F.3d at 121. Zweighaft's testimony on the tax treatment of performance-based compensation, however, is inadmissible as rebuttal testimony. Gerber's report did not address tax treatment, and a rebuttal report is limited to "the same subject matter identified by another party." Fed. R. Civ. P. 26; *United States v. Tejada*, 956 F.2d 1256, 1266 (2d Cir. 1992) ("The function of rebuttal evidence is to explain or rebut evidence offered by an opponent.") Although "rebuttal is not limited to direct contradiction," *United States v. Barrow*, 400 F.3d 109, 120 (2d Cir. 2005), and Gerber did testify that the audit of the Performance Statistics was "consistent with the industry standard" (Gerber Report ¶ 21), the connection between proper accounting and auditing and tax treatment is too attenuated to justify admission of that portion of Zweighaft's testimony.

**CONCLUSION**

For the reasons stated above, McBeth's motion for leave to file a Fourth Amended Complaint is DENIED; Defendants' motion *in limine* is GRANTED in part and DENIED in part; McBeth's motion *in limine* is GRANTED in part and DENIED in part; and McBeth's separate

17

motion to exclude expert testimony, including his request for a *Daubert* hearing, is DENIED. Additionally, as described above, the parties are ORDERED to submit, **no later than November 21, 2018**: (1) joint proposed jury instructions; (2) a joint proposed verdict sheet; and (3) from each party, a statement of the damages claimed. Additionally, the parties are granted leave to file, by the same date, letter briefs, not to exceed five pages each, addressing any outstanding damages issues. (By the same date, Defendants may respond, in a letter brief not to exceed three pages, to McBeth's argument regarding the relevance of certain paragraphs in the TAC to his non-dismissed claims.)

The Clerk of Court is directed to terminate Docket Nos. 178, 186, 189, and 200.

SO ORDERED.

Dated: November 15, 2018
New York, New York

JESSE M. FURMAN
United States District Judge