UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DONALD F. McBETH,

                    Plaintiff,

          v.                            15 CV 02742(AKH)

GREGORY I. PORGES, SPECTRA
FINANCIAL GROUP, LLC, and
SPECTRA INVESTMENT GROUP, LLC,

                    Defendants.
                                        Trial
------------------------------x
                                        New York, N.Y.
                                        December 13, 2018
                                        10:00 a.m.

Before:

                HON. ALVIN K. HELLERSTEIN,

                                        District Judge
                                          and a Jury


                        APPEARANCES

HARRIS, ST. LAURENT & CHAUDHRY, LLC
     Attorneys for Plaintiff
BY:  PRIYA CHAUDHRY
     LINDSAY R. SKIBELL
     S. GABRIEL HAYES-WILLIAMS

SCHULTE ROTH & ZABEL, LLP
     Attorneys for Defendants
BY:  HOWARD SCHIFFMAN
     ROBERT GRIFFIN

ALSO PRESENT:
Derrick Cole, Technician
Julie Blackman, Jury Consultant
Katherine Will, Legal Assistant, Schulte, Roth & Zabel

ICDLMCB1

1

2          THE COURT:  Good morning, everyone.  Be seated.We

3     distributed last night later than we had proposed, the copy of

4     the substantive section of the jury charge.  I did not see -- I

5     have not seen the entire jury charge.  Mr. Ross can give it to

6     you now.  I've marked the entire document Court Exhibit 4.

7          Mr. Schiffman?

8          MR. SCHIFFMAN:  We can proceed, your Honor.  Thank

9     you.

10         THE COURT:  I will take your comments on the

11    substantive section of what we gave out to give you more time

12    to look at the rest of the stuff, which should not be

13    controversial.  We gave you later last night the aspect of the

14    charge that will be given to the jury after it returns its

15    verdict on the plaintiff's claim.

16         So, I want to emphasize the notes that are on the

17    first page of the jury charge.  The purpose of this conference

18    is to see if there's modifications that are necessary with

19    respect to this jury charge.  I'll make the corrections I

20    indicate, but the draft remains subject to corrections as I

21    listen to your arguments.  This will be the only copy given to

22    you.

23         I give my charge to the jury reading most of it, but

24    also extemporizing where I think the jury looks like they

25    haven't caught on to what I've been saying or if they need

1    repetition or explanation.  So, the charge I give will not be

2    the charge in this document.  I do it this way because I've

3    found, after long years of practice, that it's unreliable to

4    give a document to even an intelligent witness and expect that

5    the person will have read and understood it entirely.  And so,

6    I developed a practice of depending on the oral questions and

7    answers to understanding the document, the important document,

8    by a witness or by a jury.  And that's why I don't give them

9    the written charge.

10        The second reason is that if there are questions about

11   the charge, people who feel they can read and understand a

12   written document better than others become the interpreters of

13   the charge to the rest of the jury.  I firmly believe that the

14   jury is a democratic institution, each person having the right

15   to his own opinions and exercising them.  And I don't want to

16   create a condition where some feel that they can't interpret

17   the words of the document as others.  So, I'd much rather have

18   the jury have the questions come out, put the questions to me

19   and discuss them with you, and an answer can be given following

20   advice of counsel.

21        The third reason is that often deliberations, if there

22   is no consensus developing, can be bitter and acrimonious, and

23   people dig into their positions.  And I've found that if they

24   come out and put their questions in the form of some further

25   explanation of the charge that had been given, it's an

1    opportunity for tempers to cool.  I've found that out also in

2    the course of the years.  So, that's why I do this.  I thought

3    you should know.

4            So, the part that was sent to you last night begins on

5    page seven and continues to page --

6            MR. SCHIFFMAN:  May I approach, your Honor?

7            THE COURT:  -- page 13.  So, we'll take that.  One

8    person -- the plaintiff -- can tell me what page he or she has

9    a comment on.

10           So, you start, Mr. Skibell.  What's the first page you

11   have a comment on?

12           MR. SKIBELL:  That will be page seven.

13           THE COURT:  Yes.

14           MR. SKIBELL:  And it is the third paragraph.  And it's

15   the second clause, "Were intended by defendants."

16           THE COURT:  The paragraph begins with what,

17   "defendant's --

18           MR. SKIBELL:  The paragraph begins, "Plaintiff claims

19   the defendant's money transfers."

20           THE COURT:  Yes.

21           MR. SKIBELL:  And it's the clause starting "Were".

22           THE COURT:  "Were intended by defendants."

23           MR. SKIBELL:  Yes.All right.  So, let me explain.

24   This is what my four concerns about the charge is.  And I

25   appreciate that the Court wants to make things as

1    straightforward as possible for the jurors; however, we can't

2    ignore the law of contracts.  And a loan is a contract.  A loan

3    is not enough to create a loan.And I'd like to, if I may, read

4    from the case that was included in our earlier letter, which I

5    think sets forth quite clearly the elements of a loan.

6              This is the Second Circuit opinion, *In re: Renshaw*.

7    It's 222 --

8              THE COURT:  I tell you what.  Save your argument.

9              The purpose of these instructions is to stay out of

10   your adversary positions as much as possible.  If this bothers

11   you, let's see if we can fix it up so it won't bother you.

12             MR. SKIBELL:  Correct.

13             THE COURT:  How about we say, "Plaintiff claims that

14   defendant's money transfers to the Spectra Opportunities Fund

15   should not have been classified as loans and that repayment of

16   these money advances breached defendant's fiduciary duty to

17   plaintiff?"

18             MR. SKIBELL:  That sounds good to me, your Honor.

19             THE COURT:  Here's what the way I propose, Plaintiff

20   claims that the defendant's money transfers to the Spectra

21   Opportunities Master Fund should not have been classified as

22   loans by defendants, and that repayment to defendants of these

23   money advances breached defendant's fiduciary duty to

24   plaintiff."

25             Is that okay, Mr. Skibell?

1              MR. SKIBELL:  Your Honor, that, works for us.

2              THE COURT:  Mr. Schiffman?

3              MR. SCHIFFMAN:  Mr. Griffin is going to do most of the

4    talking, but I think that's fine, your Honor.

5              MR. GRIFFIN:  I don't know how to respond.

6              MR. SCHIFFMAN:  I have nothing else.

7              MR. SKIBELL:  On the next page, page nine --

8              THE COURT:  You have anything before nine, Mr.

9    Griffin?

10             MR. GRIFFIN:  I do.I think that in light of the change

11   to the third paragraph, the fourth paragraph should be slightly

12   edited just to say that the transfers made to Spectra

13   Opportunities were intended to be loans and were loans.

14             THE COURT:  No.  I'm not going to say "and were loans"

15   because that's an affirmative statement by me.

16             MR. GRIFFIN:  Okay.

17             THE COURT:  But I should add "or gift" because there

18   is that theory, too.  So, it will read, "Defendants denied

19   plaintiff's claim and allege that the transfers made to Spectra

20   -- I shouldn't say -- that defendants made" --

21             MS. CHAUDHRY:  Yes.

22             THE COURT:  -- "to Spectra Opportunities and Master

23   Fund were intended to be loans, not contributions of capital or

24   gifts, and that the repayment of the loans to defendants was

25   proper."

1            You okay with that?

2            MR. GRIFFIN:  That's fine, your Honor.

3            MR. SKIBELL:  Yes, your Honor.

4            THE COURT:  Okay.

5            Anything on eight, Mr. Griffin?

6            MR. GRIFFIN:  No, Your Honor.

7            THE COURT:  Page nine, Mr. Skibell?

8            MR. SKIBELL:  Yeah.  At the bottom paragraph where it

9    says, "a loan," I believe it should read, "A loan is a contract

10   for" -- and then the rest of the sentence continues.

11           THE COURT:  Mr. Griffin?

12           MR. GRIFFIN:  I mean, the sentence, as written, is

13   accurate.  I'm not sure it's necessary to add, "is a contract."

14   I think it's fairly --

15           THE COURT:  I think that's a legal construct.I could

16   lend you money, Mr. Skibell, not as a Judge, but if you and I

17   were friends, and I didn't have a position of judging your

18   case.  I could lend you money just orally.  And say, look,

19   you're short, here's a hundred dollars, pay me back when you

20   can.

21           MR. SKIBELL:  Your Honor, you could do that, but it

22   would only be a loan if there was consideration and it wasn't

23   barred by the New York statute of frauds.

24           THE COURT:  Look, I think you can argue those things,

25   but I don't think that's true.  You have a distinction between

1     a loan made with the expectation of repayment, and a loan

2     that's enforceable in a court of law.  If it's money that's

3     given with the expectation of repayment, it's a loan.

4          MR. SKIBELL:  Your Honor, that's not what the Second

5     Circuit says.  It's the *Renshaw* case.  It's very clear that one

6     element of a loan is a contract.  And that's what we all know a

7     loan to be.You cannot ignore the law of contracts including

8     consideration in the statute of frauds.  It's just not the law.

9     So I --

10          THE COURT:  Is there a writing that's required?

11          MR. SKIBELL:  Your Honor?

12          THE COURT:  Is there a writing that's required?

13          MR. SKIBELL:  There's a writing required under the

14     statute.  There's an exception under statute of frauds.

15          THE COURT:  Can they waive the statute?

16          MR. SKIBELL:  I don't recall that they can waive the

17     statute of frauds.

18          THE COURT:  They can waive it.

19          MR. SKIBELL:  But when something's indefinite --

20          THE COURT:  You don't plead the statute of frauds.

21     The loan can be enforced.  It's affirmative defense.

22          MR. SKIBELL:  In any event, your Honor, we believe

23     that both consideration and the law of oral contracts or the

24     statute of fraud should be included.

25          THE COURT:  Hold up for a minute.

1          I propose the following:  Starting with the third

2     line, where it says, "maturity or on demand," the next sentence

3     can be inserted as follows, "A loan is a contract requiring a

4     meeting of the minds of lender and borrower for consideration.

5     There may or may not be a written note or other writing

6     evidencing the loan.  If there is not such a writing, there

7     still may be a loan, but the loan might not be enforceable in a

8     court of law."

9          And then the last sentence, "The lender is entitled,"

10    etc.

11          MS. CHAUDHRY:  Could you read that again?

12          THE COURT:  You satisfied, Mr. Skibell?

13          MR. SKIBELL:  Could you read it one more time,

14    your Honor?

15          THE COURT:  Sure.

16          The reporter need not write it back a second time.

17          MR. SKIBELL:  Yeah.  I think it's fine.

18          MR. GRIFFIN:  A couple objections, your Honor, or

19    comments.

20          The final sentence about the loan not being

21    enforceable in a court of law, it seems to be unnecessary.  I

22    mean, for one reason it's not an issue in the case, whether,

23    you know, a loan that's not a writing is enforceable in a court

24    of law.

25          Second, it's inconsistent with the facts here, where,

1    you know, the statute of frauds would only kick in, in an oral

2    loan agreement if there's absolutely no possibility of it being

3    repaid within a year.  I mean, I have case law I can cite to

4    you on this.

5         THE COURT:  And payable within a year is not subject

6    to a statute of fraud; isn't that right, Mr. Skibell?

7         MR. SKIBELL:  No.  It's wrong.  If it's indefinite,

8    then it is subject to the statute of frauds because it's

9    considered not payable within a year.

10        THE COURT:  These were three-year notes at the

11   discretion of the borrower.

12        MR. SKIBELL:  That's a matter for the jury to decide.

13        THE COURT:  No.  That's a matter of contract.  That's

14   the way it's written.

15        MR. SKIBELL:  They may decide that what Mr. Porges

16   intended was an oral contract with himself, that was of an

17   indefinite term that would be barred by the statute of frauds.

18        THE COURT:  That's not true.  That's not true because

19   each note was in writing, signed in dual capacities, went from

20   one company to another company.  That's not unusual.  It is

21   prepayable within a year.Frankly, I don't know right now.  We

22   have to check whether it was not a statute, but I think you're

23   right, Mr. Griffin, that that sentence is unnecessary.

24        MR. GRIFFIN:  Okay.  Two more comments, your Honor.

25        First, on the first sentence, the original first

1    sentence, the portion that states, "Together with any interest

2    payable on the loan," I don't think it was your Honor's

3    intention, but our view is that that portion of the instruction

4    may be a bit confusing to the jury.  And we want to make clear

5    that you don't need interest on the loan.  It can be a zero

6    percent interest loan and still be a loan.

7            THE COURT:  But it wasn't.

8            MR. GRIFFIN:  But it can be.

9            THE COURT:  You're treading on difficult waters,

10   because it can also be considered a gift.  If you lend, for

11   example, to a child and you don't take some rate of interest

12   that's consistent with normal practice that's codified by the

13   internal revenue service regulations, it may not be a loan, and

14   you may not be able to take an interest charge or utilize

15   interest income.

16           MR. GRIFFIN:  Right.  But this sentence is dealing

17   exclusively with loans, not gifts.

18           THE COURT:  And I'm going to leave it.

19           MS. CHAUDHRY:  Sir, could you tell us --

20           THE COURT:  There's nothing in here that says that you

21   can't not waive interest.  But I'll be glad to say that, too.

22           Mr. Schiffman?

23           MR. SCHIFFMAN:  Yes.  That's the point.  That's

24   exactly the point.

25           THE COURT:  I'll read the entire paragraph again.

 1              MR. GRIFFIN:  One more, your Honor.

 2              When we add the line about requiring a meeting of the

 3    minds --

 4              THE COURT:  Can you wait a minute?

 5              MR. GRIFFIN:  Sure.

 6              THE COURT:  Go ahead.

 7              MR. GRIFFIN:  So, when we add the section about

 8    requiring a meeting of the minds -- and I'm reading from a case

 9    called Larson v. Eney, 741 F.Supp.2d 459 SDNY (2010).  We have

10    a copy.

11              THE COURT:  Who was the Judge?

12              MR. GRIFFIN:  The judge is Judge Marrero.

13              It says, "However, in addition to a meeting of the

14    minds, a critical issue in the determination of whether a

15    transaction is a loan is whether the intent to make a loan was

16    present."

17              So, we would want to add that second part of it too,

18    that a critical element is whether the intent to make a loan is

19    present.

20              THE COURT:  I don't think I need to say anymore.  Let

21    me read the whole paragraph.

22              "A loan is money paid by one party, the lender, lent

23    to another party, the borrower, with the intent that the loan

24    shall be paid, together with any interest payable on the loan,

25    on maturity or on demand.  The lender, if he wishes, can waive

1    interest without changing the classification as loan.  A loan

2    is a contract requiring a meeting of the minds of lender and

3    borrower for consideration.  There may or may not be a written

4    note or other writing evidencing the loan."If there is not such

5    a writing, there still might be a loan.  A lender is entitled

6    to have his loan paid first before any funds are distributed to

7    the company's equity holders."

8            Yes, Mr. Skibell?

9            MR. SKIBELL:  Your Honor, I don't understand why you

10   have about the interest waive.  The law is that you need

11   consideration for a contract as well as a modification of a

12   contract.  What New York UCC says is that a promissory note,

13   when it's first made -- I don't know about modified -- can be a

14   no-interest loan.  What you're saying, the sentence you added,

15   is not the law.  And I think it suggests that -- it implies

16   there was some sort of modification that I don't believe the

17   testimony supports.  So I think --

18           THE COURT:  No.  You can have consideration in any

19   form.  And if a loan is made to preserve an investment or

20   preserve a position, there is consideration.  So, from a point

21   of view of a lender, the lender had invested in the fund and

22   wanted to preserve his investment and was willing to make loans

23   to enable the investment to stand.  And from the point of view

24   of the borrower, the borrower wanted to stay in business.  And

25   if the loan had not been received, he would be out of business.

1              MR. SKIBELL:  Your Honor, that's not right. Many of

2     these entities have no investment in the fund. And it's highly

3     speculative to say they would have done better if they had

4     entered into these agreements.

5              THE COURT:  Affiliated company under common control.

6     And I don't think --

7              MR. SKIBELL:  That doesn't mean that there's

8     consideration.  You can't ignore the corporate fund for this

9     limited purpose.

10             THE COURT:  I'll leave it the way it is.  I overrule

11    the objection.

12             MS. CHAUDHRY:  Your Honor, may I step out for a few

13    minutes?

14             THE COURT:  Yes.

15             MS. CHAUDHRY:  Thank you.

16             MR. SKIBELL:  So, your Honor, if I understand, you're

17    making a determination and taking away from the jury the

18    decision as to whether there was consideration?

19             THE COURT:  You can argue it.

20             MR. SKIBELL:  Right.

21             THE COURT:  You can argue it.  I said for

22    consideration, you can argue it.  I'm staying out of your way.

23             MR. SKIBELL:  Your Honor, the modification language, I

24    think, implies that there was a modification.  I don't think

25    that's staying out of the way.  That's my concern.

1            THE COURT:  What you do you mean by a modification?

2            MR. SKIBELL:  The "and can be modified," the "interest

3    can be waived" sentence, I think implies that that's what took

4    place, when I don't think that's necessary or appropriate.

5    That was my concern.  I think it's superfluous.

6            THE COURT:  Supposing I take out the clause "together

7    with any interest payable on the loan?"

8            MR. SKIBELL:  I think that might work.

9            THE COURT:  "The loan is money paid by one party, the

10   lender, lent to another party, the borrower, with the intent

11   that the loan shall be paid on maturity or on demand."

12            And then no comment about waiving interest.

13            MR. SKIBELL:  And then it says something about

14   consideration in the next sentence?

15            THE COURT:  A loan is a contract requiring a meeting

16   of the minds of lender and borrower for consideration.

17            MR. SKIBELL:  I think that works, your Honor.

18            THE COURT:  Also page nine -- page ten?

19            MR. SKIBELL:  Your Honor, I have serious difficulties

20   with the damages language.

21            THE COURT:  With what?

22            MR. SKIBELL:  I have serious issues with the damages

23   language, because it misstates the law on equitable tolling,

24   which was the letter I sent.

25            THE COURT:  Which part?

1          MR. SKIBELL:  Starting, "If you find the defendants

2     are liable to plaintiffs, plaintiffs damages are" --

3          THE COURT:  The bottom paragraph.  What's your issue?

4          MR. SKIBELL:  Actually, your Honor, there's one other

5     thing.  I forgot.  I apologize for that.  It was with the gift

6     language, if we could go back there for one minute.

7          THE COURT:  Okay.

8          MR. SKIBELL:  And this is my concern about the gift

9     language.  So, the *Gruen* case that's cited in the jury

10    instructions says that the donated intent must be to transfer

11    the property.  It does not say you have to have a specific

12    intent to transfer a gift.  As a gift, I don't think it's

13    accurate.  I would suggest the donor must intend to transfer

14    "the gift," not "as a gift," for it to read properly.

15         THE COURT:  I don't agree.

16         MR. SKIBELL:  Well, your Honor, can quote from *Gruen*

17    *v. Gruen* and --

18         THE COURT:  I don't agree with you.  The intent to

19    give is with respect to something that's given.

20         MR. SKIBELL:  Yes.  But to define it as an intent to

21    transfer as a gift is circular.  Of course, you're --

22         THE COURT:  If you transfer it as a pledge, you

23    transfer it as a loan.  If you transfer it as a gift.

24         MR. SKIBELL:  All it requires is that you want to

25    revoke your rights to it and that it's property of some type.

1              THE COURT:  I'm leaving it.

2              MR. SKIBELL:  The other thing is the last sentence

3    there, talks about donated intent must be proved by clear and

4    convincing evidence.  *Gruen v. Gruen* does not single out

5    donated intent.  It applies to all elements.  So, the way it's

6    written puts undue weight on it.

7              THE COURT:  The truth is that I'm highly suspicious of

8    these added burdens.  Clear and convincing, for example,

9    contradicts the general rule of preponderance of the evidence.

10   But cases say that.  And cases say that there must be a clear

11   and convincing evidence that the intent was to give something

12   as a gift.

13             MR. SKIBELL:  Your Honor --

14             THE COURT:  The law does not really favor gifts, and

15   to prevent abuse, wants to make it clear.A lot of this came up

16   with promises to marry and engagement.  And there was

17   litigation over the effort by the gentleman who gave the ring

18   to get it back.  Was it a gift or was it given on a condition

19   of marriage?  So, that's where the law says you've got to be

20   very clear and convincing that it was a gift.

21             MR. SCHIFFMAN:  I have no problem with the clear and

22   convincing standard, I just think it should be clear applying

23   to all elements and not single out donated intent.

24             THE COURT:  What other elements are there?

25             MR. SKIBELL:  Must be delivered and must be accepted.

1    Delivering acceptance come up all the time in cases.

2              THE COURT:  You said each of them?

3              MR. SKIBELL:  Yes.  Each of them is clear and

4    convincing according to the *Gruen* case.

5              THE COURT:  Okay.  Against your interest.

6              MR. SKIBELL:  Yeah, I know.  But donated intent, I

7    just don't want to make it look like it's singled out.

8              THE COURT:  All right.  So, I will say in the third

9    sentence, "The law requires that each of these elements must be

10   proved by clear and convincing evidence."

11             MR. SKIBELL:  That works, your Honor.

12             THE COURT:  Okay.  And now go down to the bottom

13   paragraph.

14             MR. SKIBELL:  So, this goes --

15             THE COURT:  One minute.  Okay.

16             MR. SKIBELL:  So, my concern with the bottom paragraph

17   has to do with the issue of equitable tolling, which is

18   incorrectly stated in here and is the reason your Honor is

19   limiting the damages to what they are.  And I'd like to discuss

20   what Delaware law on equitable tolling says.

21             THE COURT:  How would you like to change this?

22             MR. SKIBELL:  I would like to change this so that the

23   jury is left up to determine it inconsistent with the expert

24   testimony and other evidence that they've heard.

25             THE COURT:  You would want to change the 1.44 million

1    to something else?

2              MR. SKIBELL:  I want to take out any numbers here and

3    let the jury decide in accordance with the evidence that

4    they've heard.  And I think that's consistent with the

5    directions they got when they saw these various demonstratives.

6    And the parties can argue on closing what's the measure of

7    damages, and it will be for the jury to decide.

8              THE COURT:  Mr. Griffin?

9              MR. GRIFFIN:  I disagree, your Honor.  I think that

10   this instruction, the first sentence is fine as written.  I

11   have a minor change to the number, just to correct that it's

12   actually 1.42 that went out.

13             THE COURT:  1.42?

14             MR. GRIFFIN:  Yeah.  The total --

15             THE COURT:  Give me the correct number -- exact

16   number.

17             MR. GRIFFIN:  The total alpha was $1,420,568.94.

18   That's the March 7, 2012 transfer.  Apart from that, though --

19             THE COURT:  Frankly, can we come back to this after we

20   clear the statute of limitations?

21             MR. GRIFFIN:  That's what I was going to suggest.

22             MR. SKIBELL:  I think that's a good idea.

23             THE COURT:  So, any comment on 11?  Let's come back to

24   11.  All right.  So, 12.

25             MR. SKIBELL:  On page 13, your Honor appears to have

1   taken out the sentence that we had serious issues with.  And I

2   would suggest one more sentence for explanatory value since --

3           THE COURT:  Are you okay with page 12?

4           MR. SKIBELL:  Yes.  Yes.

5           THE COURT:  And what on 13 would you like to change?

6           MR. SKIBELL:  I would like to add a sentence.

7           THE COURT:  To where?

8           MR. SKIBELL:  To before, "Inquiry notice does not

9   require full knowledge of material facts."

10          THE COURT:  That's the last paragraph?

11          MR. SKIBELL:  Yes.  And I can explain why, if that

12  would be helpful.

