1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   DONALD F. McBETH,

4                    Plaintiff,

5            v.                          15 CV 02742(AKH)

6   GREGORY I. PORGES, SPECTRA
    FINANCIAL GROUP, LLC, and
7   SPECTRA INVESTMENT GROUP, LLC,

8                    Defendants.
                                         Trial
9   ------------------------------x
                                         New York, N.Y.
10                                       December 14, 2018
                                         10:00 a.m.
11
    Before:
12
                      HON. ALVIN K. HELLERSTEIN,
13
                                         District Judge
14                                         and a Jury

15
                          APPEARANCES
16
    HARRIS, ST. LAURENT & CHAUDHRY, LLC
17        Attorneys for Plaintiff
    BY:  PRIYA CHAUDHRY
18        LINDSAY R. SKIBELL
          S. GABRIEL HAYES-WILLIAMS
19

20
    SCHULTE ROTH & ZABEL, LLP
21        Attorneys for Defendants
    BY:  HOWARD SCHIFFMAN
22        ROBERT GRIFFIN

23  ALSO PRESENT:

24  Derrick Cole, Technician
    Julie Blackman, Jury Consultant
25  Katherine Will, Legal Assistant, Schulte, Roth & Zabel

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

```
1    ICELMCB1                    Deliberations
```

2              THE COURT:  Good morning, members of the jury.  Be

3    seated everyone.

4              I have your note, Court Exhibit 9.  The jury requests

5    the following evidence:  JX-1, 2, 3, 4; Deborah Rose's

6    deposition entered into evidence; Exhibit DX-122; transcript of

7    counterclaim counsel closing statements.

8              The first three requests are reflected in these

9    documents as a response to your request.

10             Ms. Jones, would you give it to Mr. Garnett.

11             I do not give closing statements.  Closing statements

12   are not evidence, they're arguments.  You have to make the

13   decision from the evidence, so you're not going to get the

14   closing statements.

15             Does that answer your response, Mr. Garnett?  Anything

16   else you need?

17             THE FOREPERSON:  We were about to send another note

18   that the jury request the Judge to give another charge and

19   further explain acquiescence.

20             Do you want the note?

21             THE COURT:  Well, you've made the request in court, so

22   you don't need to, unless one of the lawyers wants me to.

23             MS. CHAUDHRY:  No, Your Honor.  Thank you.

24             MR. SCHIFFMAN:  You're going to read the whole charge,

25   your Honor?

 1           THE COURT:  Word for word.

 2           MR. SCHIFFMAN:  Okay.  Thank you.

 3           THE COURT:  Defendants have asserted a counterclaim

 4   against McBeth for breach of contract.  In a claim that

 5   plaintiff withdrew prior to trial, plaintiff stated that when

 6   he invested in the Spectra Opportunities Fund, he relied on

 7   allegedly misleading marketing materials given to him by

 8   Deborah Rose, showing historical performance statistics of

 9   other funds managed by Porges.

10           Defendants allege that plaintiff was entitled to rely

11   only on statements contained in the fund's PPM and the

12   subscription agreements.  The defendants argue that McBeth

13   breached clause four of the subscription agreement by relying

14   on marketing materials not contained within the private

15   offering memorandum, that they suffered damages by the

16   substantial amount of attorney's fees they incurred in

17   defending against plaintiff's claim based on those materials."

18           Then I read to you paragraph four of the subscription

19   agreement.  I'll read it again.

20           Subscriber acknowledges that in deciding to invest in

21   the company, subscriber has relied solely upon the information

22   in it and referred to in the memorandum and nothing else.

23   Subscriber acknowledges that no person is authorized to give

24   any information or to make any statement not contained in the

25   memorandum.  Any information, or not, contained in or referred

1    to in the memorandum must not be relied upon as having been

2    authorized by the company.

3         Paragraph 20 of the subscription agreement provides,

4    in relevant part:  Subject to applicable law, subscriber agrees

5    that it will indemnify and hold harmless the company for itself

6    as an trusted agent for the benefit of the company parties,

7    from and against any and all direct and consequential loss,

8    damage, liability, cost or expense, including reasonable

9    attorneys' and accountants' fees and disbursements, whether

10   incurred in an action between the parties hereto or otherwise,

11   which any company party may incur by reason of, or in

12   connection with, the subscription documents, including any

13   misrepresentation made by subscriber or any of subscriber's

14   agents and any breach of any declaration, representation or

15   warranty of subscriber.

16        Defendants have the burden of proving by preponderance

17   of the evidence that McBeth had a contract with defendants,

18   that McBeth breached representations and warranties in that

19   contract by relying on materials outside of the contract in

20   making his investment decision, and that defendant suffered

21   damages that were proximately caused by McBeth's breach.