13          THE COURT:  Go ahead.

14          MR. SKIBELL:  So, I think a sense of explanation will

15  be helpful for the jury to understand, since inquiry notice is

16  a difficult concept.  And it says here that -- in the sentence

17  beforehand, that the second part of it is that Mr. McBeth, if

18  he pursued discovery, would have led to discovery of the

19  breach.

20          THE COURT:  It begins with "notice means debt."

21          MR. SKIBELL:  Yes.  The last clause.

22          THE COURT:  And you're focused on the last cause?

23          MR. SKIBELL:  Would have led to discovery of the

24  breach.

25          So, what Delaware case law says is you not just have

1    to discover that you may have a claim, you got to have enough

2    evidence to assert a viable complaint.  So, this means Mr.

3    McBeth would have had to have known about the specific issues

4    that this case is about, which means the loans.  And I think

5    that a sense of explanation would explain it's not just

6    discovery that he has a problem --

7         THE COURT:  How about if I add the words, "officially

8    to state a claim?"

9         MR. SKIBELL:  That would be fine, your Honor.

10        MR. GRIFFIN:  Your Honor, I would object.The whole

11   concept of inquiry notice is that it's a red flag's concept.

12   You don't need to know all the elements of your claim to be on

13   inquiry notice.

14        MR. SKIBELL:  That's not true in Delaware law.

15        THE COURT:  Don't argue with yourselves.  The

16   conversation is to me.

17        How about if I say the "discovery of the facts given

18   rise to the breach?"

19        MR. SKIBELL:  "Sufficient to support a claim."

20        THE COURT:  Right.  But leave out "sufficient to

21   support a claim."

22        MR. SKIBELL:  But that's the law.

23        THE COURT:  I'm trying to get a consensus for you.

24        "The discovery of the fact giving rise to the breach."

25        MR. SKIBELL:  Could you read it one more time,

1    your Honor?

2        THE COURT:  The clauses would have led to discovery of

3    the breach, and I'm suggesting we should say, "Would have led

4    to discovery of the facts giving rise to the breach."

5        MR. SKIBELL:  I can live with that, your Honor.

6        THE COURT:  Mr. Griffin?

7        MR. GRIFFIN:  I propose striking "the facts" so it

8    would say "discovery of facts" because the point here with

9    inquiry notice --

10        THE COURT:  I can do that, "discovery of facts giving

11    rise to the breach."

12        MR. SKIBELL:  I can live with that, your Honor.

13        THE COURT:  Okay.  So with that in mind, let's go back

14    to ten.

15        Without looking at the words, your position is that if

16    the statute of limitations is not tolled, the limit of damage

17    is one, four $1,420,586.94.  And I think both sides go along

18    with that.

19        MR. SKIBELL:  No, Your Honor, not at all.

20        THE COURT:  No?  Okay.

21        MR. SKIBELL:  I'm sorry.  You said "no toll."

22        THE COURT:  Right.

23        MR. SKIBELL:  That's fine, your Honor.  I mean, we

24    respectfully disagree.  We think it should include the other

25    disbursements from the fund.

1            THE COURT:  You accept that sentence, if it's "no

2    tolling?"

3            MR. SKIBELL:  I accept that sentence, but I'd like to

4    object to the fact that it doesn't include the three other

5    disbursements from the fund.  There are two that are qualified

6    as expense reimbursements and there's one that's called a

7    distribution.  It's all money that lasts, and it should be part

8    of that number for the jury to decide.

9            MR. GRIFFIN:  Your Honor, the expenses he's referring

10   to, the plaintiff filed a fourth amended complaint --

11           THE COURT:  Just a minute.  The expenses that were

12   paid were paid after the cut-off date, the statute of

13   limitations applies.  So, they're within the statute.

14           MR. SKIBELL:  Correct.

15           THE COURT:  The different issue is whether they can or

16   cannot be reimbursed.

17           Why wouldn't ordinarily necessary expenses be

18   reimbursed?

19           MR. SKIBELL:  I think it's up to the jury to decide

20   whether they're ordinary and necessary expenses.  They have

21   like $300,000 which posted Bloomberg terminals --

22           MR. GRIFFIN:  Your Honor, this is -- this is --

23           THE COURT:  Stop arguing with each other, please.

24   I'll give you time.

25           It identifies the Bloomberg terminals and the like,

1    that's what -- would it -- these businesses require?  There's

2    no evidence that that's not ordinary and reasonable expense.

3    I'm not going to tell the jury about that.  There's not enough

4    facts in the record to indicate that this was not an ordinary

5    and reasonable expense.  Indeed, what was said about this is it

6    was an ordinary and reasonable expense in running the business.

7            MR. SKIBELL:  At the time the fund wasn't operating.

8            THE COURT:  Yeah.  But it's their consideration,

9    because it used these terms.  So, I'm not going to say anything

10   about the expenses.So, we agree that the 1,420,000 is the

11   correct number if there is no tolling.

12           MR. SKIBELL:  Your Honor, there's still the final

13   disbursement from check to itself, which is around 800,000.

14           MR. GRIFFIN:  Your Honor, Mr. McBeth received a pro

15   rata distribution.

16           MR. SKIBELL:  And we're subtracting that out of any

17   damages claim.

18           THE COURT:  Wait a minute.

19           That last transaction was the distribution to the

20   capital investors according to the proportion of five to 12.5.

21   And that is not part of the damage.You're complaining that this

22   1,420,000 should have been added to that for a distribution.

23   It's not capital and it's not a loan; it's a gift.  If it's

24   capital, its contribution is added.  So, that argument, in my

25   mind, is not a meritorious argument.  All right.  Moving on to

1    the next point:  If there is tolling.Let me put this to Mr.

2    Griffin.  If there is tolling, what's the damage?  What's the

3    number?

4         MR. GRIFFIN:  Well, if there's tolling, we think that

5    inquiry notice kicks in and the statute bars the claim.

6         THE COURT:  I see.  And if you lose on that, what's

7    the number the jury picks?

8         MR. GRIFFIN:  Well, it would depend on when the

9    statute was tolled.

10         THE COURT:  What's the number, Mr. Skibell?

11         MR. SKIBELL:  I don't think that we can put a specific

12    number here because it depends on any factual determinations by

13    the jury in terms of which things were loans, which things were

14    capital contributions.  For example, there's a difference

15    between SIG versus the other ones, and I think we should leave

16    it up to the jury to decide in accordance with the expert

17    testimony and whatever evidence they hear during closing.

18         THE COURT:  My recollection is that there was no

19    distinction made with regard to dates.  If it was a loan, it

20    was a loan.  If it was a capital contribution, it was a capital

21    contribution.  If it was a gift, it was a gift, as it pertains

22    to the law.

23         There's no focus on that.  I think if it has to do

24    that, it is no bounds to instruct.

25         MR. SKIBELL:  Well, your Honor, there's only three --

```
 1              THE COURT:  Burden of proof to show equitable estoppel

 2   is on the plaintiff, right?

 3              MR. SKIBELL:  Your Honor, it's not equitable estoppel;

 4   it's equitable tolling.  And equitable tolling under Delaware

 5   law --

 6              THE COURT:  You're saying equitable tolling, correct?

 7              MR. SKIBELL:  I believe it is our burden.

 8              THE COURT:  It's your burden.  So, you have to prove

 9   when, as in when there was a tolling.  When was it that --

10              MR. SKIBELL:  Your Honor, can I make one note on that?

11              THE COURT:  One minute.

12              When was it?  "But it would be practically impossible

13   for a plaintiff to discover the existence of his or her claim."

14              He had access to a portal, so he could have found it

15   if he looked.

16              MR. SKIBELL:  No, Your Honor.  It's a different one.

17              Delaware law is extremely favorable for fiduciaries.

18   An investor who has a fiduciary relationship with someone is

19   allowed to rely on a fiduciary and not filing a case until

20   inquiry notice is shown.

21              THE COURT:  And it applies to situations where there's

22   a true fiduciary relationship.  This is not a true fiduciary

23   relationship other than the obligations of the majority

24   stockholders.

25              MR. SKIBELL:  Your Honor, these cases are all Delaware
```

1    cases about stockholders.  They specifically apply to

2    situations like this.  And they say an investor is entitled to

3    rely on a fiduciary until there's inquiry notice.  So, the

4    burden shifts to them, so there's a fiduciary relationship.

5    And we don't think there's any inquiry notice here because it's

6    literally impossible for them to figure out there were loans

7    going.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            THE COURT:  So if he were on the issue, how much is it

2    that you get?

3            MR. SKIBELL:  There were two different calculations we

4    ran and one that they did.  I believe those three numbers are

5    all fine.  They just depend on different assumptions.  I do not

6    have them in front of me, but if we take a break, I can pull

7    them up very briefly.

8            THE COURT:  I would like to have specific numbers to

9    give to the jury.

10           MR. GRIFFIN:  Your Honor, may I speak?

11           THE COURT:  Yes.

12           MR. GRIFFIN:  This is, we argue, all a sideshow at

13   this point.  I am referring to footnote 4 of the instruction,

14   which says, "In light of the court's view that the only

15   arguable breach of fiduciary duty occurred in March 2012 within

16   the limitations period, the court proposes not to give this

17   instruction."  And defendants agree.

18           The only possible breach of fiduciary duty -- and we

19   obviously don't believe there is one -- is that $1.4 million

20   loan repayment.  Because what you have to remember is this is a

21   duty of loyalty case.  And the question, the key question here

22   is whether the Spectra entities and Mr. Porges put their

23   interests above Mr. McBeth by funding margin calls.  So whether

24   they are loans or whether they are capital contributions or

25   whether they are gifts, they are all going to keeping the fund

1    afloat.

2            THE COURT:  I believe that the only potential breaches

3    are the repayments.

4            MR. GRIFFIN:  Right.

5            THE COURT:  And there were three repayments.

6            MR. GRIFFIN:  Right.  So you don't have to get into --

7            THE COURT:  The first, the first -- and ultimately,

8    see, it is not so easy, and I keep flipping on this issue in my

9    own mind, because Mr. Skibell's theory is that every repayment

10   was improper, not just the net of 1.4 at the end.

11           MR. GRIFFIN:  But they were solvent the whole time,

12   and the money was going in to pay margin calls.

13           THE COURT:  It has nothing to do with solvency.  It

14   has to do with the classification as loans.  If they were

15   contributions of capital all along, they couldn't be return of

16   capital --

17           MR. SCHIFFMAN:  Sure they could.

18           THE COURT:  -- to one investor.

19           MR. SCHIFFMAN:  Sure they could.

20           MR. SKIBELL:  That's our theory.

21           MR. SCHIFFMAN:  If I may speak, your Honor?

22           THE COURT:  Who wants to speak.

23           MR. SCHIFFMAN:  May I speak?  I know Mr. Griffin has

24   been handling this, but could I.

25           THE COURT:  Yeah, you can speak.

1          MR. SCHIFFMAN:  Again, I thought what your Honor was

2   saying, and we agree, is until the fund had -- while the fund

3   is solvent, he could -- just like they say he could make an

4   unlimited number of capital contributions, he could make an

5   unlimited capital withdrawal.  It is completely irrelevant

6   while the fund is solvent whether it is capital or not.  He can

7   take it in, he can take it out.

8          THE COURT:  I think, Mr. Schiffman, that if it is

9   capital, you can't give one investor a return of capital

10  without giving --

11         MR. SCHIFFMAN:  Sure you can.

12         THE COURT:  -- unless there is a clause that says

13  so.

14         MR. SCHIFFMAN:  It does.  He has the right to go in

15  and out.  Every hedge fund, people go in and out all the time.

16  Not everybody has to go out at the same time.  He could have

17  redeemed and Mr. Porges could have stayed in.  That's the exact

18  point.  There is no reason why, while they are solvent, he

19  couldn't have gone in 71 times and out 71 times and would not

20  have put his own interest above Mr. Porges.  Mr. McBeth could

21  have redeemed any time he wanted to.

22         THE COURT:  I got your point.

23         MR. SCHIFFMAN:  There is no fiduciary duty.

24         THE COURT:  I understand your point.

25         What's your comment, Mr. Skibell?

1              MR. SKIBELL:  Your Honor, we have been treating this

2    case, from the very beginning of this trial, as the repayments

3    are the breaches.  It is for the jury to decide.  What this

4    footnote 4 was based on was an incorrect statement of equitable

5    tolling based on a '99 Lanham Act case in the Southern

6    District.  Delaware law is very different on equitable tolling,

7    and so the footnote 4 no longer applies.  It is for the jury to

8    decide when Mr. McBeth was on inquiry notice based on Delaware

9    law, and we shouldn't take that away from them at the 11th and

10   45 minute hour.

11             THE COURT:  I'm going to give this charge, the statute

12   of limitations charge, so we can take out footnote 4, but I

13   don't read the footnotes anyhow.  This is just a comment to

14   you.

15             MR. SKIBELL:  Your Honor, if you want us to take a

16   break and give you the different damages scenarios, we can --

17   each side can do that, and then we can give three numbers in

18   there and it will be up to the jury to make decisions.

19             THE COURT:  Okay.  Okay.

20             Should I be moving the last paragraph on page 10, with

21   some rewording, to a page 13A?

22             MR. SKIBELL:  Yes, I think that would make good sense.

23             THE COURT:  Do you agree, Mr. Griffin?

24             MR. GRIFFIN:  To page 13A?

25             THE COURT:  A new page, the bottom of the instruction

1   on limitations.  Probably have to merge the two.

2          MR. GRIFFIN:  Yes.  I don't have any objections to the

3   placement.  I just want to reiterate, though, the idea that

4   there is a breach of fiduciary duty before the insolvency

5   repayments start, it is just completely inconsistent.

6          THE COURT:  I understand.  Mr. Schiffman made the

7   point that he had the right, even if it was capital, to get a

8   return of capital.

9          MR. GRIFFIN:  But it is a little bit more than that.

10  Remember, the duty of loyalty here, has the fiduciary -- in

11  this case, the Spectra entities and Mr. Porges -- placed their

12  interest above Mr. McBeth's?  All --

13         THE COURT:  The only -- you are arguing, and I

14  agree, that the only breach, the only potential breach of the

15  duty, fiduciary duty, is to prefer himself by a $1.4 million

16  return.

17         MR. GRIFFIN:  Right.  So it moots the statute of

18  limitations.

19         THE COURT:  I agree with you.  I agree with you.

20         MR. SKIBELL:  Your Honor --

21         THE COURT:  But Mr. Skibell wants to argue beyond

22  that.  The case has been opened to do that, and I want to let

23  him make the record that he wants to make.

24         MR. GRIFFIN:  Your Honor, there is no evidence to

25  support that.

1     THE COURT:  Because, heaven knows, there will be

2  appeals on the issue afterwards.

3     What?

4     MR. GRIFFIN:  There no evidence to support that.  The

5  evidence in this case is that the fund needed cash to fund

6  margin calls.

7     THE COURT:  You can argue that to the jury.  I am

8  giving you ample room to argue this case to the jury, so I'm

9  trying to avoid eliminating any question from the jury.  The

10  jury is going to decide.  We have to bear with the -- I have

11  got to give them structure for it, but they will decide, and

12  you will make your arguments.

13     Okay.  Ten-minute break.

14     (Recess)

15     THE COURT:  Okay, folks.

16     So, Mr. Skibell, where are we?

17     MR. SKIBELL:  Your Honor, I brought in my damages

18  expert, Ms. Chaudhry, to give the numbers.

19     MS. CHAUDHRY:  So, your Honor, as noted in our

20  demonstrative, which the court has a copy of, which is PX 101,

21  if all of the transfers are not loans and are gifts, do you

22  want the final number of what the damages would be or do you

23  want the calculation?

24     THE COURT:  Both probably.

25     MS. CHAUDHRY:  Okay.

```
 1              THE COURT:  Say it again.  If all returns of

 2      capital --

 3              MS. CHAUDHRY:  Okay, sir, I didn't realize you would

 4      be looking at the returns of capital.  We would --

 5              THE COURT:  Let's start again, Ms. Chaudhry.

 6              MS. CHAUDHRY:  Okay.  If all the returns of capital

 7      were inappropriate, then that amount is 11 -- sorry.  We had

 8      done the calculation based on all the payments in, not the

 9      payments out, but the number is about 11.5 million.  It is,

10      sorry, $11,134,331.94.

11              THE COURT:  That's the sum total of money paid back.

12              MS. CHAUDHRY:  Paid out, yes.

13              THE COURT:  Paid back.

14              MS. CHAUDHRY:  Paid back, yes.

15              MR. SCHIFFMAN:  Which chart are we on?  I apologize.

16              MS. CHAUDHRY:  This is just from PX 73.

17              MR. SCHIFFMAN:  Is that a new document?

18              MS. CHAUDHRY:  No.  It is in evidence.

19              THE COURT:  Look at me.  Look at me.  What is the

20      source?  Exhibit PX 73?

21              MS. CHAUDHRY:  PX 73.

22              THE COURT:  $11,134,331.94, and that would posit that

23      these amounts were not capital, they were gifts.

24              MS. CHAUDHRY:  Right, and then repayment of those is

25      not appropriate.
```

 1              THE COURT:  If they were gifts, no payment is

 2   appropriate.

 3              MS. CHAUDHRY:  No payment is appropriate.  And also --

 4              THE COURT:  If they were capital --

 5              MS. CHAUDHRY:  If they were capital, then I believe

 6   the damages calculation done by defendants is the right one.

 7   Equity dilutes Mr. McBeth, and --

 8              THE COURT:  Okay.

 9              MS. CHAUDHRY:  -- they have their hypothetical damages

10   listed on their --

11              THE COURT:  So there are three theories of breach of

12   fiduciary duty.  One is that there was no breach, namely, these

13   were loans and they could be paid back --

14              MS. CHAUDHRY:  Yes.

15              THE COURT:  Number two was that they were capital, in

16   which case the defendant's chart will be used, it was about

17   300 --

18              MS. CHAUDHRY:  $323,000, yes.

19              THE COURT:  The third thing is if these were gifts,

20   and that is a figure of $11,134,331.94 is the right amount.

21              MS. CHAUDHRY:  And Mr. McBeth gets his share of that,

22   which is his share of the equity of the fund.

23              THE COURT:  McBeth's share on a 5 to 12.5 ratio.

24              MS. CHAUDHRY:  5 to 17.5.

25              THE COURT:  Same thing.

 1            MS. CHAUDHRY:  So it's 28.6 percent of that.

 2            THE COURT:  28.6 percent.  All right.

 3            Now, when is the date of accrual in the statute of

 4    limitations, what is the date?

 5            MR. SKIBELL:  It's when the first repayment begins.

 6            THE COURT:  You allege something in the complaint.

 7            MR. SKIBELL:  It is January 3, 2011, your Honor.

 8            THE COURT:  That's when the cause of action arises.

 9            MR. SKIBELL:  Yes.

10            THE COURT:  Okay.  So if it is tolled, we can go

11    backwards.  How much difference does it make?  Withdrawn.

12            If it's tolled -- let's do it this way.  If it's not

13    tolled, what is in issue, just the $1.7 million?

14            MR. SCHIFFMAN:  1.4.

15            MR. SKIBELL:  That is correct, your Honor.

16            THE COURT:  1.4 or 1.7?

17            MR. SKIBELL:  It's 1.42, I thought.

18            MS. CHAUDHRY:  44.

19            MR. GRIFFIN:  It's 1.42.

20            MR. SCHIFFMAN:  1.42.

21            THE COURT:  If it's not tolled.  This would apply to

22    the gift theory, right?  Because under your theory,

23    Mr. Schiffman, it is either nothing or $330,000.

24            MR. SCHIFFMAN:  Yes.

25            THE COURT:  Under plaintiff's theory, it is 11 million

1    something if there is tolling, and 1,042,000 if there is no

2    tolling.

3            MR. SKIBELL:  Your Honor, that would also apply to the

4    capital.  If it is treated as capital, the 1.44 --

5            THE COURT:  It has to be --

6            MR. SKIBELL:  -- added back in.

7            THE COURT:  So is the relation -- no, it is a gift you

8    are saying.

9            MR. SKIBELL:  If it were either, it would give rise to

10   a breach of fiduciary duty claim, it would be different --

11   Howard is about to say correctly -- that there would be a

12   change in the equity.

13           THE COURT:  You are telling me that if -- how would it

14   change?  It would be 5 million to what?

15           MR. SKIBELL:  It would be 5 million to whatever -- all

16   the equity going in.  What's the final if all the equity goes

17   in number?  It's on their chart.  It would be 23.7 percent to

18   76.3 percent.

19           MS. CHAUDHRY:  The equity gets diluted to 23.7 percent

20   for Mr. McBeth.

21           MR. SKIBELL:  So it would be 23.7 percent of 1.44

22   million.

23           MR. GRIFFIN:  Not if you add back $11 million.

24           THE COURT:  1,042,000.

25           MR. SKIBELL:  This is not gift.  It is capital.

```
 1                THE COURT:  So let me get this clear.  If defendants

 2   win, it is zero.  If it is capital and not loans, it is, I

 3   think, 334,000 times 28.6 percent.

 4                MR. SCHIFFMAN:  No.  I thought it would be the --

 5                THE COURT:  You have already done that.

 6                MR. SCHIFFMAN:  It is the percentage of the 1

 7   million --

 8                THE COURT:  You have already done that.  What's your

 9   exhibit?

10                MR. SCHIFFMAN:  What's the exhibit number?

11                THE COURT:  Yes.

12                MR. GRIFFIN:  It is DX 175.  Do you want a copy?

13                MR. SCHIFFMAN:  Should I approach, Judge?  Do you want

14   a copy.

15                THE COURT:  Please give it to me, yes.

16                So there are three theories, as I said before.  There

17   is loans, capital, and gift.

18                MR. SKIBELL:  Yes, your Honor.

19                THE COURT:  If it is a gift and the statute of

20   limitations is tolled, you would get 11,134,000, etc., times

21   what percentage?

22                MS. CHAUDHRY:  28.6.

23                THE COURT:  If it is not tolled, what would you get?

24                MR. SCHIFFMAN:  Zero.

25                MR. SKIBELL:  If it's not tolled in the world that it
```

1   is loans?

2          THE COURT:  If it's not tolled and it's gifts, what

3   would you get?

4          MR. SKIBELL:  You would get the same percentage times

5   1.44.

6          THE COURT:  1.42.

7          MR. SKIBELL:  Yes, whatever the number is.

8          MR. SCHIFFMAN:  That's capital.  It's not gifts.  If

9   it's not tolled, there is no gifts.  There is no claim as to

10  the gifts.

11         THE COURT:  Say that again, Mr. Schiffman.

12         MR. SCHIFFMAN:  I'm not sure I'm following any of

13  this, but my understanding is if it is not tolled, then the

14  gifts would be -- all the gifts would be beyond the statute.

15  They would be not timely.  They are out.  They would be zero.

16         THE COURT:  The returned money would be -- the 1.42

17  million return would be within --

18         MR. SKIBELL:  Yes, your Honor.

19         THE COURT:  -- the statutory period.

20         MR. SCHIFFMAN:  Because you are saying that 1.42 is a

21  gift.

22         THE COURT:  It's a return of a gift.  It would work.

23         MR. SCHIFFMAN:  Your Honor, can I just -- I am still

24  confused as to how the damage number, whatever you are putting

25  before the jury, can ever exceed 1.42 million.  If that's the

1  only breach, there is no scenario, regardless of the statute,

2  as to what it can be.  The only actionable -- there can be no

3  jury instruction that the damage can exceed 1.42.  It can be

4  some percentage of it, but unless -- what they want to do is

5  toll the statute and then go back and pick up other breaches.