22        Proximate cause exists if an act, unbroken by an

23   intervening cause, produces an injury that would not have

24   occurred absent the breach, and that was a reasonably

25   foreseeable consequence of the breach.

1        Where a party's own actions are responsible for it's

2   claim losses, the causation requirement is not satisfied.  In

3   other words, if a party's own conduct interrupts the causal

4   link between the alleged breach of contract and the resulting

5   harm, the conduct constitutes an intervening cause and the

6   causation requirement will not be satisfied.

7        In this case, if you find that McBeth's breach of the

8   subscription agreement proximately caused the defendant's

9   losses, then you should find in favor of defendants.  You

10  should not consider the amount of damages.  The Court will do

11  that if you find liability.

12       The doctrine of acquiescence --

13       THE FOREPERSON:  Your Honor after you read paragraph

14  20, can you re-read -- begin after paragraph 20 and reread what

15  you just read again?  And then we'll go into acquiescence.

16       THE COURT:  "Defendants have the burden of proving by

17  a preponderance of the evidence" -- from there, Mr. Garnett?

18       THE FOREPERSON:  Yes, please.

19       THE COURT:  Defendants have the burden of proving by

20  preponderance of the evidence that McBeth had a contract with

21  defendants, that McBeth breached representations and warranties

22  in that contract by relying on materials outside the contract

23  in making his investment decision, and that the defendant

24  suffered damages that were proximately caused by McBeth's

25  breach.

1    Proximate cause exists if an act, unbroken by an

2    intervening cause, produces an injury that would not have

3    occurred absent the breach, and that was a reasonably

4    foreseeable consequence of the breach.  Where a party's own

5    actions are responsible for its claimed losses, the causation

6    requirement is not satisfied.  In other words, if a party's own

7    conduct interrupts a causal link between the alleged breach of

8    contract and the resulting harm, the conduct constitutes an

9    intervening cause and the causation requirement would not be

10   satisfied.

11        In this case, if you find that McBeth's breach of the

12   subscription agreement proximately caused defendant's losses,

13   then you should find in favor of the defendants.  You should

14   not consider the amount of damages.  The Court will do that if

15   you find liability.

16        The doctrine of acquiescence bars a breach of a

17   contract claim.  When a party has full knowledge of its rights

18   and either freely does what amounts to recognition of, or

19   acceptance of, the complained act, or acts in a manner that

20   leads the other party to believe the act allegedly constituted

21   a breach has been approved.

22        Even if you find that McBeth committed a breach of

23   contract, you can still find in favor of McBeth if he has

24   proved by preponderance of the evidence that defendants

25   acquiesced in his investment, knowing and intending that he

1    would rely on historical performance statistics contained in

2    the Spectra Opportunities Fund marketing materials.

3              Jury need anything else?

4              THE FOREPERSON:  No, Your Honor.

5              THE COURT:  Please continue to deliberate.

6              (Jury deliberations resumed at 10:50 a.m.)

7              THE COURT:  Anything further from counsel?

8              MR. SKIBELL:  No, Your Honor.

9              MR. SCHIFFMAN:  No, Your Honor.  Thank you.

10             THE COURT:  All right.  Thanks.  You all can be

11   seated.

12             MS. CHAUDHRY:  Do you want us to stay here, or?

13             THE COURT:  You can wander around.

14             (Recess)

15

16

17

18

19

20

21

22

23

24

25

```
 1              THE COURT:  So, a note from the jury reads as follows,
 2     "The jury requests the meaning of question-two answers.  If
 3     yes, finds for whom?  If no, finds for whom?"
 4              So, I propose to say that, first of all:  If one is
 5     answered no, they don't have to answer question two, and if two
 6     is answered yes, the counterclaim has to be dismissed.
 7              Yes?
 8              MR. SCHIFFMAN:  I don't think that's a good answer,
 9     because I think they want a name.
10              THE COURT:  You think what?
11              MR. SCHIFFMAN:  They want a name.
12              THE COURT:  They want a what?
13              MR. SCHIFFMAN:  A name.
14              In other words, I think they want you to say:  If you
15     answer yes to number two, Mr. McBeth prevails; if you answer no
16     to number two, Mr. Porges prevails.  They want a name
17     associated with that.  I don't think it's necessary to mention
18     first one is all.  I would just suggest answer their question,
19     which is:  If you answer yes, Mr. McBeth prevails, if you
20     answer no, Mr. Porges prevails.
21              Is that the right direction?  I don't have the form in
22     front of me.
23              THE COURT:  Ms. Chaudhry.
24              MS. CHAUDHRY:  Your Honor, I agree with your
25     suggestion that you explain that if they answer no to number
```

1   one, they don't have to answer number two.  And then I agree

2   with Mr. Schiffman that it would probably be helpful to them

3   saying the name.