6         THE COURT:  Let's not talk theoretically here because

7  my mind is not catching this.  Practically speaking, what I am

8  telling the jury is that there are three theories.  One is that

9  these were loans, in which case defendants win.

10         MR. SCHIFFMAN:  Okay.

11         THE COURT:  Second is that these were capital

12  contributions and it was impermissible to give any money back.

13  Sorry.  These were capital contribution --

14         MR. SCHIFFMAN:  And they have to give back --

15         THE COURT:  -- and the damage figure netting

16  everything that happened is $334,000.

17         MR. SCHIFFMAN:  Right.  And if they are gifts --

18         THE COURT:  And the third is that the money was gifts.

19         MR. SCHIFFMAN:  Yes.

20         THE COURT:  But only that part of the gift that was

21  returned during the permissible three-year period can be paid,

22  and that would be 23.7 percent of the $1,042,000.

23         MR. SKIBELL:  Your Honor, what --

24         THE COURT:  If, however, the tolling takes place, then

25  the total amount of damages is 11 million some-odd times 28.6

1   percent.

2          MR. SCHIFFMAN:  I don't understand how that's

3   possible, your Honor.  I understand that's their theory, but

4   what's the underlying breach that gets you to 11 million?

5          MR. SKIBELL:  All the --

6          THE COURT:  The breach is that the -- the point is

7   that the only thing that can be breached is the amount

8   returned, so the amount returned was 11,134,000.

9          MR. SCHIFFMAN:  Your Honor said the only amount that

10  is returned that's breached is the million four.

11         THE COURT:  No.

12         MR. SCHIFFMAN:  Okay.

13         THE COURT:  If everything that was put in by Porges or

14  his companies was considered a gift, no money could be paid

15  back to Porges.

16         MR. SCHIFFMAN:  Why not?  Why can't you return a gift?

17  Why is a gift any different than capital or a loan?

18         THE COURT:  Because it's a different transaction.  You

19  taught me, Mr. Schiffman, that there is a clause that allows

20  the majority owner to put in capital and take out capital.

21         MR. SCHIFFMAN:  Okay.

22         THE COURT:  So that takes care of the return of

23  capital to the defendants.  However, if it is a gift, if it's a

24  gift, with the proper intent, the property then becomes the

25  ownership of the fund.

1        MR. SCHIFFMAN:  Okay.

2        THE COURT:  And no money can be returned, so that -- I

3    think Mr. Griffin's got this, right?  So that the proper

4    measure of damages, the total amount returned, 11 million

5    some-odd money times McBeth's interest in it, which is 28.6

6    percent.

7        MR. SCHIFFMAN:  The only problem I have with that is

8    wouldn't the net -- if I give you 100, you give me back 75 and

9    I give you back 25, did I give you a gift of 200 or did I give

10   you a gift of 100?  It's got to be netted.

11       THE COURT:  No, it is not.  And if it is netted, we

12   get back to your theory.

13       MR. SCHIFFMAN:  No, no.  It is still going to be more.

14       THE COURT:  No.  Once it's a gift, it is clear that no

15   money could be paid back; and since money is fungible, you are

16   not knowing what the source of the money is that's coming back

17   in.

18       MR. SCHIFFMAN:  All right.

19       THE COURT:  Okay.  So that does it.

20       MS. CHAUDHRY:  Your Honor, would you like that number

21   with what the 28 percent is of the 11 million?

22       THE COURT:  Yes.

23       MS. CHAUDHRY:  3,184,418.67.

24       (Pause)

25       THE COURT:  What about the rest of this document?  It

1    is stuff I use in every case I have, so.

2              MR. SCHIFFMAN:  This is the first time you have done

3    this, right?

4              THE COURT:  What?

5              MR. SCHIFFMAN:  The general instructions.

6              THE COURT:  First time I've done it?

7              MR. SCHIFFMAN:  Yes, right.

8              THE COURT:  No, it is not the first time I have done

9    it.  I could almost recite it from memory.

10             MS. CHAUDHRY:  That's --

11             MR. SCHIFFMAN:  I think that's called tried and true.

12             THE COURT:  I did add one thing to the boilerplate.

13   Look at page 21.  That is new language.  If you want to look

14   back to the impeachment that I just gave, look at page 18.

15             MR. SCHIFFMAN:  We are okay with it, your Honor.  I

16   suspect this is tried and true, right?

17             THE COURT:  The deposition testimony I just wrote.

18   That's the first time I'm using that.  It's got a different

19   connotation in this case than other cases.

20             MR. SKIBELL:  We have no issues, your Honor.

21             THE COURT:  Okay.  All right.  We are going to draft

22   the verdict sheet.  It is now quarter after 12.  The jury is

23   going to be here in 15 minutes.

24             (Pause)

25             THE COURT:  Ms. Chaudhry, do you have the number of

1    the 1,042,000 times 23.7 percent?  First, what's that full

2    number?  It's 1 million 400 -- you have it.

3              MR. GRIFFIN:  Yes, it is 1,420,586.94.

4              THE COURT:  And if you multiplied by 23.7 percent,

5    what do you get?

6              MR. SCHIFFMAN:  Your Honor, it makes a few dollars

7    difference.  Let me tell you what the issue is.

8              THE COURT:  Let me get this number first.

9    Ms. Chaudhry is giving me a number.

10             We can do that arithmetic.  I will do it.  Let me get

11   Mr. Schiffman's point.

12             MR. SCHIFFMAN:  It's an incredibly small point.  I

13   actually think the math is -- you have got to go back and

14   because of the 521 and the 323, what I think is the better

15   math, again, it's going to make about a $7,000 difference.

16             THE COURT:  What is this 521 and --

17             MR. SCHIFFMAN:  Do you have my chart in front of you

18   that I handed you?

19             THE COURT:  Exhibit 175?

20             MR. SCHIFFMAN:  Yes.

21             THE COURT:  Yes.

22             MR. SCHIFFMAN:  Again, what I think you have to do

23   mathematically is you have to take the million four two, you

24   have to add back 197 and add back 521 and then do the

25   percentage, because those -- you have got to go back and say,

1    okay, if this is all capital, the 197, the 521, and the million

2    four.

3              THE COURT:  You have got to be a little bit more

4    elaborate.  I'm not following you.

5              So where is the 521 on this page?

6              MR. SCHIFFMAN:  The money that Mr. Porges paid himself

7    back, remember?

8              THE COURT:  Yes.

9              MR. SCHIFFMAN:  And then --

10             THE COURT:  I see it is in column 1, three lines from

11   the bottom.

12             MR. SCHIFFMAN:  Yes, sir.

13             MS. CHAUDHRY:  That's not right.  He didn't pay

14   himself that back amount.

15             MR. GRIFFIN:  It's not the right number.  It's 580.

16             MR. SCHIFFMAN:  Oh, it's 580?

17             (Counsel confer)

18             THE COURT:  Can you do the arithmetic between

19   yourselves and just give me a final?

20             MR. SCHIFFMAN:  I just think it is this chart.  That's

21   all.  I just think the number is 323,496.77.  That's the final

22   number.  That's the number.  Ms. Chaudhry said our chart is

23   right.

24             THE COURT:  Okay.  That's what I was going to use.

25             MR. SCHIFFMAN:  It's right if my theory is right.

1          MS. CHAUDHRY:  I just said his math is right, before

2    he accuses me of saying their chart is right.  I am just saying

3    the math is right.

4          MR. SCHIFFMAN:  I just think that in scenario two --

5          (Pause)

6          THE COURT:  If there is no tolling, it is

7    $1,420,586.94 times 28.6 percent.

8          MR. SCHIFFMAN:  No.  That is the problem.  I can

9    explain to you the math.  But the number is, where there is no

10   tolling, the number is 323,496.77 and the way you get that

11   number is you have to add one million four, you have to add

12   580, you have to add 197, and then you apply the percentage of

13   the new equity, and that's 23.7 percent.  Because when you

14   rebalance because of the capital, that's what it comes out to.

15         THE COURT:  If there is a gift.

16         MR. SCHIFFMAN:  This is not the gift.

17         MR. SKIBELL:  This is capital.

18         MR. SCHIFFMAN:  This is just capital.

19         THE COURT:  If it's just capital, we agree the number

20   is 323,000.

21         MR. SCHIFFMAN:  Yes.

22         THE COURT:  Now, if it's a gift --

23         MR. SCHIFFMAN:  It's 11 million.

24         THE COURT:  It's a different scenario.

25         MR. SCHIFFMAN:  Yes.

```
 1                THE COURT:  We have two subsets.  One is if there is

 2    tolling, another one if there is no tolling.

 3                MR. SCHIFFMAN:  Right.

 4                THE COURT:  If there is no tolling, the amount is

 5    $1,420,586.94 times 28.6 percent.

 6                MR. SCHIFFMAN:  Yes, on the gift side, that's right.

 7                THE COURT:  And if there is tolling, the number then

 8    becomes $3,184,418.67.  Okay.  We have got it.

 9                So we have finished with the charge.  I have not yet

10    given you the verdict sheet.  Do you need that before your

11    summation?

12                MS. CHAUDHRY:  I do not, sir.

13                THE COURT:  Probably the answer is yes.

14                MS. CHAUDHRY:  I assume it is going to say what we

15    just discussed.

16                THE COURT:  What?

17                MS. CHAUDHRY:  I assume it is going to say what we

18    just discussed:  If you find this, then this is the number.

19    Right?

20                THE COURT:  Yes.  It will be very laconic.

21                MS. CHAUDHRY:  Yes.  That's my preference.

22                MR. SCHIFFMAN:  I think I can do without it.  If you

23    get it, that's great.

24                THE COURT:  We will get it to you as soon as we can.

25                MR. SCHIFFMAN:  Let's not hold the train up for that.
```

1              THE COURT:  So now we have ten minutes to eat.  The

2    jury will be here at 12:30.

3              Off the record.

4              (Discussion off the record)

5              (Luncheon recess)

```
 1                        AFTERNOON SESSION

 2                           1:30 p.m.

 3          MS. CHAUDHRY:  Your Honor, would you like for us to

 4   reserve objections until after closing, if we have any?

 5          THE COURT:  No.  Make your objections as you go along.

 6          MS. CHAUDHRY:  Okay.

 7          THE COURT:  If you say something improper, you wait.

 8   You can't repair it, so make your objections as you go along.

 9          (Jury present)

10          THE COURT:  Good afternoon, members of the jury.  I

11   apologize for not bringing you in at 12:30 but we weren't

12   finished at 12:30.

13          All right.  We will have summations in the case.

14   Summations are presentations by the lawyers of what they think

15   they proved and why they think their adversary has not proved

16   what the adversary is supposed to prove.

17          What the lawyers say is not evidence.  The evidence

18   came from the witnesses and the documents.  They're speaking

19   about the evidence.  From time to time, there may be

20   objections.  I'll rule on the objections.  Same things apply.

21   There won't be any speaking objections, and the objections

22   don't matter from your point of view.  They're not evidence.

23          So, I think we'll listen now first to Ms. Chaudhry,

24   who's arguing for the plaintiff; and Mr. Schiffman, who's

25   arguing for the defendants.  Ms. Chaudhry will go first.  She's
```

1     the plaintiff.  And Mr. Schiffman will go second.  And then Ms.

2     Chaudhry will have an opportunity to do rebuttal if she wishes.

3     Each side has been given an hour.  Okay.

4          Ms. Chaudhry.

5          MS. CHAUDHRY:  Thank you, your Honor.

6          If you came here for McBeth, you may have been

7     disappointed for two reasons.  First, this wasn't that McBeth,

8     and second, this wasn't about McBeth.  But you definitely saw a

9     tragedy.  This story is called Porges, and it is about what

10    Greg Porges did.  Poor Mr. McBeth just happened to be there at

11    the wrong place at the wrong time.  If any of you had invested

12    in the Spectra hedge fund, this would have happened to you.

13         Members of the Jury, at the opening of this case, my

14    partner told you that this story is like a play.  And now we

15    are finally here, the famous fifth act.  This is the most

16    important part of the case.  It is your part of the case.  Now

17    you get to decide what happens.  This act is unwritten, and you

18    write it.  You get to turn tragedy into justice.

19         Now, all tragedies need betrayal.  And the betrayal

20    here is a breach of fiduciary duty.  Mr. Porges owed Mr. McBeth

21    fiduciary duty, meaning that because he had Mr. McBeth's money

22    and he had control over Mr. McBeth's money, he had to treat Mr.

23    McBeth fairly.  Mr. Porges was not allowed to help himself

24    while he hurt Mr. McBeth, yet, that's exactly what he did with

25    these so-called loans.

1          Greg Porges had been managing his own money for 20

2     years, and evidently it had been going well.  But then he

3     started a hedge fund, and for the first time, he had someone

4     else's money.  He had an outside investor.  And that changes

5     everything.  Mr. Porges was in over his head.  The hedge fund

6     started flopping early and it started flopping fast.

7          Mr. Porges did not end the fund, even though he could

8     have.  He did not stop the trading, even though he could have.

9     Instead, he started frantically moving his own money around to

10    try and stay above water.  He called these loans.  But when

11    everything fell apart and the hedge fund failed, he realized

12    that his "loans" wouldn't pass an audit, so he didn't tell the

13    auditors about these loans and he called off the audit.

14         But then Mr. McBeth filed this lawsuit and started

15    asking questions.  So, Mr. Porges suddenly finds 76 promissory

16    notes stuck in a drawer.  He started making up stories about

17    negotiating these loans and interests being recorded on the

18    books.  And he tells stories about having told Mr. McBeth

19    everything about this.  He made up stories about how Mr. McBeth

20    doggedly pursued him to invest in the hedge fund, which, by the

21    way, doesn't matter, it's not a defense, and about how Mr.

22    Porges repeatedly told him not to invest in the hedge fund,

23    which, by the way, it doesn't matter, it's not a defense.

24         You are here to decide one central question:  Were

25    these transfers of money loans?  Not even close.  These

1    transfers of money are a travesty of a mockery of a sham.  Now,

2    you all come from different backgrounds.  You have different

3    jobs and different lives.  But the one thing you all have in

4    common, you're all New Yorkers.  And New Yorkers know a scam

5    when they see a scam.  And what does a scam look like?  It

6    looks like this?

7         In order to spare you another native Excel file, we

8    have blown up PX-94.  This is the chart our expert did of all

9    the transactions from PX-73.  And if you recall, this is

10   everything that goes in and out of the opportunity fund.  These

11   greens are all loans.  These are, quote, "loan repayments."

12   This is the Spectra Investment Group:  Money in, money out;

13   money in, money out.  Spectra Capital Management:  Money out,

14   money out, money out, money out.  Greg Porges, spectra

15   Investment, Spectra Financial Group, Andrew Burton, how it's

16   classified and the source reference.  There are so many of

17   these that this first page just goes to February 1st.  Second

18   page shows the same thing.  And even though there's 76 loans

19   here, you will see 250, almost, transactions to make 76 loans.

20        Now, this round robin shell game of money flows is

21   what Mr. Porges wants you to believe is the legitimate loans of

22   a sophisticated financial firm handling tens of millions of

23   dollars.  Now, think about that.  Is this how a private

24   investment firm makes loans of over $13 million?  From Mr.

25   Porges to SCM, to SIG, to the fund, and then back to SIG, and

1    then back to Mr. Porges?  All in a single day?  Why?  What is

2    the purpose of this shell game?

3         When you borrow money for a student loan or a

4    mortgage, you go to the lender, you fill out paperwork --

5    probably a lot of paperwork.  And that paperwork was just

6    between you and the person lending you money, no one else.  You

7    don't have your sister, your cousin and your neighbor's best

8    friend be in the chain of the loan.

9         Do you know what this is?  This is like Mr. Potato

10   Head.  Do you remember him?  He's the toy that starts as a

11   plastic potato and then you dress him up with these fun pieces

12   of clothing.  So, the potato, that's Greg Porges's money.  And

13   then it goes to SCM.  That's like putting the glasses on.  And

14   then it goes to SIG.  That's like adding the nose.  And then it

15   shows up into the fund in disguise.  But why the disguise,

16   Mr. Potato Head?  Ask yourself:  What is the purpose of all of

17   this if these loans are on the up and up?  Why doesn't the

18   money just go from Greg Porges loaned into the Spectra

19   Opportunities Fund?

20        You heard our expert, David Zweighaft.  He's the

21   forensic accountant who worked with the federal prosecutors

22   following money and helping to solve financial crimes.  And he

23   told you the purpose.  He's seen this.  The only reason to play

24   Mr. Potato Head with this money is so that no one knows where

25   the money really came from and so that no one can figure out

1    what really happened here, not even an asset-tracing expert.

2        There is no economic rationale for passing the money

3    from Mr. Porges's pocket into SIG to SCM, then to the fund,

4    then back to SCM, then back to SIG, and then back to Mr.

5    Porges' pocket.  Mr. Porges absolutely could have made these

6    loans directly from his account into the fund and then repaid

7    himself, skipping the three stops along the way, but he never

8    did.  Instead of making a loan to the fund, he made what he

9    called capital contributions into one of his other entities,

10   and then he started the Mr. Potato Head game.

11       And when I questioned him, I went over all those

12   capital contributions that he made just to SIG to show you that

13   he had the cash in his own account and he could have just made

14   a direct loan, but he didn't.  Why not?  You know the answer.

15   Mr. Porges did this to hide the fact that the money was really

16   coming from him.  Is that all he hid?  To tell or not to tell

17   the auditors.  Well, we saw what happened there.  There is no

18   dispute that the auditors wanted to know about any related

19   party loans.  There is no doubt that the auditors asked about

20   the related party loans.  There is no doubt that all related

21   party transactions must be disclosed on an audit report.  There

22   is no doubt that the auditors spoke to Deborah Rose on

23   December 21st, 2011, after 71 loans had been made in 2011.

24   There is no doubt that Deborah Rose did not tell the auditors

25   about a single one.  There is no doubt that Deborah Rose and

1   Greg Porges sent the representation letter that you saw on

2   December 21st, which lied and told the auditors about zero of

3   the 71 related party loans from 2011.

4          The auditor himself, Jim Bobrowski, told you that he

5   never saw a single promissory note, and he knew nothing of

6   these loans.  There is no doubt that even though Mr. Porges was

7   required by the subscription agreement here to provide Mr.

8   McBeth with an audited financial statement of 2011, Mr. Porges

9   decided, without any right to do so, to simply cancel the

10  audit.  This means that there was no reason for the auditors to

11  come to the Spectra offices and examine the books and records

12  for 2011.  Convenient, huh?  It's like firing the person

13  investigating you.

14         The defendants, they wanted to show you that Omnium,

15  the outside administrator, had full access to the loan

16  shenanigans.  And then they wanted to show you that the

17  auditors had access to Omnium, and so obviously, they argue,

18  they're not hiding anything.  But we show you that the Omnium

19  documents don't line up with Deborah Rose's own ledger.  So,

20  clearly there's something rotten in the State of Denmark.

21  Remember, the auditors were looking closely at 2010.  And then

22  they were relying on Greg Porges and Deborah Rose to tell them

23  what happened in 2011.  And Mr. Porges and Deborah Rose chose

24  to lie to the auditors.  So, I guess the answer is, not to tell

25  the auditors.

1          To tell or not to tell Mr. McBeth.  Well, it depends

2     on who you ask.  Greg Porges testified that, of course, he

3     explained this entire Mr. Potato Head scheme to Mr. McBeth in

4     January of 2011, and he hells you Deborah Rose was right there.

5     And what does the thorny rose say?  According to her, they had

6     no duty to tell Mr. McBeth about any of the loans and no one

7     ever told him in her presence.  So, which one of them is lying?

8     Does it matter?  You saw and heard them both, totally coached,

9     ready to spew their practiced answers, regardless of my

10    questions.  When their lawyers questioned them, they went on

11    and on with these rehearsed answers.  But when I questioned

12    them, they were unwilling to answer even the simplest questions

13    without a fight.  They got angry.  They conveniently didn't

14    recall anything they didn't want to tell you about.  But then

15    they remembered in crystal clarity the details of events of

16    seven years ago to help their case.

17         And Mr. Porges changed his story about these loans.

18    In 2016, under oath, he said these loans were negotiated and

19    interest was recorded on the books.  Two years later, sitting

20    here in front of you, he said something totally different.

21    Plus, there's not a single document that corroborates Mr.

22    Porges' story that he met with Mr. McBeth in January 2011 and

23    told him all about these loans.  Now, imagine this:  Setting up

24    a meeting in 2011 without any sort of documentation, not a

25    calendar entry, not an email, not a note taken, not a letter

1    sent, not a text message, nothing.

2            And you saw email after boring email, where Deborah

3    Rose chatters away with her Uncle Skip about family stuff,

4    always signing off:  Hugs and love.  And nowhere did she say,

5    oh, this month we put another $5 million in loans, as we

6    discussed.  And we never saw any emails between Greg Porges and

7    Mr. McBeth, even though Greg Porges claims that they had this

8    great relationship and they would talk on the phone and meet

9    all the time.

10           Now, what did Mr. McBeth say about this?  He told you

11   the truth.  You saw how he answered questions.  He was the same

12   person when we questioned him and when they questioned him on

13   cross-examination.  That is something you should consider when

14   judging the credibility of a witness.  And he was entirely

15   credible.  Mr. McBeth told you that he had no idea about this

16   loan scheme, not before he signed up, not in January 2011 and

17   not when he found out that all his money was gone in 2012.  If

18   he had known, he would have pulled the emergency brake, taken

19   his money and gone.  And this makes sense.  Now, think about

20   it.  Here you are getting to see the inner workings of how Mr.

21   Porges was really running this hedge fund, the truth about

22   these Mr. Potato Head loans.  Would you ever invest with Mr.

23   Porges knowing all of this?  Would you?  Would you?  No.  No

24   one would, including Mr. McBeth.  So, I guess the answer is:

25   Not to tell McBeth.

1              So, how are you going to decide if these are loans?

2    The good news is that you get to use your common sense, the

3    evidence in this case and the judge's instructions.  And all

4    three point to the same answer:  These are not loans.  First,

5    let's use your common sense.  For every legitimate loan you've

6    ever taken, you filled out paperwork, probably a lot.  And

7    there's a document that shows the real terms of the loan,

8    including the interest you will pay.  And then you pay

9    interest.  And when you paid the loan off, you definitely made

10   sure you had evidence of that.  When you file your taxes, there

11   are tons of questions about loans and interest payments, and

12   you answer those.  You may have given your accountant all the

13   documents that go with any loan you have.  If you have multiple

14   loans, like multiple credit cards, you know exactly which loan

15   you're paying each month, and you know what the new balance is

16   on that loan.  And the lender sends you a monthly statement,

17   right?  Loans are a normal part of our lives, and they're a big

18   deal.  Your loans do not secretly exist in a drawer in your

19   office; no real loans do.

20             Think about your own life.  If you had a mortgage and

21   the terms are written down, those are the actual terms.  What

22   they're suggesting here is the equivalent of you entering a

23   30-year mortgage with your bank at 5 percent interest, but you

24   and the bank have a secret agreement that no interest will be

25   paid and the whole thing will be paid off in less than a year.

1    And here, Mr. Porges is the bank and the borrower, and the

2    transfers were for millions of dollars.  Greg Porges knows how

3    to make a real loan if he wants to, but he didn't.  Common

4    sense and your own life experience tell you that these are not

5    loans.  If it walks like a sham and it talks like a sham, it's

6    a sham.