4            THE COURT:  That, if they answer yes to number two,

5   Mr. McBeth prevails, and the counterclaim must be dismissed.

6            MS. CHAUDHRY:  Yes.

7            MR. SCHIFFMAN:  And if you answer no, Mr. Porges

8   prevails and the counterclaim is --

9            THE COURT:  Right.

10           MS. CHAUDHRY:  Yes.

11           MR. SCHIFFMAN:  Right.

12           THE COURT:  Okay.  Get the jury.

13           (Jury present)

14           THE COURT:  Thank you.  Be seated, ladies and

15  gentlemen.

16           Now, on this last note, which we marked Court Exhibit

17  10, which came out at 11:50 a.m, reads as follows:

18           The jury requests the meaning of question-two answers.

19  If yes, finds for whom?  If no, finds for whom?

20           So, let me put it this way.  Starting with question

21  one:  Have defendants proved by a preponderance of the evidence

22  that plaintiff, Donald McBeth, breached the subscription

23  agreement?

24           If the answer is yes, you have to go on to question

25  two.  If the answer is no, then you go on to question two.

1          In other words, if defendants have proved by a

2   preponderance of the evidence that plaintiff, Donald McBeth,

3   breached the subscription agreement, it means that defendant,

4   Porges and the others, won and McBeth lost.  If no, then, of

5   course, McBeth was the winner.

6          MR. SCHIFFMAN:  I think you got --

7          THE COURT:  All right?

8          MS. CHAUDHRY:  Yes.

9          THE FOREPERSON:  So, that's question one?

10          THE COURT:  That's question one.

11          Now, if you answer yes to question one, you go to

12   question two.  If you answer no to question one, you stop.

13          THE FOREPERSON:  Yesterday we were told that we had to

14   answer both questions.

15          THE COURT:  I did.  But in looking at this, there is

16   no point to it.  You guys are really sharp.

17          JUROR NO. 2:  That's why we've been in there for an

18   hour and a half.

19          THE COURT:  All right.  So, it's clarified.  Question

20   two:  Has the defendant, Donald McBeth, proved by a

21   preponderance of the evidence that the defense of acquiescence

22   precludes the defendant's breach of contract claim; yes or no?

23          So, if McBeth proves that the doctrine of acquiescence

24   applies, then he wins, wins this part of the case.  If the

25   answer is no, that means that the Porges people win.

1            You got it straight now, folks?

2            JUROR NO. 2:  Yes.

3            THE COURT:  You all understand me?

4            THE FOREPERSON:  Yes.

5            THE COURT:  Sorry I complicated it for you.

6            THE FOREPERSON:  There was one other question from the

7   subscriber agreement, paragraph 23F, the arbitration clause, a

8   question of why we're actually here.

9            THE COURT:  Yes.  You have to ask that to the lawyers

10  first.  It's really not our business.  If the arbitration had

11  been resolved, it would be another story.  But the parties are

12  not required to go to arbitration.  If they contract for it,

13  either party could change its mind -- both parties could change

14  their mind.

15           MR. SCHIFFMAN:  May I approach, your Honor?

16           THE COURT:  Yes.

17           (Continued on next page)