7         And second, you get to use the evidence in this case

8    in deciding whether these are real loans.  I want to quickly

9    talk about one of their witnesses, Mr. Stupay.  He was

10   Spectra's bookkeeper.  They called him to try to convince you

11   that these were real loans and Spectra has always done it like

12   this.  But Mr. Stupay is not an auditor.  He told you he just

13   did what they told him to do.  They said "loan," he wrote

14   "loan."  He never saw the notes.  He never examined whether

15   that was the right thing to call them.  Garbage in, garbage

16   out.  They wasted your precious time with his testimony.

17        Now, their expert, Mr. Miller, he sounded pretty good

18   on direct exam, but then he fell apart on cross-examination.

19   He simply had not done the work to substantiate his testimony.

20   He didn't examine the documents like he would if Spectra was

21   his actual client.  And he agreed with our expert that, yeah,

22   the generally accepted accounting principles require interest,

23   and if interest isn't being charged, then he's required to do a

24   calculation of what it would have been and booked that.  And he

25   said he then needs a letter of representation from his clients

1    about this interest not being paid.  And none of that happened

2    here.  Mr. Miller could not tell you how long these longs were

3    supposedly for or what the interest rate was.  No one could.

4    Everyone agrees that the only purpose of these notes was for

5    filling up a filing cabinet with paper.

6               (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            MS. CHAUDHRY:  Even if these were legitimate

2    interest-free loans, they were not treated in a legitimate way

3    and thus don't get to be loans now.

4            Now let's talk about our expert, Mr. Zweighaft, the

5    forensic accountant.  He is the one who worked for the U.S.

6    Marshals following money, uncovering financial fraud.  Remember

7    what he said?  He said, under GAAP, you have to look at four

8    things:

9            One, whether these are arm's length transactions; and

10   if they are not, you have to look closer because there is a

11   greater risk of fraud.

12           He then said you have to look at whether there is an

13   expectation of repayment, and he pointed out that some of these

14   loans were made when the fund's NAV was zero.

15           Now, remember, Mr. Porges knew every single day what

16   the value of the funds was.  He knew that exact value when he

17   made more loans into the fund.

18           Now, how can you expect to be repaid when you don't

19   keep track of whether a particular loan has actually been paid?

20   I will explain.  If you have three loans for a million dollars

21   each from the same entity and you make a $50,000 payment, which

22   of those loans are you repaying?  It is impossible to tell,

23   right?  That's not how loans work.  You have to look for

24   interest expense payments being reflected on the books and

25   records.  But we know that never happened.  There was never any

interest, even though Mr. Porges previously lied and said that

interest was in fact recorded on the books.

And then finally, Mr. Zweighaft said that he needs to

look, under GAAP, at the formal acknowledgment of these loans,

and here we come to the stack of promissory notes.

Ah, the promissory notes, a true work of fiction, and

you finally get your hands on these 76 pieces of paper we have

been talking about. And when you go back in that jury room,

spoiler alert, you are going to be totally underwhelmed.

Nothing on this document means what it says. This is the

travesty of a mockery of a sham. These 76 notes magically

appear in this lawsuit and before that no one outside Spectra

ever saw them.

Now, do you remember Deborah Rose said she doesn't

recall anything about how they were made or kept, but

Mr. Porges said that Deborah Rose made all 76 of them and kept

them in a filing cabinet? Now, can you imagine this? You type

up a promissory note and it prints out, and you walk it from

here to there, so that Greg Porges can sign it for both sides

but not date it, and then you put it in a filing cabinet, and

you do this 76 times, and you have no memory of ever having

done it? Is that possible?

Ms. Rose says the terms of the notes were never

negotiated because Mr. Porges was signing on both sides. But

Mr. Porges, he said that Ms. Rose negotiated the terms of the

 1    notes.

 2              These notes all say that they are for three years, but

 3    everyone agrees they were never meant to be.

 4              And Mr. Porges and Ms. Rose tell the auditors that the

 5    2010 loan for $660,000 that was reported for which, by the way,

 6    there is no note, is a demand note.  But every single witness

 7    testified that these are not demand notes.

 8              And the best thing?  No one in the world, including

 9    Greg Porges, can tell you whether or when any of these notes

10    have been paid off.  The expert told you that a satisfied note

11    is physically stamped, it's either hole punched, and the

12    marking is clear that the debtor is now free of this debt.  But

13    these?  They look brand-spanking new.

14              A private financial firm with 20 years of experience

15    has these 76 notes sitting in a drawer just like this.  What

16    would anyone in the world think if they found these at Spectra?

17    They would think that right now, as you sit here, seven years

18    later, the hedge fund owes $13 million in loans.  And what is

19    their answer?  We've always done it like this.  Well, that's a

20    confession, not a defense.

21              Before Mr. McBeth showed up, Mr. Porges never had an

22    outside investor.  He told you he has always moved money

23    between his accounts.  He called it a loan.  He never paid

24    interest.  But he never had auditors.  No one ever knew.  A

25    tree fell in a forest, and no one was around.  It didn't

1  matter.

2         When all the accounts are yours and yours only, moving

3  money between them is like moving money from your right pocket

4  to your left pocket.  You know where it is.  You know why you

5  moved it.  You know where you moved it.  In Mr. Porges's case,

6  it's like he had cargo pants with lots of pockets.  He had all

7  these entities and he would move money from here to there to

8  there to there, and he did that for years.

9         But when you have an outside investor, everything

10 changes.  You can't do the same shenanigans.  It is not your

11 money, and your investor can't see what you are doing.

12 Remember, Mr. Porges never had an audit before.  No one peeked

13 behind the curtain until Mr. McBeth came along.  And when the

14 auditors did ask Mr. Porges what's going on, he lied to them

15 and then he fired them.

16        By calling these loans, Mr. Porges cut in front of

17 Mr. McBeth secretly.  See, we all heard debt gets paid before

18 equity, so he called these loans without telling Mr. McBeth he

19 was doing this, and then he got to stick his hand out first and

20 get paid first and take millions of dollars, nearly drained the

21 fund, and left Mr. McBeth holding air.

22        So, fine.  The promissory notes were fiction.  So what

23 was the real loan agreement?  Just whatever is in Greg Porges's

24 head?  Then why do a sham loan agreement at all?  Why not just

25 write down the real terms?  He made them on a computer.  Edit

1    the document and make them real.  We have all edited documents.

2    It's not that hard.  In fact, each time one of these promissory

3    notes was made, it was edited, but then it was still kept

4    fictional.  Why?

5         Was there ever a real loan agreement?  Was this an

6    interest-free, short-term loan like in Mr. Porges's head or a

7    three-year loan with 2 percent interest like in Mr. Porges's

8    drawer?  That question really matters.

9         And as the judge will instruct you, loans require the

10   lender to give the borrower money with expectation and with the

11   intent that it will be repaid with interest due.  And that

12   makes sense.  That's what happens in your real life every day.

13   But here, no interest was ever expected or paid or intended by

14   either the lender or the borrower.  These aren't loans.

15        So what are they?  Now we come to the process of

16   elimination.  If they are not loans, they are either capital

17   contributions or they are gifts.  Now, we know only members of

18   the fund can make capital contributions, and we know there is a

19   rigorous process for every time a capital contribution is made.

20   And it is not just enough for Mr. Porges to intend that this be

21   a capital contribution.  We know that only SIG and Mr. McBeth

22   were members of the fund.  So that means for all other

23   entities, we have eliminated a possibility.  They cannot make

24   capital contributions.  No money coming from any other entity

25   could be a capital contribution.

1          So neither loans nor capital contributions, all that's

2     left is gifts.  And what about the money from SIG?  If it's not

3     a loan, then it must be a capital contribution or a gift, and

4     Mr. Porges told you over and over what a headache it is to make

5     a capital contribution.  You have to freeze the accounts and

6     you have to do a recalculation of equity, and we know that they

7     never went through that process.  I mean, look at this.  SIG on

8     the same day goes in and out, and the next day it goes in and

9     out, on the next day it goes in and out.  There is no freezing

10    here.  So capital contribution is eliminated for SIG, too, and

11    once again we are left with only one option:  It's a gift.

12          Now, I want to talk to you about a red herring that

13    the defendants have thrown at you.  They love talking about the

14    $3 million that Mr. Porges sent back to Mr. McBeth, but let's

15    be really clear.  Mr. Porges sending Mr. McBeth back $3 million

16    does not change his fiduciary duty to Mr. McBeth and it does

17    not suddenly wave a wand over these sham loans and make them

18    real.  These two things are totally unrelated.  They are just

19    trying to trick you into thinking that Mr. Porges was "doing

20    right" by Mr. McBeth, so he didn't breach his fiduciary duties

21    with this loan scheme.  But remember, just because someone

22    decided not to run over you with a car doesn't mean they didn't

23    also steal from you.  These are two separate events we are

24    talking about.  And the defense witnesses, they just kept

25    trying to sneak in testimony that "we are just trying to do

1    right by Mr. McBeth," and they said that's why they gave him a

2    $197,000 distribution at the end in 2012.

3         But let's look at what else they did in 2012.  We have

4    shown you in evidence PX 62, which is a spreadsheet.  It is the

5    check register, partial check register for the Spectra

6    entities.  You will see that in 2012, Mr. Porges paid Deborah

7    Rose over $544,000, including almost $275,000 as bonus and

8    salary for 2011, the year the hedge fund imploded.

9         And even though Deborah Rose, former Goldman Sachs,

10   pretended not to recall how much she was paid, the check

11   register, which is in evidence, shows that the next year, in

12   2013, Mr. Porges paid Ms. Rose over half a million dollars, and

13   that's just going on the check register.  That doesn't even

14   include her base salary.

15        And if you look at PX 62, you will see that from 2007

16   to the end of 2013, Mr. Porges paid Ms. Rose over $2 million.

17   And we have no idea what he paid her in 2014 or '15 or why she

18   was still even working for the fund after it had failed in

19   2011.  But we do know that she has billed him for her time

20   working on this lawsuit and that, as she sat there and

21   testified, Mr. Porges still owes her money, and we know that

22   she will charge him for her testimony -- sorry, we don't know

23   what she will charge him for her testimony here.  And we all

24   know that when we called her in our case to testify, she did

25   not come, even though she was supposed to.

1          Also, let's really examine their claim for doing

2    everything for Mr. McBeth's benefit.  In the record you have

3    Mr. McBeth's monthly account statements, and our expert's

4    document showing the monthly loan payments by Mr. Porges to his

5    own entities.

6          In January of 2011, Mr. McBeth lost $1.17 million and

7    Mr. Porges repaid $2.5 million to his entities.

8          In February, Mr. McBeth lost another million dollars

9    while Mr. Porges repaid $1.13 to his entities.

10          In April, Mr. McBeth lost $400,000.  Mr. Porges repaid

11    $1.6 million to his entities.

12          While Mr. McBeth's $5 million drained quickly to zero,

13    Mr. Porges repaid over $11 million in loans to his own

14    entities.  These were interest-free loans that did not have to

15    be paid back for three years, and Mr. McBeth had no idea this

16    was happening.

17          You may have noticed that their defense was basically

18    to make fun of Mr. McBeth, this 78-year-old-man who trusted

19    them with his money.  You heard Mr. Schiffman make all sorts of

20    nasty comments when he was cross-examining Mr. McBeth about

21    Mr. McBeth's memory, even though Deborah Rose had major amnesia

22    on the witness stand.

23          THE COURT:  Lawyers' objection or method of

24    cross-examination is not relevant.  You can be cross when you

25    cross or you can be nice when you cross.  What's important is

1    what the witnesses say.

2           Get off this line, Ms. Chaudhry, please.

3           MS. CHAUDHRY:  Sure.

4           They want you to know, they wanted to make sure you

5    knew that Mr. McBeth is a wealthy man, that he is a

6    sophisticated investor by definition, and then they made him

7    out to be a fool for not asking questions about the fund, for

8    not asking for meetings, and for not redeeming his investment.

9           Well, you know who else didn't redeem?  Greg Porges,

10   the guy who knew every single day what was happening in the

11   fund.  And let's be clear.  Whether you are wealthy or old or

12   trusting, fiduciary duty is a fiduciary duty.  Mr. McBeth's

13   wealth or investment experience are not a defense to what Greg

14   Porges did here.

15          And Mr. McBeth's trust is also key to why he is not

16   barred by the statute of limitations.  The defendants are going

17   to argue that we are too late, that we had three years to bring

18   the claim and it's been more than three years, so too bad, so

19   sad.  But there is a tolling provision, and the judge will

20   explain it to you, and what you need to know when you think

21   about the tolling provision is this:  There is no way that

22   Mr. McBeth or anyone outside of Spectra, including their own

23   auditors, could have found out about these loans.  These notes

24   were hiding in Mr. Porges's drawers.  The books were kept by

25   Ms. Rose and kept away from Mr. McBeth.  He did not have access

1    to the bank statements to see the withdrawals and transfers

2    into the fund.  And his own account statements never show these

3    loans.  Plus, he trusted the fiduciary, especially he trusted

4    Deborah Rose, a woman who was like a daughter to him, and she

5    told him nothing about this loan scheme.

6            And then later, more than once, she told him that

7    Mr. Porges was going to pay him back.  She told his son, Craig

8    McBeth, the same thing, in his house, at his housewarming

9    party.  And her lies worked.  Mr. McBeth believed her again.

10   He waited for Mr. Porges to pay him back.  He met with him

11   several times with his son to talk about repayments.  And then

12   when that didn't happen, he filed this lawsuit.

13           And because this conduct of the defendants tolled the

14   statute of limitations, all of Mr. McBeth's claims are valid at

15   this time.  That means that all of these loan repayments, all

16   the reds from one sheet to the next, to the next, to the next,

17   to the next, all of these loan payments -- loan repayments were

18   a breach of fiduciary duty because these were not loans.  This

19   means that the damages owed to Mr. McBeth are his share of the

20   transfers out of the fund, all the reds added together on the

21   left column.  That total transfers out of the fund in 2011 is

22   $11 million -- sorry $11,134,311, and Mr. McBeth's share of

23   that is just his share of the hedge fund, and that amount is

24   $3,184,418.

25           Now, as the plaintiff, we have the burden of proof on

1   our claim here, and as the judge explained in the beginning,

2   the burden is by a preponderance of evidence.  I think he did

3   the scale thing for you, which means the scale tips ever so

4   slightly in our favor.  Essentially, the weight of one of these

5   sham promissory notes.  And we have presented you with 76 of

6   these fake pieces of paper so that you can write the final act

7   of this story.

8           Members of the jury, we ask you to right the wrong

9   here and turn this tragedy into justice for Mr. McBeth.

10          Thank you.

11          THE COURT:  Mr. Schiffman.

12          MR. SCHIFFMAN:  Thank you, your Honor.

13          Good afternoon.

14          First, I want to thank the jury for the time and the

15  patience it has spent.  I appreciate your listening to all of

16  the evidence.  As Ms. Chaudhry said, this is what's great about

17  our American justice system; that you get to decide the fate of

18  this case, and we appreciate you giving your time and not

19  giving time next week.

20          As the judge will instruct you, and Ms. Chaudhry never

21  mentioned this, I'm going to go back to a new theme which I

22  didn't have when I first started, what the judge told you is

23  important.  The arguments of the lawyers are not the evidence.

24  The evidence is the documents.  It's the testimony.  The vast

25  majority of Ms. Chaudhry's closing was her argument.  I'm going

1    to show you as you go through this that on many occasions there

2    are no support for it.  It's a gorgeous argument, it's a

3    beautiful play, but it's not the evidence in the trial that you

4    watched over the last week.

5         The issue for you, and she never even mentioned this,

6    is what was Mr. Porges's intent?  You will hear this from the

7    judge as soon as we are done, that the issue is what was

8    Mr. Porges's intent?  Did he intend to make a loan, did he

9    intend to make a capital contribution, or did he intend to make

10   a gift?  That is the issue.  What is his intention?  Not some

11   theatrical event.

12        I believe the evidence will show you overwhelmingly,

13   and I think you already know this without my telling you this,

14   that his intention was to make loans, and that these loans were

15   legitimate loans.  They weren't sham loans.

16        And this idea that there was an attempt to hide it

17   from the auditors, you know that's not true.  You have seen the

18   documents.  This was fully disclosed to Omnium, fully disclosed

19   to the auditors.  This is a sham argument is what it is.  It is

20   the unrebutted testimony of Mr. Porges that his intention, his

21   intention, and the judge will tell you his intention is

22   critical, was to make short-term loans.  Mr. Porges told you

23   that he had been using -- had been making short-term loans to

24   pay margin debt since 2003.  She mocks it, but it is not -- is

25   there such a word as mockable?  Because that shows you his

1    intention.  This is what intended to do.  This is what he

2    thought he should do.  He has a pattern of behavior that proves

3    his intention.  And in fact, Mr. Stupay and Ms. Rose also

4    testified that this is true.  That's the way they did it.  It's

5    the way they intended to do it.

6         Mr. Porges went on to tell you that the form of the

7    promissory notes, these notes, again, that she mocks, were

8    suggested by a law firm, written by corporate lawyers in 2003.

9         MS. CHAUDHRY:  Objection.

10         THE COURT:  Overruled.

11         MR. SCHIFFMAN:  And that Mr. Porges intended for these

12    notes to be short-term loans that he was going to use to

13    facilitate the payment of a margin and then get them repaid.

14    There is no dispute as to what Mr. Porges's intention was, and

15    his Honor will tell you that his intention is the critical

16    element -- one of the critical elements of the case.

17         Again, Ms. Chaudhry showed you the promissory notes,

18    and there is no doubt that these notes, which Ms. Chaudhry

19    showed you, were executed at the time of the loans.  This

20    fictional suggestion is an argument by the lawyer, not the

21    facts of the evidence.  You have direct, unrebutted testimony

22    by both Mr. Porges -- Mr. Porges, and by Ms. Rose that the

23    documents were in fact executed on the day of the loan.  There

24    is no testimony on the other side of this issue.  That's the

25    evidence before you.  Not the lawyers' argument, the evidence.

1          But in fact -- and in fact her -- again, this is

2    another classic example, we went over this time and time, about

3    argument by her that's not fact.  Okay?  Mr. Bobrowski, you all

4    saw Mr. Bobrowski.  Mr. Bobrowski didn't say he didn't see the

5    loans.  What Mr. Bobrowski said is that I don't remember.  I

6    don't remember one way or the other if I saw the notes.  He

7    didn't remember one way or the other the entire year I suspect.

8    Right?  He didn't testify that the notes were withheld from

9    him.  In fact, what he testified to on cross is, yes, I had

10   access to the information.  I don't know what my team looked at

11   one way or the other.  I don't even know what my team was

12   doing.  But, again, you don't have to simply rely on the

13   testimony of the intent of Mr. Porges and Ms. Rose although

14   that would be sufficient.  In fact, the contemporaneous

15   evidence, documents, the documents which are evidence before

16   you, show that these were related party loans.  She said

17   nobody -- the transfer of the money was hidden.  Well, you know

18   that's not true.  You have seen all these books and records.

19   Every penny going in and out was tracked in the books and

20   records by Omnium, reviewed by the auditors.  There is no

21   hiding of it.  That is a statement by her that is an argument

22   not a fact.

23          And in fact you have seen the documents that did that.

24   You saw the documents by Ms. Rose, PX 73 is an example, and

25   you -- I'm sorry, PX 73 is an example of Ms. Rose tracking

1  every single penny going in and out.  It is not hidden.  It is

2  in the books.

3          Similarly, you have seen more than you wanted to see

4  probably that it is in the books of Omnium, the third-party

5  administrator, and you see that every month the money going in

6  and out is tracked to the penny by a third-party administrator;

7  and, in fact, the money can't even go in and out without the

8  approval -- the evidence, I'm not telling you this, this is the

9  evidence -- the money can't go in and out without the approval

10 of the third-party administrator.  They can't even move the

11 money -- forget hiding it, they can't move the money without

12 Omnium's agreement.  And you see these documents, and in these

13 documents it discloses every month exactly what the short term

14 note payable is.  That's the evidence, not the argument.  And

15 in fact every month Ms. Rose reconciled her documents which

16 showed the ins and outs with Omnium's documents that showed the

17 ins and out.  Where is the evidence that this was hidden?  It's

18 good argument, but it's not true.

19          And in fact not only was it not hidden from Omnium, it

20 wasn't even hidden from the auditors.  This canard that there

21 was some scheme to hide it from the auditor, again, is a great

22 argument, but it is not the evidence that you saw.

23          Again, the auditors were involved in this process from

24 the beginning, before Mr. McBeth is even invested.  This is

25 before Mr. McBeth is invested, Ms. Rose goes to the auditors,

1    look, I have got this short-term loan program.  Omnium needs

2    evidence that we are doing it.  And she writes to

3    Mr. Bobrowski, I need some evidence that it is okay, and what

4    does he write back?  The loans between the entities will be

5    disclosed as follows.  This is common practice within the

6    industry to not have a formal agreement.

7         Again, Ms. Chaudhry says to you, but no evidence, well

8    nobody in the industry does it this way.  What's the evidence

9    of that?  It's a great argument, but who testified to that?

10   Who said that's so?  You have to say what's the evidence before

11   me, not her argument about McBeth.  That's the problem.  In

12   fact, it is common practice in the industry.  That's what

13   Mr. Bobrowski said long before Mr. McBeth invested.  I believe

14   that's what Mr. Miller said, and I believe that's what

15   Mr. Stupay said.  That's the evidence that you have to

16   consider.  And in fact, as you saw, the auditors were well

17   aware about this and in fact gave her the draft language here

18   as to how to disclose it.  There is no dispute about that.

19        And in fact, at year end 2010, in 2010, this wasn't

20   hidden from the auditors.  In fact, the auditors audited it and

21   put a note in the financial statements disclosing the existence

22   of the third-party loans.  And in fact the one loan that

23   doesn't have a document, the one loan that doesn't have a

24   document, remember that loan schedule from their expert here is

25   all the loans, the only loan that doesn't have a document is

the $660,000 loan, is as a matter of fact fortuitously the one

loan that they actually discussed, but even the loans there

wasn't documentation on was disclosed to the auditors and

included in the financial statements.  There is no hiding --

there is no evidence of hiding.  There is just Ms. Chaudhry's

argument.

        And again, this red herring of an argument about

subsequent events is a red herring.  Whether or not the

auditors did or didn't review subsequent events, and whether it

should or shouldn't have been disclosed doesn't change whether

they existed or not.  There's no doubt that the loans existed

in 2011.  And you see documents of Mr. Ahn looking at them in

2011 before the 2012 audit report is done.  I don't know

whether McGladrey did a good job or not and I'm not an expert

on GAAP accounting and what should be in subsequent events, but

what I know is that it has nothing to do with whether

Mr. Porges intended to make loans and whether there were loans.

        And again, here is that clean audit report, JX 17.

They know about the 660.  Even the 660 doesn't have a note.  If

Ms. Chaudhry's argument had any basis, there is no note because

you don't need a note.  You don't need to charge interest.  She

says in the industry, well, they don't do it that way.  Well,

who says so?  You have a clean audit opinion in which they know

about this loan without a note and they know they don't charge

interest and it is perfectly appropriate.

1    And again, this idea, again, that the -- hidden from

2    the auditor you saw DX 117, DX 127, DX 120.  This happens to be

3    DX 38.  This is Mr. Ahn actually looking at the file, the

4    monthly reports, and saying we are able to retrieve the two

5    files.  What is her evidence that it was hidden?  The evidence

6    is that Mr. Ahn -- and what's the date of this?  Can you guys

7    read it?  I'm so old, I can't.  '11, right?  This is during the

8    subsequent period in which they say, oh, we hid from them the

9    existence of these loans.  It wasn't in subsequent events.

10   This is Mr. Ahn in 2011, during a subsequent period, looking at

11   the loan transactions.