18

19

20

21

22

23

24

25

```
 1              (At side bar)

 2              MR. SCHIFFMAN:  I just think the answer is that

 3    parties agreed to proceed in court rather than arbitration,

 4    period.  There's no confusion as to what happened here.

 5              MR. SKIBELL:  That's why I don't think this matters to

 6    -- the explanation was fine.  I don't feel strong about that.

 7          (Continued on next page)

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           (In open court; jury present)

2           THE COURT:  The parties agree that they would proceed

3    in court rather than in arbitration, which is their right to

4    do.

5           THE FOREPERSON:  Thank you, your Honor.

6           THE COURT:  If there are no further questions, the

7    jury shall continue to deliberate.

8           THE FOREPERSON:  Thank you.

9           (Jury resumed deliberations at 12:03 p.m.)

10           (In open court; jury not present)

11           THE COURT:  Be seated please.

12           Another letter reads, "Jury has reached a verdict.

13    Signed, Richard Garnett.  14th of December."

14           Next note is, "Jury recognizes and thanks the court

15    staff for their professionalism and assistance, also to the

16    Court for creating scheduling solutions."

17           Bring in the jury.

18           (Jury present)

19           THE COURT:  Be seated everybody.  I have two notes.

20    Court Exhibit No. 11, "The jury has reached a verdict at 1:00

21    o'clock.  And at 1:03, The jury recognizes and thanks the court

22    staff for their professionalism and assistance and also to the

23    Court for creating scheduling solutions.  Thank you."

24           Lisa, also thanks to you.

25           All right.  If you would check the attendance of the

1  jury, please.

2          DEPUTY CLERK:  Please answer "present" when your name

3  is called.

4          Juror No. 1, Galiya Moshkovich.

5          JUROR NO. 1:  Present.

6          DEPUTY CLERK:  Juror No. 2, Chad Ondrusek.

7          JUROR NO. 2:  Present.

8          DEPUTY CLERK:  Juror No. 3, Nathaniel Antman.

9          JUROR NO. 3:  Present.

10         DEPUTY CLERK:  Juror No. 4, Richard Garnett.

11         JUROR NO. 4:  Present.

12         DEPUTY CLERK:  Juror No. 5, Carol Cook.

13         JUROR NO. 5:  Present.

14         DEPUTY CLERK:  Juror No. 6, Uziel Fradkin.

15         JUROR NO. 6:  Present.

16         DEPUTY CLERK:  Juror No. 7, Daniela Morell.

17         JUROR NO. 7:  Present.

18         DEPUTY CLERK:  Juror No. 8, Leslie Needham.

19         JUROR NO. 8:  Present.

20         THE COURT:  Could you take the verdict, please.

21         Return the verdict to Mr. Garnett.

22         DEPUTY CLERK:  Please rise.

23         Have defendants proved by preponderance of the

24  evidence that plaintiff, Donald McBeth, breached the

25  subscription agreement?

1          THE FOREPERSON:  Yes.

2          DEPUTY CLERK:  Has plaintiff, Donald McBeth, proved by

3     a preponderance of the evidence, that the defense of

4     acquiescence precludes defendant's breach of contract

5     counterclaim?

6          THE FOREPERSON:  Yes.

7          THE COURT:  Thank you, Mr. Garnett.  Please give the

8     verdict view to the lawyers.

9          Is there anything else, Mr. Schiffman?

10          Anybody want the jury polled?

11          MR. SCHIFFMAN:  No, Your Honor.

12          MR. SKIBELL:  No, Your Honor.

13          THE COURT:  May this jury be discharged?

14          MR. SKIBELL:  Yes, your Honor.

15          MS. CHAUDHRY:  Yes, your Honor.  Thank you.

16          MR. SCHIFFMAN:  Yes, your Honor.  Thank you.

17          THE COURT:  Members of the jury, you can just leave

18     now, but I was going to thank you.

19          As I said before, I always get excited when a jury

20     enters our business, because it's everybody's business.  It's a

21     land in a country that prides itself ideally on equality of

22     justice, and you performed it.  You've worked hard and have

23     been very attentive.  Thank you very much.  Go your ways.

24          Now, you have two choices.  You can talk about the

25     case to anybody or you can keep it confidential.

 1             I like to tell jurors that what they've told each

 2    other was in confidence and perhaps should be kept in

 3    confidence.  No one needs to know what one juror thought or

 4    felt about how other jurors' thought or felt.  It's your

 5    secret.  It's your confidence.  It's your work.  So, if you

 6    wish not to talk about this case to anybody who inquires, it's

 7    your privilege, your right, but do whatever you want.

 8             Thank you very much for your service.

 9             THE FOREPERSON:  Thank you.  The jury requests 20 or

10    30 minutes with the Judge.  If you have a moment, we would like

11    that.

12             THE COURT:  Sure.  In the presence of the lawyers?

13             THE FOREPERSON:  Maybe not.

14             THE COURT:  I think it better.  I think lawyers should

15    be available.  I will feel uncomfortable otherwise.

16             THE FOREPERSON:  Okay.

17             THE COURT:  So, everybody sit.

18             JUROR NO. 5:  We were wondering if you could give us

19    some historical viewpoint into this case.

20             THE COURT:  Counsel?

21             Well, my history is very short.  One of my colleagues

22    had this case since it began until three weeks ago, something

23    like that.  And he was pressed into other matters that needed

24    very quick decisions and couldn't handle it.  And so, the Court

25    asked me to handle it, so I handled it.  But the case goes on

1   long before me.

2           So, Mr. Skibell, you want to answer the question?

3           MR. SKIBELL:  I mean, Your Honor and jury, it's a long

4   story.  And I appreciate why you'd want to know, because there

5   was a lot of back and forth and some things that you didn't

6   have access to.  I would personally -- and I'm sure Mr.

7   Schiffman would be happy to talk to you individually afterwards

8   if anybody wants to know more.  I thought maybe that would be