12        Again, this audit report that she -- another one of

13   these canards.  She suggests to you that we didn't do a report

14   in 2012, audit report in 2012, right?  And she said that's

15   unusual or hiding.

16        First off, I ask you, would you have paid for an audit

17   once the fund was closed down?  Would you have spent

18   Mr. McBeth's money, would you spend your own money to do an

19   audit when the fund is closed down?  No.  And in fact, because

20   she doesn't listen to the evidence, the evidence which is

21   unrebutted is that Deborah Rose talked to Mr. McBeth and he

22   agreed not to do the audit because it was a waste of money.

23   And then she goes even a step further, because she is not

24   constrained by the evidence, she said the auditors --

25        MS. CHAUDHRY:  Objection.

1           THE COURT:  Let's not have *ad hominem* arguments.

2           MR. SCHIFFMAN:  All right.

3           She said that the auditors fired us.  I didn't hear

4      that.  Did any of you hear that?  What evidence was it the

5      auditors fired us?  I'm not aware of that.  Maybe I forgot it,

6      but I didn't hear that and I didn't see it in any of the

7      documents and I didn't see her refer you to any document or

8      show you any evidence about that.

9           Now, again, just to show you that this -- it is not

10     just his intent and just his testimony, we have lots of

11     documents that show these loans exist.  There is no doubt, if

12     you look at JX 7, 18, you look at the investment management

13     agreement, DX 2, you look at the LLC agreement, the investment

14     manager had the power to make these loans, to trade margins,

15     borrow from banks, brokers, or other institutions.  There is no

16     doubt, the evidence shows, that we had that power.

17          And in fact, these loans were short-term in nature and

18     in fact the first loan which they complain about, the January 3

19     loan, she says don't worry about the fact that he paid back the

20     3 million, we will get back to that in a second, they in fact

21     lent them money on January 3 and 4, and they were repaid on

22     January 5.  That's precisely what Mr. Porges intended.  The

23     conduct is consistent with what he intended.

24          And in fact, had the fund -- there was some suggestion

25     why would the fund give back the money?  Everybody likes free

1    money.  Everybody likes free money.  But the fact of the matter

2    is, as the testimony, which is again unrebutted, is that had

3    the fund not given back the money, there would never have been

4    another loan.  That liquidity crisis which would go on couldn't

5    have been met thereafter.  And in fact the lender wouldn't have

6    had money to make new loans if they hadn't got their money back

7    and they wouldn't have made new loans because their intention,

8    which is critical, was only to make a short-term loan.

9           And again, you will hear, we will get there in a

10   second, it is also -- when you decide it is capital, you have

11   to look at his intention.  Did he intend to contribute capital?

12   We will go through this in a second.  You have heard from --

13   absolutely not, I didn't want to improve capital.  I had $12.5

14   million invested.  I didn't want anymore risk, and I surely

15   didn't want to tie up my money for a long time.

16          Again, another factor to decide whether loans are

17   real, you know what a sham loan is.  Sham loans are that I loan

18   money to X, X loans money to Y, and Y then gives me back the

19   money, and the money never really moves out of hand.  That's a

20   sham loan.

21          There used to be -- I look at this jury.  Nobody is

22   quite old enough to remember, like I do, the tax fraud days.

23   There was tax advantages in having loans that if you had the

24   indebtedness, you could take tax advantage and people would do

25   sham loans.  It wasn't really a loan.  They would pretend there

was a loan, so you get the tax benefit.  That's what a sham

loan is, when a loan doesn't really exist, when there is no

economic substance.

     Well, here there clearly was economic substance.  The

money really moved.  The money really moved from the Spectra

entity to the Master Fund to a third party to pay an actual

debt.  And then the money actually moved back from the

third-party, the prime broker, back to the Master Fund and back

to the Spectra entity.  There is no sham here.  This is

economic reality, economic substance.

     And if the margin debt hadn't been paid, it was

incredibly important to Mr. McBeth, to -- I'm sorry, to the

investors in the Master Fund, to the investors in the Strategic

Opportunity Fund to pay the margin call.  Their own expert,

Dr. O'Neal, admitted that there would be serious negative

consequences for the fund if they didn't meet their margin

call.

     Similarly, their expert, Dr. Zweighaft, you heard his

testimony, acknowledged that these transactions were in the

books and records.  They were in the books and records

maintained by Spectra and by Omnium.  The very demonstrative

that he showed you was showing you what happened with the

movements of money by going through the records of Omnium and

seeing it.  That's how he came up with his analysis.  And he

acknowledged that Spectra's auditors and administrators were

1   aware of these loan transactions and he acknowledged that the

2   Master Fund benefited from these loans.  It is clear that the

3   administrator had the power to make loans, that they had the

4   power to make loans.  We showed you JX 7, where they had that

5   power, DX 2, the LLC agreement.  Not only was the

6   administrator's existence disclosed, not only were these loans

7   disclosed to the auditor's administrator, you heard Mr. Porges

8   disclosed loans to Mr. McBeth in January 2011.  And in fact

9   January -- in their own complaint, in the complaint they filed

10  in this case, they allege that Mr. Porges told them about the

11  loans in 2013.

12          Again, listen to arguments, listen to evidence.  The

13  suggestion that there is no memo on this meeting, did you see

14  any memos on any meetings with Mr. Porges and Mr. McBeth when

15  he met him initially, the social meeting?  Did you see any memo

16  on that?  When he met him later in the next year, did you see

17  any memo on that?  It was regular course of their business

18  activity that there are no records of the meetings one way or

19  the other.  There is nothing suspicious about that January

20  meeting.  That's just an argument.

21          Most importantly I would say to you, impressively, was

22  the testimony of Guy Miller.  Guy Miller has been a partner in

23  a hedge fund audit space for almost 15 years and done over 800

24  audits.  Mr. Miller has spent his entire career working on

25  hedge funds, not testifying about them, and he unequivocally

stated that these were loans and were consistent with industry

practice.  That's evidence.  That's somebody who testified as

to what was industry practice.  The fact that the bear -- the

loans did not bear interest was of no moment as he told you.

Similarly, he rejected plaintiff's argument that because they

carried a three-term -- three-year term but were paid quickly,

he says, doesn't matter.  That's not how the industry looks at

it.  He told you that it doesn't matter whether the loans bear

or don't bear interest.  They are still loans, and that was the

intention of Mr. Porges.  And as the judge will tell you,

that's the issue before you.

         And in fact, again, because they don't want to talk

about what's really the issue in the case, they want to talk

about well, where did the various Spectra entities get the

money from?  Who cares?  Who cares?  Why does it matter where

they got the money from?  And what Mr. Miller said, it's

irrelevant, irrelevant.  That's the evidence.

         The fact that Mr. Porges -- I think his testimony was

the fact that Mr. Porges made a capital contribution to Spectra

Capital Management in no way would change whether or not there

is a loan.

         And in fact Mr. Zweighaft, in his evidence, testified

that related party transactions are common in the industry.  To

be a loan, there is no need to be a writing.  There is no need

for interest.  Again, Ms. Chaudhry said to you the judge is

1  going to tell you that you need interest for a loan.  Pay

2  attention to what the judge tells you, because he is not going

3  to tell you that.  Not true.

4         Again, there needs to be agreement.  That agreement

5  can be between related parties and can be the same person.

6  There needs to be some consideration back and forth, and there

7  is no dispute here that these loans benefited all of these

8  entities, and there was a good deal.  Again, the concept of

9  consideration is a very minimal concept.  All you need is a

10  dollar of consideration.  You don't need real cash.  You need

11  some very slight benefit to support these transactions.

12         Their contra theory, which is that these were either

13  gifts or capital contributions, again, again, intent is

14  critical.  To be a gift, you have to intend to be a gift.  You

15  have to have what's known as donative intent.  You have to

16  bestow a present on you.  Do you think that Mr. Porges bestowed

17  $13 million of gifts on Spectra Opportunity Fund?  What

18  evidence was there of that?  It is a silly theory.

19         And in fact, but that's what Mr. O'Neal testified.  He

20  testified that the money, I think he said in his chart, was $13

21  million of gifts that Mr. Porges made to Spectra, and she

22  asked -- she asked you in her argument, he gave $13 million in

23  gifts.  I want $3 million.  Mr. McBeth is entitled to $3

24  million.  That's their damage claim.  He made gifts, and now

25  you should pay it to Mr. McBeth.  That's their claim.

1          Again, for a gift and the judge will instruct you on

2     this -- let me see if -- I lost my piece of paper -- to be a

3     gift, a gift is a gratuitous voluntary transfer of something of

4     value without expectation of repayment.  First off, Mr. Porges

5     had an expectation of repayment.  The donor must intend to

6     transfer the property as a gift, and the gift must be delivered

7     to the recipient and the recipient must accept the gift and the

8     law requires that this donative intent, the intent to give a

9     gift, not only has to be proved by the plaintiff, but have a

10    higher standard of proof on this area.  They have to prove it

11    by not just preponderance of the evidence, but they have to

12    prove it by clear and convincing evidence.  I submit to you

13    there is simply no evidence -- clear or otherwise -- supporting

14    this was a gift.

15         Yet here just to remind you -- what did I do wrong?

16    Okay.  I don't have it here, so I will skip it.

17         Their chart that you saw for Dr. O'Neal, his entire

18    damage theory was that $13 million of these inflows were gifts.

19    $13 million was gifts.  That's what he testified to.

20         We are going to get back to this in a second, but she

21    mentioned their claim as to the gifts, which I think is --

22    borders on not really based in any fact, is only viable if they

23    prove that Mr. -- that Mr. McBeth delayed in filing his lawsuit

24    because a promise was made to him that he would get repaid.

25         First off, putting aside Deborah Rose, because

Summation - Plaintiff

whatever Deborah Rose promised doesn't bind Mr. Porges, there
is no evidence that Mr. Porges made any such promise.  There is
no claim by that.  Nobody testified other than Mr. McBeth who,
as you remember, said I vaguely remember a consideration, but
when the judge asked him was there a promise, he said no, no
promise.

        Again, you saw, most importantly, Craig McBeth on the
stand, and you heard his testimony as to what happened at those
three meetings, and he begrudgingly acknowledged that at no
time in those meetings did Mr. Porges make a promise.  In fact,
he acknowledged that Mr. Porges got mad, made accusations of
him, and said, I'm not a crook.  I didn't take your money.
That's the testimony, not the argument.  Look at the facts.  As
a result of that, because there is no promise, nothing would
have induced Mr. McBeth not to sue, that claim is barred.

        The arguments that this was capital contributions
versus gift fair no better.  First, as they acknowledge, the
transactions over the Master Fund, you can't make a capital
contribution to the Master Fund.  As they acknowledge, the
payments by Spectra entity other than SIC can't be a capital
contribution because they don't have a capital account at SOF,
at the feeder fund.  As you heard Guy Miller testify and
several other witnesses, to make a capital contribution it has
to be the feeder fund not the Master Fund.

        And in fact, in Dr. O'Neal's analysis, which you saw,

1    he in fact -- the reason he says they are gifts is because he

2    acknowledges that the money from Spectra Financial Group,

3    Spectra Capital Market, and Spectra Investments couldn't be

4    capital contributions, so he has got no choice -- because he

5    doesn't want to say they are loans -- but to call them gifts.

6         And again, Mr. Porges told you, again, intent is

7    critical, that's what the judge will instruct you, intent is

8    critical, and Mr. Porges testified -- there is no rebuttal in

9    effect -- I did not intend to make a capital contribution.  I

10   did not want to own more equity.  I had made a $12.5 million

11   investment, and that was it.  And it wasn't doing well.  And in

12   fact Mr. McBeth made an $8 million investment, and we took him

13   down to 5 because we didn't want to put more equity in.

14        And capital involves sort of a length of a period.

15   You don't put capital in for five minutes.  You put it in for a

16   length of time.  And Mr. Porges told you he didn't intend to

17   put the money in for a long time.  And it is clear that this

18   money was only in for a short time.

19        Also the timing of these transactions prove that they

20   are not capital contributions.  Again, as you heard from

21   Mr. Zweighaft, there is a limitation on when you can invest.

22   You can't just put the money in any time you want to.  You can

23   only put it in at a certain period of time, and that was

24   inconsistent with the behavior here.  And as you heard from

25   Mr. Stupay and Mr. Miller, that the idea that you are going to

1    make 71 separate withdrawals and you are going to make 71

2    separate redemptions is practically impossible.  It can't be

3    done.  It takes too long to do it.  Nobody would make capital

4    contributions 71 times and take it out 71 times.  And in fact

5    you saw DX 51, the Omnium agreement, which specifically says,

6    look, if you try to do this other than at the end of the month,

7    I'm going to charge you extra, because it is difficult to do.

8         Now, Ms. Chaudhry said, and I agree with her, that

9    this case is about a breach of loyalty -- a breach of fiduciary

10   duty.  Did Mr. Porges breach his duty of loyalty?  Under

11   Delaware law, he has a very narrow duty.  The only duty he has

12   to him is a duty of loyalty.  He can't place his interest above

13   the interest of Mr. McBeth.  Their suggestion is that the loans

14   place Mr. McBeth's interest over the interest of Mr. Porges --

15   I'm sorry, the loans place Mr. Porges's interest over the

16   interest of Mr. McBeth.  And she says, well, it doesn't matter

17   about the $3 million.  Of course it matters.  He put his own

18   money in rather than using Mr. McBeth's money.  Then they say

19   he was placing his own interest ahead of him.  That doesn't

20   make any sense.

21        I think, as we showed you time and time again,

22   Mr. Porges, not only did not breach his fiduciary duty, he went

23   over and above what he was required to do to try to protect

24   Mr. McBeth.

25        Now, Mr. McBeth was a sophisticated investor, as you

saw in JX 7, JX 5, JX 5-1.  He represented that he was one.  He

represented that he had assets in excess of $40 million.  He

represented that he could afford to lose his entire investment

and that he was sophisticated enough to know the risk of this

highly volatile, highly leveraged fund.  And in fact, again,

not breaching his fiduciary duty, not putting his loyalty

aside, Mr. Porges took Mr. McBeth in without charging him a

management fee.  Let him in for free.

Similarly, you saw JX 68.  In October, when the

performance wasn't good, went out of our way, we wrote him a

letter and said, we didn't do good in June, July, August,

September, October.  Don't put your money in.  Is that putting

your interest ahead of his interest?

Again, the events of December, you saw JX 68 right

here, that's a letter in which they said, look, you don't have

to put your $8 million in.  And what does Mr. Porges --

Mr. McBeth do?  The next day he sends in the money.

And of course the most instructive events are the

events of December 10 and early January.  I think you know the

story.  It was clear that when Mr. Porges made that loan, his

intent was to make -- to put the 1.6 million for short term,

and he gave Mr. McBeth back his money.  He didn't intend it to

be a capital contribution.  Again, you remember our

demonstrative that shows the movement of the money, remember

the prime broker making the margin call at the same time

1    Mr. Porges gives him back the 3 million and he puts his own

2    money in.

3            As you know, the performance continued to disappoint.

4    Now, Mr. Porges cares two and a half times more about that bad

5    performance than Mr. McBeth does, and Mr. Porges didn't redeem.

6    Mr. Porges was -- understood the risk and he took the risk and

7    he lost his money and that's it.  And that should be the same

8    for Mr. McBeth.  He took the risk, he was a big boy, and now he

9    lost his money.  Move on.  But in fact her suggestion that

10   Mr. McBeth would have redeemed had he known about the loan

11   transaction can't be -- can't be justified in connection with

12   his own activity.  You saw in DX 129, DX 132, and DX 135 that

13   in April, May, and July, Mr. McBeth was told about millions of

14   dollars of losses, at one point up to $4 million of losses, and

15   he didn't redeem.  You are telling me that you could find

16   reasonably that knowing that there has been a loan would cause

17   him to redeem when $4 million doesn't cause him to redeem?  In

18   fact, when he was told that he lost $4 million he didn't even

19   want to meet about it.  "On vacation.  See you soon.  Thanks."

20           Again, is it a capital contribution?  No.  One of the

21   other reasons, again, as I said, the money -- I'm sorry.

22   Rewind.  They say that we breached our fiduciary duty to him.

23   In fact, the opposite is true.  Even at the end of the day, at

24   the end of the day, now that Spectra has -- the Opportunities

25   Fund, Master Fund has gone into liquidation, it is in SIPA, the

1    money has been tied up since October, that's why there is no

2    monthly reports, that's why there is no audit report, it is

3    tied up, at the end of the day, they now recover from SIPA

4    close to $3 million.  He owes himself, on the loans that he

5    intended to be short-term which he hasn't got paid on, he owes

6    himself $3.3 million.  What does he do with that money?  He

7    doesn't pay it back to himself completely.  He in fact pays

8    expenses, then he takes a little less than half of it, 1.4, and

9    he pays a loan, then he takes that extra money, which he is

10   entitled to as a creditor above equity, he makes an equity

11   distribution.  He gives Mr. McBeth $197,000, which Mr. McBeth

12   had no right to receive.  That's not a breach of fiduciary

13   duty.  That's not a breach of duty of loyalty.  That was

14   treating Mr. McBeth fairly.

15       Remember, I ask you when you go back to deliberate,

16   look at the evidence.  Look at the documents.  Look at the

17   testimony.

18       Mr. Porges lost 15 million, around 15, $14 1/2

19   million.  His equity was only 12 1/2.  He lost an extra $2

20   million because of these loans.  He didn't take repayment.  And

21   in fact because Mr. Porges looked out for Mr. McBeth, rather

22   than losing $8 million, he only had $5 million invested.  And

23   he gave him back 200,000 of that, so he lost 4.8.  That is not

24   the evidence of a breach of fiduciary duty.  That is evidence

25   investment went bad, no doubt about it, everybody lost money.

1          Again, I thank you for your patience.  I'm often

2    longwinded.  I'm sorry for that.  But I think you have to look

3    at the evidence, and I ask you when you deliberate to find that

4    the money lent by the Spectra entities to the Master Fund were

5    intended.  What were they intended to be?  They were intended

6    to be loans.  And it doesn't matter whether they are

7    formalized, not, interest or not, term or not, they were

8    intended to be loans, they are loans, and accordingly we would

9    ask you to enter a judgment in favor of the defendants.

10          Thank you so much.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Thank you.

2          Surrebuttal.  Then we're going take a break.

3          MS. CHAUDHRY:  Would you prefer a break now, sir?

4          THE COURT:  Do rebuttal right now.

5          MS. CHAUDHRY:  Hello, again.  I just want to respond

6    to some of the things that the defense has raised.

7          Mr. Schiffman asked you rhetorically, would you have

8    paid for an audit in 2011 and wasted Mr. McBeth's money.  That

9    is irrelevant because they owed Mr. McBeth a 2011 audit.  And

10   no one was allowed to waive the 2011 audit, not Mr. McBeth and

11   not Mr. Porges.  And there's no documentation that Mr. McBeth

12   ever agreed to waive a 2011 audit.

13         And when they talk about wasting money, let's look at

14   the check register and see what they did.  They spent a lot of

15   money in 2012, including when the $3.3 million came back.  They

16   had expenses.  One of those expenses should have been the 2011

17   audit.  They didn't pay that.  Instead, Mr. Porges repaid

18   himself on one of his loans.

19         And, let's think about this.  They want you to believe

20   that Mr. McBeth, who has spent time -- now years and money --

21   filing this lawsuit would have waived an audit, the audit that

22   would have showed him what actually happened here, just to save

23   money.  That makes no sense.

24         Now, the defense also brought up the idea of

25   consideration, which your Honor will tell you about.

1018

Summation - argument

1      Consideration is basically something of value.  To have a valid

2      loan, there has to be a reason somebody is giving you this

3      money.  And what is the thing of value?  What on earth does

4      Spectra Capital Management get for giving a few million dollars

5      to the fund for a few days for free?  The answer is nothing.

6      It's nothing.  They got nothing.  That's zero.  It's not even

7      the dollar that Mr. Schiffman referred to.

8             Now, the thing about gifts is gifts don't get repaid.

9      You give someone a gift, it's theirs.  It's over.  Once the

10     gift goes into the fund, Mr. Porges is not allowed to repay it

11     out.  Every repayment is the breach of fiduciary duty.

12            Mr. Schiffman spoke about the tolling and about the

13     promise.  There was no promise.  But you'll hear from the

14     Judge, tolling doesn't require a promise.  It's about

15     discovery.  The burden is actually on them to show you that Mr.

16     McBeth could have figured out all of this about the loan scheme

17     within the three-year statute of limitations.

18            Now, this is tricky, so bear with me.  The defense

19     just argued that we know the money into the fund through Mr.

20     Porges' entities was not a capital contributions because, as

21     they just said, capital contributions and capital investments

22     are intended to be long-term, not short-term.  Well, that's

23     fascinating, because Mr. Porges does make things he calls

24     capital contributions into SIG every day for four days and

25     capital withdrawals.  Short-term, right?  So, why is it that he

1    couldn't make a capital contribution?

2         So, look.  Here we go.  Greg Porges makes a capital

3    contribution.

4         THE COURT:  What are you showing to the jury?

5         MS. CHAUDHRY:  I'm sorry.  It's the first page of the

6    blown-up demonstrative, PX-94.

7         This is his decision to call it a capital

8    contribution, and he makes it from his own account to SIG on

9    January 4th.  And then, look, he makes another capital

10   contribution to Spectra Investment Group on the 5th.  And then

11   14 days later, he calls it a capital withdrawal.  So, in his

12   other accounts, in Spectra Investment Group, these are

13   short-term, quick-moving moneys.  But according to them,

14   capital contributions aren't short-term.  So, what is it?  Why

15   do you get to call it one on one day and something else on

16   another?

17        And they do another red herring at you.  They said,

18   there's no management fee charged here.  But let's be clear,

19   that does not cancel their fiduciary duty to Mr. McBeth.  Mr.

20   McBeth's fiduciary duty that he is owed has no relationship to

21   whether or not he had paid a management fee.  That is the law.

22   Do not be tricked by that.

23        And then, as I predicted, they said that Mr. McBeth

24   didn't redeem, he didn't redeem, he didn't redeem.  This is not

25   about McBeth.  Redemption is not the issue.  It's about Porges

1020

```
1    and his breach.  It doesn't matter that Mr. McBeth didn't
2    redeem in those months.  It's about the breach of fiduciary
3    duty.
4            And then the last thing that they argued is that Mr.
5    Porges lost a lot of money.  Again, that just does not matter.
6    That does not absolve him of his fiduciary duty to Mr. McBeth.
7    There's nothing in the law that says that.  The fiduciary duty
8    existed the day Mr. McBeth gave him his money and it existed
9    the whole time he had Mr. McBeth's money.  It didn't matter
10   whether he was paying a management fee or that Mr. Porges lost
11   money.  It doesn't matter that Mr. McBeth is sophisticated.  It
12   doesn't matter that Mr. McBeth is wealthy.  Didn't matter that
13   Mr. McBeth didn't redeem.  None of those things mattered.
14           Thank you.
15           THE COURT:  That's it.  Finished?
16           MS. CHAUDHRY:  Yes.
17           MR. SCHIFFMAN:  I don't get to say anymore, do I?
18           THE COURT:  No more.
19           MR. SCHIFFMAN:  That's what I thought.
20           THE COURT:  Only I can now speak.
21           Members of the Jury, let's take about ten minutes.
22   It's 20 till 3:00.  We'll come back say, five minutes till
23   3:00.
24           (Recess)
25           (In open court; jury not present)
```

```
 1              THE COURT:  I gave you Court Exhibit No. 5, which is a
 2    proposed verdict form that I'd like to use.
 3              Has the plaintiff, Mr. Skibell, had an opportunity to
 4    review this?
 5              MR. SKIBELL:  Yes.
 6              THE COURT:  Any comments?
 7              MR. SKIBELL:  This is wrong as to the law on tolling.
 8    It should not say it was tolled by defendant's conduct.  Mr.
 9    McBeth can be entitled to tolling --
10              THE COURT:  I'll scratch "by defendant's conduct."
11              MR. SKIBELL:  Thank you, your Honor.
12              MR. SCHIFFMAN:  Well, wait I beg to differ.  As to Mr.
13    Porges individually, it would only be by his own conduct.
14              MR. SKIBELL:  That's not the law.
15              MR. SCHIFFMAN:  There is no --
16              THE COURT:  Don't debate.  Sit down, Mr. Skibell.
17              MR. SCHIFFMAN:  Again, as to Mr. Porges, her conduct
18    cannot toll as to him.
19              THE COURT:  Who's her?
20              MR. SCHIFFMAN:  Ms. Rose.  She doesn't represent him.
21              THE COURT:  They're both officers of the same company.
22              MR. SCHIFFMAN:  And so, she could bind that company.
23    And I agree with that.  But she can't bind him.
24              THE COURT:  Mr. Schiffman, you've represented all
25    three companies, indicating there was no conflict of interest
```

1    between them.  They both represent the defendants here because

2    we made no particular distinction between the financial group

3    and investment group and Mr. Porges.  I'm leaving it the way it

4    is.