9   the easiest way.

10          THE COURT:  That would inevitably cause a

11  give-and-take.  And the jurors would be pressed into talking

12  about what happened, and I don't really care for that.

13          I'll tell you --

14          MR. SCHIFFMAN:  I can answer the question a little

15  bit.

16          THE COURT:  Okay.

17          MR. SCHIFFMAN:  So, the case was initially filed in an

18  arbitration, pursuant to whoever noticed the arbitration

19  provision.  And at the same time it was filed in court in New

20  Jersey.  The parties then agreed that, rather than doing the

21  arbitration -- and the reason why if you're curious legally

22  why, I think that some of the people weren't subject to the

23  arbitration agreement.  So, you would have had an arbitration,

24  but you wouldn't have had everybody in the arbitration.  And

25  so, there was a compromise made by the parties so that we would

1    have one proceeding in which this was, where we had everybody.

2         That case then proceeded and it proceeded on a number

3    of different theories.  It started principally on the theory of

4    misrepresentation, principally -- actually it started on a

5    theory of gross negligence, that the trading losses were so

6    significant that --

7         THE COURT:  I don't think we need to get into the

8    different kind --

9         MR. SCHIFFMAN:  Okay.  It was a series veers of claims

10   and --

11        THE COURT:  How did it come to New York?

12        MR. SCHIFFMAN:  It came to New York by agreement,

13   your Honor.  It came, as we said, when we compromised as to the

14   arbitration and as to New Jersey, the compromise was to come to

15   the Southern District of New York.  That was the compromise.

16        THE COURT:  Instead of the courts of New Jersey?

17        MR. SCHIFFMAN:  Federal New Jersey.  So, the

18   compromise was to come here.

19        THE COURT:  Did you dismiss the case there and bring

20   it here?

21        MR. SCHIFFMAN:  Without prejudice.  Exactly.  Yeah.

22        THE COURT:  Okay.  I can tell you this.  This is not a

23   federal claim.  Federal courts have jurisdiction, very broadly

24   speaking, over two types of claims:  One, those that arise

25   under the laws or constitution of the United States, and

1  secondly, those between citizens of different jurisdictions.

2  So that, here -- I don't remember what the lineup was.  One

3  party I think lived in New York; the other parties lived in New

4  Jersey.  So, that was it and that was the diversity

5  jurisdiction.

6           MR. SCHIFFMAN:  I can just answer one thing I suspect

7  was on their mind.

8           So, there was a lawsuit at one point involving whether

9  exhibits one, two, three and four were accurate.  And what

10  happened is, it discontinued.

11           THE COURT:  It was withdrawn.

12           MR. SCHIFFMAN:  And so that case pivoted away from

13  that case, and then the case you heard was what was left of the

14  allegations.  And then at one point, whether Exhibits one, two

15  three and four were, in fact, accurate was the subject of

16  litigation.

17           THE COURT:  There were four different theories of

18  gaining recovery.  For strategic reasons, the plaintiff decided

19  to go only on the case that was presented to you.  So, that's

20  the case that we tried.  But the counterclaim was based on the

21  other three complaint numbers as well.  So, that's what was

22  brought before you.

23           So, every case has a long history before the trial.

24  The pleadings start and define the case.  This complaint went

25  through several amendments.  There was a lot of motion practice

1    as the parties tried to narrow or expand their rights and tried

2    to get the Court to make declarations of different ways.  And

3    it had its fair share of pretrial proceedings.  It was heavily

4    litigated throughout its course.

5          THE FOREPERSON:  What typically happens, sorts of

6    things, on a side bar?

7          MR. SCHIFFMAN:  It's a secret.

8          THE COURT:  If a question is asked, if I don't know

9    what the direction is and I have a feeling that there may be

10   something I would not admit unless it's at a side bar.  And

11   then I make a ruling.  Either I'll allow it or not allow it.

12   Most of the side bars are that.

13         Sometimes the lawyers want a side bar because they

14   don't like my rulings and they feel that they can impress me

15   with some arguments that will cause me to change.

16         MR. SCHIFFMAN:  That rarely happened.

17         THE COURT:  It happened a few times.

18         And as you can see, very few times I grant the side

19   bar.  Side bars are a waste of your time.

20         MR. SCHIFFMAN:  We're discussing things at the side

21   bar that you're not allowed to hear.  So, I want to argue this,

22   but I have to ask his permission.  If I said out loud I want to

23   argue and you hear it, even if he said, no good, you've already

24   heard it.  So, I have to say I want to argue this point, and

25   the Judge either says no or allows it.

1          THE COURT:  That's very good.

2          THE FOREPERSON:  When a lawyer would make an

3   objection, at some point, you ask them not to explain why they

4   were making an objection?

5          THE COURT:  That's right.

6          JUROR NO. 5:  Is there like a set understanding of

7   what -- how you would you know why they were making -- how

8   would you be able to --

9          THE COURT:  I can tell from the question whether it is

10  consistent with or inconsistent with the rules of evidence.

11  And I make a ruling on that basis.  I don't need to know an

12  explanation.  And the explanations are not relevant, but

13  lawyers like to sugarcoat them in ways that advance their case.

14  I don't think it's appropriate.  Most of us don't.

15         MR. SCHIFFMAN:  It's the same as the side bar.  My

16  objection -- if I object, and he says, why, and I say, because

17  I think X is lying, then you're hearing -- then I'm getting

18  into evidence that would -- he -- so --