5              MR. SCHIFFMAN:  Just for a second.

6              Those factors are irrelevant to this issue.  I can

7    represent multiple defendants who have different defenses, the

8    individual people of different duties.  There is no basis for

9    saying that Ms. Rose can bind Mr. Porges.  There is no law on

10   that.  The fact that they work at the same company has nothing

11   to do with that.  How can she bind him?

12             THE COURT:  Overruled.

13             Any other comments, Mr. Skibell?

14             MR. SKIBELL:  Your Honor, just so I understand, we're

15   taking out "by defendant's conduct?"

16             THE COURT:  No.  I'm leaving it in.

17             MR. SKIBELL:  No, your Honor.  You can't do that.

18   That's not the law.

19             THE COURT:  What is the law?

20             MR. SKIBELL:  The law is the following.  I'm going to

21   read it directly.  It says from *Weiss v. Swanson*, which is

22   actually cited in the jury brief --

23             THE COURT:  I've read the case.  What about it?  It

24   states a rule in terms of a situation where estoppel is sued

25   derivatively against a company --

1              MR. SKIBELL:  Your Honor, what it says is, under the

2    theory of equitable tolling --

3              THE COURT:  Mr. Skibell, relax.  I know the argument.

4    I've heard your argument.  It's staying the way it is.

5              MR. SKIBELL:  Your Honor, one moment on this.  Under

6    Delaware law, if there's self-dealing, it can be tolled even

7    when there's no action by defendants.

8              THE COURT:  Overruled.

9              Anything else, Mr. Skibell?

10             MR. SKIBELL:  Your Honor, there's not a single case

11   that goes the other way.

12             THE COURT:  I've heard you.  I've read the cases.  I

13   know what they are.

14             Anything else?

15             MR. SKIBELL:  No, Your Honor.

16             THE COURT:  Anything else, Mr. Schiffman?

17             MR. SCHIFFMAN:  No, Your Honor.  Thank you.

18             THE COURT:  Okay.  So, I want to make these changes to

19   the jury charge.  I don't have copies for you.  If you have a

20   copy in front of you, it will be easier.

21             MS. CHAUDHRY:  Is this the same one you gave us

22   earlier?

23             THE COURT:  Yes.

24             MS. CHAUDHRY:  Yes.  We have it.

25             THE COURT:  Okay.  Look at page ten.  The bottom

1   paragraph is out.  There will be a sentence added to the

2   paragraph before ending with fiduciary duties.

3        The consequence will vary according to your findings

4   whether the transfers are funds to the opportunities fund or

5   capital contributions or gifts.

6        Paragraph on 11 is out.  This section will be:  If you

7   find that the transfer of funds by defendants to Spectra

8   Opportunities Fund should be classified not as loans but,

9   rather, as contributions of capital, the amount of recovery

10  will be $323,496.77.  This number results from a number of

11  calculations shown in DX-175.

12       MR. GRIFFIN:  Yes, your Honor.

13       THE COURT:  Basically, you start with the two capital

14  contributions by McBeth and by Porges through a company he

15  controls, Spectra Investment Group LLC, $5 million to $12.5,

16  respectively.  Then you add the net amount of funds transferred

17  into the opportunities fund and returned by the fund.  In

18  changing the ratio of the investment between McBeth and Porges

19  because of these capital contributions and several more

20  adjustments, applying the adjusted ratio to the damage figure

21  which is $323,496.77.

22       If you find that the money transferred were gifts,

23  another issue comes into play, the statute of limitations.  The

24  plaintiff alleges that his claim accrued, that is, he gained

25  the right to sue, on January 3, 2011.  The law gives him three

1    years to bring suit.  That limits the defendants' claim under

2    the theory that the transfers of money to the Spectra

3    Opportunities Fund were gifts.  The transfers back to Porges's

4    companies $1,420 586.94.  Using the 12.5 ratio investments,

5    plaintiff's recovery would be $406,287.86.

6         We then pick up on the bottom paragraph on page 12.

7    At the end of the paragraph on page 13, I want to add the

8    following:  Made statements of intent to help make good of loss

9    of money are not sufficient.  Vague unspecified conduct does

10   not give rise to equitable tolling.  The circumstances must be

11   tied to specific conduct.

12        I know you object.  It's overruled.

13        MR. SKIBELL:  Your Honor, can you give us a cite under

14   Delaware law for that proposition? Because the only cite you

15   have there --

16        THE COURT:  I cited Weiss, and I cited --

17        MR. SKIBELL:  Weiss says that a fiduciary doesn't

18   have -- there doesn't have to be any conduct.

19        THE COURT:  All kinds of fiduciary claims.  We're not

20   dealing with the kind of fiduciary claim that is involved in

21   Weiss.  We're dealing with two investors in a hedge fund.  The

22   investor, whom you represented, knew that there would be

23   borrowings, knew that the fund would be leveraged.  And there

24   is nothing about the situation that creates an enlargement of

25   the usual situation of an insider not being allowed to favor

1    himself over another.

2         The other case that I'm citing is *Central Mortgage*

3    *Company against Morgan Stanley Mortgage Capital Holdings, LLC.*

4         That was a situation where we have statements by the

5    defendant:  I'll make good on losses and the like.  And the

6    court held that facts alleged with sufficient specificity to

7    indicate a defendant affirmatively acted and induced the

8    plaintiff.  Mere attempts to repair or a promise to repair a

9    breach of contract do not preclude the running of the statute.

10   A repair rule is based on the principle of estoppel.  There

11   must be strong elements of alliance and inducement to justify

12   the defense and the statute of limitations.  Furthermore, this

13   doctrine is not likely invoked because equitable exceptions to

14   the statutes of limitation are narrow and designed --

15        MR. SKIBELL:  Your Honor, is that a case interpreting

16   New York law?  Because it doesn't sound like Delaware.

17        THE COURT:  It's involving Delaware law.  There's no

18   indication of New York law applying.  And I think it states the

19   law as I understand it, whether Delaware or New York.

20        Again, you cannot enlarge the concept of fiduciary

21   that deals with all kinds of variables.  The fiduciary

22   situation in this case is preferment, preferment of Porges and

23   his companies to McBeth.  You have three years to bring suit.

24        MR. SKIBELL:  Your Honor, I will stringently object

25   because under all these -- they don't distinguish between

1    fiduciaries.  If there's a duty of loyalty case, this principle

2    of equitable tolling applies.  And inquiry of notice applies.

3    And you're disregarding inquiry of notice altogether in your

4    charge, and that's not the law.

5           THE COURT:  I did not -- we have it in here.  Bottom

6    paragraph on page 13:  If you find that the statute of

7    limitations was tolled by any of these circumstances, the

8    statute of limitations may be rolled back to the time, if any,

9    McBeth had notice in the defendant's alleged breach.  Notice

10   means that McBeth either became aware of the breach itself or

11   became aware of facts that would have been sufficient for a

12   person of ordinary intelligence and prudence to launch an

13   inquiry.  This is language from before.

14          MR. SKIBELL:  But, your Honor, your instruction at the

15   end suggests that, in the absence of active concealment, i.e.

16   New York law on tolling, that there is no equitable tolling.

17   And I don't think that's right.  It's inconsistent with inquiry

18   notice, which is the earlier part we were just referring to.

19   There does not have to be action by the defendants.

20          THE COURT:  All right.  Mr. Skibell, although I think

21   you are in error, I will defer to you and will not read the

22   vague statements of intent, etc., to which you object, and I

23   will eliminate "by defendant's conduct," question two of the

24   verdict.

25          MR. SKIBELL:  Thank you, your Honor.

```
 1              THE COURT:  I think you are wrong in both instances.
 2     I think I'm right.  But I'm not particularly interested in
 3     giving you appealable issues, because I don't think it will
 4     make any difference of how the jury decides.
 5              MR. GRIFFIN:  Your Honor, you are right.  And the fact
 6     that you're right means it should be in the instruction.  The
 7     idea of inquiry of notice here is --
 8              THE COURT:  I can count on hands and feet, Mr.
 9     Griffin, how many times I've been right and the appellate court
10     disagreed.  It doesn't mean I think they're smarter than me,
11     except by definition.
12              MR. GRIFFIN:  You got it right this time.  Equitable
13     tolling is the first step.
14              THE COURT:  Did you hear me?  I heard.  I know.
15              MR. GRIFFIN:  I'm not quite --
16              THE COURT:  I'm cutting it out.
17              All right.  Anything else?
18              MR. SKIBELL:  No, Your Honor.
19              THE COURT:  There's one more thing I didn't read.  Let
20     me.  This will be after 13B:  Plaintiff has the burden to
21     prove, by the preponderance of the evidence, that tolling
22     occurred.  If you find that he satisfied his burden of proof,
23     plaintiff's claim based on the theory that all money transfers
24     by Porges and his companies -- let me read this again.  Sorry.
25              "Plaintiff has the burden to prove, by the
```

1    preponderance of the evidence, that tolling occurred.  If you

2    find that he satisfied this burden of proof, plaintiff's claim,

3    based on the theory that all money transfers by Porges and his

4    companies to the opportunities fund or gift, covers all returns

5    or extends to all money flowing back from the Spectra

6    opportunities fund.  The amount flowing back is $11.134,331.94,

7    Applying the 5 million to 12.5 million.  I don't know ratio of

8    capital contributions.  The end result of the damages claimed

9    would be $3,184,418.67.  I will illustrate all this by the

10   verdict form at that particular point.

11             Okay.  We cool?

12             MR. SKIBELL:  No objection, your Honor.

13             THE COURT:  Mr. Schiffman?

14             MR. SCHIFFMAN:  Yes.

15             THE COURT:  All right.  Good.  I think a smile is

16   consent.  All right.  Let's get the jury.

17             MS. CHAUDHRY:  Your Honor, may we have a printout of

18   all this?

19             THE COURT:  No.

20             MR. SCHIFFMAN:  Your Honor, I will just note for the

21   record, we object.

22             (Jury present)

23             Thank you very much, members of the jury, for your

24   attention throughout the case.  Jurors tend to want to avoid

25   jury duty.  I hope that this experience, participation with the

1    Judge and lawyers in this civil case -- if you had that frame

2    of mind -- changed it.

3         There's no higher calling in this country than the

4    equal administration of justice to all persons, regardless of

5    color, creed, national origin or any other protectable status.

6    The delivery of justice doing right, addressing wrongs, of

7    upholding that liability doesn't exist.  All these

8    possibilities that exist in a civil trial are part of the

9    administration of justice and part of a satisfied public.  They

10   are the protections against improper procedures of property.

11   They're protections against redress of rights or violations of

12   rights.  This is not to prejudge the case, it's only to commend

13   you for your attention throughout this case.

14        And now it's your turn.  It's you that has to decide

15   this case by these instructions, and you are obliged to carry

16   out these instructions.  I tried to inform you of the rules and

17   procedures that generally apply to civil jury trials.  And then

18   I will give you the substantive law to see if plaintiff has

19   proven, by preponderance of evidence, that defendants violated

20   the law.  And third, I will tell you about the procedures that

21   should conduct your deliberations.

22        Having heard all the evidence in the case, the final

23   arguments of the lawyers, these instructions, you're ready to

24   decide the case.  You must take the law as I give it to you,

25   regardless of whether you think it's right or wrong.  You

1    decide the facts.  I have no opinion on the facts.  Nothing I

2    do should suggest to you that I have an opinion on the facts.

3    It's your job to decide the facts.  In deciding the facts, you

4    pass upon the weight of the evidence, you determine the

5    credibility of the witnesses, you resolve any conflicts that

6    might exist in the testimony, and you draw whatever reasonable

7    inferences are appropriate from the facts as you see them.

8           The evidence before you consists of the answers given

9    by witnesses -- that is their testimony -- and the exhibits

10   that were received in evidence.  You must base your verdict

11   solely upon that evidence.  It would be highly unfair to the

12   parties and other jurors because of some private notion or

13   private whim you thought that was decisive.  The verdict must

14   be based on the facts according to the law, as I give it to

15   you.

16          If I granted any motion to strike exhibits or

17   testimony or if I granted objections, that doesn't count.  The

18   evidence that you may have heard doesn't count.  It's only the

19   relevant and admissible evidence that can count with regard to

20   your verdict.

21          Donald F. McBeth, as plaintiff, must prove the facts

22   to support his claim.  His burden is preponderance of the

23   evidence.  You also have a counterclaim in the case.  I will

24   tell you about that after you return the verdict in this case.

25   They don't hang together.  They're not dependent on each other,

1    so we've reserved that for another round.  And there's a

2    different burden of proof on that, which I will tell you about

3    when the time comes.  But in this case, Mr. McBeth has the

4    burden of proof by preponderance.

5         When a party is required to prove a fact by

6    preponderance of the evidence, it means that that party must

7    prove that the fact is more likely true than not true.  A

8    preponderance of the evidence means the greater weight of the

9    evidence.  Not how much evidence, but the weight of provable

10   evidence.  Does it persuade you?

11        In determining whether a claim has been proved by the

12   preponderance of the evidence, you may consider the relevant

13   testimony of all witnesses, regardless of who called them, and

14   of all exhibits received in evidence, regardless of who offered

15   them.  If you find that the credible evidence on a given issue

16   is evenly divided between the parties, that is, equally

17   probable that the plaintiff is right as it is that the

18   defendants are right, then you must decide that issue against

19   the plaintiff, because the plaintiff has failed in proving by a

20   preponderance.  If the evidence relevant to an issue is equal,

21   the party bearing the burden of proof has failed to satisfy the

22   burden of proof.  However, the party bearing the burden of

23   proof need prove no more than a preponderance.  If you find

24   that the scales tip however slightly in favor of the party

25   bearing the burden of proof, that what that party claims is

1   more likely true than not true, that party will have proved the

2   issue by a preponderance of the evidence.

3          You remember my example of an even weights on a scale

4   and how the scale tips.  I need not repeat it.

5          Some of you may have heard about proof beyond a

6   reasonable doubt, that that's a standard of proof in a criminal

7   trial.  It is no implication in this civil trial.  This case

8   involves two claims:  A breach of fiduciary duty claim by the

9   plaintiff, and a breach of contract counterclaim by the

10  defendant, which, as I said, we'll pass on to the next stage.

11         Let me tell you a little bit about both claims so

12  you'll have a picture.  It will be brief.  First, plaintiff's

13  claim.  Plaintiffs claim that defendants' money transfers to

14  the Spectra Opportunities Fund should not have been classified

15  as loans and that repayment of these money advances to the

16  defendants breached defendant's fiduciary duty to plaintiff.

17  That's the claim.

18         Defendants deny the claim and allege that the

19  transfers made to the Spectra Opportunities Fund were intended

20  to be loans, not contributions of capital and not gifts, and

21  that the repayment of the loans to the defendants was proper.

22  That's the claim of the defense and the issue that you will

23  have to be trying in this round.

24         Just to give you a picture of the counterclaim, the

25  defendants seek the return of money they spent defending

against this lawsuit.  They allege that plaintiffs promised

defendants before investing, in writing, that it relied only on

certain identified documents but he based his lawsuit on

different documents.  And defendants allege that this breached

the contract between them.  Neither the plaintiff's allegations

nor the defendants' denial of allegations are proofs.  They're

merely assertions.  You, the jury, are to evaluate the proofs

and determine if plaintiff has proved his claim by

preponderance of the evidence and whether the defendants have

proven their claim.

Let me tell you how to measure plaintiff's claim and

how to define the claim.  The majority, or controlling owner,

of a company has a duty not to pervert himself or his companies

against the interests of a minority shareholder.  We call that

a fiduciary duty.  Here, the defendants, Gregory Porges and the

Spectra companies he owned and controlled, were the majority

owner and manager of Spectra Opportunities Fund and had a duty

not to prefer themselves over McBeth.  McBeth, the plaintiff,

was the minority shareholder.  He had no decision-making power

in the company.

The issue in this case arises from the manner in which

margin calls the Spectra Opportunities Fund were funded.  If

the amounts transferred to the fund were loans, the lenders had

a right to be paid before the owners or shareholders.  This is

true, even if the lender is a majority or controlling entity.

1          However, if the transfers were capital contributions

2     or gifts, then it was a breach of fiduciary duty for defendants

3     to transfer the money from Spectra Opportunities Fund to the

4     defendants.

5          So, I need to define loans and contributions to

6     capital and gifts.  A loan is money paid by one party, the

7     lender, to another party, the borrower, with the intention that

8     the loan shall be paid on maturity or on demand.  A loan is a

9     contract requiring a meeting of the minds of lender and

10     borrower for consideration.  There may or may not be a written

11     note or other writing evidencing the loan.  But if there is not

12     such a writing, there still may be a loan.  A lender is

13     entitled to have his loan paid first before any funds are

14     distributed to the company's equity owners.

15          If you need repetition of any of this, just raise your

16     hand, and I'll do it.

17          A capital contribution is an amount of money given to

18     a company to obtain a share of ownership or equity of the

19     company.  The value of equity rises or falls with the overall

20     value of the company.  Equity holders are not entitled to have

21     equity returned to them until all creditors have been paid.

22     Creditors, of course, include lenders.  A gift is a gratuitous

23     voluntary transfer of something of value without any

24     expectation of payment -- repayment.  I'll repeat.

25          A gift is a gratuitous voluntary transfer of something

1  of value, without any expectation of repayment.  The donor,

2  that is, the giver of the gift, must intend to transfer the

3  property as a gift.  The gift must be delivered to the

4  recipient and the recipient must accept the gift.  The law

5  requires that each of these elements be proved by clear and

6  convincing evidence.  A standard higher than preponderance of

7  the evidence, but lower than beyond a reasonable doubt.

8        You will have to determine whether at the time Porges

9  and his companies transferred funds to the Spectra

10 Opportunities Fund, defendants intended the transfers to be

11 loans, capital contributions or gifts.  If you determine that

12 the transfers were loans, defendants were entitled to be paid

13 before any payment to equity owners.  In consequence, the

14 defendants would not have breached their fiduciary duties to

15 plaintiff, and you should return a no-liability verdict, and

16 there will be no damage.

17       If you determine that the transfers were not loans,

18 defendants breached their fiduciary duties, the consequence

19 will vary according to your findings whether the transfers of

20 funds to the opportunities fund were capital contributions or a

21 gift.  There are three possibilities:  Loans, capital

22 contributions, gifts.

23       JUROR NO. 4:  Your Honor, what would be the standard

24 for capital contributions?  Can you reread the standard for

25 capital contributions?

 1              THE COURT:  Sure.

 2              JUROR NO. 4:  Just whether it's preponderance of the

 3   evidence or something higher.

 4              THE COURT:  It's preponderance of the evidence.

 5              JUROR NO. 4:  Okay.  Thanks.

 6              THE COURT:  Everything is preponderance of the

 7   evidence except --

 8              JUROR NO. 4:  Gifts.

 9              THE COURT:  -- gifts.

10              JUROR NO. 4:  Yes.

11              THE COURT:  And that's clear and convincing.

12              JUROR NO. 4:  Thank you.

13              THE COURT:  If you find that the transfer of funds by

14   defendants to Spectra Opportunities Fund should be classified

15   not as loans but, rather, as contributions of capital, we have

16   worked out -- the lawyers and I -- a damage amount.  And I'll

17   give you this in a document in a document: $323,496.77.  This

18   number results from a number of calculations shown in Exhibit

19   DX-175.  Basically, you start with two capital contributions by

20   McBeth and by Porges through a company he controlled, Spectra

21   Investment Group, LLC:  $5 million by McBeth; $12.5 million by

22   Porges's company.

23              Then you add the net amount of funds transferred into

24   the opportunities fund and returned by the fund and, thus,

25   changing the ratio of investments between McBeth and Porges,

1  with several more adjustments, and apply the adjusted ratio.

2  The damage figure comes to $343,496.77.

3         Now, let me stop here and tell you about the verdict

4  form.  So, the foreperson will get this verdict form, and the

5  jury has to be unanimous.  And as the jury decides unanimously

6  one way or the other, the foreperson will check the appropriate

7  box.

8         The first question:  Has plaintiff, Donald McBeth,

9  proved by a preponderance of the evidence that defendants

10  breached a fiduciary duty to plaintiff?

11         If it's yes, you answer yes.  If no, no.  Either way,

12  it has to be unanimous.

13         I'm going to get into the statute of limitations and

14  I'll come back to this form.  But we've covered one of the

15  other possibilities, so let me read that to you.  If you check

16  yes to question one, that is, plaintiff is entitled to recover,

17  plaintiff must prove defendants are liable, that is, what

18  amount of damages the plaintiff prove?  And I ask you to choose

19  the following:  Were the transfer of funds by the defendant to

20  Spectra Opportunities Fund capital contributions and should

21  plaintiff's recovery be $323,496.77, you check that box.

22         Then we go on with the possibility of gifts.  But that

23  raises another complication, and I'll return to it.

24         If you find that the transfers of funds by defendants

25  to the Spectra Opportunities Fund should be classified not as

loans, as they were, but, rather, as contributions of capital, the amount of recovery, as I said, would be $323,496.77.  We've gone into that.

Now, if you find that the money transfers were gifts, another issue comes into play:  Whether the statute of limitations limits recovery.  Plaintiff alleges that he gained the right to sue on January 3, 2011.  The law gives him three years to bring suit.  Anything that happens actionable within those three years can be the basis of the lawsuit.

That theory limits defendant's claim, assuming that he proves by a preponderance that the transfers of money were gifts.  I guess it's more than a preponderance; he has a clear and convincing proof.  The limitations would come out to be $1,420,586.94, reflecting a transfer from the fund to the Spectra companies in that amount.

Using the ratio of capital contributions originally, 5 million to 12.5 million, plaintiffs recovery would be $406,287.86.  And that works out, again, calculations that you've seen here.  And it's covered by one of the questions in the verdict form.

The running of the period of limitations can be tolled under any one of three circumstances.  That is to say, we can disregard the statute of limitations if there is tolling.  One of three situations:  First, when it would be practically impossible for a plaintiff to discover the existence of his or

1    her claim.

2         Second, when a defendant fraudulently has concealed

3    from a plaintiff the facts necessary to put him on notice of

4    his claim.