19         THE COURT:  When you watch television, everything

20  advances with the objection.  It also saves a lot of time.

21         THE FOREPERSON:  How is the length of this trial and

22  what we experienced relative to other cases?  Typical,

23  non-typical?

24         THE COURT:  That's very hard to say because every case

25  is different.

1          Civil cases that go to trial in this court tend to be

2    longer than the average criminal case that goes to trial.  And

3    more difficult for the Judge.  Criminal law is more categorical

4    in different ways and all over it's extremely difficult to

5    frame a charge that is intelligible to the jury.

6          Civil laws and rules are very nuanced.  As you see, it

7    will go one way in one part and another way in another part.

8    And each of these documents are further nuanced.  And it's

9    important for the judge to try to capture all of this.  And

10   this also takes a lot of time.

11         The longest trial I've had in 20 years was a six-week

12   marijuana trial.

13         Right, Ms. Jones?

14         THE CLERK:  Uh-huh.

15         THE COURT:  Involving a lot of defendants.

16   Fascinating case.  The marijuana was smuggled from California

17   to New York in these big trailer trucks, mixed with deliveries

18   of groceries.  And there were a few of those cases.  And the

19   federal police were onto the shipment and sprung a trap, so

20   when it got delivered, the entire federal police descended on

21   them and caught them all.

22         In those days also, the administration of

23   prosecutorial discretion tried to get the longest prison

24   sentence they could.  And so, it was hard for them to plead

25   guilty.  But there are changes in guidelines, and judges are

1    getting much more discretion.  More cases are settled
2    criminally because the less the Judge knows about the true
3    facts, the easier it's going to be.  And there are benefits
4    from pleading.  And it becomes less of a harsher world in
5    criminal law, at least in this district.  That's reduced the
6    number in length of criminal trials.  But every once in a while
7    we get one.  I have one in February that may last over a month.
8             Ms. Chaudhry has probably tried more criminal cases.
9             MS. CHAUDHRY:  I'm a criminal defense lawyer mostly.
10   And I've tried cases in this courthouse.  And the longest I've
11   done is also six weeks of criminal cases.
12            THE COURT:  There was a terrorist trial that lasted
13   three months.  And I was the Judge that had all the 911 cases,
14   none of which went to trial.  But the trial that was coming on,
15   I think would have lasted six weeks, maybe longer.
16            Most jurors in this city are paid for two weeks.  If
17   they are government employees, they get paid longer.  But for
18   example, hospitals will pay a juror for two weeks of salary.
19   And so, any trial lasting more than two weeks imposes a
20   hardship and will cause some jurors not to be able to serve.
21   It's very important that the jury be a cross-section of the
22   population to serve.  So, the fewer the reasons for excusing a
23   juror, the better it is for the system, I think.  Long trials
24   pose more risk that way.  I have to be more sensitive to
25   excuses for not serving, and altogether it becomes a much more

 1    difficult problem.

 2          MR. SCHIFFMAN:  I think the longest civil trial we

 3    tried recently was a class action, lawsuit against all the

 4    shareholders suing the company.  And I think that lasted about

 5    six weeks as well.

 6          THE COURT:  Terrorist trials were the longest.  We

 7    have one in Brooklyn now going against El Chapo.  It's a

 8    several month trial.

 9          THE FOREPERSON:  The drama in the courtroom was most

10    entertaining.

11          MR. SKIBELL:  I wanted to thank you.  We could tell

12    the whole time that everyone was really engaged and tried hard.

13    We discussed it and wanted to say thank you for all your

14    efforts.

15          MR. SCHIFFMAN:  Out of all the trials I've ever had,

16    this is the most engaged jury, paying the most attention.  So,

17    thank you very much.

18          DEPUTY CLERK:  I would agree.

19          THE COURT:  Brigitte agrees.  So do I.

20          MS. CHAUDHRY:  And I just want to say that all of my

21    colleagues who are trial lawyers love the fact that you guys

22    asked questions and objected.  That was the first time I've

23    ever seen that.  And I really appreciated how much you cared.

24    So, thank you.

25          MR. SCHIFFMAN:  And most importantly, this is Mr.

1   Griffin's premier.

2            MS. CHAUDHRY:  And Mr. Hayes-Williams also.

3            THE COURT:  So, there's a controversy among the

4   judges, how active they should be.  For example -- how should I

5   put it?  Judges will be very tolerant of lawyers asking

6   questions, even though they may be repetitious and things

7   stretch on.  As you saw, I take the position of, you've heard

8   it, they're intelligent enough to understand it, go on.  From

9   the lawyer's point of view, it's just so difficult.  I was a

10  lawyer for a long time.  You never know whether you've

11  succeeded in persuasion or not.  And the tendency is to go on

12  too long, particularly in cross-examination.

13           Secondly, few judges allow juries to ask questions.

14  They're aghast at that.  A judge can get reversed, so, the less

15  the jury involved in spontaneous questions, the better.  But I

16  try to imagine how it is with you and what you're understanding

17  and not understanding.  And sometimes I feel that points need

18  to be more rounded or pressed a little more.  And the tendency

19  is that I get more willingness to answer from a witness than

20  answer from a lawyer.  And it's probably better not to do so

21  much of it, because you don't want the Judge to take sides or

22  appear to take sides, but I do it one because I'm bored and

23  partly to move along the trial and get you involved and keep

24  you involved.  That's a difficult task, especially in the

25  afternoons.