5         And third, whether there's self-dealing when a

6    plaintiff reasonably relies on the competence and good faith of

7    a fiduciary and causes the plaintiff to delay filing the claim.

8         If you find that the statute of limitations was tolled

9    by any of these circumstances, the statute of limitations may

10   be rolled back to the time, if any, that McBeth had notice of

11   defendant's breach, that is, their wrong.  Notice means that

12   McBeth either became aware of the breach itself or became aware

13   of facts that would have been sufficient for a person of

14   ordinary intelligence and prudence to launch an inquiry, which,

15   if pursued, would have led to discovery of the facts giving

16   rise to the breach.

17        Inquiry of notice does not require full knowledge of

18   the material facts; however, it requires more than an ability

19   to piece together the potential claim from publicly available

20   sources.

21        So, you toll back to the extent, if any, that McBeth

22   had the notice, as I defined it, that he was aware of facts

23   that would have been sufficient for a person of ordinary

24   intelligence and prudence to launch an inquiry, which, if

25   pursued, would have led to the discovery of the breach.

1          Plaintiff has the burden to prove, by a preponderance

2   of the evidence, that tolling occurred.  If you find that

3   plaintiff satisfied his burden of proof, plaintiff's claim,

4   based on a theory that all money transfers by Porges and his

5   companies to the Spectra Opportunities Fund were gifts, that

6   would cover all returns or money flowing back from Spectra

7   Opportunities Fund to the defendants.  That total amount is

8   $11,134,331.94, that is, if you disregard the net and just look

9   at the money flowing back from the fund to the Spectra

10  companies.  The aggregate of that is that $11 million number I

11  read.  And when you apply the ratio of 5 million to

12  12.5 million, the ratio of McBeth investment to Porges

13  investment, the end result of damages claim would be

14  $3,184,418.67.

15         Let me review again the verdict form.  So, question

16  number one, again is:  Has plaintiff, Donald McBeth, proved by

17  a preponderance of the evidence that defendants breached

18  fiduciary duty of the plaintiff?  The answer is yes or no.

19         The next question:  Has plaintiff proved by a

20  preponderance of the evidence that the statute of limitations

21  was tolled?  Again, yes or no.

22         Now, if you have found unanimously that the plaintiff

23  failed to prove by a preponderance of the evidence that the

24  defendants breached a fiduciary duty to the plaintiff, your

25  answer would be no, of course.  And you don't do anything more

1    with this document except sign it and return it.

2        If you find that he the did breach, then I ask you to

3    find if he proved by a preponderance of the evidence, that the

4    statute of limitations was tolled.  And you answer yes.

5        If plaintiff proved that defendants are liable, what

6    amount of damages did plaintiff prove?  And you choose the

7    following:

8        A, were there transfers of funds by defendant to

9    Spectra Opportunities capital contributions and should the

10    plaintiff's recovery it be $323,496?  Or, were the transfers of

11    funds by the defendants to Spectra Opportunities Fund gifts?

12    We talked about that.  And that breaks down into two

13    categories.

14        So, if the answer was yes, they were gifts, I ask you:

15    Should plaintiff's recovery be limited to claims accruing

16    during the period by the statute of limitations and

17    $406,287.66?  Or, if plaintiff's recovery should not be limited

18    because the statute of limitations was tolled, should the

19    recovery be $3,184,418.67?

20        To recapitulate, at the risk of being overly general,

21    there are four outcomes to this case:  One is no liability,

22    these are loans and they could be repaid.  Two is, they were

23    intended as contributions to capital.  Three and four, they

24    were gifts.  The plaintiff either is allowed to sue only within

25    the period of limitations or because plaintiff has proved that

1    tolling applies the full recovery throughout the whole period.

2    Those are the four possibilities in the verdict form.

3            We shall give the verdict form to the foreperson at

4    the end of these instructions.

5            Now, let me go on to discuss the rules of evidence.

6    The law recognizes two types of evidence, direct evidence and

7    circumstantial evidence.  You may rely upon either in reaching

8    your decision.  Evidence is direct when exhibits that are

9    admitted into evidence show facts, and when the testimony is

10   sworn to by witnesses with actual knowledge of them from

11   something they've derived from exercise of their senses, such

12   as something they heard, something they saw, something they

13   smelled, something they touched and so on; that's direct.

14           Circumstantial evidence is evidence that tends to

15   prove a disputed fact by proof of other facts.  You infer on

16   the basis of reason and experience and common sense of an

17   established fact the existence or nonexistence of some other

18   fact.  Circumstantial evidence is of no less value than direct

19   evidence.

20           As a general rule, the law makes no distinction

21   between direct and circumstantial evidence.  What you look for

22   is the strength of evidence, what proves the case to you.  Each

23   form of evidence, direct or circumstantial has strengths and

24   weaknesses.  You have to use your common sense, weighing all

25   the evidence to see where plaintiff has satisfied his burden to

1    prove the case by a preponderance of the evidence.

2         An inference is made from one set of facts to infer

3    another fact.  You draw that on the basis of your reason,

4    experience and common sense.  An inference is not a suspicion

5    or a guess.  It's a reasonable, logical decision to conclude

6    that a disputed fact exists on the basis of another fact that

7    you know exists.  There are times when different inferences may

8    be drawn from the facts whether proved by direct or

9    circumstantial evidence.  You have that here in this case.

10   Plaintiff may ask you to draw one set of inferences, while

11   defendant may ask you to draw another.  It's for you and you

12   alone to decide what inferences you will draw.

13        An inference is a deduction or conclusion that you,

14   the jury, are permitted but not required to draw from the facts

15   that have been established by either direct or circumstantial

16   evidence.

17        There have been things said in the openings and

18   summations of counsel about whether particular witnesses should

19   be believed.  I'm sure that it's clear to you by now that

20   you're being called upon to resolve various factual issues in

21   the face of different and irreconcilable pictures painted by

22   the parties and their witnesses.  You will now decide whether

23   plaintiff has proved his case by a preponderance of the

24   evidence.  An important part of this decision will involve

25   making judgments about the testimony of the witnesses you've

listened to and observed.  In making those judgments, you

should carefully execute and analyze all the testimony of each

witness, the circumstances under which each witness testified,

and any other matter in evidence which may help you to decide

the truth and the importance of each witness's testimony.

(Continued on next page)

1    THE COURT:  As a general rule, there is no magic

2    formula for evaluating testimony.  You bring to this courtroom

3    all the experience and background of your lives and your

4    everyday affairs.  You determine for yourself every day and in

5    a multitude of circumstances the reliability of statements that

6    are made by others.  Use the same tests you would use in your

7    daily activities to determine to what extent the witness is

8    telling the truth or not telling the truth.

9    Your decision can rest on a number of considerations:

10   What was the quality of the witness' observations of the

11   events?  Was the witness's vision clear or obstructed?  We

12   don't have that in this case.  Was the witness candid, frank,

13   and forthright and filling in with inference what the witness

14   did not see my observation?  Did the witness seem as if he or

15   she was hiding something, being evasive, or suspect in some

16   way?  How did the way in which the witness testified on direct

17   examination compare with the way in which the witness testified

18   on cross-examination?  Was the witness's testimony consistent?

19   Was there contradictions?  Did the witness appear to know what

20   he or she was talking about, and did the witness strike you as

21   someone who was trying to report his or her knowledge

22   accurately?

23   You may consider a witness's prior inconsistent

24   statements in evaluating credibility, and you have had read to

25   you witnesses' various prior statements asserting that they

1    were inconsistent.

2              If you find that the witness made an earlier statement

3    that conflicted with his or her trial testimony, you may

4    consider that conflict in deciding how much to credit the

5    witness.  You may consider whether the witness purposely made a

6    false statement or if was an innocent mistake, whether the

7    inconsistency turns on important facts or whether it turns on

8    minor details.

9              What was the reason given by the witness for the

10   inconsistency, if any, and did that explanation appeal to your

11   common sense?  It is your duty, based on all the evidence and

12   your own judgment, to decide if the prior statements you heard

13   were inconsistent with the trial testimony, and, if so, to what

14   extent and how much weight, if any, to give to the apparent

15   inconsistency.  How much you choose to believe a witness may be

16   influenced by the witness's bias.  Does the witness have a

17   relationship with one of the parties or the outcome of the case

18   that may affect how he or she testified?  Does the witness have

19   some bias, prejudice, or hostility that may have caused the

20   witness -- consciously or not -- to give you something other

21   than a completely accurate account of the facts of the subject

22   of the witness's testimony?  If the witness has an interest in

23   the outcome -- and both plaintiff and defendants have an

24   interest in the outcome -- the witness is not necessarily

25   incapable of giving truthful testimony.  It is for you to

1    decide to what extent, if at all, the witness's interest has

2    affects or colored that witness's testimony.  But evidence that

3    a witness is biased, prejudice, or hostile with respect to

4    someone else requires you to view that witness's testimony with

5    caution, to weigh the evidence with care, and subject it to

6    careful consideration.

7         If you find that a witness has willfully testified

8    falsely as to any material fact, you have the right to reject

9    the testimony of that witness in its entirety.  Alternatively,

10   even if you find that a witness has testified falsely or

11   inaccurately about one matter, you may reject as false or

12   inaccurate that portion of his or her testimony and accept as

13   true any other portion of the testimony.

14        You size up a person according to the person's

15   demeanor, the explanations given and all the other evidence in

16   the case just as you would do in any important matter when you

17   are trying to decide if a person is truthful, straightforward,

18   and accurate or somehow shading his answers.

19        It is perfectly legitimate for counsel to attack the

20   credibility of any witness by attempting to impeach the

21   witness.  You should neither favor nor disfavor a witness

22   simply because of a lawyer's effort to impeach or the manner

23   used by the lawyer or by the judge.  My questions are of no

24   more value than the parties' questions and subject to objection

25   the same way as their questions.

1    There are some cases where the witnesses may have met

2    with the lawyers beforehand.  That is nothing unusual.  It

3    happens in every case almost with every witness, but you can

4    consider such meetings in evaluating the credibility of a

5    witness.

6    A deposition is the sworn testimony of a witness taken

7    before trial.  We had some use of depositions.  Depositions

8    have been used in this case in two ways:  First, to impeach a

9    witness by the witness's prior sworn testimony at a deposition.

10   I have already instructed you about any inconsistency in that.

11   It also can be used as relevant evidence if a witness is not

12   available to testify.  Ms. Rose's short testimony was read to

13   you rather than wait for her to appear on the next day.

14   Deposition testimony is entitled to the same consideration.  It

15   has to be judged insofar as possible in the same way as if the

16   witness had been present to testify.

17   We have had three expert witnesses in this case.

18   These witnesses came here to express their opinions about

19   matters in issue in the case because they had special

20   knowledge, skill, experience, and training that I judged would

21   be helpful to you in evaluating the case.

22   In weighing their opinion testimony, you may consider

23   the witness's qualifications and reasons for testifying.  You

24   apply the same rules and credibility as you do to all other

25   witnesses and give the testimony whatever weight you decide it

1    deserves.  It is your decision, not theirs.

2         Now, you have taken an oath to decide this issue

3    fairly and impartially and only on the evidence presented in

4    court.  There can be no bias or prejudice or sympathy that

5    interferes with your thinking.  The question that you decide is

6    determined by the merits, not by any extrinsic question.

7         Your personal feelings about a person, about the

8    parties, or about any subject like race, religion, national

9    origin, sex, or age are all outside what you should be doing.

10   We are a court of justice.  All these matters are outside the

11   sphere of justice.

12        It is the duty of the attorneys on each side of the

13   case to object when the other side offers testimony or other

14   evidence which the attorney believes is not properly

15   admissible.  They have a right and duty to ask the Court to

16   make rulings of law and to request conferences at the sidebar

17   or to look annoyed when the Court does not give them a ruling

18   they would like to have.

19        Don't show any prejudice against an attorney or his

20   client because the attorney objected to the admissibility of

21   evidence or asked for a conference out of the hearing of the

22   jury or asked me for a ruling on the law or expressed

23   disappointment that my ruling did not accord with what the

24   lawyer thought I should be doing.  These rulings are matters of

25   law.  They do not indicate any opinion by me as to who is right

1    and who is wrong.

2            A party can win the case and lose every ruling during

3    the course or vice versa.  Rulings on issues of law or on

4    objections have nothing to do with the merits of the case.

5            Do not allow your feelings about a lawyer, whether you

6    like the lawyer or don't like the lawyer, to interfere with

7    your job fairly and impartially to view the merits of the case

8    according to the rules of law.

9            My questions are entitled to no greater weight than

10   the lawyers' questions.  My questions are not evidence and,

11   again, are not intended to express any opinion on my part.

12           Now, there's been a lot of exhibits in the case.  We

13   are not sending it all back to you.  It would be overwhelming.

14   The lawyers will collect all the exhibits and have them

15   available to you if you want to see them.  What you do if you

16   want to see exhibits or if you have questions that you need to

17   address is to write a note.  The foreperson writes the note,

18   puts a date and time on it, and sends it out to the court

19   security officer, who will give it to Ms. Jones, who will give

20   it to me.  I will discuss the note with the lawyers, and we'll

21   respond to your note.  It's critical that you do not indicate

22   anything about what you are thinking about or doing in your

23   deliberations.  No one is entitled to know that except you.  So

24   if you are sending a note, don't mention that this or that

25   juror wants it.  The whole jury wants it.  If one juror wants

1   it, the whole jury wants it.  I don't need to know who wants

2   something or is recalcitrant or not.  None of these things are

3   to be indicated, just the question of your note.

4           If you have a doubt as to what a witness has said and

5   the lawyers have sometimes given you different versions of what

6   the witness said, it's your recollection that counts.  You may

7   use your notes to refresh your recollection, but you cannot use

8   the notes to persuade another juror.  Each juror can use only

9   his or her own notes.

10          You can ask by reason of a note sent out to me for a

11  repetition of particular aspects of testimony which we will go

12  over, review with the lawyers, and give to you.  It may take a

13  little time and slow your deliberations, but if you have doubts

14  about anything that a witness said and you consider it

15  important, the way to find out for sure is to ask.  Certainly

16  if you have a doubt about my instructions, that is also

17  something that you can ask.

18          In your deliberations, the first step is to appoint a

19  foreperson.  Customarily if the jury does not appoint a

20  foreperson, we appoint the first juror, Galiya Moshkovich, as

21  the foreperson, but the jury decides who is the foreperson.

22  The foreperson is no more important than anybody else.

23          The job of the foreperson is to see that everyone has

24  an equal opportunity to discuss things.  It doesn't matter how

25  educated you are or how uneducated you are.  It doesn't matter

1    how nicely you speak or how roughly you speak.  Every one of

2    you is the same, entitled to equal weight and equal respect.

3    You must listen patiently to what other people say and argue,

4    and you must give them the benefit of your own thinking.

5    That's the whole concept of deliberation.

6            At the end of the process, you must be unanimous.  You

7    can't give me a majority vote.  If you can't decide

8    unanimously, it is a mistrial.  So you have to work until you

9    can get a unanimous decision.

10           A unanimous decision is a decision satisfying the

11   conscience of each and every juror as to what the result should

12   be.  When you deliberate, you must deliberate as a group.  If

13   seven of you are here and one of you is not here, you cannot

14   start to deliberate.  You can only deliberate as a group.  You

15   will deliberate in the jury room.  That is the place of

16   deliberation, and you must wait until all jurors are present.

17           I think that covers everything I need to say.

18           Just one more thing.  When you reach a verdict and

19   fill out the verdict form, don't hand it in.  Send a note

20   saying that the jury has reached a verdict.

21           The verdict must be read in open court.  What will

22   happen is that, when you reach a verdict, we will call you in,

23   and the foreperson will be asked to read the verdict and then

24   it will be inspected by the parties.

25           When we have your verdict on the first part of the

 1  case, there will be short summaries and instructions dealing

 2  with the second part of the case, and then you will be

 3  finished.

 4          May I see the lawyers at sidebar.

 5          (At sidebar)

 6          THE COURT:  Any comments or objections by the

 7  plaintiff?

 8          MR. SKIBELL:  No.

 9          THE COURT:  By the defendant.

10          MS. CHAUDHRY:  We just renew the prior objections.

11          THE COURT:  All objections made before are continued.

12          MR. SCHIFFMAN:  No objections.

13          THE COURT:  OK.

14          (In open court)

15          THE COURT:  The Court security officer should step

16  forward, please.

17          Ms. Jones will administer the oath.

18          (Marshal sworn)

19          THE COURT:  All right.  So I remind the lawyers that

20  you should not be traveling in any elevator with the jurors.

21  The jurors will begin to deliberate.  It is now 4 o'clock.

22  What time do you want to work to?  Do you want to see how you

23  feel about 5 clock?

24          JURORS:  6:00.

25          THE COURT:  I don't have to be present when you decide

                   SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

1    to stop.  Just tell the court security officer that you're

2    stopping.

3            When do you want to come back tomorrow?  10 o'clock?

4            JURORS:  9.

5            THE COURT:  9 o'clock.

6            Folks, you may retire and begin to deliberate.

7            Thank you again for your attention.

8            (The jury retired to deliberate upon a verdict at 4:01

9    p.m.)

10            THE COURT:  Let's take a several-minute break and then

11    we will go into the instructions that are the second part of

12    the case?

13            MS. CHAUDHRY:  When would you like us back?

14            THE COURT:  I would say in about 10 minutes.

15            Quarter after.

16            MS. CHAUDHRY:  Thank you.

17            (Recess)

18            THE COURT:  Be seated, please.

19            We sent last night the proposed jury instruction to

20    you.  I will go over it now.

21            Mr. Skibell first.

22            MR. SKIBELL:  We have no issues with the instruction.

23            THE COURT:  Mr. Schiffman?  Mr. Griffin?

24            MR. GRIFFIN:  We don't have any issues as well.

25            THE COURT:  OK.  They're done.

 1              MS. CHAUDHRY:  Your Honor, may I ask, when we close on

 2   the counterclaim, will you have time limits, and what would

 3   those be?

 4              THE COURT:  You don't seem to need any time limits.

 5              MS. CHAUDHRY:  OK.

 6              THE COURT:  I think 15 minutes is adequate.

 7              We will pass out the verdict sheet.  I am marking the

 8   proposed instructions Court Exhibit 6 and the verdict sheet

 9   Court Exhibit 7.

10              THE COURT:  Are you ready, Mr. Griffin?

11              MR. GRIFFIN:  Am I ready?  Yes.

12              THE COURT:  Ms. Chaudhry, Mr. Skibell, any comments on

13   the verdict form?

14              MR. SKIBELL:  We have no issues.

15              THE COURT:  Mr. Griffin?

16              MR. GRIFFIN:  No issues.

17              THE COURT:  OK.

18              Leave your whereabouts with Brigitte and we'll recess

19   until the jury calls.

20              MS. CHAUDHRY:  How close would you like us?

21              THE COURT:  Preferably here.

22              MS. CHAUDHRY:  In the room?

23              THE COURT:  Yes.

24              MR. SCHIFFMAN:  Should we give you our cell phone?

25              THE DEPUTY CLERK:  You can do that.

1               Off the record.

2               (Discussion off the record)

3         (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1058

```
 1            THE COURT:  Be seated.  I have a note.  I'll read it

 2     to you.

 3            The first one is asking for various items of evidence

 4     which was marked Exhibit No. 6, which means it should be number

 5     seven.

 6            The jury requests the following evidence:  Spectra

 7     representation letter from Spectra to auditors for 2010.

 8     Second, JX-68 with a question mark, subject to an October 2010

 9     email from Rose to McBeth.  Three, the PPM.  Four, the

10     subscription agreement.  Five, 2010 audited financial

11     statement.  And then signed Richard Garnett, foreperson.

12            Mr. Garnett is Juror No. four.  And all these

13     documents, I take it, the attorneys agree to give to the jury?

14            MS. CHAUDHRY:  Yes, your Honor.

15            THE COURT:  Okay.  Next letter, number seven:  The

16     jury has reached a verdict.  13th of December, 2018, 5:30 p.m.,

17     signed, Richard Garnett.

18            Shall we call in the jury?

19            (Jury present)

20            THE COURT:  All the jurors are here.

21            DEPUTY CLERK:  Ladies and gentlemen, say present when

22     your name is called.

23            Juror No. 1, Galiya Moshkovich.

24            JUROR NO. 1:  Here.

25            DEPUTY CLERK:  Juror No. 2, Chad Ondrusek.
```

```
 1              JUROR NO. 2:  Here.

 2              DEPUTY CLERK:  Juror No. 3, Nathaniel Antman.

 3              JUROR NO. 3:  Present.

 4              DEPUTY CLERK:  Juror No. 4, Richard Garnett.

 5              JUROR NO. 4:  Present.  Juror No.

 6              DEPUTY CLERK:  Juror No. 5, Carol Cook.

 7              JUROR NO. 5:  Present.

 8              DEPUTY CLERK:  Juror No. 6, Uziel Fradkin.

 9              JUROR NO. 6:  Here.

10              DEPUTY CLERK:  Juror No. 7, Daniela Morell.

11              JUROR NO. 7:  Present.

12              DEPUTY CLERK:  Juror No. 8, Leslie Needham.

13              JUROR NO. 8:  Present.

14              THE COURT:  I have an obligation to read the notes to

15    the jury.  So, we start with the first note.

16              The jury requests the following evidence:  Spectra

17    representation letter from Spectra to auditors for 2010.  JX-68

18    with a question mark.  October 2010 email from Rose to McBeth.

19    Three, the PPM.  Four, subscription agreement.  Five, 2010

20    audited financial statement.  Signed at 5:10 p.m., Richard

21    Garnett, foreperson for the jury.

22              Mr. Garnett, have all these documents been given to

23    the jury?

24              THE FOREPERSON:  Yes, your Honor.

25              THE COURT:  The next note, "The jury has reached a
```

1    verdict, signed Richard Garnett, 13th, December, 2018, 535

2    p.m."

3          Would you kindly pass the verdict up for review?

4          Hand this back to Mr. Garnett, please.

5          DEPUTY CLERK:  Foreperson, please rise.

6          Has plaintiff, Donald McBeth, proved by a

7    preponderance of the evidence that defendants breached a

8    fiduciary duty to plaintiff?

9          THE FOREPERSON:  No.

10         THE COURT:  And it's signed by Mr. Garnett?

11         THE FOREPERSON:  That is correct.

12         THE COURT:  And the date is 4:34 -- 5:34 p.m.

13         THE FOREPERSON:  Correct.

14         THE COURT:  Thirteenth of December, 2018.

15         THE FOREPERSON:  Yes.

16         THE COURT:  Would you kindly give it to Ms. Jones

17   again, please.

18         Ms. Jones, please ask the lawyers if they would like

19   to review it.

20         Would either side like the jury polled?

21         MS. CHAUDHRY:  Yes, please.

22         THE COURT:  Ms. Jones, please poll the jury.

23         DEPUTY CLERK:  Has plaintiff, Donald McBeth, proved by

24   a preponderance of the evidence that defendants breached a

25   fiduciary duty to plaintiff?  No.

1          Juror No. 1, is that your verdict?

2          JUROR NO. 1:  Yes.

3          DEPUTY CLERK:  Juror No. 2, is that your verdict?

4          JUROR NO. 2:  Yes.

5          DEPUTY CLERK:  Juror No. 3, is that your verdict?

6          JUROR NO. 3:  Yes.

7          DEPUTY CLERK:  Juror No. 4, is that your verdict?

8          THE FOREPERSON:  Yes.

9          DEPUTY CLERK:  Juror No. 5, is that your verdict?

10         JUROR NO. 5:  Yes.

11         DEPUTY CLERK:  Juror No. 6, is that your verdict?

12         JUROR NO. 6:  Yes.

13         DEPUTY CLERK:  Juror No. 7, is that your verdict?

14         JUROR NO. 7:  Yes.

15         DEPUTY CLERK:  Juror No. 8, is that your verdict?

16         JUROR NO. 8:  Yes.

17         THE COURT:  The jurors have been polled.

18         We're ready for the second part of the case.  I'm

19    asking you first, the plaintiffs.  As to the second part of the

20    case, are you ready, Ms. Chaudhry?