```
 1              If you have more, we'll stay.  But did you all enjoy

 2   your service?

 3              THE FOREPERSON:  Yes.  There was discussion about

 4   before we were called, the anxiety and stress of being called.

 5   but then once we were called, we were all committed.

 6              THE COURT:  Yes.  Were you surprised at the time it

 7   took to pick a jury?

 8              JUROR NO. 2:  Yes.  I was surprised.

 9              THE COURT:  You thought it was too short, too long?

10              JUROR NO. 2:  Yes.  Too short, I thought.

11              THE COURT:  You think the process should have been

12   longer?

13              JUROR NO. 2:  No.  I think that there is always a

14   method to the madness.

15              THE COURT:  In state court it takes longer to pick a

16   jury.

17              JUROR NO. 2:  Right.

18              MR. SCHIFFMAN:  You're pretty fast though, Judge.

19   That was pretty quick and pretty efficient.

20              THE COURT:  The lawyers will give you, in advance of

21   trial, the questions they want to ask.  And I try to

22   incorporate the questions into the series of questions that I

23   ask you.  And then at the end of the process I ask if they have

24   any more questions.  So, that's how the process goes.

25              And challenges are much more given in state court, so
```

1    there's more revolving and replacing jurors and the like.  The

2    lawyers do a lot of flirtation with the jury in the state court

3    that you can't do here.  So, we get the system done faster.

4    The longest it takes to do a jury, in most cases, it's the bulk

5    of the day.  And the narcotics cases are the most difficult.

6    People have strong opinions about narcotics.  Many have

7    suffered injuries from narcotics or their children have done

8    them.  It's also surprising how many people have been involved

9    in crimes or suffered from crimes.

10          How can we have done the system better from your

11   critiques?

12          JUROR NO. 2:  I think we all thought it was spot-on.

13          THE COURT:  Thank you so much for your service.

14          THE JURY:  Thank you.

15          (Jury dismissed)

16          THE COURT:  Rule 59 gives each of you 28 days to make

17   a motion for a new trial or set aside the verdict.  From my

18   point of view, I have enough work to do.  But it's your choice.

19          I think it's jurisdictional.  I think there's a risk

20   that you ask me for adjournment and I grant it, it won't help

21   you at all because it affects the rules for noticing appeal.

22   But that's for you to decide.

23          I want to thank you for a very good trial.  I know

24   that there's always disappointment in the process and that's

25   why it's so important to try to settle these kinds of cases

1   beforehand.

2          I remember when I was a trial lawyer, there were two

3   settlements that I had.  I thought, I'm going to lose this

4   case.  And there was no way to really evaluate how it should

5   have been.  And so, you come on a trial, and somebody loses and

6   somebody wins.  And they find it very hard because it's very

7   expensive.  Sometimes it's very expensive for both sides.  And

8   this is a very good example.

9          As we talked about different schools of judges, there

10  were some judges who are actively involved in settlement cases

11  and some who are quite passive about it.  I feel that it's what

12  we call distributive justice.  There's not an absolute quality

13  of what's just and what's not and what the law is in in this

14  case and what's not.  It's a matter of inflection and nuance.

15  And it's important to help the parties come along the way to

16  try to resolve their differences in a settlement.

17         But there are other fine colleagues of mine who feel

18  that the judge calls the shots in the rule of law and doesn't

19  get involved in the process of settling because it has a big

20  risk of affecting its neutrality in the case.  But these are my

21  views.

22         I'm sorry for you, Mr. McBeth.  I think you're a

23  person of extraordinary character.  I like the way you

24  testified.  I thought that you were being honest even when

25  honesty hurt you.