21         MS. CHAUDHRY:  I was hoping to close tomorrow morning.

22         THE COURT:  The answer is yes or no?

23         MS. CHAUDHRY:  Well --

24         THE COURT:  Why don't you do this first, since you

25    seem reluctant.

1          What is the jury's wish, to do the second part of the
2     case now or come back?
3          THE FOREPERSON:  Estimate in time for the second part?
4          Sorry.  You're looking for like how long we could stay
5     for?
6          THE COURT:  Among other things.  I estimate -- it's
7     about ten minutes to 6:00.  And everyone's had a full day.  But
8     if you want to work, we'll all defer to you.  In terms of
9     estimate of time, it will probably take less than a half hour
10    to do all the summations and the instructions, give or take.
11         THE FOREPERSON:  Okay.  That's acceptable to the jury.
12         THE COURT:  Sorry?
13         THE FOREPERSON:  Yes.  Tonight.
14         THE COURT:  Keep going?
15         THE FOREPERSON:  Yes.  Keep going.
16         THE COURT:  Okay.  So, the counterclaim party is now
17    the defendant.  And they go first.
18         So, we're ready, Mr. Schiffman.
19         MR. SCHIFFMAN:  Thank you, your Honor.  I guess we'll
20    start this one by:  Good evening.
21         As you recall --
22         THE COURT:  You should say thank you first.
23         MR. SCHIFFMAN:  As you recall -- this may be the
24    slowest I'll ever talk, having gotten about three hours' sleep
25    in the last four days.

1      So, as you recall, as part of Mr. McBeth's agreement

2  to invest in Spectra Opportunities, he had to read and agree

3  with the provisions of the subscription agreement.  And that

4  was JX-5.  That subscription agreement specifically had

5  paragraph four, and that's in front of you right now.

6  Paragraph four says that the subscriber acknowledges that, in

7  deciding to invest in the company, the subscriber has relied

8  solely upon the information in and referred to in the

9  memorandum.  And the memorandum is the PPM, Exhibit 6, and

10  nothing else.

11      Subscriber acknowledges that no person authorized to

12  give any information or to make any statement not contained in

13  the memorandum, that any information or statement not contained

14  in or referred to in it, the memorandum must not be relied upon

15  as having been authorized by the company.  So, that's call a

16  non-reliance provision.  That provision is sort of standard in

17  the industry.

18      Further, in that same subscription document, Exhibit

19  5, which I think you're all familiar with, is paragraph 20.

20  Paragraph 20 is a little bit of legal mumbo-jumbo.  It's not

21  the easiest provision to read.  So, let me see if I can parse

22  it for you.

23      It says:  Subscriber agrees that it will indemnify and

24  hold harmless.  Indemnify and hold harmless means:  I'll pay

25  you back.  If you spend money, I will give you that money back.

1    Hold you harmless.  All right.  Hold the company.

2            And the company here is Spectra Opportunities Fund.

3    The subscriber here is Mr. Porges.  You can skip --

4            THE COURT:  Subscriber is McBeth.

5            MR. SCHIFFMAN:  The subscriber is McBeth.  Did I say

6    Porges?  Told you I'm tired.

7            Then you skip to, "From and against any and all direct

8    consequential losses."

9            So, I'm going to indemnify the subscriber, indemnify

10   the company, from any losses --

11           THE COURT:  You want to talk about company parties?

12   That's a defined term.

13           MR. SCHIFFMAN:  I think that's just the fund,

14   your Honor.  But in this case it's just the fund.

15           "From and against any or direct losses, damages,

16   liability or costs, including attorney's fees" -- and

17   ultimately here, that's what we're going to be asking for --

18   "whether any action between the parties" -- that means the

19   parties are suing each other and that's what happened here --

20   "including any liability which results directly or indirectly

21   from" -- and then there's a whole list of things.  But then we

22   want to skip down to, "Including any misrepresentation made by

23   the subscriber or any of the subscribers' agents, or any breach

24   of any of the declaration, representation or warranty

25   described."

1     What that is saying is that Mr. McBeth promises the

2   company that if there's a lawsuit between Mr. McBeth and the

3   company, the Spectra companies, and the Spectra companies spend

4   money on that lawsuit, if that lawsuit is the result of any

5   misrepresentation, he has to pay us back the money.  And that's

6   what we're asking for here.

7     All right.  So, he has promise that if there's a

8   lawsuit between him and us, he's going to hold us harmless and

9   any of our attorney's fees that we spent in defending that

10  lawsuit if the claims in that lawsuit result from any

11  misrepresentation that he made in the subscription agreement.

12  Remember, back to four, he's representing that he's only

13  relying on the PPM.  So, at the end of the day, we're saying

14  that misrepresentation is number four.  Okay.

15     And then, no surprise, as you know, Mr. McBeth

16  executed that subscription agreement.  So, JX5, he signs the

17  document agreeing to the contract, which I just described to

18  you.  He signs that document.  He also signs the document a

19  second time on December 1st, 2010.  This is -- I know it's 122

20  but I can't read my own handwriting.  DX-122.  So, he made the

21  initial agreement:  I represent to you I didn't rely on

22  anything else -- when he signed JX-5.1 in June of 2010 and then

23  he agrees to it again and re-executes it on December of 2010.

24     And what are the documents that he actually relied on?

25  He actually sued in this case, assuming that he relied on JX1,

1   JX-2, JX-3 and JX-4.  They're in evidence in the case.  I think

2   you may or may not remember seeing them.  But those are the

3   marketing materials that contained it.  And, in fact, those

4   materials -- here's the JX-4 -- again repeated, you should not

5   rely on the information contained in the fund document, you

6   should not rely in any way on this presentation.

7          So, the very document, JX-1, JX-2, JX-3 and JX-4

8   contained -- really two and four contained similar disclosure

9   that you can't rely on these documents.

10          Obviously in connection with this lawsuit, Mr.

11   Schiffman and his team cost money.  We enjoy doing it, but we

12   actually charged Mr. McBeth for doing it.  And so, there are

13   substantial costs incurred in doing this.  And those are the

14   costs.  The lawsuit, which was -- this claim is that there is a

15   breach of the subscription agreement because he alleged that he

16   was relying on documents which he had previously represented

17   that he would not rely on.  And the acceptance of his

18   investment was based on that representation, that he only

19   relied on the PPM.

20          Based on the information, we ask you to find Mr.

21   McBeth liable for the breach of that representation under the

22   contract.  And then it will be the Court's -- you don't have

23   to -- on this section of the case, it is not for the jury to

24   decide damages.  If you find for the plaintiff -- for the

25   counterclaim defendant, it is the Judge's responsibility to

1      decide the damage issue.

2             Now, obviously that's pretty clear, right?  Contract,

3      he misrepresented, done.

4             So, what do they say?  What you're going to hear them

5      say is there is a defense known as acquiescence.  And His Honor

6      will describe that to you.  And what they're going to say is,

7      although the contract said that I can't rely on anything, you

8      acquiesced.  You agreed not to enforce that provision against

9      me.  You agreed that even though I signed the contract and I

10     agreed to do something, you agreed that I didn't have to do it.

11     And their argument is, I believe, that the reason he's going to

12     say it is because, you gave me these documents, if you didn't

13     intend for me to read these documents and rely on them, you

14     shouldn't have given them to me.  And that's just not true.

15     That's not the case.  And you heard Mr. Porges testify about

16     this, that that representation that he wouldn't rely on the

17     documents is incredibly important and without them, he would

18     not have accepted any of this.

19            You heard him testify that Mr. McBeth -- and this is,

20     again, standard in the industry.  If Mr. McBeth wanted to rely

21     on other information, there is a procedure to do that.  That's

22     called a side letter.  And in that side agreement, you say,

23     look, I read the PPM but I also want to rely on, let's say

24     performance statistics.  I am making my investment decision on

25     performance statistics.  Then Mr. Porges has the option to say,

 1    yes, and put in a another contract, or no, I don't want to do

 2    that.  But Mr. McBeth did not ask for nor enter into any side

 3    agreement.

 4          You heard Mr. Porges say that that paragraph 20 was

 5    very important to him and it was material to his going into the

 6    contract, and that he relied on those representations.

 7    Mr. McBeth tries to establish his defense, because he has no

 8    evidence that Mr. Porges in any way acquiesced.  There is no

 9    evidence.

10          So, here's only evidence they have.  And this is the

11    testimony they read in at the end of the day yesterday.  And,

12    in fact, I believe that it actually proves conclusively why the

13    counterclaim is valid.  The question, which is really the

14    second one here:  And that document -- referring to one of the

15    marketing materials:  And that's a document that you understood

16    investors would rely on or use in deciding whether to invest in

17    the fund.  They're asking her to admit that when you gave me

18    the document, you knew I was going to rely on it.  And that

19    would be their acquiescence defense.

20          But, in fact, what Ms. Rose answered was exactly the

21    right answer, which is it's one of the documents they used.

22    There's a difference between used -- obviously everybody uses

23    the documents, that's why the marketing materials are being

24    distributed.  But did we agree that he could rely on it?  Were

25    we waiving the provisions of paragraph 20?  And the answer, she

1   specifically said no, given the precise question.  And that's

2   exactly why.

3           Of course, people used the documents.  It's marketing

4   material.  The reason why every hedge fund has the same

5   agreement is because, as a promoter of a hedge fund, there's

6   lots of material out there.  And some of it is carefully

7   prepared, some of it is less carefully prepared.  People make

8   statements.  And you want the investors to say, if you're going

9   to rely on something, I want to know what it is, because I have

10  liability for that.  And so, I want a precise agreement.  I

11  want to put a fence around what you're relying on.  You can be

12  other things other than the PPM, but we start with the PPM.

13  Mr. McBeth put in a representation that he was relying only on

14  the PPM, and then he breached that representation.

15          And accordingly, we would ask you to award -- to find

16  liability for his failing -- for his breaching of that promise.

17  Thank you.

18          THE COURT:  Counsel, side bar, please.

19          (Continued on next page)

20

21

22

23

24

25

1            (At side bar)

2            THE COURT:  Does the jury know what the claim is?

3            MR. SCHIFFMAN:  I didn't go anywhere near any of that

4    stuff.

5            THE COURT:  I know.  That's why I called you up.

6    Because I've said a number of things.  We have to know what the

7    complaint number is.

8            MR. SCHIFFMAN:  Let me tell you what I think the

9    answer is.

10           THE COURT:  I know what the claim is.  Oh, you do

11   know.

12           MR. SKIBELL:  He said it's a breach of the rep based

13   on the marketing materials.  That's all he needed to say.

14           MR. SCHIFFMAN:  I would love to say, as you know, lots

15   more.

16           THE COURT:  You're content with it the way it is now?

17           MR. SKIBELL:  I think so.

18           MS. CHAUDHRY:  Yes.

19           THE COURT:  I want to foreclose the argument that the

20   jury did not have the information about what the claim is.

21           MS. CHAUDHRY:  No --

22           THE COURT:  So, we'll leave it as is.  Thank you.

23           (Continued on next page)

24

25

1          (In open court)

2          THE COURT:  Now we'll hear from Ms. Chaudhry in

3    opposition.

4          MS. CHAUDHRY:  Members of the Jury, I just want to be

5    clear about the basis of their claim.  They're saying that Don

6    McBeth should not have relied on the very documents that they

7    gave him.  They're not saying that he relied on independent

8    research and that was inappropriate, or he relied on another

9    adviser and that was inappropriate.  They're saying, how dare

10   you listen to anything we told you?  How could you have relied

11   on us?  And the materials that they're complaining about, these

12   are Spectra marketing materials.  They're the ones that created

13   it to try to get a hundred million dollars of investors.

14          Did Mr. McBeth rely on those?  Well, that's what they

15   wanted him to do.  That's why they gave him those materials.  I

16   asked Mr. Porges about this.  And I asked him if the whole

17   purpose of hiring Deborah Rose was to help launch the hedge

18   fund, and he agreed and he said that part of her job was to

19   work with auditors to make a track record, and that took maybe

20   up to a year, and they had to do a performance audit, and that

21   he kept it current and up to date, and that material went to

22   everyone who they were trying to get to invest.  It's the honey

23   they used to attract people.

24          And Mr. Porges told you that the purpose of the

25   performance audit was to represent potential investors, what

1    he'd already done and what he'd hoped to do again.  Remember,

2    this was a brand new fund.  It had no information.  The only

3    way to get anybody to even be interested was to give those

4    people information about himself.  Why else would a stranger

5    off the street come and give Greg Porges any money?  And he

6    knew this was going to be sent out to investors.  And he knew

7    that Mr. McBeth in particular got all of these materials.

8         And not only did Mr. McBeth get these materials before

9    he signed the PPM, but I showed you JX-68, which was the email

10   from Deborah Rose that I think you just looked at again.  It's

11   the email where she says, the fund's performance has gone down

12   and you no longer have to fund your investment.  And then she

13   attaches even more historic information about the Spectra

14   funds.  Remember I showed you that?  It had the historic track

15   record from 2004.  And the email, itself, invites Mr. McBeth to

16   ask more questions.

17        What were they going to do if he asked a question?

18   They were going to answer it and then, according to them, they

19   would have sued him for relying on their answers.  I mean, does

20   that make any sense at all?  Obviously they want him to rely on

21   it.  They expect him to rely on it.  They need him to rely on

22   it.  And this email was sent after he signed the PPM, so

23   they're still doing that pattern of behavior.  This is intent.

24   You gave it to him to listen to you.  You gave him more so that

25   he would be interested in you.  And then as you're telling him,

1    you don't have to fund the investment, you're sending that

2    information to him again and inviting him to ask for more

3    information.

4           And you do recall that both Ms. Rose and Mr. Porges

5    pointed out that Mr. McBeth, before he signed up, didn't ask

6    them more questions.  And, again, if he had asked and they had

7    answered, they would still be suing him for relying on the

8    answers that they gave him, because it is technically not on

9    that document, the PPM.  That's what acquiescence is.  You know

10   that what you're doing is going to work.  You're getting

11   somebody to pay attention to you by giving them these things.

12   You want them to give you your money, and that's why you're

13   giving them these things.

14           And here's what Ms. Rose said.  Now, Mr. Schiffman

15   showed you only part of her transcript.  I read you the whole

16   thing yesterday.  I'm going to read you the whole thing,

17   including the part he didn't read you.  At her deposition, when

18   asked about the track record.

19   "Q.  Do you know why it was created?

20   "A.  Answer we were looking to market a fund with outside

21   capital and in order to do that, you need to have a track

22   record to produce the potential investors.

23   "Q.  And that's a document that you understood investors would

24   rely on or use in deciding whether to invest in the fund?

25   "A.  It's one of the documents they use.

1          Now, this is the part he didn't read you.

2     "Q.  And one of the reasons you created such a document was so

3     that they would have it and be able to look at the historical

4     track record for Mr. Porges?

5     "A.  For the Spectra Entities.

6     "Q.  And this was a fund you were starting from scratch so it,

7     itself, had no historical track record, right?

8     "A.  It's a brand new fund.

9     "Q.  And so, the only information they would have as to what

10    they could expect in terms of performance was the historical

11    performance of the Spectra Entities?

12    "A.  Correct."

13         That's why she gave it to people.  That's why they

14    spent all this time and money on an auditing firm creating

15    these materials.  And that's why, even though she sent him an

16    email saying he could opt out, she sent him that information

17    again.  That email doesn't say, don't fund the investment.  It

18    says you can opt out, and by the way, look at how well you've

19    done in the past.  Do you have anymore questions?  That's what

20    that email says.

21         And they're now relying on a provision of the PPM to

22    say that Mr. McBeth should be liable to them for believing them

23    and for trusting them and for relying on the very documents

24    that they gave him in order to get his money.  They have

25    definitely acquiesced here.  And you should find against the

 1   counterclaim.  Thank you.

 2          MR. SCHIFFMAN:  Very briefly, your Honor?

 3          THE COURT:  Yes.

 4          MR. SCHIFFMAN:  Unfortunately, I think Ms. Chaudhry is

 5   missing the point.

 6          You get brochures all the time.  You want to go to a

 7   hotel, you get a hotel brochure.  You read advertisements all

 8   the time.  But you can't rely on it.  Again, you're all too

 9   young for this, other than the Judge and I.  There was an

10   advertisement on TV that said -- it was an airline that said,

11   "Come on down on me."  And somebody sued him.  You can't rely

12   on that.  Now, the reason they had that advertisement was they

13   wanted people to come to Florida.  They didn't do it for

14   nothing.

15          THE COURT:  Stick to your rebuttal in this case,

16   please.

17          MR. SCHIFFMAN:  Okay.

18          So, again, there is no doubt, there is no dispute that

19   they had marketing materials to attract people.  There's no

20   dispute about that.  That's why Ms. Rose said people use it.

21   That's the point of it.  But what you can can't do is rely on

22   it.

23          Again, I think Ms. Chaudhry has got it backwards

24   because the failure to ask questions is the very problem.  He

25   signs up as a sophisticated investor.  He says, I am

1   sophisticated.  I know how to evaluate these risks.  I know how

2   to do the due diligence that's necessary to buy this highly

3   volatile, highly speculative investment.  Then he fails to

4   answer any questions and then says, it's your fault.  He could

5   have asked questions if he wanted to do.  So, she's absolutely

6   right, he could have asked questions.  But when he stands

7   silent, he can't say, oh, well, that contract doesn't count.

8          Back to the point.  Again, just a small bit as I

9   showed you before.  She says in the material.  That's why I

10  showed you earlier DX-122.  He resigns the representation in

11  December.  So, he renews the contract after he gets those

12  documents.  So, there is no doubt that the idea that he --

13  there it is, 12/1/2010.

14         Thank you, Derrick.

15         Again, there's no doubt that he gets it.  Again, it is

16  pretty simple.  He made a promise.  He is a sophisticated

17  investor.  Look, I feel sorry for Mr. McBeth.  It's one thing I

18  should have said to you before.

19         THE COURT:  Mr. Schiffman.  Rebuttal.

20         All right.  Members of the Jury, you will please

21  remember all the instructions I gave to you previously about

22  your job and how you weight the evidence and so on.  They all

23  apply here as well.  But unless someone wants me to repeat, I

24  won't.

25         Defendants have a asserted a counterclaim against

 1   Donald McBeth for breach of contract.  In a claim that

 2   plaintiff withdrew prior to trial.  Plaintiff alleged that when

 3   he invested in the Spectra Opportunities Fund, he relied on

 4   allegedly misleading marketing materials given to him by

 5   Deborah Rose, showing historical performance statistics of

 6   other funds managed by Gregory Porges.

 7           The defendants allege that plaintiff was entitled to

 8   rely only on the statements contained in the fund's private

 9   offering memorandum, the PPM, and the subscription agreement.

10   The defendants argue that McBeth breached the clause four -- or

11   paragraph four of the subscription agreement by relying on

12   marketing materials not contained within the PPM, and they

13   suffered damages by the substantial amount of attorney's fees

14   they incurred as a result of defending against plaintiff's

15   claim based on those materials.

16           Paragraph four of the subscription agreement provides:

17   Subscriber acknowledges that, in deciding to invest in the

18   company, subscriber has relied solely upon the information in,

19   and referred to in, the memorandum and nothing else.

20   Subscriber acknowledges that no person is authorized to give

21   any information or to make any statement not contained in the

22   memorandum, and that any information or statement not contained

23   in, or referred to in, the memorandum must not be relied upon

24   as having been authorized by the company.

25           Paragraph 20 of the subscription agreement provides in

1  relevant part, subject to applicable law, subscriber agrees

2  that it will indemnify and hold harmless the company for itself

3  and on trust of its agent for the benefit of the company

4  parties -- all the Spectra Entities -- from and against any and

5  all direct and consequential loss, damage, liability, cost or

6  expense, including reasonable attorneys and accountant's fees

7  and disbursement, whether incurred in an action between the

8  parties hereto or otherwise, which any company party may incur

9  by reason of, or in connection with, these subscription

10  documents, including any misrepresentation made by subscriber

11  or any of the subscriber's agents and any breach of any

12  declaration, representation or warranty of subscriber.

13       The defendants have the burden of proving by a

14  preponderance of the evidence that McBeth had a contract with

15  the defendants, that McBeth breached representations and

16  warranties in that contract by relying on materials outside the

17  contract in making his investment decision, and that the

18  defendant suffered damages that were proximately caused by

19  McBeth's breach.

20       Proximate cause exists if an act, unbroken by any

21  intervening cause, produces an injury that would not have

22  occurred absent the breach and that was a reasonably

23  foreseeable consequence of the breach.  Where a party's own

24  actions are responsible for its claimed losses, a causation

25  requirement is not satisfied.  In other words, if a party's own

1    conduct interrupts the causal link between the alleged breach

2    of contract and the resulting harm, the conduct constitutes an

3    intervening cause and the causation requirement will not be

4    satisfied.

5         In this case, if you find that McBeth's breach of the

6    subscription agreement proximately caused defendant's losses,

7    that is, incurring attorney's fees, then you should find in

8    favor of defendants, the counterclaim defendant-plaintiffs.

9    You should not consider the amount of damages.  I will have to

10   do that if you find liability.

11        The doctrine of acquiescence bars the breach of

12   contract claim when a party has full knowledge of its rights

13   and either freely does what amounts to recognition of, or

14   acceptance of, the complained act or acts in a manner that

15   leads the other party to believe the act allegedly constituting

16   a breach has been approved.

17        Even if you find that McBeth committed a breach of

18   contract, you can still find in favor of McBeth if he has

19   proved by a preponderance of the evidence that defendants

20   acquiesced in his investment, knowing and intending that he

21   would rely on historical performance statistics contained in

22   the Spectra Opportunities Fund marketing materials.

23        You'll have a verdict form, like you did last time.

24   You'll have two questions.  You must answer both.  The

25   foreperson, again, has to indicate where the jury is unanimous,

1    yes or no.

2            Question number one:  Have defendants proved by a

3    preponderance of the evidence that plaintiff, Donald McBeth,

4    breached his subscription agreement; yes or no?  And the jury

5    must be unanimous.

6            Two:  Has plaintiff, Donald McBeth, proved by a

7    preponderance of the evidence that the defense of acquiescence

8    precludes defendants' breach of contract counterclaim; yes or

9    no?  And, again, foreperson signs and dates it and puts the

10   time.

11           Counsel have anything for me?

12           MR. SCHIFFMAN:  Nothing further, your Honor.

13           MS. CHAUDHRY:  Nothing further, your Honor.

14           THE COURT:  All right.  Ms. Jones will give you the

15   verdict form.  The court security officer has already been

16   sworn.  I remind you that you remain under oath.  And the jury

17   may return.

18           One juror has given me a personal note, which I don't

19   think should be marked.  But I'd like both sides to see the

20   note.

21           MS. CHAUDHRY:  Does that also contain the secret of

22   how long they're staying?

23           THE COURT:  And I'd like your consent that this does

24   not have to be marked.

25           MR. SKIBELL:  You have our consent, your Honor.

1          MR. SCHIFFMAN:  You have our consent, your Honor.

2          THE COURT:  All right.

3          (Adjourned to December 14, 2018, at 10:00 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25