```
 1            And, Mr. Porges, I feel sorry for you as well, that
 2    you've gone through this great challenge.  You've lost more
 3    money than Mr. McBeth did in that hedge fund.  And this
 4    couldn't have been pleasant for you either.  And that's why I
 5    think these cases need to be settled.
 6            I found the lawyers very good.  Both of you questioned
 7    diligently.  You didn't try to dramatize too much.  You were
 8    helpful to me when I needed help, and I appreciate working with
 9    you.  Thank you very much.
10            MR. SCHIFFMAN:  Thank you, your Honor.
11            MR. SKIBELL:  Thank you.
12            MS. CHAUDHRY:  Your Honor, there's one more thing.
13            MR. SKIBELL:  One last thing, your Honor.  We will be
14    making a fee application.  And I wanted to see the process that
15    you'd like to see for that.
16            THE COURT:  Oh, yes.  Forgot all about that.  You're
17    the prevailing party.  I think what you need to do -- there's
18    no time limit on that.  I think what you need to do is share
19    your time records with Mr. Schiffman.
20            The big question will be how to allocate between the
21    fees that were expended on the three withdrawing counts and
22    this particular count on which you prevailed.  So, the trial
23    expenses clearly afford this case that you brought.  But much
24    of the pretrial expenses, I think, were not.
25            MR. SKIBELL:  Yes, your Honor.
```

1           THE COURT:  And that might be the basis of settlement.

2           MR. SKIBELL:  Agreed, your Honor.

3           THE COURT:  So, give yourself -- I'll tell you what

4    I'd like you to do.  Take the time you need.  Before you make

5    any motions, try to work it out.  If you can't work it out,

6    give me a schedule of briefing.  And don't provide for --

7           MR. SKIBELL:  Yes, your Honor.

8           MR. SCHIFFMAN:  Your Honor, to give you a heads-up,

9    it's going to be more complicated than that because we believe

10   that the fee shift thing doesn't work because of the indemnity,

11   and so it would just kick right back again and they would owe

12   us the money.  We're not going to agree on that, so we're going

13   to have to be back before your Honor.

14          THE COURT:  And you make that motion.

15          MR. SCHIFFMAN:  Of course.

16          THE COURT:  Shouldn't that be before -- shouldn't you

17   do that before even getting involved in calculating the fees?

18          MR. SCHIFFMAN:  It's up to you, your Honor.

19          THE COURT:  I'm trying to save you money.

20          MR. SCHIFFMAN:  I guess theoretically, maybe it's

21   better for them to calculate their fees.  And obviously this is

22   not going to be the case, but if they ask for ten dollars, it

23   would be cheaper to pay the ten dollars than it would be to

24   fight about it.

25          THE COURT:  Well, you know it's not going to be that.

1          MR. SCHIFFMAN:  Right.  So, I suspect it's better to

2   have them tell us what they think the allocation is, and then

3   that will allow us to bring all these fees at the same time.

4          THE COURT:  You have a ballpark figure of how much

5   fees you spent in trial?

6          MR. SKIBELL:  No, Your Honor, I don't.

7          THE COURT:  Why don't you try to give a ballpark

8   figure, have a conversation with Mr. Schiffman, see if you

9   can't resolve it.  If you can't, I think you'll need to make a

10  motion before you go through the business of settling the fee.

11  Or, you can do it any way you want.

12         MR. SKIBELL:  Thank you, your Honor.

13         MR. SCHIFFMAN:  Thank you, your Honor.

14         MS. CHAUDHRY:  Your Honor, one question.  I like to

15  ask judges if they would give me feedback.  If you'd be open to

16  that, I would love to make an appointment to sit down and hear

17  what you have to say.

18         THE COURT:  If I do have to do it, it's right now, or

19  I'll forget.

20         MS. CHAUDHRY:  Can I come up to side bar by myself?

21         THE COURT:  Is that all right?

22         MR. SCHIFFMAN:  Yes.  I'm always interested in

23  hearing.

24         THE COURT:  I should do it privately though.

25         MS. CHAUDHRY:  Yes.

1              THE COURT:  Okay.  So, we'll talk a few minutes.

2         (Adjourned)